**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE *EX PARTE* APPLICATION OF
SPS I FUNDO DE INVESTIMENTO DE AÇÕES –
INVESTIMENTO NO EXTERIOR

                              *Petitioner,*

For an Order Pursuant to 28 U.S.C. § 1782 to Take
Discovery for use in Contemplated Proceeding in the
Federative Republic of Brazil.

---

No. Misc. _____

---

### *EX PARTE* APPLICATION FOR ORDER PURSUANT TO 28 U.S.C. § 1782 AND MEMORANDUM OF LAW IN SUPPORT THEREOF

**BAIRD HOLM LLP**
Jeremy C. Hollembeak
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
Phone: 402.636.8317
Email: jhollembeak@bairdholm.com

**MB SCANLON PLLC**
Gabriela M. Scanlon
(*pro hac vice* application to be submitted)
4301 50th Street NW, 1st Floor
Washington, D.C., 20016
Telephone:  (202) 410-9293
Email: gabriela@mbscanlon.com

*Attorneys for Petitioner SPS I Fundo de Investimento de Ações – Investimento no Exterior.*

April 21, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

A.      The Parties ..............................................................................................................4

1.      JBS S.A. and the Batista family ...........................................................................4

2.      The Petitioner: SPS I Fundo De Investimento De Ações – Investimento No Exterior.....................6

3.      The Discovery Target: J.P. Morgan Chase Bank, N.A. and Barclays USA, Inc. ..............................6

B.      The Foreign Tribunal: Comissão de Valores Mobiliários (the "CVM")...........................................7

C.      The Contemplated Proceeding.............................................................................................8

D.      Legal Standard......................................................................................................................11

ARGUMENT......................................................................................................................................12

I.      THIS APPLICATION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782.12

A.      Respondents are Found in the District ...............................................................................12

B.      Discovery Sought is "For Use" in a Contemplated Foreign Proceeding .........................13

C.      The Petitioner will be an interested person in the Contemplated Proceeding. ...............15

II.     THE COURT SHOULD EXERCISE ITS DISCRETION IN FAVOR OF GRANTING THIS APPLICATION 16

A.      None of the Respondents is a Party to the Foreign Contemplated Proceeding................................17

B.      The Foreign Tribunal Will be Receptive to Information Obtained in Discovery Pursuant to Section 1782. 17

C.      This Application is Made in Good Faith and Does Not Circumvent Foreign Proof-Gathering Restrictions. 19

D.      This Discovery Request is Narrowly Tailored and Not Unduly Intrusive or Burdensome.............19

III.    THIS APPLICATION SHOULD BE GRANTED *EX PARTE* ......................................................20

CONCLUSION....................................................................................................................................22

SPS I Fundo de Investimento de Ações – Investimento no Exterior ("**SPS**" or the "**Petitioner**") respectfully submits this memorandum of law in support of its *ex parte* application for an order permitting Petitioner to obtain discovery from J.P. Morgan Chase Bank, N.A. ("**JPM**") and from Barclays USA, Inc. ("**Barclays**" and with JPM, each a "**Respondent**" and together the "**Respondents**") for use in a contemplated foreign legal proceeding pursuant to 28 U.S.C. § 1782 (the "**Application**").

The pertinent facts set forth herein are supported by the declaration of Petitioner's Brazilian attorney, Gustavo Machado Gonzalez (the "**Gonzalez Declaration**" or "**Gonzalez Decl.**"), attached hereto as <u>**Exhibit A**</u>.

## <u>PRELIMINARY STATEMENT</u>

The Application seeks an order authorizing SPS to seek the discovery of documents evidencing transactions conducted by the following companies: Unifleisch Limited ("**Unifleisch UK**"), Unifleisch SA ("**Unifleisch SA**"), Lunsville International Inc. ("**Lunsville**") and Valdarco Investments Inc. ("**Valdarco**"), through the intermediation of the services provided by Respondents, both financial institutions located in the Southern District of New York, for use in a contemplated proceeding in Brazil.  The discovery requests are detailed in the form of subpoenas addressed to Respondents which are exhibited to Petitioner's proposed form of order being filed contemporaneously herewith (the "**Proposed Order**").

As discussed below, Petitioner is a minority shareholder of one of the largest Brazilian public companies, JBS S.A. ("**JBS**") (Gonzalez Declaration ¶¶ 23 and 24.), which was used by its controlling shareholders (the "**Batista family**") for the purpose of conducting an illicit bribery scheme, defrauding JBS and its minority shareholders.

This complex bribery scheme involved several companies and financial institutions headquartered outside Brazil and led to a series of investigations and proceedings involving JBS

and the Batista family in Brazil and in the United States, from which important evidence was obtained (Gonzalez Decl. ¶ 24 and 29.).

In 2020, the Batista family, through the controlling company of JBS, J&F Investimentos S.A. ("**J&F**"), entered into a Plea Agreement with the United States Department of Justice ("**DOJ**") due to a series of unlawful actions taken by them, including the fraudulent merger of Bertin S.A. and JBS in 2009 (the "**JBS-Bertin Merger**").

In September 2020, new facts connecting JBS and the Batista family to some companies incorporated outside Brazil and unknown to Brazilian authorities were unveiled through an international journalistic investigation named "FinCen Files" (Gonzalez Decl. ¶ 30.). The investigation originated from another operation conducted by the US Financial Crimes Enforcement Network ("**FinCen**") that showed in a report issued in 2017 that bank Barclays raised red flags regarding some companies that were linked directly to the Batista family and to the corruption scheme they operated in Brazil (Gonzalez Decl. ¶ 37.).

According to suspicious activity reports (SARs) issued by Barclays, potential companies involved in suspicious activities included: Unifleisch UK, Unifleisch SA, Lunsville and Valdarco. The evidence suggests that these entities received orders directly from the Batista family, making several recurrent international transactions that pointed to a high risk of money laundering and payment of bribes to Brazilian officials, although the Batista family tried to conceal the fact that they were the true beneficial owners of those companies (Gonzalez Decl. ¶ 38.). This Application seeks discovery from Respondents regarding international transactions conducted by the companies above listed that may be linked to unlawful conducts taken in detriment to JBS assets and its minority shareholders (Gonzalez Decl. ¶ 47.).

The evidence sought in this Application is for use by SPS in a contemplated complaint to be presented by SPS to the Brazilian's securities and exchange commission – *Comissão de Valores Mobiliários* (the "CVM") against the Batista family (Gonzalez Decl. ¶ 27 and 48.). The

complaint of SPS would report to the CVM the relevant evidence of wrongdoings perpetrated by the Batista family, which could constitute severe violations under Brazilian Law, including abuse of their control power as defined in Brazilian Corporate Law (Gonzalez Decl. ¶ 12.). The actions of the Batista family led JBS being involved in several investigations in recent years, which reflected negatively on its market performance and harmed its minority shareholders (Gonzalez Decl. ¶ 24 and 25.).

CVM has the power to initiate and judge administrative enforcement proceedings against public companies, its managers, and shareholders; and, historically, information provided by third parties (as investors) are extremely important for investigations conducted by the CVM (Gonzalez Decl. ¶ 16-19.). SPS expects that its complaint will lead CVM to start an enforcement proceeding against the Batista family (the "Contemplated Proceeding").

For the reasons set forth below, the Petitioner respectfully requests that the Court enter an order granting this Application. First, this Application meets the statutory requirements for a Section 1782 application because Respondents are "found" in this district, and the discovery sought is "for use" in a Brazilian proceeding to be initiated by the CVM in reaction of the new claim the Petitioner intends to file. Second, the discretionary factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) (hereinafter "**Intel Corp.**") all weigh in favor of granting this Application:

(i) Respondents will not be parties to a foreign proceeding to be initiated in the CVM, and SPS is otherwise unable to obtain the sought-after discovery in Brazil;

(ii) The potential foreign proceeding would be receptive to the discovery that SPS seeks;

(iii) The Application is not designed to circumvent foreign proof gathering restrictions; and

(iv) The discovery sought is neither unduly intrusive nor burdensome.

Granting this Application would also further the "twin aims" of Section 1782: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."[1]

SPS therefore respectfully requests that the Court enter an order granting this Application substantially in the form of the Proposed Order filed contemporaneously herewith.

## Factual Background

**A.      The Parties**

**1.  JBS S.A. and the Batista family**

JBS is one of the world's largest meat supplier and meat-processing company. It is publicly traded on the São Paulo Stock Exchange and is one of the largest Brazilian public companies. (Gonzalez Decl. ¶¶ 24.) The company rapidly grew from a small, family-owned business to an international conglomerate with over 250 subsidiaries across five continents.[2] Despite this rapid growth, JBS remains largely family-owned and controlled by the Batista family through their holding company, J&F[3].

In addition to using J&F to own and control JBS, the Batista family also used J&F to perpetrate one of the largest corruption schemes in the world. In June 2017, J&F pleaded guilty to corruption and other criminal conduct in Brazil,[4] and, in October 2020, J&F pleaded guilty

---

[1] *Mees v. Buiter*, 793 F.3d 291, 297–98 (2d Cir. 2015)

[2] *See* JBS's Annual Report (*Formulário de* Referência) (Jan. 1, 2021), Item 7.1, https://api.mziq.com/mzfilemanager/v2/d/043a77e1-0127-4502-bc5b-21427b991b22/50eb2f9d-db39-964e-2192-e3f867987174?origin=1.   JBS's reports with the CVM are only available in Portuguese.  Upon request of the Court, the Petitioner will provide English translations of any portions of those reports.

[3] *Id.* at Item 15.

[4] *See id.* at Item 4.1.  J&F entered into a plea agreement with Brazil's Federal Prosecutor's Office – *Ministério Público Federal*, or MPF, in June 2017.

to conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act in the Eastern District of New York.[5]  The total fines imposed by the Brazilian authorities and the United States Department of Justice exceed $3 billion.

Pursuant to the statement of facts supporting J&F's guilty plea in the Eastern District of New York, between 2005 and 2017, J&F engaged in a bribery scheme, with the involvement of the Batista family, involving more than $148 million in payments to Brazilian government officials and a high-ranking executive from the Brazilian Development Bank, or BNDES. As stated by the then-Acting United States Assistant Attorney General: "With today's guilty plea, J&F has admitted to engaging in a long-running scheme to bribe corrupt officials in Brazil to obtain financing and other benefits for the company."[6]  To engage in these unlawful acts, the Batista family involved several financial institutions and companies located outside Brazil, as described below.

The Batista family themselves have also pleaded guilty and entered into plea agreements with Brazil's Federal Prosecutor's Office – the *Ministério Público Federal* (the "MPF") – in 2017.

However, in September 2020, the FinCen Files demonstrated that other companies incorporated in foreign countries were used by the Batista family to make wire transfers to pay bribes to Brazilian Officials, which evidence that the Batista family provided the Brazilian foreign authorities with incomplete and inaccurate information.

---

[5] *See* Plea Agreement attached hereto as **Exhibit B**.

[6] *See* Press Release, U.S. Dep't of Justice, J&F Investimentos S.A. Pleads Guilty and Agrees to Pay Over $256 Million to Resolve Criminal Foreign Bribery Case (Oct. 14, 2020), https://www.justice.gov/opa/pr/jf-investimentos-sa-pleads-guilty-and-agrees-pay-over-256-million-resolve-criminal-foreign.

2. **The Petitioner: SPS I Fundo De Investimento De Ações – Investimento No Exterior**

The Petitioner is a minority shareholder of JBS. In such capacity and according to Brazilian Corporate Law, Petitioner is entitled to initiate a claim before the CVM or before a Brazilian Court to investigate and punish the controlling shareholders of a company for abuse of their controlling power, and its managers, for their wrongdoings. (Gonzalez Decl. ¶ 11-14 and 19-22.)

SPS, based upon new sources of evidence, including the FinCen Files, fears that other illicit transactions were guided by the Batista family and by the companies they incorporated or controlled that have not been unveiled to Brazilian authorities and to the market that regard to the abuse of controlling power or other violations in detriment to minority shareholders.

3. **The Discovery Target: J.P. Morgan Chase Bank, N.A. and Barclays USA, Inc.**

All Respondents are financial institutions that are found or have offices operating in the Southern District of New York.  Those banks act as worldwide correspondents in New York City to process U.S. Dollar denominated wire transfers.

Barclays was identified by the FinCen Files as one of the financial institutions in which Unifleisch UK held an account to receive a significantly large amount of funds from JBS and later transfer them through suspicious transactions to companies located in high-risk jurisdictions like Panama and Switzerland (Gonzalez Decl. ¶ 38.). Those companies were, among others, Lunsville, Valdarco and Unifleisch SA.

As for JPM, it was a major financial advisor of JBS and the Batista family for more than a decade and it was directly involved in the incorporation of Blessed Holdings, a company used by the Batista family to hide the fraudulent aspect of the JBS-Bertin Merger. (Gonzalez Decl.

¶¶ 42 and 43.)  In addition, in a statement (the "**JPM Statement**") [7] presented by JPM on June 15, 2017, Lunsville – one of the companies known to have been used in the bribery schemes involving the Batista family – was listed as one of Blessed Holdings' beneficial owners, directly controlled by the Batista family[8]. (Gonzalez Decl. ¶ 44.)

The Application seeks to obtain evidence from documents evidencing wire transfers, among other conducts, taken by Unifleisch UK, Unifleisch SA, Lunsville and Valdarco, or other entities in connection to J&F, Batista family, or JBS, through the intermediation of the services provided by the banks that could relate to the use of those companies, or other entities, to extract funds from JBS, such as provided by bank Barclays' reports disclosed within the FinCen Files.

Respondents will not be parties to the complaint to be filed by SPS with the CVM, or to the Contemplated Proceeding to be initiated by the CVM, but the transactions that happened involving companies outside Brazil – with the aid the services provided by the Respondents – are key elements for the Contemplated Proceeding.

The main purpose of the Contemplated Proceeding would be to hold liable the majority shareholders of JBS, the Batista family, and its managers for severe violations under Brazilian Law, such as their abuse of power concerning their controlling status, as the company's assets were engaged by them in a complex illicit scheme, to the detriment of JBS and its minority shareholders. (Gonzalez Decl. ¶ 46.)

B.  **The Foreign Tribunal: Comissão de Valores Mobiliários (the "CVM")**

The CVM (Brazil's Securities and Exchange Commission) was created by Law No. 6,385, dated December 7, 1976 (the "Brazilian Securities Law").  (Gonzalez Decl. ¶ 15.)  This

---

[7] A copy of the original JPM Statement in Portuguese as well as an English translation of same are attached hereto as **Exhibit D**.

[8] *See* Exhibit D, JPM Statement ¶ 8.

federal administrative body is independent and shares similar regulatory traits to the United States Securities and Exchange Commission ("SEC"). However, there is one notable difference concerning CVM's powers as compared with the SEC's powers: the CVM's commissioners are in charge of judging administrative proceedings that result from investigations conducted by the CVM. (Gonzalez Decl. ¶ 18.) In such situations, the target of the investigation is charged through an administrative indictment. Where an administrative indictment is filed, the CVM's commissioners act as administrative judges for the purpose of reviewing and deciding the administrative proceedings within the CVM's statutory powers, as conferred by Brazilian law. (Gonzalez Decl. ¶ 18.)

The CVM is authorized to commence investigations at its own discretion when it suspects that publicly traded companies and/or their managers are in breach of Brazilian securities and corporate laws, which often occurs based upon a complaint presented by an interested third person, such an investor. (Gonzalez Decl. ¶ 17 and 19.) The CVM can charge companies and individuals who are accused of violations to Brazilian corporate and securities laws, as well as provide relevant evidence to other Brazilian authorities, such as the MPF, which can then pursue criminal charges against the accused. (Gonzalez Decl. ¶ 21.)

In addition, the CVM is suffering from a major insufficiency of resources for conducting investigations. This context creates additional relevance to the participation of interested third persons in the proceedings with the CVM, in order to provide evidence and information that the Commission would not be able to otherwise collect or produce. (Gonzalez Decl. ¶¶ 20 and 22.)

## C. The Contemplated Proceeding

Although CVM, in recent years, has investigated the controlling shareholder of JBS on potential violations and has already accused the Batista family for fraud on the context of a

specific transaction, CVM does not seem to have initiated any investigation in connection with the illegal transfer of JBS funds to foreign companies.

This information was first disclosed by Mr. Demilton Antônio de Castro ("**Demilton**"), a former J&F agent who entered into a plea agreement with MPF. The companies mentioned by Demilton were Lunsville and Valdarco. Both companies received money from JBS declared as a commission related to the company's exports. However, those values were used for the payment of bribes in Brazil and for the personal use of Joesley Batista. (Gonzalez Decl. ¶¶ 32-34.)

