**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF SPS I FUNDO DE INVESTIMENTO DE AÇÕES – INVESTIMENTO NO EXTERIOR FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:22-mc-00118-LAK |

**DECLARATION OF PABLO RENTERIA**

I, Pablo Renteria, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.      I submit this declaration in support of Joesley Batista, Wesley Batista, JBS S.A., and J&F Investimentos S.A.  ("Intervenors")'s motion to vacate the *ex parte* order authorizing SPS I Fundo de Investimento de Ações – Investimento no Exterior ("SPS" or "Petitioner") to take discovery pursuant to 28 U.S.C. § 1782 and to quash the subpoena served on J.P. Morgan Chase Bank, N.A. ("J.P. Morgan") and Barclays USA, Inc. ("Barclays" and, with J.P. Morgan, "Respondents") in this matter.

2.      All facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents and (c) information supplied to me by JBS or professionals retained by it.

3.      All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies. Where an exhibit is in a foreign language a certified translation is provided.

## I.      PROFESSIONAL BACKGROUND

4.      I have been admitted to the Bar Association of Brazil, Rio de Janeiro Section, since 2004. My professional activity is focused on private law, with an emphasis on corporate law, contract law and securities market regulation. Currently, I am a partner at the firm Renteria Advogados Associados, specializing in legal consulting on issues related to public companies and the regulation of financial services and market operations. I also represent clients before CVM, and I act as arbitrator in arbitration proceedings.

5.      From 2008 to 2018, I held different positions in the Brazilian Securities Commission (CVM). From 2008 to 2009, I held the position of Advisor for Regulatory Matters; from 2009 to 2011, Chairperson's Chief of Staff; from 2011 to 2013, Superintendent of Administrative Proceedings; and, from 2015 to 2018, Commissioner.

6.      Since 2008, I have been a professor of private law at Pontifícia Universidade Católica do Rio Janeiro (PUC-Rio), where I regularly teach undergraduate classes. At the beginning of last year, I became coordinator of the Legal Practice Center on Securities Regulation at Fundação Getúlio Vargas Law School (FGV). In addition, I am invited to teach private law and securities market regulation in post-graduate courses offered by the PUC-Rio, the State University of Rio de Janeiro (UERJ), the State Magistracy School of Rio de Janeiro (EMERJ), the São Paulo Lawyers Institute – IASP and the Brazilian Association of Publicly-Held Companies (ABRASCA).

7.      I have a doctorate in private law from the UERJ, a master's in private law from the UERJ and a master's in international law from the Paris II University – *Panthéon-Assas*.

8.      A copy of my resume is attached herein as **<u>Exhibit 1</u>**.

## II.    FACTUAL BACKGROUND

9.    SPS, according to information provided by JBS, became a Company's shareholder on June 13, 2018, and currently has 0.01% of the shares issued by it. Based on its shareholder status, the Petitioner has, without much success, continually sought to intervene in and influence a series of disputes involving the Company and its controlling shareholders.

10.    Some examples are worth noting. After acquiring JBS shares, SPS commenced an arbitration proceeding before the Market Arbitration Chamber – CAM in São Paulo (CAM Arbitration No. 110/18), similar to another arbitration proceeding that had already been initiated by other minority shareholders (CAM Arbitration No. 93/17). Through such proceeding, among other accusations, SPS alleged it sought damages supposedly caused to the Company due to facts involving a merger, into JBS, of all shares issued by a Brazilian company named Bertin S.A., approved by the JBS shareholders in 2009 (the "JBS-Bertin Merger").

11.    Nonetheless, JBS had initiated another arbitral proceeding (in which SPS is acting as an "assistant" to the claimant) with the same objective itself, and, in view of that, the Superior Court of Justice – the court responsible in Brazil for standardizing the interpretation of the federal infra-constitutional legislation and also ensuring its uniform application by the federal and local second instance authorities – decided to suspend the arbitration proceedings initiated by SPS and other minority shareholders.[1]

12.    Separately, SPS also attempted to intervene in a CVM proceeding regarding the JBS-Bertin Merger. On September 4, 2020, the CVM accused the JBS' controlling shareholders for allegedly failing to disclose some information to the public regarding the merger. On October

---

[1] Conflict of Competence No. 185705/DF, Rapporteur Minister Marco Aurélio Bellizze, ruling on March 04, 2022.

22, 2021, SPS filed, in the relevant proceeding, a statement requesting that the rapporteur of the proceeding consider certain information and documents that, in the Petitioner's opinion, could contribute to the analysis of the dispute.

13.     Between November 17, 2021 and December 10, 2021, the defendants submitted their objections to SPS's request and requested the removal of SPS's filing from the CVM's records.  By way of the order dated December 30, 2021, the CVM rapporteur, with regard to the request for recognition of the illegitimacy of the attempted intervention by SPS, highlighted that this would not be possible because, among other reasons, SPS had not even formally requested for its admittance as an interested third party in the CVM Action.

14.     Considering that such information and documents were already public, the CVM rapporteur accepted SPS' request on April 20, 2022, but he didn't recognize SPS' status of formal interested party nor any potential right of the Petitioner to submit evidence into the proceeding.

15.     On May 9, 2022, certain parties sought reconsideration of the April 20, 2022 order issued by the CVM and requested a declaration that SPS lacked standing in proceeding.  On May 13, 2022, the CVM issued an order noting that it already rendered a decision on December 30, 2021 regarding whether SPS is a formal participant in the CVM proceeding (and confirming that it wasn't).