In addition, a Brazilian tax investigation, *Procedimento Fiscal n° 08165002016-00436-8* ("Tax Proceeding") revealed that Unifleisch UK had a major role in connection with the transfer of funds from JBS to Lunsville and Valdarco (i.e. the commissions referred to by Demilton). It was revealed that Unifleisch UK acted as an intermediary among such companies, whereby it received commissions from JBS, under a seemingly legitimate commercial representation agreement, and then transferred those funds (with no apparent economic purpose) to Lunsville and Valdarco. (Gonzalez Decl. ¶ 33.).

The use of funds that were transferred to Valdarco and Lunsville from JBS (with the intermediation of Unifleisch UK) would be subject to the discretion of Joesley Batista – including for the payment of bribes, as mentioned above. In this context, one can potentially state that Unifleisch UK was a company incorporated for the sole purpose of creating a false chain of payments that would finally lead to the controlling shareholders of JBS, who were benefiting from the assets taken from JBS and using them for corruption schemes (Gonzalez Decl. ¶ 33.).

In September 2020, new evidence relating JBS to Unifleisch UK and to Unifleisch SA were unveiled by the FinCen Files. Among the documents, a report dating from 2017 disclosed that the bank Barclays raised red flags on Unifleisch UK after some suspicious transactions

directed to high-risk jurisdictions constantly linked to money laundering. (Gonzalez Decl. ¶¶ 37 and 38.) It was pointed out that the company received orders from JBS, Lunsville and Valdarco for all actions taken, which further suggests the close relationship among all those companies, and the Batista family. Besides, money transfers to Antigua Investments LLC ("Antigua"), a company based in Switzerland and incorporated by the patriarch of the Batista family, Mr. José Batista Sobrinho, raised more concerns on Barclays. (Gonzalez Decl. ¶ 33 and 38.)

On another occasion, the Brazilian tax authorities identified transfers to Antigua coming from Lunsville, and Joesley Batista, in his plea agreement, referenced that Antigua was the company responsible for making wire transfers to Brazilian officials.

Beyond the documents provided by the FinCen Files, in the JPM Statement, JPM states that it provided the services of global custodian to Blessed Holdings and that, in 2009, JPM received a "Statement of Organizer in Lieu of Organization Meeting" indicating that Lunsville and Gilberto Souza Biojone Filho were managers of Blessed and that Lunsville was the sole member of the company[9]. After a due diligence proceeding conducted by JPM, it was found that Lunsville was detained by members of the Batista family (Gonzalez Decl. ¶ 43 and 44.).

For these facts and reasons, the Batista family apparently engaged in a complex operation to defraud JBS and its minority shareholders using companies incorporated in foreign countries so it would be easier to escape from Brazilian authorities' vigilance, while also paying bribes to Brazilian officials through the intermediation of those companies.

After taking notice of the documents revealed by the FinCen Files, Petitioner seeks new evidence through this Application for use in a new proceeding with the CVM – evidence concerning the Batista family and the companies they used to operate financial transactions that appoint to fraudulent money transfers. (Gonzalez Decl. ¶¶ 47 and 48.)

---

[9] *See* Exhibit D, JPM Statement ¶ 8.

By obtaining and providing such evidence to the CVM, the Petitioner will file a complaint asking CVM to initiate the Contemplated Proceeding based on relevant evidence that could potentially lead to severe charges of the Batista family, including for their abuse of control power in light of Brazilian Corporate Law (Gonzalez Decl. ¶¶ 12 and 48.)

## D. <u>Legal Standard</u>

In evaluating an Application pursuant to Section 1782, courts must first determine whether "certain statutory requirements" are met.[10] Specifically, a district court may grant a Section 1782 application where: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign or international tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."[11]

Where, as here, those statutory requirements are satisfied, a court may grant a Section 1782 application at its discretion.[12] The Supreme Court has enumerated four factors relevant to the court's exercise of discretion: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" such that "the need for § 1782(a) aid is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign ... court ... to U.S. federal court judicial assistance"; (3) whether the request "conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or

---

[10] *In re Accent Delight Int'l Ltd.,* 869 F.3d 121, 128 (2d Cir. 2017).

[11] *Mees*, 793 F.3d at 297

[12] *Id.*

burdensome[.]"[13] Finally, when considering a Section 1782 application, courts must "exercise their discretion under § 1782 in light of the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.' "[14]

## ARGUMENT

Section 1782 authorizes federal district courts to order discovery to assist petitioners like SPS in obtaining evidence in the United States for use in foreign legal proceedings. To obtain discovery under Section 1782, a Petitioner must satisfy three statutory requirements: (i) the person from whom discovery is sought must reside or be found within the district; (ii) the discovery must be for use in a proceeding before a foreign or international tribunal; and (iii) the application must be made by an interested person.[15] As shown below, SPS's Application satisfies each of these three requirements.

## I.    THIS APPLICATION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782.

### A.   Respondents are Found in the District

The banks from whom discovery is sought, JPM and Barclays, are present in the Southern District of New York because either they are organized under the laws of New York State or have offices operating and representing it in the District.[16]

---

[13] *Intel Corp.*, 542 U.S. at 264-65.

[14] *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012) (Quoting *In re Metallgesellschaft,* 121 F.3d 77, 79 (2d Cir.1997).

[15] 28 U.S.C. 1782(a).

[16] *See* 28 U.S.C. 1782(a) ("The district court of the district in which a person resides . . . may order him to give his testimony or statement or to produce a document or other thing . . ..."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) (respondent is "found" if physically present in the district).

Those banks have long-established connections to New York and they all maintain headquarters or branches in this District. According to Barclays' website, "New York is home to Barclays' US headquarters"[17]. The same is applicable to JPM[18].

Thus, Respondents are clearly "found" within the district for the purposes of Section 1782.[19]

### B. Discovery Sought is "For Use" in a Contemplated Foreign Proceeding

A Section 1782 petitioner need only show that the materials sought "will be employed with some advantage or serve some use in the proceeding – not necessarily something without which the petitioner could not prevail."[20] The "for use" requirement imposes a "*de minimus*" burden on the Petitioner to show that the requested discovery has some relevance to the foreign proceeding.[21]  Relevance is "broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case."[22] When relevance is in doubt, the district court should be permissive.[23] District courts

---

[17] Available at: https://home.barclays/careers/barclays-office-locations/.

[18] JPM is headquartered at 383 Madison Avenue, New York, NY, 10179.

[19] *See In re Edelman*, 295 F.3d at 179-80 (mere "physical presence" sufficient to satisfy "is found" prong of Section 1782) (citations omitted).

[20] *Mees*, 793 F.3d at 298 ("[D]iscovery sought pursuant to 1782 need not be necessary for the party to prevail in the foreign proceeding in order to satisfy the statute's 'for use' requirement."); *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015) (Section 1782 merely requires showing that the evidence "is something that will be employed with some advantage or serve some use in the [foreign] proceeding."); *Brandi-Dohrn*, 673 F.3d 7at 82-84 ("for use" requirement does not mean that the evidence must be admissible in foreign tribunal); *In re Chevron Corp.*, 633 F.3d 153, 163 (3d Cir. 2011) ("as the Court made clear in Intel, there is no requirement that the material be discoverable in the foreign country for it to be discoverable pursuant to section 1782 in the United States.").

[21] *In re Veiga*, 746 F. Supp. 2d 8, 17−18 (D.D.C. 2010).

[22] *Id*. at 19 (citing *Alexander v. FBI*, 194 F.R.D. 316, 325 (D.D.C. 2000)).

[23] *Id.*

should not attempt to determine whether the evidence would or could be discoverable or admissible in the foreign proceeding.[24]

Besides, it is not necessary that the proceeding is pending, and it is authorized that courts grant discovery if the proceeding is "within reasonable contemplation".[25] Even though proceedings have not yet begun, "§ 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings. *Intel Corp., 542 U.S. at 260–61* (2004)*. There is also no requirement that the proceedings be imminent. Id.* As the Intel court explained, all that is necessary is that the evidence may be eventually used in such a proceeding. *Id.*"[26].

Therefore, even though a proceeding is not pending, courts[27] have granted applications pursuant to Section 1782 when Petitioner demonstrates that the evidence sought is enough to support a future potentially contemplated proceeding.

---

[24] *Id*. at 17–18 (citing cases); *Brandi-Dohrn*, 673 F.3d at 76 (noting unanimity among the Circuits who have ruled on the issue).

[25] *Mees*, 793 F.3d at 291, 299, (quoting *302 Intel, 542 U.S. at 259, 124 S.Ct. 2466). "[A] § 1782 applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P., 798 F.3d 113, 124 (2d Cir. 2015).* The applicant "must provide some objective indicium that the action is being contemplated ... [and] the proceedings cannot be merely speculative." *Id. at 123-24.*".

[26] *Pinchuk v. Chemstar Prod. LLC, No. 13-MC-306-RGA*, 2014 WL 2990416, at *2 (D. Del. June 26, 2014).

[27] 542 U.S. 241, 259, 124 S. Ct. 2466, 2480, 159 L. Ed. 2d 355. "In short, we reject the view, expressed in *In re Ishihara Chemical Co*., that § 1782 comes into play only when adjudicative proceedings are "pending" or "imminent." *See 251 F.3d, at 125* (proceeding must be "imminent—very likely to occur and very soon to occur" (internal quotation marks omitted)). Instead, we hold that § 1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation. *See Crown Prosecution Serv. of United Kingdom, 870 F.2d, at 691; In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago, 848 F.2d 1151, 1155, and n. 9 (C.A.11 1988); Smit, International Litigation 1026* ("It is not necessary ... for the [adjudicative] proceeding to be pending at the time the evidence is sought, but only that the evidence is eventually to be used in such a proceeding.")".

SPS intends to present a claim asking to initiate the Contemplated Proceeding before a foreign tribunal, the CVM. The Supreme Court explained that "Congress introduced the word 'tribunal' to ensure that 'assistance is not confined to proceedings before conventional courts,' but extends also to 'administrative and quasi-judicial proceedings.' *Intel,* 542 U.S. 241, 249 (2004). The Supreme Court found that the European Commission was a tribunal under Section 1782. *Id.* at 258. The European Commission "exercises responsibility over the wide range of subject areas covered by the European Union treaty." *Id.* at 250. Therefore, CVM can be interpreted as a tribunal under the Supreme Court interpretation.

### C.  The Petitioner will be an interested person in the Contemplated Proceeding.

The case law defines an "interested person" broadly. In fact, an interested person does not need to be an official party to the proceeding.[28] In *Intel Corp.*, the Supreme Court held that a person who has significant "participation rights" in a proceeding "possesses a reasonable interest in obtaining judicial assistance, and therefore qualifies as an interested person" under the statute.[29]

Petitioner is a minority shareholder of JBS, therefore it is more than interested that the controllers of the company be charged due to violations of Corporate Laws that led to the extract of assets from JBS.

---

[28] *Id.* 241, 247.

[29] *Id.* 256-57; *In re Crown Prosecution, 870 F.2d at 689-90* ("interested person includes "litigants before foreign or international tribunals… as well as any other person… [who] possess[es] a reasonable interest in obtaining the assistance."); *Consorcio Ecuatoriano*, 2014 WL 104132, at *4–6 (potential plaintiff seeking discovery for use in contemplated foreign civil proceeding is an "interested person"). Persons who assist or direct a foreign party in an official capacity also qualify as interested persons for purposes of Section 1782. See *Setraco Nigeria Ltd.*, No. 3:13-MCR, 2013 WL 1704913, at *2 (M.D. Fla. Apr. 19, 2013) ("The term interested person is not restricted to litigants, foreign sovereigns, or designated agents of those sovereigns, but rather encompassed a complainant who triggered an investigation.")

Moreover, Brazilian Law specifically authorizes minority shareholders to take legal action, in the context of violations performed by controlling shareholders (Gonzalez Decl. ¶¶ 12-14.); and information provided by third parties, such as shareholders, is relevant to CVM's enforcement activities (Gonzalez Decl. ¶ 19.). In this context, SPS has a clear interest to contribute to the Contemplated Proceeding.

## II.   THE COURT SHOULD EXERCISE ITS DISCRETION IN FAVOR OF GRANTING THIS APPLICATION

Once the statutory requirements of Section 1782 have been met, courts next use their discretion in granting discovery by considering four factors set forth by the Supreme Court in *Intel*: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) whether the application conceals an attempt to circumvent foreign proof-gathering restrictions or other policies; and (4) whether the discovery sought is unduly intrusive or burdensome.[30] In considering these factors, courts should exercise their discretion "liberally in favor of granting discovery." [31] In this case, all four factors favor allowing discovery.

Furthermore, when exercising their discretion, courts should consider the twin aims of Section 1782, namely, "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."[32]

---

[30] 542 U.S. at 264-65.

[31] *See Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability.")

[32] *KPMG, L.L.P.*, 798 F.3d at 117

**A.  None of the Respondents is a Party to the Foreign Contemplated Proceeding**

The first *Intel* factor considers whether the requested discovery is sought from a participant in the foreign case.[33] Pursuant to *Intel*, this first factor favors the Petitioner where the respondent is not a participant in the foreign proceeding.[34] As the Supreme Court and several lower courts have recognized, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."[35]

None of the Respondents will be a party in the Contemplated Proceeding to be commenced with the CVM, given that it will deal directly with JBS's majority shareholders conducts.

Accordingly, there is no danger that obtaining evidence from them in this district will in any way disrupt or interfere with the jurisdiction or proceeding of CVM. Additionally, as the financial institutions are New York entities, or have offices operating in New York it is unlikely that SPS will be able to obtain such discovery absent an order from this Court. Thus, the first discretionary factor is satisfied and should favor SPS.

**B.  The Foreign Tribunal Will be Receptive to Information Obtained in Discovery Pursuant to Section 1782.**

The second *Intel* factor allows courts to "take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign

---

[33] *In Re Pishevar*, 439 F. Supp. 3d 290, 303 (S.D.N.Y. 2020) (Citing *Intel*).

[34] *Intel*, 542 U.S. at 264.

[35] *Id.*; *see e.g., In re Imanagement Servs. Ltd.*, No. Misc. 05-89 (FB), 2005 WL 1959702, at *3 (E.D.N.Y. Aug. 16, 2005) (favoring discovery where targets were not parties to the foreign action, because "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid").

government or agency abroad to U.S. federal court judicial assistance."[36] Additionally, "absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance."[37] Discovery should only be denied on the basis of lack of receptiveness where it is provided with "authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782."[38] Courts in other circuits have held similarly in cases specifically pertaining to Brazilian proceedings before courts. [39]

Moreover, the CVM has been, historically, receptive to information provided by third parties – such as shareholders, investors, directors, officers, members of fiscal committees and auditors – for purposes of CVM's investigations.  In fact, several enforcement proceedings initiated by the CVM began with complaints filed by third parties (Gonzalez Decl. ¶ 19.).

Additionally, Brazil is a signatory to the Hague Convention, which is a further indicator that the Brazilian Court would be receptive to the evidence sought here. [40]  Thus, the second *Intel* factor strongly favors granting this Application.

---

[36] *Intel* 542 U.S. at 264.

[37] *In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166, 176–77 (S.D.N.Y. 2020) (citing *Euromepa S.A. v. R. Esmerian, Inc.,* 51 F.3d 1095, 1102 (2d Cir. 1995)).

[38] *Id*.

[39] *See In re De Melo Pimenta*, 942 F. Supp. 2d 1282, 1288 (S.D. Fla. 2013) ("there is nothing in the record suggesting the Brazilian Probate Court would be unreceptive to the Application").

[40] *In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Ord. Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 13 MISC. 397 PGG, 2014 WL 7232262, at *8 (S.D.N.Y. Dec. 10, 2014) (explaining that as Cyprus is a signatory to the Hague Convention, it is unlikely that Cypriot courts would not be receptive to U.S. federal-court assistance).

**C. This Application is Made in Good Faith and Does Not Circumvent Foreign Proof-Gathering Restrictions.**

Courts typically weigh the third Intel factor against the Petitioner only where they find that an application is brought in bad faith.[41]

Here, SPS seeks the requested discovery for use in a Contemplated Proceeding in Brazil, a jurisdiction that has historically been open to the use of proof gathered pursuant to Section 1782.[42]

Furthermore, the CVM has not issued orders preventing SPS from seeking U.S. federal-court assistance, and there is no evidence that SPS is making this request in bad faith. Indeed, SPS has already provided evidence to the CVM in connection with the CVM Proceeding. Accordingly, this factor weighs in favor of granting the Application.

**D. This Discovery Request is Narrowly Tailored and Not Unduly Intrusive or Burdensome.**

The fourth Intel factor favors the Petitioner if the requests for discovery are not overly burdensome or duplicative.[43] In evaluating the scope of a Section 1782 request, the court applies the "familiar standards" of the Federal Rules of Civil Procedure and are encouraged to issue a "closely tailored discovery order rather than… simply denying relief outright."[44] Where, as

---

[41] *See In re Application of Hill*, No. M19-117, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007) ("Absent any indication of bad faith on [the Petitioner's] part, the Court is simply unwilling to weigh the request for § 1782 assistance itself as a negative discretionary factor") (internal quotations omitted); *In re Gemeinsschaftspraxis Dr. Med. Schottdorf*, No. M19-88, 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006).