16.     Additionally, SPS has also tried to join three ongoing criminal proceedings before the Brazilian courts, based on its alleged interest in repairing purported damage caused to JBS. Yet, all the Petitioner's requests were rejected due to its lack of standing.[2]

---

[2] Citing the decision rendered on June 9, 2021 in Criminal Electoral Action no. 0600011-12.2020.6.20.0002, in process in the 1st Electoral Area of Natal/RN; the decision rendered on August 27, 2021 in Criminal Electoral Action no. 0600087-37.2021.6.26.0001, in progress in the 1st Electoral Area of São Paulo/SP; and the decision rendered on December 6, 2021, in Criminal Action no. 1006459-54.2019.4.01.3400, in progress in the 12th Federal Criminal Court of Brasília/DF.

17.     The current 1782 discovery request seeking information from the 1782 Respondents seems to be another fragile attempt by SPS to generate a litigation involving JBS. Once again SPS is alleging its willingness to collaborate with the CVM as a pretext to obtain information and documents that can be used in an eventual litigation against the JBS's controlling shareholders, without going through an arbitration procedure. Indeed, as provided for in Article 48 of JBS's bylaw,[3] any dispute involving the company and its shareholders and managers should be resolved through arbitration and, as a result, the arbitral tribunal should have the authority to examine and judge any requirement for producing evidence.

18.     The current § 1782 discovery request is entirely based on the disclosing, in September 2020, of the result of the FinCEN Files, a journalistic operation conducted by the International Consortium of Investigative Journalists – ICIJ and based on the illegal leaking of classified documents from the Financial Crime Enforcement Network, an agency of the United States Department of the Treasury.[4]

19.     SPS states in its application to obtain the discovery ("Application"), that the FinCEN Files had revealed new facts supposedly related to financial transactions made by, on the one side, the publicly-traded Brazilian company JBS and its controller shareholders (the "Batista Family") and on the other side, certain offshore companies, incorporated outside of Brazil ("Foreign Companies").  Also in accordance with SPS, these facts indicated the practice of alleged

---

[3] "Art. 48. The Company, its shareholders, managers, members of the Supervisory Board, permanent and substitutes, if any, undertake to resolve, through arbitration before the Market Arbitration Chamber, under its regulation, any dispute that may arise between its issuer, shareholders, or managers (...)."

[4] Information available at https://www.icij.org/investigations/fincen-files/what-is-the-fincen-files-investigation/, accessed on 5/22/2022.

illegal activities that had been hidden from the Brazilian authorities with whom the Batista Family had entered into plea bargain agreements with (pp. 2 of the Application).[5]

20.     The Petitioner bases its statement exclusively on a report purportedly issued by Barclays in 2017, which had "raised red flags regarding some companies [the Foreign Companies] that were linked directly to the Batista Family and to the corruption scheme they operated in Brazil" (pp. 2 of the Application). The report then would have suggested "that these entities received orders directly from the Batista family, making several recurrent international transactions that pointed to a high risk of money laundering and payment of bribes to Brazilian officials" (*idem*).

21.     To the extent that JBS, the Batista Family and one of the Foreign Companies had relied on the services provided by J.P. Morgan and by Barclays, the Petitioner intends to obtain discovery "from Respondents regarding international transactions conducted by the companies above that may be linked to unlawful conducts taken in detriment to JBS assets and its minority shareholders" (pp. 2 of the Application).

22.     SPS declares that, with this information in hand, it intends to file a complaint to the Brazilian Securities and Exchange Commission (CVM - Comissão de Valores Mobiliários), the regulatory body similar to the Securities Exchange Commission, so that investigations may be commenced. In accordance with SPS, these investigations may lead to setting-up of administrative disciplinary proceedings against the administrators and the Batista Family (as controlling shareholders of JBS) due to alleged violations of the provisions of Law No. 6.404/1976 (the Brazilian Corporate Law) (pp. 3 of the Application).

---

[5] The following companies are mentioned in the application: Unifleisch Limited, Unifleisch SA, Lunsville International Inc. and Valdarco Investments Inc.

23.     However, in addition to being purely speculative, the SPS request involves equivocal interpretations and makes incorrect statements regarding the enforcement activity of the CVM, that are to be exposed in the declaration herein. Accordingly, it is initially worth setting out in general the rules that govern the investigative activity of the CVM.

## III.    OVERALL PANORAMA OF THE INVESTIGATIVE ACTIVITY OF THE CVM - INQUISITORIAL SYSTEM

24.     Unlike the SEC and the majority of market regulators around the world, pursuant to the terms of Art. 9, paragraphs V and VI, and Art. 11 of Law No. 6.385/1976 (the Securities Market Act), the CVM has the powers to investigate not only violations of securities market legislation that are committed by market players (intermediaries, fund managers etc.), but also violations of the Brazilian Corporate Law by shareholders and the administrators of publicly-traded companies.

25.     Another particularity of the CVM is that its enforcement powers are very wide-reaching, since it is entrusted with the attribution of investigating any irregularities that are within the scope of its jurisdiction, accusing potential violators and ultimately, judging whether accusations are substantiated. If it regards the accusations meritorious, the CVM has the autonomy to impose penalties on the violators.[6]

---

[6] According to Art. 11 of Law No. 6.385/1976, the CVM may separately or cumulatively impose the penalties of (i) A warning; (ii) Fine; (iii) Temporary disqualification for exercising the position of administrator or auditing board member of a publicly-traded company, entity of the distribution system or other entities that depend on authorization or registration at the autarky; (iv) Temporary disqualification or suspension of the authorization or registration for exercising the activities pursuant to Law No. 6.385/1976; (v) Temporary prohibition on performing certain activities or operations, for members of the distribution system or other entities that depend on CVM authorization or registration; or (vi) Temporary prohibition on operating, directly or indirectly, in one or more operational modes on the securities market.