[42] *See Supra* page 18.

[43] *Intel*, 542 U.S. at 265.

[44] *In re Top Matrix Holdings Ltd.*, No. 18 MISC. 465 (ER), 2020 WL 248716, at *7 (S.D.N.Y. Jan. 16, 2020).

here, a Petitioner's requests concern "the precise subject matter of the underlying litigation," the requests are not unduly burdensome.[45]

SPS's limited discovery request seeks documents relating to financial transactions conducted by Lunsville, Valdarco, Unifleisch UK and Unifleisch SA through the intermediation and services offered by Respondents, while avoiding unnecessary burden or intrusion upon them. Moreover, SPS's counsel has narrowly tailored these discovery requests to what will be necessary to start the Contemplated proceeding with the CVM while providing evidence that will contribute to the Commission's investigation activities. As a result, the requested discovery is appropriate.

A copy of the subpoenas that SPS intends to serve on Respondents is attached as exhibits to the Proposed Order being filed contemporaneously with this Application. The potential burden and expense of compliance would be minimal because the requested discovery implicates a discrete universe of documents relating to financial transactions operated by the companies.

The relevant documents should thus be easily identifiable, readily accessible, and not burdensome for Respondents to produce. In the unlikely event, however, that this Application and the desired discovery create a burden or other issues for one of the Respondents, SPS would be more than willing to accommodate and confer with them to resolve any such issues in good faith.

## III.   THIS APPLICATION SHOULD BE GRANTED *EX PARTE*

Finally, the Court should grant SPS's Application on an *ex parte* basis. Courts in this Circuit and across the country have recognized that Section 1782 applications made on an *ex*

---

[45] *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998); see, e.g., *Veiga*, 746 F. Supp. 2d at 25 (granting a Section 1782 application where "the subject matter of the requests are reasonably tailored to speak to the claims and defenses raised in the proceedings at issue").

*parte* basis are properly filed and routinely granted.[46] Such applications are "customarily received and appropriate action taken with respect thereto *ex parte*," because "witnesses can ... raise[] objections and exercise[] their due process rights by motions to quash the subpoenas."[47] Here, SPS requests that its *ex parte* Application be granted without prejudice to Respondents' rights to move to vacate this Court's approval order and/or quash the subpoenas SPS would issue thereunder.

---

[46] *See e.g.*, *Esses v. Hanania (In re Esses)*, 101 F.3d 873, 874 (2d Cir. 1996) (affirming grant of ex parte order under Section 1782); *In re Application of Gianoli*, 3 F.3d 54, 55 (2d Cir. 1993) (same); *see also In re Mota*, No. MC 19-00369 (MN), 2020 WL 95493, at *1 (D. Del. Jan. 8, 2020) ("Discovery applications under § 1782 are often granted *ex parte*"); *In re Request for Int'l Jud. Assistance From the Nat'l Ct. Admin. of the Republic of Korea*, No. C15-80069 MISC LB, 2015 WL 1064790, at *2 (N.D. Cal. Mar. 11, 2015) ("An *ex parte* application is an acceptable method for seeking discovery pursuant to § 1782.").

[47] *In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1219 (9th Cir. 1976); *see also Gushlak v. Gushlak,* 486 F. App'x 215 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."); *In re Letter of Request from Supreme Court of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991) ("Indeed, such *ex parte* applications are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request, and will then have the opportunity to move to quash the discovery or to participate in it."); *In re Gemeinschaftspraxis Dr. Med. Schottdorf,* No. Civ. M19-88 (BSJ), 2006 U.S. Dist. LEXIS 94161, at *1 (S.D.N.Y. Dec. 29, 2006) (denying motion to quash subpoena issued ex parte under 1782).

## CONCLUSION

For the foregoing reasons, SPS respectfully requests that the Court enter an order granting this Application substantially in the form of the Proposed Order filed contemporaneously herewith and such other relief as the Court deems just and proper.

Dated:   April 21, 2022
         Omaha, Nebraska

Respectfully submitted,

**BAIRD HOLM LLP**

*/s/ Jeremy C. Hollembeak*
Jeremy C. Hollembeak
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
Phone: 402.636.8317
Email: jhollembeak@bairdholm.com

-and-

**MB SCANLON PLLC**
Gabriela M. Scanlon
(*pro hac vice* application to be submitted)
4301 50th Street NW, 1st Floor
Washington, D.C., 20016
Telephone:  (202) 410-9293
Email: gabriela@mbscanlon.com

*Attorneys for Petitioner SPS I Fundo De*
*Investimento De Ações – Investimento No*
*Exterior*

# **EXHIBIT A**

**Gonzalez Declaration**



**DECLARATION OF GUSTAVO MACHADO GONZALEZ**

I, Gustavo Machado Gonzalez, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.       I submit this Declaration in support of the request of SPS I Fundo de Investimento de Ações – Investimento no Exterior ("SPS") for entry of an order allowing it to take discovery for use in a contemplated proceeding in Brazil, as further described below, pursuant to 28 U.S.C. § 1782 ("1782 Application").

2.       All facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) my review of the documents that SPS provided to me; and (iii) information obtained from SPS.

**I.       Personal background information**

3.       I am an attorney admitted to practice in Brazil and in the State of New York.  I currently focus my practice on Brazilian law. I am over the age of 21 and fluent in English and submit this Declaration in this language.

4.       In 2004, I graduated in Law from Pontifícia Universidade Católica of Rio de Janeiro.  In 2005, I obtained my MBA in Finance from INSPER; and, in 2009, I obtained my LL.M. degre from Columbia Law School (Harlan Fiske Stone Scholar).  Currently, I am pursuing a Doctorate Degree in Commercial Law at the University of São Paulo.

5.       In addition to the private practice, I have experience in the public sector. Between September 2012 and March 2014, I was the Chief of Staff (*Chefe de Gabinete da Presidência*) at the Brazilian securities and exchange commission – *Comissão de Valores Mobiliários*, or CVM.  Between July 2017 and February 2021, I served as a Commissioner (*Diretor*) at CVM.

6.       In August 2021, I founded my law firm: Gustavo Gonzalez Advogados.  The firm is a specialized boutique focused on complex securities and corporate law issues involving publicly held companies and other market participants, with an emphasis on providing legal opinions and advising on securities and corporate litigation and other CVM-related matters.



7.      In parallel, I have also been committed to academic activities.  Since 2012, I have been an adjunct professor in specialization and postgraduate courses at Brazilian universities – such as Fundação Getúlio Vargas (Rio de Janeiro), Pontifícia Universidade Católica of Rio de Janeiro (Rio de Janeiro), and INSPER (São Paulo).  I am also the author of several articles published in specialized books and magazines.

## II.      A brief overview of the Brazilian capital markets profile

8.      The capital markets in Brazil is characterized for a pattern of highly concentrated ownership. Most of the Brazilian publicly held companies have a single shareholder (or a small group of shareholders bound by a shareholders' agreement) owing more than 50% of their voting capital.

### II.1.     Derivative actions against the controlling shareholder

9.      The Brazilian Corporate Law (Law No. 6,404/1976) provide specific provisions for controlling shareholders.

10.      Article 116, caput, defines controlling shareholder "as an individual or a legal entity, or a group of individuals or legal entities bound by a voting agreement, or under common control, which: (a) possesses rights which permanently assure it a majority of votes in resolutions of general meetings and the power to elect a majority of the members of management; and (b) in practice uses its power to direct the corporate activities and to guide the operations of the divisions of the corporation.

11.      Article 116, Sole Paragraph, provides that "a controlling shareholder shall use its controlling power in order to make the corporation accomplish its purpose and perform its social role, and shall have duties and responsibilities towards the other shareholders of the corporation, those who work for the corporation and the community in which it operates, whose rights and interests the controlling shareholder must loyally respect and meet".

12.      Article 117, caput, states that "a controlling shareholder shall be liable for any damage caused by acts performed by abuse of its power". Paragraph 1 of article 117 exemplifies some actions that may be regarded as an abuse of controlling power, including "to guide a corporation towards an objective other than in accordance with its corporate purposes or harmful to national interest, or to induce it to favor another Brazilian or



foreign corporation to the detriment of the shareholders' interest in the profits or assets of the corporation or of the Brazilian economy" (Art. 117, paragraph 1, "a"); "to induce, or attempt to induce, any management or audit committee member to take any unlawful action, or, contrary to their duties under this Law and under the bylaws, and contrary to the interest of the corporation, to ratify any such action in a general meeting" (Art. 117, paragraph 1, "e"); "to enter into contracts with the corporation directly, through a third party or through a company in which the controlling shareholder has an interest, in unduly favorable, or inequitable, terms" (Art. 117, paragraph 1, "f").

13.    According to Article 246 of the Brazilian Corporate Law, the controlling share-holder must reimburse any damage caused to the company on account of actions taken in breach of Articles 116 and 117 of the Brazilian Corporate Law. Recognizing that a com-pany with a controlling shareholder may lack the incentives and the independence to file and conduct a lawsuit against its controlling shareholder, the Brazilian Corporate Law authorizes any minority shareholder to file a lawsuit on behalf of the company against the controlling shareholder without submitting the matter to a shareholders general meeting.

14.    Depending on its ownership stake, the shareholder may be required to post collat-eral to guarantee the payment of the legal costs (including court costs, attorney fees and lost fees) in case of an adverse ruling[1]. If the suit is successful, the award must sentence the controlling shareholder to redress the damage and pay court costs, attorney fees at 20% based on the amount of the award and a 5% premium also based on the amount of the award to the shareholders who sponsored the suit (Brazilian Corporate Law, Article 246, paragraph 2).

**II.2.    CVM administrative enforcement proceedings**

15.    CVM is a federal entity in charge of overseeing the Brazilian securities market. CVM holds rulemaking power and the authority to oversee and enforce compliance with

---

[1] The Brazilian Corporate Law establishes a 5% minimum share ownership requirement to file a derivative lawsuit without presenting a bond but authorizes CVM to reduce the ownership requirement for listed com-panies (Article 291) based on the amount of their capital stock. Pursuant to CVM Resolution No. 70/2022, for listed companies with outstanding capital stock: (i) above BRL 10 billion, the requirement is 1%; (ii) be-tween BRL 5 billion and BRL 10 billion, 2%; (iii) between BRL 1 billion and BRL 5 billion, 3%; (iv) be-tween BRL 100 million and BRL 1 billion, 4%; and (v) below BRL 100 million, 5%.



the Brazilian Securities Law (Law No. 6,385/1976), the Brazilian Corporate Law (Law No. 6,404/1976[2]), and its own rules, among others.

16.     The administrative enforcement proceedings commenced by the CVM are entirely conducted inside the entity.  In other words, CVM has the power to conduct investigations, bring charges, and impose penalties to companies and individuals[3].

17.     CVM staff is divided in several units that are called "*Superintendências*", each one responsible for overseeing a specific segment of the securities markets[4] or for administrative matters concerning CVM's activity.  Each operating unit holds the power to investigate potential violations related to the matters under its jurisdiction[5] and to start an administrative enforcement proceeding (*processo administrativo sancionador*).

18.     The Board of Commissioners is not involved in the investigation or in the decision to accuse a company or an individual, initiating an administrative enforcement

---

[2] In Brazil, corporate law is a federal law matter.  CVM's authority on corporate law is restricted to matters involving publicly-held companies.

[3] Pursuant to Section 11 of the Brazilian Securities Law, CVM may apply the following penalties on companies and individuals: (i) warning; (ii) fines; (iii) temporary inability to act as director or officer, or as member of the fiscal council of a publicly-held corporation of an entity which is part of the securities distribution system, or of other entities which require authorization by, or registration with, the CVM, for up to twenty (20) years; (iv) suspension of the authorization or registry to exercise any activities regulated by the Brazilian Securities Law; (v) temporary inability to exercise any activities regulated by the Brazilian Securities Law, for up to twenty (20) years; (vi) temporary prohibition to practice certain activities or transactions, for entities which are part of either the securities distribution system or other entities that require authorization or registry with the CVM, for up to twenty (20) years; and (vii) temporary prohibition to act, directly or indirectly, in one or more categories of transaction it the securities market, for up to ten (10) years

[4] For instance, the following units of the CVM are responsible for registration, oversight, orientation, sanctioning and support to rulemaking in connection with their respective areas, pursuant to CVM Resolution No. 24/2021: (i) the Division of Companies' Relationship (*Superintendência de Relações com Empresas* – SEP), in connection with public-held companies, as well as disclosure activities, and conduct of members of the management and of shareholders, of public-held companies, among others; (ii) the Division of Relations with the Market and Intermediaries (*Superintendência de Relações com o Mercado e Intermediários* – SMI), in connection with exchanges and other organized securities markets, clearing and settlement agents, custodians, bookkeeping agents, central depositaries, brokerage activities, distribution agents and self-regulatory entities, as well as irregular intermediation activities, among others; and (iii) the Division of Oversight of Institutional Investors (*Superintendência de Supervisão de Investidores Institucionais* – SIN), in connection with foreign investors, investment clubs, portfolio managers, securities advisors, securities analysts and investment funds, except for activities relating to securitization, among others.

[5] Article 3 of CVM Resolution No. 45/2021.



proceeding.  The Board of Commissioner is responsible to judge these proceedings and is competent to impose penalties on those charged with wrongdoings.

19.    Even though the administrative enforcement proceedings commenced by the CVM are entirely conducted inside the entity, information provided by third parties – such as shareholders, investors, directors, officers, members of fiscal committees and auditors – are, historically, extremely important for the investigations conducted by the CVM.  In fact, several enforcement proceedings initiated by the CVM began with complaints filed by third parties.

20.    In addition, in recent years, the CVM has suffered from a major insufficiency of resources (including personnel) for conducting investigations.  Such situation is further aggravated by the significant number of investigations and punitive proceeding already in course within the CVM. In this context, the submission of robust evidence to the CVM, by third parties, plays an even more significant role.

21.    The CVM's enforcement activity, such as via enforcement proceedings, does not prevent other government entities to bring other charges to the targets, such as criminal charges to be brought by the Public Attorney's Office (when the conduct also constitutes a crime), or civil actions seeking indemnification for losses resulting from the same wrongdoing.

22.    As a matter of fact, the CVM does acknowledge that third party contribution is important and complementary to its enforcement activity[6].  In my view, an example of

---

[6] During 2018 and 2020, CVM, jointly with the Ministry of Economy and the advisory of OCDE, promoted a series of initiatives with the objective of contributing to the improvement of private enforcement in the Brazilian capital market.  The first main product of this project was a report named "Strengthening the enforcement of shareholders' rights," dated as of October 2019, and prepared by members of CVM, the Ministry of Economy and OCDE, which states the following in its introduction: "Currently, the Brazilian Securities Commission (CVM) plays an important role in shareholder disputes.  CVM has jurisdiction over corporate law matters, and authority to start administrative proceedings and impose penalties against wrongdoers.  However, CVM does not have authority to determine reimbursement for compensation for those affected. (…)  Therefore, the main mechanisms available in Brazil for investors redress are beyond CVM's administrative jurisdiction, since, as a rule, the Commission does not participate in and sometimes is not even aware of lawsuits and arbitral proceedings involving publicly held companies or other market participants.  According to the findings of OECD Corporate Governance Committee's survey on supervision and enforcement in corporate governance, though most jurisdictions rely more heavily on public enforcement, those that have both public and private enforcement found that they play important complementary roles. This complementarity is especially relevant when it comes to redress since it usually requires a shareholder suit.  The OECD's supervision and enforcement review found that, in Brazil, private enforcement is very weak in practice.  There are flaws in the current system that does not encourage enough



the complementarity of the CVM's punitive activity with other measures is the fact that the entity does not hold the power to compel wrongdoers to indemnify those who were harmed by the wrongdoings.

### III.    A brief overview of SPS's existing and contemplated actions in defense of JBS

23.    SPS is a Brazilian investment fund managed by SPS Capital. SPS Capital is an asset manager specialized in special situation investments, including complex litigation.

24.    JBS S.A. ("JBS") is one of the largest Brazilian public companies. Over the last years, a series of scandals involving JBS has come into light. The company has suffered substantial losses due to wrongdoings perpetrated by (or pursuant to the instructions) of its indirect controlling shareholders, the Batista family (the "Batistas").

25.    In the past few years, SPS has been seeking legal measures against the Batistas on behalf of JBS to defend the interests of JBS and its minority shareholders. SPS has initiated an arbitration on behalf of JBS, in which it seeks indemnification to the company for damages caused by its controlling shareholders. Additionally, SPS is currently seeking to provide additional evidence to CVM in an administrative enforcement proceeding initiated by the CVM due to wrongdoing caused by the Batistas and other JBS's management related to a transaction involving the merger of Bertin S.A. (a former major Brazilian company in the meat industry) into JBS, in 2009[7].