26.     In order to prevent this accumulation of powers from infringing on its impartiality during its enforcement activities, the CVM has adopted the so-called accusatorial system by separating the activities of investigation and accusation on the one side, from its judging activity on the other. The former are assigned to different superintendent's offices of the CVM, subject to the division of jurisdictions between them,[7] while the latter is performed by its Commission Board.[8] Accordingly, the superintendent's offices (mainly comprised of career employees) do not take part in the sentencing, while the Commission Board may not meddle in the investigations or formulation of the accusations.

27.     In this sense, for example, the Commission Board has no power to interfere in the investigations conducted by the CVM, deciding whether an investigation must be initiated or imposing the way it will be conducted. It also has no competence to determine the accusation of individuals, nor to choose who, among the CVM employees, shall work on a particular investigation. Such decisions are exclusively made by the CVM superintendent offices.

28.     There are different ways in which the CVM may commence investigations. The CVM may commence an ex officio investigation, when, during the course of its market supervision activity, it identifies evidence of irregularities perpetrated by agents under its supervision. It addition to this, the CVM *may* commence an investigation based on the receipt of a complaint that indicates the practice of a potentially irregular act.

---

[7] See Art. 3 of CVM Resolution No. 45/2021, "the superintendent office is responsible for investigating administrative violations, procedural instruction and the filing of administrative disciplinary proceedings designed to ascertain illegal acts and practices not equitable to company administrators, members of the audit committee, members of the statutory committee and shareholders of publicly-traded companies, mediators and other market players."

[8] Art. 49 of CVM Resolution No. 45/2021 states that "it is the responsibility of the Commission Board to judge the proceedings, at a public hearing, convened at least 15 (fifteen) days in advance, and access may be restricted to third parties due to public interest."

29.     Any person may file a complaint to the CVM. This is because Art. 5, XXXIV, paragraph *a*,[9] of the Federal Constitution of Brazil guarantees the right to petition to any person, regardless of the payment of costs. As a result of this right, any person may file a complaint to the relevant public authority in order to inform the occurrence of facts that, in his or her view, deserves the adoption of appropriate measures. This is a universal right, that may be exercised by any person, regardless of the demonstration of their interest in the matter.

30.     For example, if a citizen believes that a given administrator or controlling shareholder has perpetrated a conduct that contravenes the Brazilian Corporate Law, this citizen may – by the way of a complaint – bring this fact to the CVM's knowledge, even if he or she is not even a shareholder or investor in the company.

31.     However, filing a complaint does not render the complainant an interested party in the procedure initiated by the CVM to examine the complaint. The complainant has no right to participate in the investigation, which, pursuant to Art. 9, §2, of the Securities Market Act,[10] is normally conducted under secrecy by the CVM. In effect, the complainant is a mere informant, who brings information to the knowledge of the CVM, that may justify the commencing of investigations.

---

[9] "Art. 5 - All are equal before the Law, without distinction of any nature, ensuring Brazilians and foreigners residing within the Country the unassailable right to life, liberty, equality, security and property, subject to the following terms:

(...)

XXXIV - Regardless of the payment of fees, all are ensured:

a) The right to petition Public Powers in defense of rights or against illegality or the abuse of power;"

[10] According to the provision, the administrative process filed to investigate illegal acts "may be preceded by an investigative phase, during which the secrecy necessary to elucidate the facts or required by public interest, is guaranteed, and abides by the procedure stipulated by the Committee."

32.     The CVM has a specific superintendent's office for the receipt of complaints from the general public. This is the Superintendent Office for Investor Protection and Guidance - SOI, which is responsible, according to Art. 50, paragraph II of the Internal Rules of the CVM (Annex I of CVM Resolution No. 24/2021), "for analyzing formal complaints filed by the public in general on the actions of market players," among other attributions.

33.     When receiving a complaint, the SOI conducts a preliminary analysis in order to verify whether it contains elements that justify investigating the facts, as well as whether the CVM has any jurisdiction in relation to the subject of the complaint. Should it conclude that the complaint is meritless, the SOI may summarily dismiss the complaint, regardless of consent from the respective complainant.

34.     Should the complaint survive the preliminary analysis conducted by the SOI, it is then referred to the relevant technical area of the CVM in order to investigate the facts presented therein. Hence, for example, if the complaint relates to an alleged breach of the Brazilian Corporate Law, the relevant technical area is the Superintendent Office of Company Relations - SEP (Superintendência de Relações com Empresas). On the other hand, if it relates to a possible breach of the regulations on mediating activities, the complaint is referred to the Superintendent Office of Market and Mediator Relations - SMI (Superintendência de Relações com o Mercado e Intermediários).

35.     Once the complaint is received, the superintendent office in charge proceeds with another preliminary examination, supplementary to the one conducted by the SOI, for the purpose of verifying whether there is substantial evidence of an irregularity that must be investigated. If it understands that the complaint is meritless, the technical area may summarily dismiss the case, without adopting any additional measure whatsoever.