26.    I have been regularly advising SPS on legal matters, including in connection to its investment on JBS. I represent SPS on the pending CVM administrative enforcement proceeding against the Batistas and have been retained to assist them on a new set of legal measures related to different facts, as described below.

27.    In summary, SPS is contemplating filing a complaint with the CVM, in order to report the violations perpetrated by the controlling shareholders of JBS that are still not

---

shareholders to seek redress by themselves, and which creates an imbalance that concentrates the enforcement burden on public authorities (CVM and public prosecutor service).  In summary, claims by shareholders to the CVM have replaced private enforcement action.  Considering, among other factors, the CVM limitations regarding investor redress, this report seeks to find mechanisms to balance public and private enforcement by providing suggestions on how to improve private enforcement in Brazil."  Available at: https://www.gov.br/cvm/pt-br/centrais-de-conteudo/publicacoes/estudos/strengthening-the-enforcement-of-shareholders2019-rights-interim-report-cvm-ocde-spe-me-outubro-2019.

[7] PAS CVM nº 19957.008434/2019-03 (8434/2019).



object of an enforcement proceeding. The matters described under the complaint would be subject to investigation by the CVM units, which could bring charges against the controlling shareholders, resulting in the initiation of an administrative enforcement proceeding.

28.     The set of violations under CVM's complaint would be related to a severe illicit scheme performed by the controlling shareholders of JBS, to the detriment of the company, as described below.

**IV.     Overview of the violations by the controlling shareholders of JBS**

29.     The facts briefly described below have been gathered based on information arising from investigations conducted by authorities in Brazil and in other jurisdictions, including the United States, which have been unveiled in recent years – for instance, certain key facts were only revealed in 2020.

30.     In that context, an investigation conducted in the United States by the Financial Crimes Enforcement Network ("FinCen") unraveled important evidence, which was disclosed by an international consortium of journalists in September 2020, under an operation named "FinCen Files." Relevant evidence was also extracted from investigations performed in Brazil in recent years, including a proceeding conducted by Brazilian tax authorities, and plea bargains with Brazilian authorities in the context of corruption scandals involving the controlling shareholders of JBS.

31.     The evidence extracted from those investigations depict an illegal scheme orchestrated by members of the Batista family– who are the indirect controlling shareholders of JBS – for the extraction of significant amounts of funds from JBS, which were intended for criminal purposes and/or to the benefit of members of the Batistas.

32.     A core component of the scheme was the employment of entities in various jurisdictions – all of which controlled by Batistas, as the evidence suggests –, apparently as a form to disguise the underlying illicit conducts. Certain entities under the name "Unifleisch" – which prior to those more recent investigations were likely unknown to the relevant authorities – have played a major role in such deceptive scheme. Other entities employed – as the Panamanian companies, Lunsville Internacional Inc. ("Lunsville") and Valdarco Investment Inc. ("Valdarco") – are known to have been key participants in major corruption dealings involving the Batistas and Brazilian officials.



33.     The evidence indicates that a vast amount of funds originated from JBS were transferred to Unifleisch Limited – UK (incorporated in the United Kingdom) ("Unifleisch UK") – under a seemingly legitimate commercial representation agreement. Later, Unifleisch UK, with no apparent economic purpose, wired such funds to various entities, including Lunsville and Valdarco (used for payment of bribes to Brazilian officials), Antigua Investments (an investment firm of the Batistas; also, used for the payment of bribes), an entity named Unifleisch SA (a Swiss company, which is managed by an individual with clear associations with companies controlled by the Batistas)[8], among other suspicious transitions.

34.     In essence, the evidence gathered suggests that Unifleisch UK extracted funds from JBS, which were, later, transferred to other offshore entities for criminal purposes – for instance, payment of bribes – and/or for the direct benefit of the Batistas – for instance, funds remained at the disposal of the Batistas or were transferred to companies associated with them. Evidence also suggests that the flow of those funds would be directed by the Batistas, who controlled the offshore companies involved in the scheme.

35.     The evidence gathered indicates that the offshore entities used the services of financial institutions with business dealings in the United States, in the context of the illicit scheme, including: (i) Barclays, which reported to FinCen various suspicious transactions performed by Unifleisch UK; and (ii) J.P. Morgan, which advised the Batistas in the context of the arrangement of a Delaware entity named Blessed Holdings LLC, which formerly had Lunsville as one its members. The connections with such financial institutions are further described below.

## V.      Evidence to be obtained pursuant to the 1782 Application

36.     Pursuant to the 1782 Application, SPS seeks to produce additional evidence, which may be in possession of the mentioned financial institutions, in connection with the illegal dealings orchestrated by the Batistas by means of Unifleisch UK and other offshore entities described above.

---

[8] Unifleisch UK was dissolved in 2016, whereas Unifleisch SA still exists and could have business dealings with JBS until today.



*Barclays*

37.     According to the investigations conducted by FinCen, Barclays made a report on suspicious activities (SARs) in connection with Unifleisch UK's account with such bank[9]. The information that is currently known to SPS on such report is based on the limited information disclosed in the journalistic operation named "FinCen Files," in September 2020.

38.     According to Barclays's report, "Unifleisch is instructed by either JBS, Lunsville, or Valdarco for all action required to be taken". The bank indicates several motivations for the filing of its suspicious activities report on Unifleisch UK, its owners and counter-parts, including the performance of transactions with "parties located in high-risk juris-diction known for money laundering, specifically Panama and Switzerland". Barclays further indicates that "these wire transfers appeared to be layered in a circular scheme as to attempt to disguise or hide the true source of funds and/or its origin".

39.     Based on the information provided by Barclays, the investigation by FinCen iden-tified various suspicious transactions involving Unifleisch UK – US$633.9 million would have been transferred by Unifleisch UK, by means of 859 wire transfers, between Sep-tember 2011 and April 2016. Those transactions involved the various offshore entities involved in the illicit scheme orchestrated by the Batistas, as previously described.

40.     Nonetheless, as mentioned, in the context of the "FinCen Files" only limited in-formation (for instance, no full copies of documents) was disclosed on the investigations conducted by FinCen, based on the report made by Barclays.

41.     Therefore, the 1782 Application is intended to obtain further evidence from Bar-clays on the suspicious transactions conducted among Unifleisch UK and other offshores entities involved in the illicit scheme (including, complete copies of reports and docu-ments presented to FinCen, and of statements of wire transfers made by Unifleisch UK). As previously described, the evidence suggests that the funds transferred by Unifleisch

---

[9] The following is an excerpt of the report of Barclays extracted from the information disclosed by the journalistic operation named "FinCen Files": "The New York Branch of Barclays Bank PLC ("Barclays NY"), a United Kingdom ("UK") banking corporation, maintains a United States Dollar ("USD") corre-spondent account for its affiliate, Barclays Bank Plc, Knightsbridge ("Barclays UK Wealth"). A Barclays UK Wealth account in the name of Unifleisch Limited, also known as Unifleisch SA and Unifleisch S/A ("Unifleisch") was flagged for review as part of Barclays NY's surveillance program".



UK to other entities, in the context of the suspicious dealings, were originated from JBS, and the flow of such funds was directed by the Batistas.

*J.P. Morgan*

42.     J.P. Morgan had been a major financial advisor of JBS and the Batistas since the company's IPO. Based on public information, the bank had an important role in developing the foreign aspects of the control structure of JBS (by the Batistas) that was adopted following the transaction involving the merger of Bertin S.A. into JBS, in 2009.

43.     J.P. Morgan's team in New York was involved in the conception of the foreign aspects of such structure, which included the creation of a Delaware entity named Blessed Holdings LLC[10], which would later be known to be controlled by the Batistas[11].

44.     Lunsville – one of the offshore companies that received funds from Unifleisch UK and was used to pay bribes to Brazilian officials – was supposedly one of the members indicated in the corporate records of Blessed Holdings LLC, in 2009.

45.     Accordingly, the 1782 Application is intended to obtain further evidence from J.P. Morgan on the relationship between Lunsville and Blessed Holdings LLC, including any information that may be in possession of the bank in connection with Unifleisch UK and other entities or aspects of the illegal scheme. As described, the evidence suggests that the funds transferred by Unifleisch UK to Lunsville, and other entities, were originated from JBS, and the flow of such funds was directed by the Batistas.

---

[10] For instance, in a deposition to the Brazilian Federal Police, of June 21, 2017, Joesley Batista stated the following: "THAT in connection with the creation of BLESSED, the Deponent [*Joesley Batista*] clarifies that it was conceived by FABIO PEGAS, of JP Morgan NY; THAT the creation of such offshore entity had the purpose to guarantee that the corporate control of JBS after the merger with BERTIN remained with the Batista family; […] THAT the Deponent affirms that he does not feel very qualified to speak of such structure, because it was fully conceived by FABIO, but informs that such strategy was used to reduce even more the possibility of the BERTIN FAMILY to have any form of corporate control over JBS" (free translation of: "*QUE em relação à criação da BLESSED, o Depoente esclarece que foi gestada por FABIO PEGAS, do JP Morgan de NY; QUE a criação dessa offshore foi pensada para garantir que o controle acionário da JBS após a fusão com a BERTIN continuasse com a família BATISTA; [...] QUE o Depoente afirma não se sentir muito habilitado para falar dessa estrutura, porque foi toda gestada por FABIO, mas informa que essa estratégia foi utilizada para reduzir ainda mais a possibilidade de que a FAMÍLIA BERTIN viesse a ter alguma forma de controle acionário na JBS*").

[11] As mentioned in the introduction of this Declaration, SPS is also adopting legal measures in connection with violations conducted by the Batistas in the context of the JBS-Bertin transaction.

**V.     Conclusion**

46.     The consequences of the wrongdoings illustrated above are detrimental to JBS and to its minority shareholders, including SPS. Consequently, SPS has a legitimate interest to initiate and contribute to further legal measures, in Brazil, as described in the introduction of this Declaration.

47.     Based upon the 1782 Application, SPS seeks to produce further evidence, which may be in possession of the mentioned financial institutions, in connection with the illegal dealings perpetrated by the Batistas by means of Unifleisch UK and other offshore entities.

48.     It is expected that the evidence that may be produced based on the 1782 Application will contribute to more effectiveness to the investigations of the CVM arising from a complaint to be filed by SPS, and, consequently, to any administrative enforcement proceedings arising from those investigations.

49.     Thus, SPS believes that such evidence may significantly contribute and impact the contemplated legal actions to be brought against the controlling shareholders of JBS, in Brazil.

50.     I declare under penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Executed on April 20, 2022.

11

## EXHIBIT B

**Plea Agreement**

F.# 2019R01685

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    PLEA AGREEMENT

  - against –                                Cr. No. 20-CR-365 (MKB)

J&F INVESTIMENTOS SA,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

    The United States of America, by and through the United States Department of Justice,

Criminal Division, Fraud Section (the "Fraud Section"), and the United States Attorney's Office

for the Eastern District of New York (the "Office") and J&F Investimentos SA (the "Defendant"

or the "Company"), by and through its undersigned attorneys, and through its authorized

representative, pursuant to authority granted by the Defendant's Board of Directors, hereby

submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the

Federal Rules of Criminal Procedure.  The terms and conditions of this Agreement are as

follows:

    <u>TERM OF THE DEFENDANT'S OBLIGATIONS UNDER THE AGREEMENT</u>

    1.  Except as otherwise provided in Paragraph 12 below in connection with the

Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last

and be effective for a period beginning on the date on which the Information is filed and ending

three years from the date on which the Information is filed (the "Term").  The Defendant agrees,

however, that, in the event the Fraud Section and the Office determine, in their sole discretion,

that the Defendant has failed specifically to perform or to fulfill completely each of the

Defendant's obligations under this Agreement, extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year. Any extension of the Term extends all terms of this Agreement for an equivalent period.

## THE DEFENDANT'S AGREEMENT

2.　　Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of New York, and to plead guilty to a criminal Information charging the Defendant with one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3, related to conduct by the Defendant in Brazil and the United States (the "Information"). The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Fraud Section and the Office in their investigation into the conduct described in this Agreement and other conduct related to the conduct described in this Agreement and the Statement of Facts attached hereto as Attachment A (the "Statement of Facts").

3.　　The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

a.　　An unlawful agreement between two or more persons to violate the FCPA existed; specifically, as a person or entity, while in the territory of the United States, to make use of the mails and means and instrumentalities of interstate commerce corruptly or to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any

2

money, offer, gift, promise to give, and authorization of the giving of anything of value, to a

foreign official, and to a person, while knowing that all or a portion of such money and thing of

value would be and had been offered, given, and promised to a foreign official, for the purpose

of: (i) influencing acts and decisions of such foreign official, foreign political party and official

thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political

party and official thereof, to do and omit to do acts in violation of the lawful duty of such official

and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign

political party and official thereof to use his, her or its influence with a foreign government and

agencies and instrumentalities thereof to affect and influence acts and decisions of such

government and agencies and instrumentalities, in order to assist the Company and others in

obtaining and retaining business for and with, and directing business to, the Company and others,

contrary to Title 15, United States Code, Section 78dd-3;

        b.      the Defendant knowingly and willfully joined that conspiracy;

        c.      one of the members of the conspiracy knowingly committed or caused to

be committed, in the Eastern District of New York or elsewhere in the United States, at least

one of the overt acts charged in the Information; and

        d.      the overt acts were committed to further some objective of the conspiracy.

    4.      The Defendant understands and agrees that this Agreement is between the Fraud

Section, the Office and the Defendant and does not bind any other division or section of the

Department of Justice or any other federal, state, local, or foreign prosecuting, administrative, or

regulatory authority.  Nevertheless, the Fraud Section and the Office will bring this Agreement

and the nature of the conduct, the nature and quality of the cooperation and remediation of the

Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of

other law enforcement, regulatory, and debarment authorities, as well as those of Multilateral Development Banks ("MDBs"), if requested by the Defendant.

5.      The Defendant agrees that this Agreement will be executed by an authorized corporate representative.  The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors, in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions"), authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

6.      The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under the Agreement.

7.      The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case, including:

a.      the Defendant did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual ("JM") Section 9-47.120, or pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), because it did not voluntarily self-disclose to the Fraud Section and the Office the conduct described in the Statement of Facts, attached to this Agreement as Attachment A;

b.      the Defendant received partial credit for its cooperation with the Fraud Section's and the Office's investigation pursuant to the FCPA Corporate Enforcement Policy, JM Section 9-47.120, by, among other things: (i) conducting an internal investigation; (ii) making factual presentations to the Fraud Section and the Office; and (iii) voluntarily making foreign-based employees available for interviews in Brazil;

4

     c.     the Defendant did not receive full credit for cooperation and remediation pursuant to the FCPA Corporate Enforcement Policy, JM Section 9-47.120, because, among other things, the Defendant initially declined to produce all relevant materials and failed to produce all relevant documents and information in a timely manner;

     d.     the Defendant entered into a resolution with the *Ministério Público Federal* (Public Prosecutor's Office) in Brazil relating to the same conduct described in the Statement of Facts (the "Brazilian Leniency Agreement"), and has agreed to pay a fine of BRL 8,000,000,000 (the current approximate equivalent of $1,441,505,636) and to contribute BRL 2,300,000,000 (the current approximate equivalent of $414,432,870) to social projects in Brazil in connection with the Brazilian Leniency Agreement, and the Fraud Section and the Office are crediting a portion of the Brazilian fine in connection with the penalty in the Agreement;

     e.     although the Defendant did not have anti-corruption controls or an anti-corruption compliance program at the time of the conduct described in the Statement of Facts, the Defendant has since engaged in remedial measures, including: (i) creating and establishing an anti-corruption compliance program that is audited annually by an independent party; (ii) significantly increasing the importance of anti-corruption compliance messaging within the company; and (iii) conducting regular and robust anti-corruption compliance training with all executives and senior managers;

     f.     based on the Defendant's remediation, the state of its compliance program, including ensuring that its compliance program will satisfy the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Reporting), as well as the fact that the Brazilian Leniency Agreement requires the implementation of an independent commission responsible for monitoring and reporting on internal investigations and compliance audits

conducted at the Defendant with ongoing reporting requirements to the Brazilian authorities, and the Defendant's agreement to report to the Fraud Section and the Office as set forth in Attachment D to this Agreement (Reporting Requirements), the Fraud Section and the Office determined that an independent compliance monitor is unnecessary;

g.      the nature, seriousness and pervasiveness of the offense conduct, which included executives at the highest level of the Company, including payment of bribes to high-level government officials in Brazil over a period of years;

h.      the Defendant has no prior criminal history; and

i.      the Defendant has agreed to continue to cooperate with the Fraud Section and the Office as described in Paragraph 12 below; and

j.      accordingly, after considering (a) through (i) above, the Fraud Section and the Office believe that the appropriate resolution in this case is for the Defendant to plead guilty to one count of violating the anti-bribery provisions of the FCPA pursuant to this Agreement; an aggregate discount of 10 percent off of the bottom of the applicable U.S. Sentencing Guidelines fine range; and the Defendant's agreement to report to the Fraud Section and the Office as set forth in Attachment D to this Agreement.