36.     If, on the other hand, the superintendent office understands that the complaint is pertinent, it should take the investigative measures it deems to be applicable in order to check evidence of illicit activity. Taking into account the information obtained during its investigations, pursuant to Art. 4 of CVM Resolution No. 45/2021, the superintendent office may proceed in one of the following ways:

(i)     Close the case, if it concludes there are no irregularities, the punishment is time-barred or the conduct is of little relevance, low expressiveness of the threat or damage to the protected legal interest and the possibility of use of other supervisory instruments or measures that it deems to be more effective (paragraph I).

(ii)    Formulate a term of indictment, if it concludes that there are sufficient elements to prove the illegal act (paragraph II); or

(iii)   Require the initiation of an administrative inquiry in order to broaden the investigation, to be conducted by the Superintendent Office of Disciplinary Proceedings - SPS (Superintendência de Processos Sancionadores), a technical area specialized in conducting investigations recognized as more complex (paragraph III).

37.     When the superintendent office formulates a term of indictment, the defendants must be summoned to present their defenses (Art. 16 of CVM Resolution No. 45/2021). Only after the summons is issued, the administrative proceedings ("*processo administrativo*") are considered formally constituted (*Id.,* Art. 21), because it is only from that moment on that CVM sets up an adversarial procedure, in which its Commission Board is deemed to judge the merit of the accusations taking into account the facts and arguments brought by the defendants. In other words,

it is only from that moment on that CVM engages in litigation to resolve the dispute between prosecution and defense by way of an administrative judgement.

38.     Before the summons is served, there is, strictly speaking, no administrative proceedings, but only an administrative procedure ("*procedimento administrativo*") for investigation purposes,[11] in which there are no adversarial procedure nor judgement to be made. No dispositive ruling is expected at this stage. Indeed, as pointed out by the CVM Commission Board,[12] investigation activities follow the so-called inquisitorial system. Under this procedure, the CVM superintendent office collects unilaterally the evidence in order to reach its own conclusions regarding the occurrence of any illegal act. There are no parties, not even the investigated person is regarded as a party, as already clarified by the CVM:

> "It is also worth clarifying that, **during the investigative phase, the investigated person is not regarded as a party in the procedure**, as alleged in the appeal, which, in its understanding, would allow it to access the case files, and that this restriction does not cover solely the public in general" (emphasis added).[13]

39.     Further in accordance with the CVM, the investigative procedure is "conducted by the public administration for the purposes of investigating certain facts," and therein "there is

---

[11] The distinction between administrative proceeding ("processo administrativo") and administrative procedure ("procedimento administrativo") is well established in Brazilian Law, the former being generally used to designate contentious procedures to be resolved by an administrative judgment. Accordingly, see Celso Antônio Bandeira de Mello, *Curso de Direito Administrativo*, 32. ed. São Paulo: Malheiros, 2015, p. 500.

[12] See, for example, (i) IA CVM No. 17/97, Rapporteur Dir. Wladimir Castelo Branco Castro, sentenced on 6/20/2005; (ii) CVM Administrative Disciplinary Proceedings (PAS) No. SP2013/0096, Rapporteur Dir. Pablo Renteria, sentenced on 3/20/2018; (iii) Evidence submission order in CVM PAS No. 14/2010, Rapporteur Dir. Henrique Machado, sentenced on 1/15/2019; and (iv) Proof submission order and appeal against the decision of the Commission Board in CVM PAS No. RJ2013/8880, Rapporteur Dir. Henrique Machado, sentenced on 2/12/2019.

[13] Appeal against decision by the SFI relation to the request for inspection within the scope of CVM Proceedings No. RJ2005/7874, Rapporteur Dir. Norma Parente, sentenced on 12/6/2005.

neither an accusation nor an accused party, since the relevant authority is not even persuaded of the occurrence of any irregularity."[14] Moreover, the CVM has already emphasized that "the unilateral nature of the collecting of evidence," by way of which the superintendent office conducts its investigation, "is intrinsic to the nature of the procedure and it does not allow during this phase that third parties compete with the public administration in the production of evidence, so as not to undermine the actual effectiveness of said investigation."[15]

40.     It is also worth pointing out that, as a result of the principle of the strict abidance of the public interest, the CVM superintendent offices (SOI, SEP, SMI etc.) have the duty to analyze all complaints received and should they identify significant evidence of wrongful activity, they are expected to conduct an investigation. Nevertheless, the CVM superintendent offices are exclusively responsible for assessing whether the complaint contains substantial evidence of illicit activity and there are exclusively responsible for deciding in which way the investigation must be conducted, i.e., which investigative measure should be adopted.

41.     Having made this brief contextualization of the investigative activity of the CVM, we now move onto the following sections, stating the mistakes committed in the discovery application made by SPS.

## IV.   THE SPS APPLICATION REPRESENTS A USURPATION OF CVM'S JURISDICTION TO DECIDE ON WHETHER A GIVEN FACT JUSTIFIES CONDUCTING AN INVESTIGATION

### A.     The SPS request is purely speculative

42.     Based on a single financial transaction monitoring report issued by Barclays, SPS builds up a purely speculative rationale in order to state that the document would be evidence that

---

[14] CVM PAS No. SP2013/0096, Rapporteur Dir. Pablo Renteria, sentenced on 3/20/2018.

[15] Idem.

JBS' controllers had omitted important information from the Brazilian authorities, with whom they signed plea agreements.