8.      The Defendant agrees to abide by all terms and obligations of the Agreement as described herein, including, but not limited to, the following:

a.      to plead guilty as set forth in the Agreement;

b.      to abide by all sentencing stipulations contained in the Agreement;

c.      to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

6

d.  to commit no further crimes;

e.  to be truthful at all times with the Court;

f.  to pay the applicable fine and special assessment;

g.  to cooperate fully with the Fraud Section and the Office as described in Paragraph 12;

h.  to implement a compliance program as described in Paragraph 9 and Attachment C; and

i.  to report to the Fraud Section and the Office annually during a term of three years, beginning on the date of sentencing, regarding remediation and implementation of the compliance measures described in Attachment C, prepared in accordance with Attachment D of this Agreement.

9.  The Defendant represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

10.  In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Defendant represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures, regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Defendant agrees to modify its existing compliance programs, including internal controls,

7

compliance policies, and procedures in order to ensure that they maintain: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The compliance programs, including the internal accounting controls systems, will include, but not be limited to, the minimum elements set forth in Attachment C.

11.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section's and the Office's ability to declare a breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Fraud Section and the Office at least 30 days prior to undertaking any such sale, merger, transfer, or other change in corporate form. If the Fraud Section and the Office notify the Defendant prior to such transaction (or series of transactions) that they have determined that the transaction or

8

transactions have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section and the Office, the Defendant agrees that such transaction or transactions will not be consummated.  In addition, if at any time during the Term of the Agreement the Fraud Section and the Office determine in their sole discretion that the Defendant has engaged in a transaction or transactions that have the effect of circumventing or frustrating the enforcement purposes of this Agreement, they may deem them a breach of this Agreement pursuant to Paragraphs 25 to 28 of this Agreement. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

12.     The Defendant shall, subject to applicable law and regulations, cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in the Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section and the Office or any other component of the Department of Justice at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Fraud Section and the Office, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the MDBs in any investigation of the Defendant, its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and any other conduct under investigation by the Fraud

9

Section and the Office or any other component of the Department of Justice. The Defendant's

cooperation pursuant to this Paragraph is subject to applicable laws and regulations, as well as

valid claims of attorney-client privilege or attorney work product doctrine; however, the

Defendant must provide to the Fraud Section and the Office a log of any information or

cooperation that is not provided based on an assertion of law, regulation, or privilege, and the

Defendant bears the burden of establishing the validity of any such assertion. The Defendant

agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the

following:

        a.      The Defendant shall truthfully disclose all factual information not

protected by a valid claim of attorney-client privilege or work product doctrine with respect to its

activities, those of its subsidiaries and affiliates, and those of its present and former directors,

officers, employees, agents, and consultants, including any evidence or allegations and internal

or external investigations, about which the Defendant has any knowledge or about which the

Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is

not limited to, the obligation of the Defendant to provide to the Fraud Section and the Office,

upon request, any document, record or other tangible evidence about which the Fraud Section

and the Office may inquire of the Defendant.

        b.      Upon request of the Fraud Section and the Office, the Defendant shall

designate knowledgeable employees, agents or attorneys to provide to the Fraud Section and the

Office the information and materials described in Paragraph 12(a) above on behalf of the

Defendant. It is further understood that the Defendant must at all times provide complete,

truthful, and accurate information.

c.     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

13.     In addition to the obligations in Paragraph 12, during the Term, should the Defendant learn of any evidence or any allegations of conduct that may constitute a violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States, the Defendant shall promptly report such evidence or allegation to the Fraud Section and the Office. Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify, in the form of executing the document attached as Attachment E to this Agreement, to the Fraud Section and the Office that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and

11

1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

14.     The Defendant agrees that any fine imposed by the Court will be due and payable as specified in Paragraph 22 below, and that any restitution imposed by the Court will be due and payable in accordance with the Court's order.  The Defendant further agrees to pay to the Clerk of the Court for the United States District Court for the Eastern District of New York the mandatory special assessment of $400 (pursuant to 18 U.S.C. § 3013(a)(2)(B)) within 10 business days from the date of sentencing.

## THE UNITED STATES' AGREEMENT

15.     In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section and the Office agree that they will not file additional criminal charges against the Defendant or any of its direct or indirect subsidiaries relating to any of the conduct described in the Statement of Facts or the Information filed pursuant to this Agreement.  The Fraud Section and the Office, however, may use any information related to the above referenced conduct against the Defendant: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.  This Agreement does not provide any protection against prosecution for any future conduct by the Defendant or any of its direct or indirect subsidiaries.  In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant.  The Defendant agrees that nothing in this Agreement is intended to release the

12

Defendant from any and all of the Defendant's tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

### FACTUAL BASIS

16.      The Defendant is pleading guilty because it is guilty of the charges contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and the Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and the Statement of Facts, and that the Information and the Statement of Facts accurately reflect the Defendant's criminal conduct.  The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the Fraud Section and the Office, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

### THE DEFENDANT'S WAIVER OF RIGHTS, INCLUDING THE RIGHT TO APPEAL

17.      Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving the Fraud Section and the Defendant or the Office and the Defendant, as: (a) substantive evidence offered by the government in its case-in-

13

chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.   In addition, the defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United States Sentencing Guidelines (including USSG § 1B1.1(a)) that the Statement of Facts set forth in this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form).   The Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section and the Office have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

18.   The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement.  The Defendant understands that the rights of criminal defendants include the following:

a.     the right to plead not guilty and to persist in that plea;

b.     the right to a jury trial;

c.     the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

d.     the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

14

        e.     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the Fraud Section and the Office in this Agreement. The Agreement does not affect the rights or obligations of the Fraud Section and the Office as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral attack challenging either the conviction or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Information and the Statement of Facts including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates the Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Fraud Section and the Office are free to take any position on appeal or any other post-judgment matter.

The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

## PENALTY

19.     The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is: a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (Title 18, United States Code, Section 371 and Title 18, United States Code, Sections 3571(c) and (d)); five years' probation (Title 18, United States Code, Section 3561(c)(1)); a mandatory special assessment of $400 per count (Title 18, United States Code, Section 3013(a)(2)(B)); and restitution in the amount of any victims' losses as ordered by the Court. In this case, the parties agree that the gross pecuniary gain resulting from the offense is $178,122,935. Therefore, pursuant to 18 U.S.C. § 3571(d), the maximum fine that may be imposed is twice the gross gain, or approximately $356,245,870 per offense.

## SENTENCING RECOMMENDATION

20.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory Sentencing Guidelines range pursuant to the Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory Sentencing Guidelines range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any Guidelines sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The

16

Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 19.

    21.    The Fraud Section, the Office and the Defendant agree that a faithful application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

    a.    The 2018 USSG are applicable to this matter.

    b.    <u>Offense Level</u>.  Based upon USSG § 2C1.1, the total offense level is 44, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 12 |
| (b)(1) | Multiple Bribes | +2 |
| (b)(2) | Amount of Bribe Payments more than $150,000,000 | +26 |
| (b)(3) | High-Level Official | +4 |
| **TOTAL** | | 44 |

    c.    <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(2), the base fine is $178,122,935.

    d.    <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | the organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(2) | Cooperation, Acceptance | -2 |
| **TOTAL** | | 8 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine (USSG § 8C2.4(a)) | $178,122,935 |
| Multipliers (USSG § 8C2.6) | 1.60 (min)/ 3.2 (max) |

17

Fine Range (USSG § 8C2.7)                    $284,996,696 (min)/
                                             $569,993,392 (max)

22.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the

Fraud Section, the Office and the Defendant agree that the following represents the appropriate

disposition of the case:

a.      <u>Disposition</u>.  Pursuant to Fed. R. Crim, P. 11(c)(l)(C), the Fraud Section,

the Office and the Defendant agree that the appropriate disposition of this case is as set forth

above, and agree to recommend jointly that the Court, at a hearing to be scheduled at an agreed

upon time, impose a sentence requiring the Defendant to pay a criminal fine, as noted below.

Specifically, the parties agree, based on the application of the United States Sentencing

Guidelines, that the appropriate total criminal penalty is $256,497,026 (the "Total Criminal

Fine").  This reflects a 10 percent discount off of the bottom of the applicable Sentencing

Guidelines fine range for the Defendant's partial cooperation and remediation.

b.      The Fraud Section, the Office and the Defendant further agree that the

Defendant will pay the United States $128,248,513, equal to 50 percent of the Total Criminal

Fine.  The Defendant agrees to pay $47,000,000 to the United States Treasury no later than ten

business days after the entry of the judgment by the Court, and the Defendant agrees to pay the

remaining $81,248,513 within six months after the entry of the judgment by the Court.  The

Fraud Section and the Office determined, after conducting an independent analysis, that this

limited payment period was necessary in light of current circumstances in order to mitigate any

potential impact the payment may otherwise have on the Defendant's ability to continue to make

the full payments owed to Brazilian authorities according to the schedule that was agreed to in

the Brazilian Leniency Agreement.

c.      The Fraud Section, the Office, and the Company further agree that the remaining amount of the Total Criminal Fine will be offset by $128,248,513 for penalties the Company will pay to the Brazilian authorities as a criminal penalty pursuant to the Brazilian Leniency Agreement related to allegations including those described in the Statement of Facts, and that such amount will be credited by the Fraud Section and the Office.

d.      The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the fine, penalty, forfeiture, or disgorgement amounts that Defendant pays pursuant to the Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.  The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of this fine.

e.      <u>Mandatory Special Assessment</u>.  The Defendant shall pay to the Clerk of the Court for the United States District Court for the Eastern District of New York within ten days of the date of sentencing the mandatory special assessment of $400.

23.     This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated.  The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

24.     The Defendant, the Fraud Section and the Office waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek a sentencing by the Court immediately following the Rule 11 hearing in the absence of a PSR.  The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court.  In the event the Court directs the preparation of a PSR, the Fraud Section and the Office will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

BREACH OF AGREEMENT

25.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 12 and 13 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 9 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, which may be pursued by the Fraud Section, the Office or any other United States Attorney's Office.  Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Fraud Section and the Office's sole discretion.   Any such prosecution may be premised on information provided by the Defendant or its personnel.  Any such prosecution relating to the conduct described in the Information and the attached Statement of Facts or relating to conduct known to the Fraud

20

Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 12 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

26.     In the event the Fraud Section and the Office determine that the Defendant has breached this Agreement, the Fraud Section and the Office agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within 30 days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation,

21

which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Defendant.

27.     In the event that the Fraud Section and the Office determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section and the Office or to the Court, including the Information and the Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

28.     The Defendant acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment.  The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## PUBLIC STATEMENTS BY THE DEFENDANT

29.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 25 to 28 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Information or the Statement of Facts will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office.  If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or the Statement of Facts, the Fraud Section and the Office shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

23

30.     The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates over which the Defendant exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section, the Office and the Defendant; and (b) whether the Fraud Section and the Office have any objection to the release or statement.

<u>COMPLETE AGREEMENT</u>

31.     This document, including its attachments, states the full extent of the Agreement between the parties.  There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

AGREED:

**FOR J&F INVESTIMENTOS SA:**

Date: 10.13.2020          By: _____
                              Lucio Batista Martins
                              Director of Legal and Compliance
                              J&F Investimentos SA

Date: 10/14/2020          By: _____
                              Ben A. O'Neil
                              William A. Burck
                              Michael B. Carlinsky
                              Quinn Emanuel Urquhart & Sullivan, LLP
                              Outside counsel for J&F Investimentos SA

24

**FOR THE U.S. DEPARTMENT OF JUSTICE:**

SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York

David Gopstein
Assistant U.S. Attorney

Date:

———10/13/20——————————————

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

Michael Culhane Harper
Joseph McFarlane
Trial Attorneys

25

## COMPANY OFFICER'S CERTIFICATE

I have read the plea agreement between J&F Investimentos SA (the "Defendant") and the United States of America, by and through the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the Eastern District of New York (the "Agreement") and carefully reviewed every part of it with outside counsel for the Defendant. I understand the terms of the Agreement and voluntarily agree, on behalf of the Defendant, to each of its terms. Before signing the Agreement, I consulted outside counsel for the Defendant. Counsel fully advised me of the rights of the Defendant, of possible defenses, of the United States Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of the Agreement with the Board of Directors. I have advised and caused outside counsel for the Defendant to advise the Board of Directors fully of the rights of the Defendant, of possible defenses, of the United States Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Defendant, in any way to enter into the Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the

Director of Legal and Compliance for the Defendant and that I have been duly authorized by the

Defendant to execute the Agreement on behalf of the Defendant.


Date: 10. 13. 2020


                        J&F INVESTIMENTOS SA

By:                                    

                        Lúcio Batista Martins
                        Director of Legal and Compliance
                        J&F Investimentos SA

CERTIFICATE OF COUNSEL

I am counsel for J&F Investimentos (the "Defendant") in the matter covered by the plea agreement between the Defendant and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the Eastern District of New York (the "Agreement").  In connection with such representation, I have examined relevant documents and have discussed the terms of the Agreement with the Board of Directors.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Defendant has been duly authorized to enter into the Agreement on behalf of the Defendant and that the Agreement has been duly and validly authorized, executed, and delivered on behalf of the Defendant and is a valid and binding obligation of the Defendant.  Further, I have carefully reviewed the terms of the Agreement with the Board of Directors and the officers of the Defendant.  I have fully advised them of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement.  To my knowledge, the decision of the Defendant to enter into the Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _____10/13/2020_____          By: _____

Ben A. O'Neil
Quinn Emanuel Urquhart & Sullivan, LLP
Outside counsel for J&F Investimentos SA

ATTACHMENT A

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Plea

Agreement (the "Agreement") between the United States Department of Justice, Criminal

Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the

Eastern District of New York (the "Office") (collectively, the "United States"), and the

defendant J&F Investimentos SA ("J&F" or the "Company").  J&F hereby agrees and stipulates

that the following facts and conclusions of United States law are true and accurate.  Certain of

the facts and conclusions of United States law herein are based on information obtained from

third parties by the Fraud Section and the Office through their investigation and described to

J&F.  J&F admits, accepts, and acknowledges that it is responsible for the acts of its officers,

directors, employees, and agents as set forth below, and that the acts described below were

performed for and on behalf of J&F.  Had this matter proceeded to trial, J&F acknowledges that

the United States would have proven beyond a reasonable doubt, by admissible evidence, the

facts alleged below and set forth in the Criminal Information attached to this Agreement:

**Relevant Entities and Individuals**

1.      The defendant J&F was a private investment holding company that

owned approximately 250 companies in 30 countries worldwide and was primarily involved in

the meat and agriculture businesses.  J&F was incorporated and based in São Paulo, Brazil.

J&F was wholly owned by J&F Executive 1 and J&F Executive 2, as defined below, and their

family members.

2.      JBS SA ("JBS") was a subsidiary of J&F headquartered in São Paulo,

Brazil.  JBS was the world's biggest meat producer.  J&F controlled JBS, although J&F's

ownership stake in JBS varied during the relevant time period.

       3.      J&F Executive 1, an individual whose identity is known to the United States and J&F, was a Brazilian citizen who was a high-level executive and partial owner of J&F.

       4.      J&F Executive 2, an individual whose identity is known to the United States and J&F, was a Brazilian citizen who was a high-level executive and partial owner of J&F.

       5.      Banco Nacional de Desenvolvimento Econômico e Social ("BNDES") was a Brazilian state-owned and state-controlled bank that performed government functions, including providing financing to private companies for endeavors that contributed to the development of Brazil. BNDES's President and Board of Directors were ultimately appointed by the President of Brazil. BNDES was an "instrumentality" of a foreign government, and BNDES's officers and employees were "foreign officials," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-3(f)(2).