43.     SPS' supposition is, however, meritless. The referred report does not reveal the perpetration of any unlawful act. In another sense, it mentions only certain red flags, which, on their own, do not indicate the occurrence of any irregularities. It is, also, what the Petitioner acknowledges when stating that "[t]he evidence **suggests** that these entities received orders directly from the Batista family" that "**may** be linked to unlawful conducts taken in detriment to JBS' assets and its minority shareholders" (pp. 2 of the Application, emphasis added).

44.     This observation is no cause for surprise. Reports such as the one issued by Barclays – commonly referred to as *suspicious activity reports* – are generated on a daily basis by financial institutions around the world. Most of the time, the information set forth therein is not investigated or reported to the domestic anti-money laundry authority, to the extent that the institutions themselves conclude, based on other information that they have available, that the operations are not atypical. In other words, a suspicious activity report may never be regarded in itself as evidence of irregularity.

45.     SPS' supposition is even more questionable in light of the fact that it is based on a serious and unproven premise that not just the controlling shareholders of JBS but also the administration of the Company itself (which is not suspected of committing any alleged irregularity relating to the FinCEN Files) had omitted information from the Brazilian authorities regarding the financial transactions reported  by the journalistic operation.

46.     This is because, pursuant to the material fact disclosed by JBS on 9/6/2017, the Company informed the market that on that date it had signed a declaration of acceptance of a leniency agreement signed by J&F Investimentos S/A ( "J&F", a company by means of which the

Batista Family controls the Company) and the Brazilian Federal Prosecutor's Office, by way of which it committed to share information with the Brazilian authorities relating to irregularities committed in the past by the economic group. As it is normal with leniency agreements, JBS has conducted an extensive and in-depth audit on its financial transactions in order to identify any possible irregularities.

47.     Furthermore, still in this regard, it is worth mentioning that, according to information provided by JBS, J&F took important measures to carry out extensive internal investigations on its behalf and on behalf of the companies it controls. In this sense, J&F hired several renowned legal advisors and firms specialized in forensic expertise to conduct investigations both in its own activities and in its subsidiaries' activities.[16] Indeed, J&F invested R$156 million, mobilized approximately 630 employees, reviewed 616 computers and 443 mobile phones, and collected and analyzed 213 terabytes of data (for context, the equivalent of 21 years of the amount of data collected by the Hubble telescope) —a monumental investment that only further evinces the company's serious commitment to the investigation and the relevant authorities. Additionally, all of the investigations' results were supervised by an Independent Supervisory Committee, which was formed by three independent members of unblemished reputation whose indication depended on the agreement of the Brazilian Federal Prosecutor's Office.

48.     In view of this, SPS' allegation, based on a single report on suspicious transactions, that JBS and J&F had not complied with its obligations set forth by the leniency agreement and

---

[16] The following legal advisors and companies were hired: (i) Barros Pimentel, Alcantara Gil e Rodriguez Advogados; (ii) Campos Mello Advogados; (iii) Sampaio Ferraz Advogados; (iv) Pricewaterhouse Coopers Contadores Públicos Ltda; (v) FTI Consulting Brasil; and (vi) Grand Thornton Corporate Consultores de Negócios Ltda.

had withheld relevant information from the Brazilian authorities, exposing itself to the serious consequences resulting therefrom, is groundless.

**B.    The CVM is responsible for assessing the merit of the complaint and deciding the measures to be taken during the course of the investigation**

49.    As shown above, when receiving a complaint, it is exclusively up to the CVM, regardless of the opinion of the complainant, to assess whether the complaint contains information that justifies conducting an investigation. And if it concludes that an investigation is needed, the CVM is responsible for deciding which investigative measures are to be taken.

50.    Accordingly, in relation to the Barclays report used by SPS to justify its discovery application, it is up to the CVM – and the CVM alone – to assess the appropriateness of an investigation, taking into account the following factors, among others:

(i)    ***if the documents are fair grounds for commencing and conducting an investigation***. The CVM is responsible for assessing whether the Barclays' report and other documents mentioned in the complaint actually contain any substantial evidence of the commitment of any illegal act that it is responsible for investigating. However, as a result of all the fragile aspects that have been analyzed above, it would be expected that the CVM would not foresee sufficient materiality in the complaint in order to commence any investigation.

(ii)    ***if the documents are legal evidence and may give rise to an investigation***. As already mentioned, the documents targeted by SPS were revealed via an illegal information leak.  In Brazil, the doctrine of the fruit of the poisonous tree is applied. According to this legal doctrine, as per the consolidated case law of the Federal Supreme Court, the highest Brazilian court, "evidence obtained by unlawful means contaminates evidence which 'exclusively' results therefrom;

rendering it inadmissible in the proceedings and may not  give rise to a criminal investigation and, with more reason, be the basis of a  complaint,  request for evidence, and judgment (Federal Constitution (CF), Art. 5, LVI)".[17] For this reason, it is very likely that the CVM will not conduct an investigation that results from the FinCEN Files, even if the complaint is followed by documents obtained in the discovery application formulated herein.