       6.      Caixa Econômica Federal ("Caixa") was a Brazilian state-owned and state-controlled bank that performed government functions. The Brazilian government directly owned 100 percent of Caixa. Caixa was an "instrumentality" of a foreign government, and Caixa's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

       7.      Petróleo Brasileiro S.A. - Petrobras ("Petrobras") was a Brazilian state-owned and state-controlled oil and gas company headquartered in Rio de Janeiro, Brazil and operating in 18 other countries, including the United States, that operated to refine, produce and

distribute oil, oil products, gas, biofuels and energy. The Brazilian government directly owned a majority of Petrobras's common shares with voting rights. Petrobras was controlled by the Brazilian government and performed government functions. Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

    8.   Fundação Petrobras de Seguridade Social ("Petros") was a Brazilian state-controlled pension fund that performed government functions and was established to administer pension, retirement and death benefits for Petrobras employees. Petrobras appointed half the members of Petros's Deliberative Board, which was Petros's highest governing body. Petrobras also appointed the Board president, who could exercise a tiebreaker vote in the event of a split board. The Deliberative Board had the power to appoint the President of Petros. Petros was an "instrumentality" of a foreign government and Petros's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

    9.   Brazilian Official 1, an individual whose identity is known to the United States and J&F, was a high-ranking executive at BNDES from in or about and between 2004 and 2006, and a high-ranking official in the executive branch of the Brazilian government in or about and between 2006 and 2015. In these roles, Brazilian Official 1 had significant influence over whether BNDES would enter into transactions in support of private companies. Brazilian Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

3

10.     Brazilian Official 2, an individual whose identity is known to the United States and J&F, was a high-ranking official in the executive branch of the Brazilian government in or about and between 2003 and 2010.  Brazilian Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

11.     Brazilian Official 3, an individual whose identity is known to the United States and J&F, was a high-ranking official in the executive branch of the Brazilian government in or about and between 2010 and 2016.  Brazilian Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

12.     Brazilian Official 4, an individual whose identity is known to the United States and J&F, was a high-ranking executive of Petros in or about and between 2011 and 2014. Brazilian Official 4 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

13.     Brazilian Official 5, an individual whose identity is known to the United States and J&F, was a high-ranking official in the legislative branch of the Brazilian government in or about and between 2003 and 2016.  Brazilian Official 5 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

14.     Intermediary 1, an individual whose identity is known to the United States and J&F, was a Brazilian businessman who was a close associate of Brazilian Official 1.

15.     Intermediary 2, an individual whose identity is known to the United States and J&F, was a close associate of Brazilian Official 5.

16.     Financial Institution 1, the identity of which is known to the United States and J&F, was a multinational investment bank and financial services holding company

headquartered in the United States.

**The Bribery Scheme**

17.     In or about and between 2005 and 2017, J&F, together with others, including J&F Executive 1, J&F Executive 2, Intermediary 1 and Intermediary 2, knowingly and willfully agreed to violate the FCPA by corruptly promising and paying bribes that it understood were to, and for the benefit of, foreign officials in Brazil, including Brazilian Official 1, Brazilian Official 2, Brazilian Official 3, Brazilian Official 4 and Brazilian Official 5, to secure an improper advantage in order to obtain and retain business for J&F, specifically, to ensure that BNDES, Petros and Caixa would enter into financing and equity transactions benefitting J&F that J&F Executive 1 and other J&F personnel had negotiated with those entities.

A.     Bribery Related to BNDES

*Overview*

18.     In or about and between 2005 and 2014, in furtherance of the bribery scheme, J&F agreed to corruptly promise and pay bribes for the benefit of Brazilian Official 1 for the purpose of improperly ensuring that BNDES would enter into certain financing and equity transactions with J&F-related entities that J&F Executive 1 and other J&F personnel had negotiated with BNDES personnel.  J&F Executive 1 understood and intended that the bribes were also for the benefit of Brazilian Official 2 and Brazilian Official 3.

19.     To facilitate the bribery scheme and conceal the true nature of the bribe payments, J&F and its co-conspirators created shell companies, opened bank accounts for the shell companies in the United States, and made payments to those accounts for the intended

5

benefit of foreign officials in Brazil, including Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.

20.     J&F and its co-conspirators, using bank accounts based in New York, New York caused more than $148 million in corrupt payments to be made for the benefit of Brazilian Official 1.  J&F Executive 1 also understood and intended these payments to be for the benefit of Brazilian Official 2 and Brazilian Official 3.

21.     In furtherance of the scheme, co-conspirators, including J&F Executive 1, Intermediary 1 and Brazilian Official 1, held meetings in the United States to discuss the bribery scheme.

### *Details of Bribery Payments Related to BNDES*

22.     In or about 2006, Brazilian Official 1 became a high-ranking official in the executive branch of the Brazilian government.  In that role, Brazilian Official 1 maintained significant influence over BNDES and was able to exercise control over whether BNDES would enter into transactions which benefitted J&F and its subsidiaries.

23.     In or about and between 2005 and 2008, JBS sought and obtained financial support from BNDES for its expansion plans.  During this time, J&F Executive 1 and Intermediary 1 agreed that J&F Executive 1 would pay a percentage of the financing JBS requested and received from BNDES to Intermediary 1 with the intention and understanding that the money paid to Intermediary 1 was intended for the benefit of Brazilian Official 1.  Between 2005 and 2008, J&F made corrupt payments to Intermediary 1 in connection with several BNDES transactions.

6

24.     In or about 2009, J&F Executive 1 stopped paying bribes to Brazilian Official 1 through Intermediary 1 and instead began communicating about bribes directly with Brazilian Official 1.  At this time, BNDES was considering purchasing approximately $2 billion of JBS debentures.

25.     In or about September 2009, at the direction of Brazilian Official 1, J&F Executive 1 opened a bank account at Financial Institution 1 in New York, New York. The account was in the name of a shell entity, Shell Company 1, the identity of which is known to the United States and J&F.  J&F Executive 1 maintained control of Shell Company 1 and the bank account in its name.

26.     In or about December 2009, BNDES purchased approximately $2 billion of JBS debentures.  Brazilian Official 1 ensured that BNDES provided this financing. Shortly before obtaining this financing, JBS purchased Company 3, an entity headquartered in the United States, the identity of which is known to the United States and J&F.

27.     In exchange for Brazilian Official 1's  assistance in obtaining this $2 billion equity transaction, between on or about December 30, 2009 and March 24, 2010, J&F Executive 1 caused transfers totaling approximately $55.1 million to the Shell Company 1 bank account for the benefit of Brazilian Official 1.

28.     In late 2010, Brazilian Official 1 told J&F Executive 1 to open a second bank account at Financial Institution 1 into which J&F Executive 1 would pay bribes. Brazilian Official 1 told J&F Executive 1 that the first bank account was also for the benefit of Brazilian Official 2 and that this new bank account would be for the benefit of Brazilian Official 3.

7

29.     In or about May 2011, JBS obtained financing from BNDES in the amount of 2 billion Brazilian reais.  Again, Brazilian Official 1 ensured that BNDES provided this financing.

30.     In or about June 2011, at the request of Brazilian Official 1, J&F Executive 1 opened a bank account at Financial Institution 1 in New York, New York.  The account was in the name of a shell entity, Shell Company 2, the identity of which is known to the United States and J&F.  J&F Executive 1 maintained control of Shell Company 2 and the bank account in its name.

31.     In or about and between August 2011 and January 2012, at the direction of Brazilian Official 1, J&F Executive 1 deposited $30 million into the Shell Company 2 bank account.

32.     Through in or about 2014, J&F Executive 1 continued to cause deposits to be made into the New York-based bank accounts that J&F Executive 1 maintained for the intended benefit of Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.  The funds were transferred to the accounts in the name of Shell Company 1 and Shell Company 2 at Financial Institution 1, located in New York, New York, through wires that travelled through the Eastern District of New York.

33.     By in or about 2014, the two accounts in the names of Shell Company 1 and Shell Company 2 had accumulated approximately $148,668,500.  These funds represented the amount of bribe payments intended for Brazilian Official 1 for his own benefit and for the intended benefit of Brazilian Official 2 and Brazilian Official 3.

8

34.     In or about 2014, Brazilian Official 1 directed J&F Executive 1 to make corrupt payments to and for the benefit of various Brazilian politicians and their political campaigns.  Instead of making those payments from the Shell Company 1 and Shell Company 2 accounts at Financial Institution 1, J&F Executive 1 caused the payments to be made, including payments made in cash, from other bank accounts located in Brazil.  The payments J&F Executive 1 made to and for the benefit of various Brazilian politicians and their political campaigns, including Brazilian Official 3, at the direction of Brazilian Official 1, totaled approximately $148,668,500, which was the amount of the bribe payments that had been transferred to the Shell Company 1 and Shell Company 2 accounts at Financial Institution 1.

35.     J&F Executive 2 learned about the BNDES-related bribes sometime after 2011, at which time J&F Executive 1 told J&F Executive 2 that J&F Executive 1 held bank accounts at Financial Institution 1 that were for the benefit of Brazilian Official 1.

36.     In furtherance of the scheme, J&F Executive 1 met with Brazilian Official 1 and Intermediary 1 on multiple occasions in New York, New York to discuss the bribe payments.

B.     Bribery Related to Petros

*Overview*

37.     In or about and between 2011 and 2017, in furtherance of the bribery scheme, J&F agreed to corruptly promise and pay bribes to, and for the benefit of, Brazilian Official 4 for the purpose of ensuring that Petros would enter into transactions with J&F-related entities that J&F Executive 1 and other J&F personnel had negotiated with Petros personnel.

9

38.      To facilitate the bribery scheme and conceal the true nature of the bribe payments, J&F and its co-conspirators, among other things, created shell companies, purchased real estate in New York City and transferred the real estate to entities controlled by Brazilian Official 4.

39.      In total, from in or about and between 2011 and 2017, J&F and its co-conspirators caused approximately $4.6 million worth of corrupt payments to be made, and items of value to be transferred, for the benefit of Brazilian Official 4.  In furtherance of the scheme, certain co-conspirators, including J&F Executive 1, travelled to the United States and took acts to further the scheme's purpose.

### *Details of Bribery Payments Related to Petros*

40.      In or about 2009, J&F, Petros and Pension Fund 1 established Investment Vehicle 1, a company the identity of which is known to the United States and J&F.

41.      In or about 2011, J&F sought to merge Investment Vehicle 1 with another entity.  As a partial owner of Investment Vehicle 1, Petros had to approve the merger. To obtain the approval of Petros, J&F Executive 1 agreed to pay a bribe to Brazilian Official 4, who was a high-ranking executive of Petros.

42.      J&F Executive 1 and Brazilian Official 4 agreed that a portion of the bribe payment would be made by J&F Executive 1 by purchasing an apartment in New York, New York and transferring ownership of the apartment to Brazilian Official 4.  As a result, in or about July 2011, J&F Executive 1 travelled to New York to view apartments and select one to purchase as a bribe payment.

10

43. Petros subsequently approved the merger involving Investment Vehicle 1, which occurred on or about November 30, 2011.

44. In or about late 2011, J&F Executive 1 created Shell Company 3, the identity of which is known to the United States and J&F. J&F Executive 1 controlled Shell Company 3. On or about December 19, 2011, Shell Company 3 purchased an apartment in New York, New York (the "New York Apartment") for approximately $1.5 million. In or about April 2012, J&F Executive 1 caused Shell Company 3 to transfer ownership of the New York Apartment to an entity controlled by Brazilian Official 4.

45. In or about and between February 2012 and March 2017, J&F paid approximately $101,225 in expenses for the New York Apartment, including condominium fees and utilities, to benefit Brazilian Official 4.

46. In addition, on or about October 15, 2012, J&F Executive 1 directed a transfer of $4.1 million from an account held at Financial Institution 1 to an offshore bank account controlled by Brazilian Official 4. Of the $4.1 million, $3 million was a bribe from J&F to Brazilian Official 4 in connection with ensuring that Petros approved the merger involving Investment Vehicle 1. The remaining $1.1 million was used to make unrelated bribe payments to Brazilian Official 4 on behalf of other individuals for whom J&F Executive 1 was acting as an intermediary.

C. Bribery Related to Caixa

*Overview*

47. In or about and between 2011 and 2014, in furtherance of the bribery scheme, J&F agreed to corruptly promise and pay bribes that were intended to, and for the

11

benefit of, Brazilian Official 5 for the purpose of ensuring that Caixa entered into certain transactions with J&F-related entities that J&F Executive 1 and other J&F personnel had negotiated with Caixa personnel.

48.     In total, from in or about and between 2011 and 2014, J&F and its co-conspirators caused approximately $25 million in corrupt payments to be made with the understanding they were for the benefit of Brazilian Official 5.  In furtherance of the scheme, certain co-conspirators, including J&F Executive 1, J&F Executive 2 and Intermediary 2, discussed the bribes while located in the United States.

### *Details of the Bribery Payments Related to Caixa*

49.     In or about 2011, J&F was seeking financing from Caixa.  In or about 2011, J&F Executive 1 was introduced to Intermediary 2.  J&F Executive 1 agreed to make corrupt payments to Intermediary 2, with the understanding that Intermediary 2 would pass the bribe payments to Brazilian Official 5.

50.     Following this agreement to pay bribes to Brazilian Official 5, Caixa made numerous loans to J&F or its subsidiaries.  For example:

> (a)     In or about November 2011, Caixa made a loan to J&F of 300 million Brazilian reais;
>
> (b)     In or about August 2012, Caixa made a loan to J&F of 250 million Brazilian reais;
>
> (c)     In or about November 2012, Caixa made a loan to J&F of 500 million Brazilian reais;

12

(d)    In or about July 2013, Caixa made a loan to a J&F subsidiary of 250 million Brazilian reais;

(e)    In or about July 2013, Caixa made a loan to a J&F subsidiary of 200 million Brazilian reais;

(f)    In or about August 2013, Caixa made a loan to a J&F subsidiary of 150 million Brazilian reais; and

(g)    In or about September 2014, Caixa made a loan to J&F of 300 million Brazilian reais.

51.    In or about and between 2011 and 2014, J&F made corrupt payments through Intermediary 2 in the amount of approximately $25 million, which J&F Executive 1 understood would go to Brazilian Official 5 to ensure that Caixa agreed to make the loans.

52.    In furtherance of the bribery scheme, the co-conspirators held the following meetings in the United States to discuss and advance the scheme:

(a)    In or about and between October 27 and October 29, 2011, Intermediary 2 travelled to New York, New York and met with J&F Executive 1 and J&F Executive 2.  During this trip, Intermediary 2, J&F Executive 2 and J&F Executive 1 discussed, among other aspects of the bribery scheme, the need for financing for certain subsidiaries of J&F.

(b)    In or about 2012, Intermediary 2 and J&F Executive 1 met in New York, New York.  During the meeting, Intermediary 2 and J&F Executive 1 discussed the loans to J&F that Caixa made in

13

or about November 2011 and August 2012, as well as the bribes

that J&F paid to facilitate the loans.

ATTACHMENT B

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, J&F Investimentos SA (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of New York (the "Fraud Section and the Office") regarding issues arising in relation to certain improper payments to foreign officials to facilitate the obtaining of financing and assist in obtaining business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section and the Office; and

WHEREAS, the Company's Director of Legal and Compliance, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) acknowledges the filing of an Information charging the Company with one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3; (b) waives indictment on such charge and enters into this plea agreement (the "Agreement") with the Fraud Section and the Office; (c) agrees to pay a fine of $256,497,026 with respect to the conduct described in the Information, $128,248,513 of which the Company agrees to pay to the United States Treasury and the remaining $128,248,513 of which the Company agrees

1

will be paid to the Brazilian authorities pursuant to a resolution the Company entered into with the *Ministério Público Federal* (Public Prosecutor's Office) in Brazil relating to the same conduct described in the Statement of Facts (Attachment A to the Agreement) (the "Brazilian Leniency Agreement"); and (d) admits the Court's jurisdiction over the Company and the subject matter of such action and consents to the judgment therein.

2. The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3. The Director of Legal and Compliance is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Director of Legal and Compliance, may approve;

4. The Director of Legal and Compliance, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms,

2

terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the  Director of Legal and Compliance, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _Jo.13. 2020_

By:  _____

Lúcio Batista Martins
Director of Legal and Compliance
J&F Investimentos SA

3

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, J&F Investimentos SA (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code, and demonstrate rigorous adherence by example. The Company will also ensure that middle management, in turn, reinforce those

1

standards and encourage employees to abide by them.  The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the company.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

a.      gifts;

b.      hospitality, entertainment, and expenses;

2

    c.     customer travel;

    d.     political contributions;

    e.     charitable donations and sponsorships;

    f.     facilitation payments; and

    g.     solicitation and extortion.