(iii) ___*if the facts are covered by the jurisdiction of the CVM*___. The CVM shall verify whether the facts to be presented by the potential SPS complaint are within its jurisdiction, either in relation to the geographical location of the facts, or in relation to  the individuals potentially investigated. It is worth highlighting that the jurisdiction of the CVM in analyzing transactions of funds is restricted to publicly-traded companies and does not include its shareholders,   whether controllers or not, much less closed companies. Accordingly, in the case herein, the jurisdiction of the CVM is limited to transactions made with funds from JBS, as a publicly-traded company registered with the Brazilian regulatory body, and does  not  extend  to  those  made  by  the  Batista  Family  or  by  the  Foreign Companies with their own funds; and

(iv) ___*if  CVM's punitive authority in relation to the facts is time-barred*___. The CVM must assess whether its punitive authority  in relation to the facts subject of the complaint are already time barred. It should be pointed out that the applicable

---

[17] See among others, Habeas Corpus 72.588/PB, Rapporteur Min. Maurício Corrêa, sentenced on 6/12/1996; Habeas Corpus Appeal (RHC) 90376, 2nd Division, Min. Rapporteur Celso de Mello, sentenced on 4/3/2007; Habeas Corpus 93050/RJ, 2nd Division, Min. Rapporteur Celso de Mello, sentenced on 6/10/2008; Interlocutory Appeal (AgR) on Habeas Corpus Appeal (RHC) 153869/DF, 2nd Division, Min. Rapporteur Celso de Mello, sentenced on 5/4/2020.

general rule applicable is set forth by Art. 1 of Law No. 9.873/1999, according to which "the statutes of limitations of the punitive authority of the  Federal Public Administration is five years (…) to exercise the police power, to investigate violations of the law in force, counted from the date the acts were committed, or in the event of permanent or continued violation, from date on which it ceases.

51.     All these considerations reveal that the Application is entirely based on a fragile presumption that a CVM *might* initiate an investigation into the facts exposed in the FinCEN Files, when, in fact, it is up to the CVM itself to assess the appropriateness of an investigation. What the SPS is expected to do, like any other complainant, is to bring FinCEN Files to the attention of the CVM so that the regulator can, within its legal powers, assess the need for an investigation and the best way to do it.

52.     Moreover, given that the FinCEN Files is a public journalistic operation, disclosed by a series of Press outlets around the world, including by Brazilian media,[18] it is very likely that the CVM has already been made aware of the information disclosed. Despite this, there is no evidence that any investigation has already been commenced.

53.     Actually, considering not only the absence of such evidence, but also the speculative nature and the fragility of the SPS request and its allegations, it can be said that it would be highly unlikely for the CVM to initiate SPS' hypothetical proceeding against JBS' controlling shareholders.

---

[18] In Brazil, Revista Piauí, Revista Época and the website Poder360 took part in the operation.

V.     **THE CVM HAS THE MEANS FOR OBTAINING THE DOCUMENTS THAT ARE SUBJECT OF THE DISCOVERY REQUEST**

A.     **The CVM may serve summons on JP Morgan, JBS or the controllers of the company in order to obtain information and documents**

54.     According to paragraphs I and II of Art. 9 of the Securities Market Act, the CVM has the powers to subpoena market mediators, publicly-traded companies, controlling shareholders and any other persons, individuals or legal entities, when the occurrence of any irregularity is to be investigated, in order to provide information, or explanations.

55.     Therefore, nothing prevents the CVM from requesting the information subject of the discovery application to JBS itself, its controlling shareholders or any other person. Thus, there is no need for a discovery request for such information to be obtained by the CVM.

56.     The CVM may also subpoena J.P. Morgan, one of the institutions  targeted by the Application, to the extent that, as the website of the Central Bank of Brazil - BCB (Banco Central do Brasil) informs, the institution already has a representation office in the country.[19] Moreover, it is worth highlighting that Exhibit C ("JPM Statement") of the petition filed by SPS makes  clear the availability of J.P. Morgan S/A DTVM, a Brazilian company and member of the economic group of J.P. Morgan, to cooperate with investigations conducted by the CVM, including by way of obtaining information from J.P. Morgan itself. As already mentioned by Exhibit C, J.P. Morgan S/A DTVM has already passed on a series of information obtained from J.P. Morgan headquarters to the CVM.

---

[19]     Information                     available                     at: https://www.bcb.gov.br/estabilidadefinanceira/encontreinstituicao, accessed on 5/22/2022.

57.     Accordingly, it should be concluded that the CVM should not face any problems in obtaining via its own means, whether from JBS or the Batista Family or JP Morgan, the information subject of the discovery application, which renders this measure unnecessary to conduct a potential investigation.

**B.     The CVM may benefit from covenants maintained with other entities and institutions**

58.     In its regulatory activity, the CVM maintains a series of covenants with a range of entities of the Brazilian Public Administration, associations, international organizations and other public and private institutions. Such covenants foresee cooperation between the CVM and other entities for the purpose of expanding its investigative capacities and the ascertaining of irregularities that affect the Brazilian securities market.

59.     Two covenants are of special relevance for the purposes of this declaration: the one signed with the Federal Prosecutor's Office of Brazil - MPF (Ministério Público Federal) and the one signed with the BCB.

60.     The covenant signed between the CVM and the MPF includes, among other aspects, "the potential transnational nature of the illegal acts of the securities market" and has as one of its goals the "notifications from the CVM to the MPF so that the latter adopts the legally applicable measures in defense of the interests of the securities market and its investors, within the administrative, civil or criminal spheres" (Clause 1.1, Item V).

61.     The covenant states that "subject to the applicable law and the spheres of the attributions of the Parties, the MPF should send the CVM any information, documents and elements of proof that are obtained within the scope of the administrative, civil or criminal investigations, that it conducts and procedures that it initiates with respect to actions that are possibly damaging to the securities market, requiring the format mutually agreed on by the Parties

to be adopted in each situation" (Clause 2.3). In addition to this, "if there is mutual interest from the Parties, the CVM may participate in procedures and measures related to conducts that are damaging to the securities market, in conjunction with the MPF" (Clause 3.1).