4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

    a.     transactions are executed in accordance with management's general or specific authorization;

    b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

    c.     access to assets is permitted only in accordance with management's general or specific authorization; and

    d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its

3

geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, potential clients and business partners, use of third parties, gifts, travel and entertainment expenses, charitable and political donations, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.      The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business

4

partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

      9.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

<em>Internal Reporting and Investigation</em>

      10.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

      11.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption

compliance code, policies, and procedures.  The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently, fairly and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

6

      a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

      b.     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

      c.     seeking a reciprocal commitment from agents and business partners. The Company will understand and record the business rationale for using a third party in a transaction, and will conduct adequate due diligence with respect to the risks posed by a third-party partner such as a third-party partner's reputations and relationships, if any, with foreign officials. The Company will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical region. The Company will engage in ongoing monitoring of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's

compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring, Testing, and Remediation*

18.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.  The Company will ensure that compliance and control personnel have

8

sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.  Based on such review and testing and its analysis of any prior misconduct, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

ATTACHMENT D

## **REPORTING REQUIREMENTS**

J&F Investimentos SA (the "Company") agrees that it will report to the Fraud Section and the United States Attorney's Office for the Eastern District of New York (the "Fraud Section and the Office") periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C.  During this three-year period, the Company shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two (2) follow-up reviews and reports, as described below:

      a.     By no later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section and the Office a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies, and procedures for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the proposed scope of the subsequent reviews.  The report shall be transmitted to Christopher Cestaro, Chief - FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Bond Building, Eleventh Floor, Washington, DC 20530, and Alixandra E. Smith, Chief, Business and Securities Fraud Section, United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY 11201.  The Company may extend the time period for issuance of the report with prior written approval of the Fraud Section and the Office.

      b.     The Company shall undertake at least two follow-up reviews and reports incorporating the Fraud Section and the Office's views on the Company's prior reviews and

1

reports, to further monitor and assess whether the Company's policies and procedures are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

   c. The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Fraud Section and the Office. The second follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty days before the end of the Term.

   d. The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section and the Office's discharge of their duties and responsibilities or is otherwise required by law.

   e. The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section and the Office.

ATTACHMENT E

**CERTIFICATION**

To:    United States Department of Justice
       Criminal Division, Fraud Section
       Attention: Chief – FCPA Unit

       United States Attorney's Office
       Eastern District of New York
       Attention: Chief – Business and Securities Fraud Section

Re:    Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 13 of the Plea Agreement (the "Agreement") filed on October 14, 2020 in the U.S. District Court for the Eastern District of New York, by and between the United States and J&F   (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 13 of the Agreement and that undersigned have disclosed to the Criminal Division's Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Eastern District of New York (the "Office") any and all evidence or allegations of conduct required pursuant to Paragraph 13 of the Agreement, which includes evidence or allegations that may constitute a violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States ("Disclosable Information").  This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 13 and the representations contained in this certification constitute a significant and important component of the Agreement and the Fraud Section and the Office's determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify respectively that he is the Chief Executive Officer ("CEO") of the Company and that he is the Chief Financial Officer ("CFO") of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Eastern District of New York.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Eastern District of New York.

1

By:   _____          Dated: _____
      José Antonio Batista Costa
      CEO
      J&F Investimentos SA


By:   _____          Dated: _____
      Andre Alcântara Ocampos
      CFO
      J&F Investimentos SA

2

# EXHIBIT C

## JPM Statemnent

DOCS/2798158.1

# J.P.Morgan

São Paulo, 15 de junho de 2017

À
**COMISSÃO DE VALORES MOBILIÁRIOS - CVM**
**Gerência de Registros e Autorizações - GIR**
**Rio de Janeiro - RJ**

At: Sra. Vera Lucia Simões Alves Pereira de Souza

**Ref.: Ofício nº. 789/2017/CVM/SIN/GIR**

Assunto: Identificação de beneficiários finais de investidores não residentes - Instrução CVM nº. 560/2015 – Processo CVM nº. 19957.003195/2017-25

Prezados Senhores,

Em resposta ao Ofício nº. 789/2017/CVM/SIN/GIR, datado de 24 de maio de 2017 ("Ofício"), e por nós recebido em 30 de maio de 2017, em referência ao Processo CVM nº. 19957.003195/2017-25, a J.P. Morgan S.A. Distribuidora de Títulos e Valores Mobiliários ("JP Morgan DTVM"), na qualidade de custodiante e representante legal da Blessed Holdings LLC (CNPJ: 97.539.050/0001-83) ("Blessed"), vem, pela presente, prestar as seguintes informações:

(1) **Geral**: Importante esclarecer, de início, que a Blessed foi cadastrada junto à JP Morgan DTVM em 12 de julho de 2011, em virtude de transferência da conta de custódia deste cliente mantida até então junto à HSBC Corretora de Títulos e Valores Mobiliários S.A. para a JP Morgan DTVM. Portanto, as respostas que ora enviamos a V.Sas., relativas aos itens 2 a 4 abaixo, estão limitadas ao período de tempo iniciado quando a Blessed tornou-se nossa cliente.

(2) **Qual é o enquadramento previsto para esse investidor, nos termos da Instrução CVM nº. 560/2015**: Para fins do disposto no Art. 1º, inciso VIII do Anexo I à Instrução CVM 560/15, o investidor não residente Blessed está enquadrado no Art. 1º, parágrafo 1º, inciso XIV do Anexo I à Instrução CVM 560/15, na qualidade de "*pessoas jurídicas constituídas no exterior não enquadradas nas categorias anteriores*".

(3) **Quem são os intermediários nos quais esse investidor possui cadastro atualmente**: A JP Morgan DTVM, na qualidade de custodiante e representante legal da Blessed, não é responsável pelo cadastro da Blessed em intermediários locais e, portanto, não possui informação sobre os intermediários nos quais a Blessed possui cadastro atualmente. A JP Morgan DTVM envia, a pedido de intermediários locais, fichas de cadastro simplificadas para os intermediários locais. O envio da ficha é uma prática de mercado que visa facilitar o cadastro dos investidores estrangeiros em intermediários locais. A JP Morgan DTVM não possui a lista dos intermediários para os quais as fichas de cadastro simplificadas são enviadas e, ainda que possuísse essa informação, não teria como confirmar se os cadastros foram, de fato, abertos por estes intermediários ou se estão ativos atualmente. Tendo em vista que o fluxo operacional de liquidação de determinadas operações envolve intermediários, a JP Morgan DTVM pode identificar apenas os intermediários com os quais a Blessed negociou utilizando a conta que é objeto da nossa custódia, se a CVM entender necessário. No entanto, a JP Morgan DTVM não



1




# J.P.Morgan

tem como confirmar se o cadastro da Blessed nesses intermediários ainda está ativo, tampouco se a Blessed possui cadastro em outros intermediários com os quais a Blessed poderia ter negociado ou negociar, utilizando contas de custódia detidas por outros custodiantes locais.

(4) **Quais desses cadastros foram efetivados com base na previsão do artigo 9º da Instrução CVM nº. 505/2011**: Como mencionado no parágrafo anterior, a JP Morgan DTVM, na qualidade de custodiante e representante legal da Blessed, não é responsável pelo cadastro da Blessed em intermediários locais e, portanto, não possui informação sobre os intermediários nos quais a Blessed possui cadastro atualmente ou sobre o tipo de cadastro realizado nestes intermediários - se completo, nos termos da Instrução CVM nº. 301/99, ou se simplificado, nos termos do artigo 9º da Instrução CVM nº. 505/2011. A JP Morgan DTVM envia, a pedido de intermediários locais, e com a autorização do investidor estrangeiro, fichas de cadastro simplificadas para os intermediários locais. O envio da ficha é uma prática de mercado que visa facilitar o cadastro dos investidores estrangeiros em intermediários locais. A JP Morgan DTVM não possui a lista dos intermediários para os quais as fichas de cadastro simplificadas são enviadas e, ainda que possuísse essa informação, não teria como confirmar se os cadastros foram, de fato, abertos por estes intermediários ou se estão ativos atualmente.

(5) **Histórico dos beneficiários finais desses investidores**: Como mencionado no parágrafo (1) acima, a Blessed foi inicialmente cadastrada na JP Morgan DTVM em 12 de julho de 2011, devido à transferência de sua conta de custódia da HSBC Corretora de Títulos e Valores Mobiliários S.A. para a JP Morgan DTVM. A JP Morgan DTVM registrou a Blessed nos termos do artigo 9º da Instrução CVM nº. 505/2011, tendo como custodiante global no exterior o JPMorgan Chase Bank, National Association ("JPMCB NA"). Neste sentido, as informações detidas diretamente pela JP Morgan DTVM são apenas aquelas constantes do conteúdo mínimo de cadastro ("cadastro simplificado") estabelecido pelo Ofício Circular 53/2012-DP da B3 S.A. – Brasil, Bolsa, Balcão (antiga BM&FBovespa S.A.) e do Anexo I da Instrução CVM 560/15. Em decorrência da estrutura de cadastro simplificado descrita acima, o processo completo de Conheça Seu Cliente (*Know Your Client*) é realizado pelo JPMCB NA.

Em 07 de fevereiro de 2017, recebemos correspondência do JPMCB NA informando que, em vista de suas políticas globais de combate à lavagem de dinheiro (*Global AML*) e de KYC (*KYC Policies and Procedures*), e dentro de suas atividades de monitoramento, investigação e checagens periódicas de seus clientes e operações relacionadas, JPMCB NA havia recebido certas informações a respeito da estrutura de capital da Blessed, que seriam relevantes para a JP Morgan DTVM.

Em complemento e em vista do Ofício, solicitamos ao JPMCB NA para confirmar o histórico dos beneficiários finais da Blessed. JPMCB NA nos confirmou o histórico dos beneficiários finais da Blessed com base em determinados documentos e informações, sendo que nem todos os documentos contêm informações consistentes, mas que podem ser resumidos da seguinte forma:

(i) Em 16 de dezembro de 2009, JPMCB NA recebeu um "*Statement of Organizer in Lieu of Organization Meeting*" ("*Statement of Organizer*") da Blessed, também datado de 16 de dezembro de 2009, estabelecendo que Lunsville International Inc. ("Lunsville") e Gilberto Souza Biojone Filho ("Gilberto") eram os administradores (*managers*) iniciais da Blessed. Naquela data (i) Lunsville era o único integrante (*member*) da Blessed, de acordo com o *Limited Liability*




2

# J.P.Morgan

*Company Agreement* da Blessed; e (ii) no melhor entendimento de JPMCB NA e de acordo com minuta de relatório de *due diligence* interno relacionado a uma conta que acabou não sendo aberta, Lunsville era detida em partes iguais por Joesley Batista ("Joesley"), Wesley Batista ("Wesley"), Valere Batista, Vanessa Batista, Viviane Batista, Jose Batista Jr. e Jose Batista Sobrinho. Em 7 de junho de 2010, JPMCB NA recebeu outro *Statement of Organizer* da Blessed, também datado de 16 de dezembro de 2009, indicando que Graal (definido abaixo) era o integrante (*member*) inicial da Blessed e que Andrea Prospero ("Prospero") e Gilberto eram os administradores (*managers*) iniciais da Blessed.

(ii) Em 15 de março de 2010, Blessed foi doada para Graal Trust, um "*purpose trust*" baseado em Bahamas ("Graal"), um tipo de *trust* que, de acordo com as informações recebidas, não nomeia beneficiários, mas serve para propósitos autorizados. O *Trust Declaration* do Graal estabelece que seu propósito é deter e administrar participações na Blessed e nomeia Demilton Antonio de Castro ("Demilton") e Florisvaldo Caetano de Oliveira ("Florisvaldo") como *protectors* do Graal. O *Trust Declaration* também prevê que os *protectors* devem instruir o *trustee* para transferir o capital não distribuído e as receitas do *trust* para qualquer pessoa que não seja o *trustee*, os *protectors* e/ou pessoas relacionadas ou afiliadas a eles. De acordo com o *Trustee's Certificate*, Joesley foi nomeado como *settlor* do Graal. O *Trust Declaration* do Graal não lista qualquer *settlor*. O *trustee* é o Private Trust Corporation Limited of the Bahamas e o *authorized applicant* é a Platinum Administration S.A., da qual Prospero é um administrador.

(iii) Em 19 de abril de 2010, Graal apresentou proposta para contratar da LCIC e da USCL (ambas definidas abaixo) e LCIC e USCL aprovaram, sujeito ao recebimento de um prêmio condicional ("on a conditional premium receipt basis"), a emissão das seguintes 12 (doze) apólices do tipo "international flexible premium variable life insurance":

| Seguradora | Apólice nº | Segurado | Beneficiário |
|---|---|---|---|
| LCIC | 10-002 | José Batista Jr. | Graal |
| LCIC | 10-004 | Valere Batista | Graal |
| LCIC | 10-006 | Vanessa Batista | Graal |
| LCIC | 10-008 | Wesley Batista | Graal |
| LCIC | 10-010 | Joesley Batista | Graal |
| LCIC | 10-012 | Viviane Batista | Graal |
| USCL | 2010002 | José Batista Jr. | Graal |
| USCL | 2010004 | Valere Batista | Graal |
| USCL | 2010006 | Vanessa Batista | Graal |
| USCL | 2010008 | Wesley Batista | Graal |
| USCL | 2010010 | Joesley Batista | Graal |
| USCL | 2010012 | Viviane Batista | Graal |

(iv) Em 26 de abril de 2010, Graal transferiu e cedeu sua participação na Blessed para LCIC e para USCL como pagamento do prêmio das apólices de seguro listadas acima por meio do Membership Interest Assignment Agreement ("*Membership Agreement*"), LCIC Global Variable Life Insurance Policies Application, e do USCL Global Variable Life Insurance Policies Conditional Premium Receipt. Após essa data e no melhor entendimento do JPMCB NA, Blessed passou a contar com a seguinte estrutura societária:




3

# J.P.Morgan

100% das ações da Blessed são de titularidade da Blessed Holdings Cayman Ltd. ("BHC"). A BHC, por sua vez, contava com a seguinte estrutura societária:

A. Lighthouse Capital Insurance Company ("LCIC") detinha 50% da BHC
    i.    Colin Murdoch-Muirhead detém 75% da LCIC
    ii.   Cogent Holding International detém 25% da LCIC
       a. Nicholas Ferris detém 50% da Cogent Holdings International
       b. Paul Backhouse detém 50% da Cogent Holdings International

B. US Commonwealth Life, A.I. ("USCL") detinha 50% da BHC
    i.    Colin Murdoch-Muirhead detém 51% da USCL
    ii.   James Walker detém 24% da USCL
    iii.  Nicholas Ferris detém 12,5% da USCL
    iv.  Paul Backhouse detém 12,5% da USCL

(v) De acordo com informações recebidas, anuidades variáveis e seguros de vida com pagamentos variáveis combinam características de seguros e de investimentos. Tais produtos diferem dos seguros tradicionais a valor fixo na forma como os benefícios são pagos. Os prêmios pagos são mantidos em uma conta segregada, o que possibilita ao contratante uma variedade de opções de investimentos. Os benefícios percebidos pelo beneficiário dependem da performance dos investimentos realizados por meio dessa conta segregada.

(vi) O *Membership Agreement* indica que LCIC e USCL criaram e inicialmente capitalizaram a BHC como uma sociedade de propósito específico para manter e administrar os interesses decorrentes das apólices na Blessed e que "LCIC e USCL observarão as instruções de Andrea Prospero, ou do gestor de investimento que o suceda designado pelo dono das apólices [Graal] de acordo com seus termos e condições, em todas as questões relacionadas à propriedade e voto das ações da BHC nos termos das respectivas apólices" (tradução livre de *"LCIC and USCL will follow the directions of Andrea Prospero or such subsequent investment manager as the policy owner of the Policies [Graal] may appoint pursuant to the terms and conditions of the Policies, in all matters pertaining to the ownership and voting of the BHC shares by the respective Policies"*).

Em conclusão:

(a) Apesar de LCIC e USCL terem detido, em conjunto, 100% das ações da BHC com poder de prevalecer nas deliberações de acionistas, LCIC e USCL concordaram em seguir ordens de Prospero (gestor de investimento) em todas as questões relacionadas à propriedade e voto das ações da BHC;

(b) Graal indicou Prospero e tinha o direito de indicar o gestor de investimento que o sucedesse;

(c) Graal detinha os benefícios econômicos do investimento da BHC na Blessed; e

(d) Graal, por sua vez, tinha como controladores finais as pessoas naturais Demilton e Florisvaldo, como *protectors* do Graal.



4

 

# J.P.Morgan

Em complemento às informações prestadas pelo JPMCB NA, conforme disposto acima, cumpre-nos informar ainda que, em 26 de maio de 2017, a JBS S.A. divulgou Comunicado ao Mercado (http://jbss.infoinvest.com.br/ptb/4143/Resposta%20Oficio%20179.2017.pdf) informando que Wesley e Joesley adquiriram, em 31 de outubro de 2016, a totalidade da participação societária da "Blessed Holdings" (o Comunicado não especificou se Blessed Holdings se referia à BHC ou à Blessed).

Não obstante, por conta de nossos procedimentos globais de *Know Your Customer*, os quais incluem o monitoramento de mídia e informações públicas, o JPMCB NA nos informou que está analisando os documentos e informações disponíveis e realizará as atualizações necessárias no cadastro da Blessed.

Permanecemos à disposição para quaisquer esclarecimentos adicionais que se façam necessários.