62.     In turn, the MPF, by way of its Secretariat of International Cooperation "establishes direct contact with Public Prosecutor's Office Services, court authorities, police forces and foreign diplomatic missions, for the exchanging of information not only related to formal international cooperation, but also to the exchange of data in order to identify, locate persons, companies and recover assets of illegal origin or instruments of crime sent to foreign countries, sharing experiences, know-how and best practices, and facilitating mutual international legal assistance."[20]

63.     Within this context, Brazil and the United States of America signed the Agreement on Legal Assistance in Criminal Matters in 1997, enacted by Decree No 3.810, of 2001. Pursuant to the preamble thereof, the agreement was signed envisaging "facilitating the enforcement of the tasks of the authorities responsible for compliance with the law of both countries, during the investigation, inquiry, criminal action and prevention of crime by way of cooperation and legal assistance on criminal matters." Accordingly, both countries were committed to "providing mutual assistance (…) in matters of the investigation, inquiry, criminal action, prevention of crimes, and procedures related to criminal offenses" (Article I, Item 1).

64.     According to Item 2 of Article I, the referred assistance includes among other measures, the supply of documents, records and assets (paragraphs *b* and *d*); the enforcement of search and seizure warrants (paragraph *f*); and any other means of assistance not prohibited by the laws of the country whose assistance has been requested (paragraph *h*). In addition to this, the

---

[20]     See     http://www.mpf.mp.br/atuacao-tematica/sci/dados-da-atuacao/assessoria-juridica/pedidos-internacionais-de-informacao, accessed on 5/22/2022.

"Requested State should make the maximum effort to arrange for the delivery of documents relating wholly or in part, to any request for assistance by the Requesting State, in compliance with the provisions of this Agreement" (Article XIII, Item 1).

65.     In light of all of this, should it deem it pertinent and necessary to exercising its investigative functions, and without prejudice to the investigative acts that it may directly perform, the CVM may benefit from the covenant held with the MPF so that the latter obtain from the relevant North American authorities, information in their possession both from J.P Morgan and from Barclays. Incidentally, as in SPS' view, the facts involve an alleged breach of plea bargains entered into and signed by the JBS Group, the MPF would most probably have a major interest in participating in the investigations alongside the CVM.

66.     The covenant signed with the BCB on its turn enables the CVM to obtain information from institutions that are under the supervision or regulation of the Brazilian Central Bank. According to the document, "the BCB and CVM, in order to fully exercise their legal attributions, must have reciprocal access to the information under their jurisdiction[s], scope or responsibility" (Whereas VIII) and have, among their goals, the regulation of the "request for information by the BCB and by the CVM, for institutions or persons supervised by any of the Autarkies" (Clause 1.1, *f*).

67.     In this respect, Clause 5.1 of the covenant states that "the BCB and CVM should maintain a permanent exchange of information, albeit protected by the secrecy set forth by Supplementary Law No. 105, of 2001, both with respect to those that result from their own acts, and to those that they have obtained or may obtain during the exercise of their legal attributions."

68.     Because J.P. Morgan has offices of representation in Brazil it is subject to the supervision of the BCB.[21] Accordingly, the CVM may, should it deems it pertinent and convenient, benefit from the agreement signed with the BCB so that it may obtain via applicable means, the information related to the data leaked by the FinCEN Files.

## VI.   SPS IS NOT TO BE REGARDED AN INTERESTED PARTY IN THE CONTEMPLATED INVESTIGATION AND PROCEEDING SHOULD SUCH INVESTIGATION AND PROCEEDING ACTUALLY COME TO BE INITIATED

69.     The Petitioner argues in its Application, that it "will be an interested person in the Contemplated Proceedings" [sic] (pp. 15 of the Application). Accordingly, it states that (i) It is a minority shareholder in JBS, that (ii) "Brazilian Law specifically authorizes minority shareholders to take legal action, in the context of violations performed by controlling shareholders," making reference to §§ 12-14 of the Gonzalez Declaration, and that (iii) "Information provided by third parties, such as shareholders, is relevant to CVM's enforcement activities" (pp. 16 of the Application).

70.     This argument, however, is not correct. The first necessary explanation is that the Gonzalez Declaration does not address, in §§ 12-14 thereof, the rules applicable to the proceedings brought by the CVM. The referred declaration makes reference to Art. 246 of the Brazilian Corporate Law, which deals with derivative actions that shareholders can bring before the Judiciary or an arbitration court so that the controlling shareholder is convicted of paying indemnity for damages caused to the company.

71.     As specified throughout this declaration, the disciplinary proceedings of the CVM are of another nature: they are governed by the law of the Securities Market and are conducted by

---

[21]   See   https://www.bcb.gov.br/estabilidadefinanceira/encontreinstituicao,   accessed on 5/22/2022.

the CVM itself. As the Gonzalez Declaration itself states, "[t]he administrative enforcement proceedings commenced by the CVM are entirely conducted within the entity" (§ 16). By way of these disciplinary proceedings, the CVM may impose sanctions on the violators, but it does not have the powers to order the payment of indemnity to any potential victims.