Atenciosamente,

J.P. Morgan S.A. Distribuidora de Títulos e Valores Mobiliários

Marcelo S. Barbosa
CPF 134.426.968-01

**Marcio Bonfiglioli**

5







**REPÚBLICA FEDERATIVA DO BRASIL**
*Paulo Fernando Santos de Lacerda*
**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34
Inglês - Francês - Espanhol - Português
**SWORN PUBLIC TRANSLATOR**
English - French - Spanish - Portuguese

p. 123

213.041(001) Livro 984 Fl. 123-132

**I, SWORN PUBLIC TRANSLATOR AND COMMERCIAL INTERPRETER SIGNED BELOW, APPOINTED BY THE PRESIDENT OF THE TRADE BOARD OF THE STATE OF RIO DE JANEIRO (JUCERJA), LICENSED IN THE FOLLOWING LANGUAGES: ENGLISH, FRENCH, AND SPANISH UNDER PERMIT 243 --------- HEREBY CERTIFY IN GOOD FAITH ------------------------------------------------ THAT ON THIS DATE A DOCUMENT WAS PRESENTED TO ME WRITTEN IN PORTUGUESE, WHICH I NOW TRANSLATE INTO THE ENGLISH IDIOM WITH THE BEST OF MY KNOWLEDGE AND IN GOOD FAITH, AS COMMANDED BY MY OFFICIAL DUTY, AS FOLLOWS: ----------------------------------------------------**

--------------------------------------------------------

*(Stamp initialed on all pages of the document submitted: J.P. Morgan – Legal Department)* -------------------------

*(Headings on all pages of the submitted document)* --------

--------------------------------------------------------

J.P. Morgan-----------------------------------------------

São Paulo, June 15, 2017 ---------------------------------

TO-------------------------------------------------------

**BRAZILIAN SECURITIES COMMISSION - CVM --------------------**

**Management of Registrations and Authorizations - GIR -----**

**Rio de Janeiro - RJ-------------------------------------**

At: Ms. Vera Lucia Simões Alves Pereira de Souza ---------

**Ref: Letter No. 789/2017/CVM/SIN/GIR** ---------------------

Subject: Identification of final beneficiaries of non-resident investors - CVM Instruction no. ----------------- 560/2015 - CVM Process No. 19957.003195/2017-25 ----------

Dear Sirs,----------------------------------------------

In response to Letter No. 789/2017/CVM/SIN/GIR, dated May 24, 2017 ("Letter"), and received by us on May 30, 2017, in reference to CVM Case No. 19957.003195/2017-25, J.P. Morgan S.A. Distribuidora de Títulos e Valores Mobiliários





**REPÚBLICA FEDERATIVA DO BRASIL**
*Paulo Fernando Santos de Lacerda*
**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34
Inglês - Francês - Espanhol - Português
**SWORN PUBLIC TRANSLATOR**
English - French - Spanish - Portuguese

p. 124

("JP Morgan DTVM"), as custodian and legal representative of Blessed Holdings LLC (CNPJ: 97.539.050/0001-83) ("Blessed"), hereby provides the following information: --

(1) **General:** It is important to clarify, at first, that Blessed was registered with JP Morgan DTVM on July 12, 2011, as a result of the transfer of the custody account of this client held until then with HSBC Corretora de Títulos e Valores Mobiliários S.A. to JP Morgan DTVM. Therefore, the responses we are sending you regarding items 2 through 4 below are limited to the time period beginning when Blessed became our customer. --------------

(2) **What is the framework provided for this investor under CVM Instruction No. 560/2015:** For the purposes of the provisions of Art. 1, item VIII of Annex I to CVM Instruction 560/15, the non-resident investor Blessed is framed in Art. 1, paragraph 1, item XIV of Annex I to CVM Instruction 560/15, as "*legal entities incorporated abroad that do not fit into the previous categories*". -----------

(3) **Who are the intermediaries in which this investor currently has a registration:** JP Morgan DTVM, as Blessed's custodian and legal representative, is not responsible for Blessed's registration with local intermediaries and, therefore, has no information about the intermediaries with whom Blessed is currently registered. JP Morgan DTVM sends simplified registration forms to local intermediaries upon request. Sending the form is a market practice that aims to facilitate the registration of foreign investors with local intermediaries. JP Morgan





**REPÚBLICA FEDERATIVA DO BRASIL**
*Paulo Fernando Santos de Lacerda*
**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34
Inglês - Francês - Espanhol - Português
**SWORN PUBLIC TRANSLATOR**
English - French - Spanish - Portuguese

p. 125

DTVM does not have the list of intermediaries to whom the simplified registration forms are sent, and even if it had this information, it would not be able to confirm whether the registrations were in fact opened by these intermediaries or whether they are currently active. Given that the operational flow of settlement of certain transactions involves intermediaries, JP Morgan DTVM may only identify the intermediaries with whom Blessed has traded using the account that is the object of our custody, if the CVM deems it necessary. However, JP Morgan DTVM is unable to confirm whether Blessed's registration with these intermediaries is still active, nor whether Blessed has registration with other intermediaries with whom Blessed could have traded or negotiated using custody accounts held by other local custodians. -----------------

(4) **Which of these registrations were made based on the provision of Article 9 of CVM Instruction No. 505/2011:** As mentioned in the preceding paragraph, JP Morgan DTVM, as custodian and legal representative of Blessed, is not responsible for the registration of Blessed with local intermediaries and, therefore, does not have information about the intermediaries with which Blessed currently has a registration or the type of registration held with these intermediaries - whether complete, pursuant to CVM Instruction No. 301/99, or simplified, pursuant to Article 9 of CVM Instruction No. 505/2011. JP Morgan DTVM sends, at the request of local intermediaries, and with the authorization of the foreign investor, simplified





**REPÚBLICA FEDERATIVA DO BRASIL**
*Paulo Fernando Santos de Lacerda*
**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34

Inglês - Francês - Espanhol - Português

**SWORN PUBLIC TRANSLATOR**

English - French - Spanish - Portuguese

p. 126

registration forms to local intermediaries. Sending the form is a market practice that aims to facilitate the registration of foreign investors with local intermediaries. JP Morgan DTVM does not have the list of intermediaries to whom the simplified registration forms are sent, and even if it had this information, it would not be able to confirm whether the registrations were in fact opened by these intermediaries or whether they are currently active.----------------------------------------

(5) **History of the ultimate beneficiaries of these investors:** As mentioned in paragraph (1) above, Blessed was initially registered with JP Morgan DTVM on July 12, 2011, due to the transfer of its custody account from HSBC Corretora de Títulos e Valores Mobiliários S.A. to JP Morgan DTVM. JP Morgan DTVM registered the Blessed under the terms of article 9 of CVM Instruction 505/2011, with JPMorgan Chase Bank, National Association ("JPMCB NA") as global custodian abroad. In this regard, the information held directly by JP Morgan DTVM is only that contained in the minimum registration content ("simplified registration") established by Memo 53/2012-DP of B3 S.A. - Brasil, Bolsa, Balcão (formerly BM&FBovespa S.A.) and Annex I of CVM Instruction 560/15. As a result of the simplified registration structure described above, the complete Know Your Client process *is* carried out by JPMCB NA.-----------------------------------------------------

On February 07, 2017, we received correspondence from JPMCB NA informing us that, in view of its global anti-



**REPÚBLICA FEDERATIVA DO BRASIL**

*Paulo Fernando Santos de Lacerda*

**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34

Inglês - Francês - Espanhol - Português

**SWORN PUBLIC TRANSLATOR**

English - French - Spanish - Portuguese

p. 127

money laundering *(Global AML)* and KYC *Policies and Procedures (KYC Policies and Procedures)* policies, and within its activities of periodic monitoring, investigation and checks of its clients and related transactions, JPMCB NA had received certain information regarding Blessed's capital structure that would be relevant to JP Morgan DTVM. ------------------------------

In addition and in view of the Letter, we ask JPMCB NA to confirm the history of the final beneficiaries of Blessed. JPMCB NA confirmed to us the history of Blessed's ultimate beneficiaries based on certain documents and information, not all of which contain consistent information, but which can be summarized as follows: ----------------------------

(i) On December 16, 2009, JPMCB NA received a "*Statement of Organizer in Lieu of Organization Meeting*" ("*Statement of Organizer*") from Blessed, also dated December 16, 2009, setting forth that Lunsville International Inc. ("Lunsville") and Gilberto Souza Biojone Filho ("Gilberto") were the initial *managers* of Blessed. At that date (i) Lunsville was the sole *member of* Blessed pursuant to Blessed's *Limited Liability Company Agreement*; and (ii) to the best of JPMCB NA's understanding and according to a draft internal *due diligence* report related to an account that ultimately was not opened, Lunsville was owned equally by Joesley Batista ("Joesley"), Wesley Batista ("Wesley"), Valere Batista, Vanessa Batista, Viviane Batista, Jose Batista Jr, and Jose Batista Sobrinho. On June 7, 2010, JPMCB NA received another *Statement of*





**REPÚBLICA FEDERATIVA DO BRASIL**
*Paulo Fernando Santos de Lacerda*
**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34
Inglês - Francês - Espanhol - Português
**SWORN PUBLIC TRANSLATOR**
English - French - Spanish - Portuguese

p. 128

*Organizer* from Blessed, also dated December 16, 2009, indicating that Graal (defined below) was the initial *member of* Blessed and that Andrea Prospero ("Prospero") and Gilberto were the initial *managers of* Blessed. -------

(ii) On March 15, 2010, Blessed was donated to Graal Trust, a Bahamas-based *purpose trust* ("Graal"), a type of *trust* which, according to the information received, does not name beneficiaries but serves authorized purposes. The Graal's *Trust Declaration* states that its purpose is to hold and manage interests in Blessed and appoints Demilton Antonio de Castro ("Demilton") and Florisvaldo Caetano de Oliveira ("Florisvaldo") as *protectors* of Graal. The *Trust Declaration* also provides that the *protectors* must instruct the *trustee* to transfer the undistributed capital and income of the *trust* to anyone other than the *trustee,* the *protectors* and/or persons related or affiliated with them. According to the *Trustee's Certificate,* Joesley was named as *settlor* of Graal. Graal *Trust Declaration* does not list any *settlor*. The *trustee* is the Private Trust Corporation Limited of the Bahamas and the *authorized applicant is* Platinum Administration S.A., of which Prospero is a manager.----------------------------------

(iii) On April 19, 2010, Graal submitted a proposal to contract with LCIC and USCL (both defined below) and LCIC and USCL approved, subject to receipt of a conditional premium ("on a conditional premium receipt basis"), the issuance of the following twelve (12) "international flexible premium variable life insurance" policies: ------





**REPÚBLICA FEDERATIVA DO BRASIL**

*Paulo Fernando Santos de Lacerda*

**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34

Inglês - Francês - Espanhol - Português

**SWORN PUBLIC TRANSLATOR**

English - French - Spanish - Portuguese

p. 129

----------------------------------------------------------

| Insurance Company | Policy No | Insured | Beneficiary |
|---|---|---|---|
| LCIC | 10-002 | José Batista Jr. | Graal |
| LCIC | 10-004 | Valere Batista | Graal |
| LCIC | 10-006 | Vanessa Batista | Graal |
| LCIC | 10-008 | Wesley Batista | Graal |
| LCIC | 10-010 | Joesley Batista | Graal |
| LCIC | 10-012 | Viviane Batista | Graal |
| USCL | 2010002 | José Batista Jr. | Graal |
| USCL | 2010004 | Valere Batista | Graal |
| USCL | 2010006 | Vanessa Batista | Graal |
| USCL | 2010008 | Wesley Batista | Graal |
| USCL | 2010010 | Joesley Batista | Graal |
| USCL | 2010012 | Viviane Batista | Graal |

----------------------------------------------------------

(iv) On April 26, 2010, Graal transferred and assigned its interest in Blessed to LCIC and USCL as payment of the premium for the insurance policies listed above by way of the Membership Interest Assignment Agreement *('Membership Agreement'),* LCIC Global Variable Life Insurance Policies Application, and the USCL Global Variable Life Insurance Policies Conditional Premium Receipt. After that date and to the best of JPMCB NA's understanding, Blessed now has the following corporate structure: -----------------------

100% of Blessed's shares are owned by Blessed Holdings Cayman Ltd. ("BHC"). BHC, in turn, had the following corporate structure:------------------------------------

A. Lighthouse Capital Insurance Company ("LCIC") owned 50% of BHC--------------------------------------------------

i. Colin Murdoch-Muirhead holds 75% of LCIC --------------

ii. Cogent Holding International holds 25% of LCIC -------





**REPÚBLICA FEDERATIVA DO BRASIL**
## Paulo Fernando Santos de Lacerda
**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34

Inglês - Francês - Espanhol - Português

**SWORN PUBLIC TRANSLATOR**

English - French - Spanish - Portuguese

p. 130

a. Nicholas Ferris holds 50% of Cogent Holdings International--------------------------------------------

b. Paul Backhouse holds 50% of Cogent Holdings International--------------------------------------------

B. US Commonwealth Life, A.l. ("USCL") owned 50% of BHC --

i. Colin Murdoch-Muirhead holds 51% of USCL --------------

ii. James Walker holds 24% of USCL -----------------------

iii. Nicholas Ferris holds 12.5% of USCL -----------------

iv. Paul Backhouse holds 12.5% of USCL -------------------

(v) According to information received, variable annuities and life insurance with variable payments combine insurance and investment features. Such products differ from traditional lump sum insurance in the way benefits are paid out. The premiums paid are kept in a segregated account, which allows the contractor a variety of investment options. The benefits perceived by the beneficiary depend on the performance of the investments made through this segregated account. --------------------

(vi) The *Membership Agreement* indicates that LCIC and USCL created and initially capitalized BHC as a special purpose company to hold and manage the interests arising from the policies in Blessed and that "LCIC and USCL will follow the directions of Andréa Prospero or such subsequent investment manager as the policy owner of the Policies [Graal] may appoint pursuant to the terms and conditions of the Policies, in all matters pertaining to the ownership and voting of the BHC shares by the respective Policies".-------------------------------------------------





**REPÚBLICA FEDERATIVA DO BRASIL**

*Paulo Fernando Santos de Lacerda*

**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34

Inglês - Francês - Espanhol - Português

**SWORN PUBLIC TRANSLATOR**

English - French - Spanish - Portuguese

p. 131

In summary:-------------------------------------------

(a) Although LCIC and USCL jointly owned 100% of BHC shares with the power to prevail in shareholder resolutions, LCIC and USCL agreed to follow orders from Prospero (investment manager) in all matters relating to the ownership and voting of BHC shares; ------------------

(b) Graal appointed Prospero and had the right to appoint the successor investment manager; -----------------------

(c) Graal held the economic benefits of BHC's investment in Blessed; and-----------------------------------------

(d) Graal, in turn, had as final controllers the natural persons Demilton and Florisvaldo, as *protectors of* the Graal.------------------------------------------------

In addition to the information provided by JPMCB NA, as provided above, we shall also inform that on May 26, 2017, JBS S.A. released a Notice to the Market (http://jbss.infoinvest.com.br/ptb/4143/Resposta%20Oficio%20179.2017.pdf) informing that Wesley and Joesley acquired, on October 31, 2016, the entire ownership interest of "Blessed Holdings" (the Notice did not specify whether Blessed Holdings referred to BHC or Blessed). ----

Nevertheless, because of our global *Know Your Customer* procedures, which include media and public information monitoring, JPMCB NA has informed us that it is reviewing the available documents and information and will make the necessary updates to Blessed's record. -------------------

We remain at your disposal for any further clarifications that may be necessary.-----------------------------------





**REPÚBLICA FEDERATIVA DO BRASIL**

*Paulo Fernando Santos de Lacerda*

**TRADUTOR PÚBLICO JURAMENTADO E INTÉRPRETE COMERCIAL**

MAT. JUCERJA Nº 243 - CPF 297.096.447-34

Inglês - Francês - Espanhol - Português

**SWORN PUBLIC TRANSLATOR**

English - French - Spanish - Portuguese

p. 132

Sincerely,----------------------------------------------

*(Signature)*----------------------------------------------

J.P. Morgan S.A. Distribuidora de Títulos e Valores

Mobiliários----------------------------------------------

*(Stamp: Marcelo S. Barbosa - CPF 134.426.968-01)* ---------

Marcio Bonfiglioll---------------------------------------

----------------------------------------------------------

**HAVING NOTHING FURTHER TO TRANSLATE FROM THIS DOCUMENT, I SIGN IT BY SETTING MY RIGHT HAND AND AFFIXING MY GOLDEN SEAL AND OFFICIAL STAMP. -----------------------------------------------------------------------**
**PAULO FERNANDO SANTOS DE LACERDA, Ph.D---------------------------------------**
**SWORN PUBLIC TRANSLATOR AND COMMERCIAL INTERPRETER PERMIT #243 ----------------------------------------------------------------------------------------------------**
**April 21, 2022. ------------------------------------------------------------------------------------------**