72.     For the CVM, it does not matter whether the complainant is a minority shareholder or not of the company allegedly harmed, since, as already clarified, the complainant – whoever they may be – is a mere informant. Accordingly, should it come to submit a complaint to the CVM, SPS (which did not even hold shares in the Company at the time of the facts included in the FinCEN Files)[22] would not be acting on behalf of nor in the interests of JBS. The complainant always acts on its own behalf.[23]

73.     The second necessary explanation is that, as mentioned above, CVM investigation activity cannot be formally considered a proceeding, since such activity does not follow an adversarial procedure and there is not a contentious issue to be ruled by an administrative judgement.  In other words, there is no dispositive ruling reviewable by any court.  As already explained, investigation activities follow the inquisitorial system, in which the CVM superintendent office collect unilaterally the evidence in order to reach its own conclusions regarding the occurrence of any illegal act.

74.     Consequently, the complainant does not become a party to the investigative procedures much less becomes an interested third party in the investigation. In effect, the right to

---

[22] As already mentioned, according to information provided by JBS, SPS became a Company's shareholder on June 13, 2018.

[23] It is worth highlighting, in this regard, that SPS has tried to act on behalf of the Company through the conduct of arbitration proceedings related to the JBS-Bertin Merger, but the Superior Court of Justice, as mentioned in the beginning of this declaration, decided to suspend such proceedings in order to safeguard the one initiated by JBS itself (Conflict of Competence No. 185705/DF, Rapporteur Minister Marco Aurélio Bellizze, ruling on March 04, 2022).

formulate a complaint should not be confused with taking part in an ongoing investigative procedure.

75.     Accordingly, the simple fact that a person files a complaint to the CVM asking for the adoption of some measure, such as, for example, the investigation of certain facts, does not make this person an interested third party.

76.     In relation to administrative disciplinary proceedings, that are initiated after the investigation is completed and the accusation formulated,[24] the regulations enacted by the CVM do not permit the participation of third parties.[25] In this respect, reference is made to the statement made by the Specialize Federal Public Prosecutor's Office to the CVM ("PFE"), responsible for controlling the legality of acts of the regulatory authority, within the scope of CVM Administrative Disciplinary Proceedings No. RJ2015/2386, of which I was the rapporteur. When consulted on the application by a third party to be accepted as an interested third party, the PFE concluded that CVM Decision No. 538/2008 – that at the time governed administrative disciplinary proceedings – does not permit this type of application:

> "Perusing CVM Decision No. 538/2008 [current CVM Resolution No. 45/2021], the rule that governs the Administrative Disciplinary Proceedings within the scope of the CVM, one notes that **there is no rule whatsoever regarding third-party intervention. This is not due to the mere oversight of the legislator, but due to its incompatibility with the accusatory system**, originated in the Criminal Procedure, adopted by the CVM in order to impose its administrative sanctions" (emphasis added).[26]

---

[24] See Art. 21 of CBM Resolution No. 45/2021.

[25] Law No. 9.784/1999, which sets out general rules on administrative proceedings, expressly states that "specific administrative proceedings are to continue to be governed by specific law, solely applying to these subsequently the precepts of this Law." This means in relation to the CVM, that its jurisdiction prevails based on Art. 9, §2 of the Securities Market Act, to govern the administrative procedures thereof.

[26] Opinion No. 00166/2017/GJU-4/PFE-CVM/PGF/AGU, of 10/19/2017.

77.     The matter was also examined by the CVM Commission Board in the decision handed down on 3/17/2020 within the scope of the CVM Administrative Disciplinary Proceedings No. 19957.005983/2019-18. At the time, the Commission Board appraised the application formulated by a third party in order to participate in the disciplinary proceedings as an amicus curiae, having rejected the application by unanimous vote and, by a majority vote determined that the documents filed by the third party be removed from the case records.

78.     Though the decision specifically related to the admission of a third party as an amicus curiae, the members of the Commission Board made more general remarks on the different forms of third-party intervention in administrative disciplinary proceedings. In his vote, the President of the CVM, Marcelo Barbosa (who is still in the position today) concluded that CVM Instruction No. 607/2019 – which at the time governed administrative disciplinary proceedings – did not permit the participation of third parties in disciplinary proceedings. See in this respect, the following section from his vote:

> "The fact that Law No. 13.506/2018 and CVM Instruction No. 607/2019 (current CVM Resolution No. 45/2021) says nothing regarding the figure of the amicus curiae **does not mean there is an oversight relating to the possibility of this form of third-party intervention in the administrative disciplinary proceedings under the responsibility of the Securities and Exchange Commission of Brazil. On the contrary: this reflects a deliberate choice, at least on the part of the regulator"** (emphasis added)

79.     Such understanding prevails until today at the CVM. CVM Resolution No. 45/2021, which replaced CVM Instruction No. 607/2019, also does not provide for the participation of interested third parties in the administrative disciplinary proceedings conducted by the regulatory body.

80.     If, as seen above, third-party participation is not applicable in administrative disciplinary proceedings (when the accusation had already been formulated), with greater reason, it does not have any applicability within the scope of investigative procedures. As already mentioned, the investigations follow the inquisitorial system and are conducted by the CVM unilaterally, without parties or even interested third parties. It is – I repeat – an activity in which third parties cannot intervene, in order to ensure that the investigation is effectively conducted. Moreover, there is no record of any cases in which the CVM has admitted an interested third party during the course of an investigation.

81.     In light of all of this, the fact the SPS is as minority shareholder or complainant does not make it a party nor grant it special rights to participate in the investigation, let alone any proceeding. For the CVM, the Petitioner would qualify solely as an informant, without any special right whatsoever to participate in the investigation to be potentially conducted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on June 3, 2022

Rio de Janeiro, Brazil

Pablo Renteria