# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF SPS I FUNDO DE INVESTIMENTO DE AÇÕES – INVESTIMENTO NO EXTERIOR FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:21-mc-00532-RGA |

## DECLARATION OF PABLO RENTERIA

I, Pablo Renteria, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.       I submit this declaration in support of Colorado Investment Holdings LLC f/k/a Blessed Holdings LLC ("Colorado Investment" or "Respondent")'s motion to vacate the ex parte order authorizing SPS I Fundo de Investimento de Ações – Investimento no Exterior ("SPS") to take discovery pursuant to 28 U.S.C. § 1782 and to quash the subpoena served on Colorado Investment in this matter.

2.       All facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents and (c) information supplied to me by Respondent or professionals retained by it.

3.       All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies.  Where an exhibit is in a foreign language a certified translation is provided.

## I.       PROFESSIONAL BACKGROUND

4.       I have been admitted to the Bar Association of Brazil, Rio de Janeiro Section, since 2004.  My professional activity is focused on private law, with an emphasis on corporate law,

contract law and securities market regulation. Currently, I am a partner at the firm Renteria Advogados Associados, specializing in legal consulting on issues related to public companies and the regulation of financial services and market operations. I also represent clients before CVM, and I act as arbitrator in arbitration proceedings.

5.      From 2008 to 2018, I held different positions in the Brazilian Securities Commission (CVM). From 2008 to 2009, I held the position of Advisor for Regulatory Matters; from 2009 to 2011, Chairperson's Chief of Staff; from 2011 to 2013, Superintendent of Administrative Proceedings; and, from 2015 to 2018, Commissioner.

6.      Since 2008, I have been a professor of private law at Pontifícia Universidade Católica do Rio Janeiro (PUC-Rio), where I regularly teach undergraduate classes. At the beginning of last year, I became coordinator of the Legal Practice Center on Securities Regulation at Fundação Getúlio Vargas Law School (FGV). In addition, I am invited to teach private law and securities market regulation in post-graduate courses offered by the PUC-Rio, the State University of Rio de Janeiro (UERJ), the State Magistracy School of Rio de Janeiro (EMERJ), the São Paulo Lawyers Institute – IASP and the Brazilian Association of Publicly-Held Companies (ABRASCA).

7.      I have a doctorate in private law from the UERJ, a master's in private law from the UERJ and a master's in international law from the Paris II University – *Panthéon-Assas*.

8.      A copy of my resume is attached herein as **Exhibit 1**.

## II.      FACTUAL BACKGROUND

### A.      The JBS-Bertin Merger

9.      JBS S.A. ("JBS" or the "Company") is a publicly-traded Brazilian company, whose stock is traded in Brazil on B3's Novo Mercado, a listing segment of the Brazilian stock exchange

made up of companies committed to complying voluntarily with Corporate Governance practices above and beyond those required by law.

10.    On September 16, 2009, JBS and Bertin S.A ("Bertin") announced to the public that their controlling shareholders entered into an association agreement in order to unify the operations of both companies.[1]  For more than three (3) months, JBS and Bertin negotiated the terms of the integration of their operations and carried out the necessary due diligence.  During this process, JBS and Bertin (i) were advised by Banco J.P. Morgan S.A. and Banco Santander S.A., respectively,[2] and (ii) created Independent Committees to evaluate the operation, in accordance with the Brazilian Securities and Exchange Commission ("CVM") Guidance Report 35.[3]

11.    On December 29, 2009, the shareholders of JBS approved, at an Extraordinary General Meeting, (i) the merger of all shares of stock issued by Bertin into JBS ("JBS-Bertin Merger"), as well as (ii) the change in JBS's corporate purpose to include the activities carried out by Bertin.[4]  Such an approval complied with the applicable provisions of Federal Law 6,404/1976 ("Brazilian Corporate Law") and CVM Guidance Report 35, since the companies created Independent Committees to evaluate the operation and the controlling shareholders abstained from voting in the relevant deliberations.  Also, the approval of JBS-Bertin Merger was followed by the necessary disclosures to the market, as requested by article 157, paragraph 4, of the Brazilian Corporate Law and CVM Rule 358/2002.

---

[1] *See* JBS's Material Fact Disclosure (September 16, 2009) (**Exhibit 2**)

[2] *Id*.

[3] *See* JBS's Material Fact Disclosure (December 7, 2009) (**Exhibit 3**).

[4] *See* JBS's Notice to Shareholders (December 29, 2009) (**Exhibit 4**).

12. The JBS-Bertin Merger was also approved by the Administrative Council of Economic Defense (CADE).[5] Likewise, the CVM evaluated the transaction and confirmed that the operation was in compliance with the Brazilian Corporate Law and CVM Rules.[6]

**B.    The CVM Action**

13. Many years later, by analyzing the JBS-Bertin Merger, the *CVM Corporate Relations Superintendent*, a unit responsible for supervising Brazilian publicly-held companies, believed there to be differences between what was officially communicated to the public and what effectively occurred during the transaction, including Respondent's role, if any, in these JBS-Bertin Merger.

14. In light of indications that the real owners of Colorado Investment would be members of the family that controls JBS—the family of Wesley Batista and Joesley Batista (the "Batista Brothers")—an administrative inquiry was launched, conducted by *CVM's Superintendent of Administrative Proceedings,* to investigate the facts in greater depth.

15. Having concluded his investigations, the *Superintendent of Administrative Proceedings* prepared his Indictment, dated September 4, 2020, according to which some of the transaction details were not disclosed to the public so that the Batista Brothers may have increased their shares in JBS to the detriment of the Company's minority shareholders ("CVM Action").

16. The *Superintendent of Administrative Proceedings* charged five people with fraudulent transactions in the Brazilian stock market. The defendants presented their defenses

---

[5]    *See* Decision of the Concentrating Operation no. 08012.008074/2009-l 1 (April 17, 2013).

[6]    *See* CVM's Report RA/SEP/GEA-4/N° 015/2010 (February 2, 2010).

between December 23, 2020 and March 23, 2021, and, on June 1, 2021, by means of a draw, CVM Director Alexandre Rangel was appointed CVM Action rapporteur.

      17.     On October 22, 2021, SPS filed, in the CVM Action records, a statement requesting that the rapporteur director consider certain information and documents that, in the opinion of SPS, could contribute to the analysis of the dispute.[7]  Between November 17, 2021 and December 10, 2021, the defendants submitted their objections to SPS's request and requested the removal of SPS's filing from the CVM Action records.[8]

      18.     On December 20, 2021, the rapporteur director issued an order granting all the defendants a period of 15 business days to make any additional statements regarding the petition filed by SPS.  Also, according to the order, the director will subsequently decide on the introduction of the information and documents presented by SPS.

      19.     Two days later, on December 22, 2021, the Batista Brothers filed a joint petition in which they asked the rapporteur director to extend the deadline for submitting their additional statements.  In addition to this, the Batista Brothers warned the rapporteur that SPS had incorrectly alleged before the Delaware Judiciary that it was an interested third party in the CVM Action and, in order to alleviate any doubts herein relating to the matter, requested that the rapporteur immediately uphold the illegitimacy of SPS's attempted intervention in the CVM Action.

      20.     By way of the order dated December 30, 2021, the rapporteur granted an extension to the deadline for the submission of additional allegations and, with regard to the request for recognition of the illegitimacy of the attempted intervention by SPS, highlighted that this would not be possible because, among other reasons, SPS had not even formally appealed for its

---

      [7] As will be made clear in this declaration, the mere submission of a filing does not make that filing, nor anything appended thereto, part of the case records.

      [8] *See, e.g.,* **Exhibits 5 to 8**.

admittance as an interested third party in the CVM Action.[9]  Finally, the rapporteur reiterated that he shall be rendering a decision on the admittance of documentary evidence submitted by SPS after receiving the defendants' additional allegations.[10]

### C.    The Arbitration Proceedings

21.    In August 2017, a few months after the plea agreement executed between the Batista Brothers and the Federal Prosecution Office of Brazil was made public (by means of which the Batista Brothers revealed to the Federal Prosecution Office facts that could lead to criminal investigations), certain JBS minority shareholders commenced an arbitration proceeding before the Market Arbitration Chamber – CAM in São Paulo, seeking damages allegedly caused to JBS due to the facts involving JBS-Bertin Merger uncovered under the plea agreement proceedings (CAM Arbitration No. 93/17).

22.    After becoming a JBS shareholder on June 13, 2018, SPS filed a similar arbitration proceeding (CAM Arbitration No. 110/18) against the same defendants and regarding facts relating to Arbitration Proceeding No. 93/17.

23.    Considering the connection between the facts, both arbitration proceedings were joined and started to be processed jointly ("Arbitration Proceedings"). The pleading stage of the Arbitration Proceedings was completed and the next planned stage is the evidentiary stage, where the parties will produce and discover documents.

24.    In this context, I am going to analyze some aspects of SPS's request for discovery in light of the particularities of the specific case and the Brazilian legal system.

---

[9]   In other words, the issue is not ripe for determination as SPS has not even tried yet to be admitted as an interested party in the CVM Action.  This is conclusory evidence that SPS is not part of the CVM Action and lacks standing to participate in that Action.

[10] *See* **Exhibits 9 to 12**.

## III. SPS'S ATTEMPT TO OBTAIN DISCOVERY IS AN ATTEMPT TO CIRCUMVENT PROOF GATHERING RESTRICTIONS IMPOSED BY CVM RULES

### A. General overview of the ordinary track of the CVM administrative proceedings.

25.     In accordance with CVM Resolution No. 45/2021, once the investigation and the accusation are concluded, the CVM is responsible for serving the complaint on the defendants so that they can present their defenses (CVM Rules, Art. 16).  After the summons is issued, the administrative proceedings are considered formally constituted (*Id.*, Art. 21).

26.     CVM Resolution No. 45/2021 provides for two different tracks: the ordinary track and simplified track (which suits less complex infractions, which do not normally require an evidentiary stage).  In this declaration, I will address only the ordinary track, since it is the one applicable to the CVM Action.

27.     The ordinary track begins with the defendants presenting their defense, which must be accompanied by the documents intended to prove their defenses, as well as the specification of any other evidence they intend to rely in the evidentiary phase of the administrative proceedings (Art. 29).  At this time, if they wish so, the defendants may also express their intention to propose to CVM a consent decree in order to close the administrative proceedings (Art. 29, § 1 and Art. 82, § 1).

28.     If a proposal for a consent decree is not submitted or if the proposal is not accepted by the CVM, the rapporteur of the proceeding is then assigned via draw among the CVM Commissioners (Art. 31).  Subsequent to being designated, the rapporteur then presides over the administrative proceeding and is responsible for deciding on any procedural issues that may arise during the course of the procedure (Art. 39).  The rapporteur's decisions, however, are subject to

appeal before the Commission Board of the CVM, whose decisions are taken via majority vote and may modify the rapporteur's decisions accordingly (Art. 39, §1).

29.     Initially, it is the responsibility of the rapporteur to analyze and fix any irregularity, if he or she identifies any irregularity in the accusation, such as, for example, the failure to indicate which legal or regulatory provisions defendants allegedly violated (Art. 41 and Art. 6, V).

30.     Then, the evidentiary phase of the administrative proceedings begins.  In this regard, the rapporteur and the CVM Commission Board, if requested, must decide on the request for discovery formulated by the defendant (Art. 43), and reject the ones that are illegal, unnecessary or delaying (Art. 43, §3).  In addition, the rapporteur has the exclusive prerogative to determine, at any time, and on his own initiative, any additional diligences that he or she considers useful to clarify the facts related to the accusation (Art. 42).  However, the decision taken by the rapporteur on his or her own initiative that determines additional diligences is subject to appeal before the Commission Board.

31.     Lastly, once it is understood that the process is duly instructed, the rapporteur issues a call for the trial session of the Commission Board to rule on the case.  Each member of the Commission Board holds one vote and its resolutions are made by majority of them (Art. 55).  The rapporteur prepares the process report and votes first (Art. 57).

**B.     The rapporteur and the CVM Commission Board control the discovery stage of the administrative proceedings.**

32.     As described above, the rapporteur and CVM Commission Board play a central role in conducting the administrative proceedings. The rapporteur takes the first decision on procedural issues, but the Commission Board has the final say if there is any appeal filed against the

rapporteur's decision or if the rapporteur, at his or her own initiative, decides to bring any request made by the defendant directly for appraisal by the Commission Board (Art. 39, §2).

33.     There are some decisions that must be deliberated on by the Commission Board, such as, for example, the legal reclassification of the facts on which the accusations are based (Art. 47) and the approval of the consent decree proposal formulated by the defendant (Art. 86).

34.     The role of the rapporteur and Commission Board is particularly important during the evidentiary stage of the proceedings.  As mentioned above, the rapporteur (and the Commission Board, if demanded) has the authority to decide which evidence must be discovered and permitted in the proceedings' records.  Not even the defendants have discretion to include in the records the evidence that they consider relevant for the case.

35.     In fact, as mentioned above, the defendants may present, together with their defense, the items of proof they have.  But the discovery of other evidence, such as, for example, depositions and documents held by third parties, must be requested at the time they present their defense, and the rapporteur or the Commission Board, if demanded, is responsible for analyzing the request and granting the discovery of those that, in their assessment, seem useful in clarifying the facts related to the accusations.

36.     This means that, in the CVM administrative proceedings, there is an appropriate time for the defendants to present the evidence they have and request the discovery of other they believe useful to their defense.

**C.**  **Violation of CVM rules regarding the evidentiary stage and SPS's usurpation of the rapporteur's powers**.

37.      This is true for the defendant and more so for third parties who are not parties to the administrative proceedings.  The regulation of the CVM administrative proceedings does not allow third parties to decide what evidence should be introduced in the administrative proceedings.

38.      As seen, it is the case rapporteur and, ultimately, the CVM Commission Board, under the terms of Articles 42 and 43 of CVM Resolution No. 45/2021, who has the power to evaluate and decide which evidence should be introduced in the administrative proceedings.  In particular, Article 42 grants the rapporteur the prerogative (subject to appeal to the Commission Board of the CVM) to decide, on his or her own motion on any new measures to be adopted in addition to those required by the defendants in their defense.  This prerogative does not belong to anyone else—not even the defendants.

39.      It remains clear, this way, that the attempt by SPS to obtain *discovery* violates the rules that govern the CVM administrative proceedings.  The CVM regulation does not allow SPS to produce evidence based on the argument that it would be, in SPS's assessment, useful to the CVM Action instruction.  Once again, this prerogative is exclusive to the CVM Action rapporteur and, ultimately, the CVM Commission Board, and cannot be circumvented by SPS initiative to conduct the discovery*, of its own accord, purportedly "for use" in the proceedings.

40.      From this it follows that SPS is trying, through discovery, to interfere with the authority that Article 42 of CVM Resolution No. 45/2021 gives only to the process rapporteur and the CVM Commission Board to assess and decide which evidence, in addition to that eventually requested by the defendants, must be discovered and admitted into the case records.

**D.     The CVM has the capacity to obtain, on its own account, the documents and information that SPS is trying to obtain through discovery**.

41.     SPS's attempted interference with the CVM Action rapporteur's authority is even more serious because, contrary to what SPS alleges in its request, the CVM Action rapporteur has full authority to request the evidence sought from U.S. authorities if he believes they are useful for the process instruction.

42.     In its 1782 Application, SPS seeks to justify the granting of the *court order* to obtain information from Colorado Investment by arguing that "the CVM cannot obtain this information itself because Colorado Investment is outside the CVM's subpoena powers."  D.I. 2 at 13.

43.     This statement, however, is not correct.  Both the CVM and the United States *Securities and Exchange Commission* ("SEC") are signatories to the *Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information* ("MMoU") of the *International Organization of Securities Commissions* ("IOSCO").

44.     The MMoU establishes the bases for international cooperation between regulators of securities markets and, among other provisions, authorizes any regulator to request from another regulator information that may be used to investigate certain illegal acts, including "misrepresentation of material information and other fraudulent or manipulative practices relating to securities and derivatives" (Paragraph 4).

45.     The MMoU provides different forms of assistance among regulators, including obtaining information and documents related to "identifying persons who beneficially own or control non-natural Persons organized in the jurisdiction of the Requested Authority" (Paragraph 7, (b), (ii)). The MMoU also authorizes assistance for "taking or compelling a Person's statement,

or, where permissible, testimony under oath, regarding the matters set forth in the request for assistance" (Paragraph 7, (b), (iii)).

46.     Since both the CVM and the SEC are signatories of the MMoU, the CVM has full authority to request, whenever it wants, the assistance of the SEC to obtain information and documents held by the legal representative of a corporate entity incorporated in the United States, which may assist in the investigation of an alleged fraudulent transaction in the Brazilian securities market, such as in the case of the CVM Action.

47.     Thus, the CVM Action rapporteur, based on the powers granted by Art. 42 of CVM Resolution No. 45/2021, and if he considered it materially relevant for the case, would be able to request SEC assistance in order to obtain, through the courts, information and documents from the representative of Colorado Investment, similarly to a discovery request.

48.     Based on my experience as a CVM Commissioner and Superintendent of Administrative Proceedings, I can say that the CVM has used the MMoU several times in its enforcement activity, in order to obtain information and documents from companies based overseas. Also, when I was CVM Superintendent of Administrative Proceedings, I used the MMoU to obtain information and documents from companies based in the State of Delaware, in the United States.

49.     That, to the best of my mind, indicates that, contrary to what it alleges, SPS is not seeking, by means of its discovery request, to gather evidence for the CVM Action that otherwise the CVM would not be able to obtain. Actually, and as I have already mentioned, I believe that SPS is circumventing the CVM rules that grant exclusively to the rapporteur and, in the last instance, the CVM Commission Board, the authority of evaluating and deciding what evidence must be discovered during the evidentiary phase of the administrative proceedings.

50.     This attempt by SPS to obtain evidence that the CVM Action rapporteur might, on its own, obtain through SEC assistance, appears to reveal that the true objective of SPS is not to contribute towards the discovery of the CVM Action, but to obtain evidence that may help it in the Arbitration Proceedings.

51.     In that regard, it is revealing that SPS has already tried, prior to the request made in the CVM Action, to join two ongoing criminal proceedings before the Brazilian Courts, based on its alleged interest in repairing damage caused to JBS.  Both requests were rejected due to SPS's lack of standing.[11]

52.     These repeated and unsuccessful attempts indicate that SPS is seeking a case—no matter which—in order to qualify itself as an "interested third party in a foreign case" and thus obtain its legal standing to initiate discovery requests in the United States under 28 U.S.C. § 1782 that may help it in the ongoing Arbitration Proceedings.  Once again, this appears to be the goal of SPS within the scope of the CVM Action.  Given its failures in its previous attempts before the Brazilian courts, this time SPS seeks to "build" the standing it lacks for discovery before the CVM.

53.     This is not, however, the only irregularity related to SPS's request for discovery.  As I will explain below, SPS is not considered an interested third party in the CVM Action; it is not authorized to produce evidence under the CVM Action and, even if it were, nothing leads to the conclusion that they would be of any use to the CVM.  In addition, upon requesting discovery, SPS also disrespects its obligation to resolve any dispute related to JBS by means of arbitration procedures, as provided for in JBS's company bylaws.

---

[11] Citing the decision rendered on June 9, 2021 in Criminal Electoral Action no. 0600011-12.2020.6.20.0002, in process in the 1st Electoral Area of Natal/RN; and the decision rendered on August 27, 2021 in Criminal Electoral Action no. 0600087-37.2021.6.26.0001, in progress in the 1st Electoral Area of São Paulo/SP. *See* **Exhibits 11-14**.

## IV. SPS IS NOT AN INTERESTED PARTY IN THE CVM ACTION

### A. A necessary preliminary distinction: right to petition and third-party intervention in administrative proceedings.

54. The Brazilian Federal Constitution, in its Art. 5, XXXIV(*a*), guarantees "the right to petition Public Authorities in defense of rights or against illegality or the abuse of power." As a result of this right, any person (whether they are an interested party or not in a case) may inform the relevant authority of a question or situation that, in their view, deserves the adoption of appropriate measures. This is a universal right, that may be exercised for free by any person, regardless of the demonstration of their interest in the matter.

55. For example, based on the right to petition, any person may bring to the attention of the CVM the occurrence of any fact they understand characterizes an illegal act within the Brazilian securities market, or for any other reason that may deserve the attention of the regulatory authority. Accordingly, a person does not even need to demonstrate their personal interest in the matter to the CVM. Hence, for instance, if a citizen believes that a given company has perpetrated a conduct that contravenes the Brazilian Securities and Exchange Law, this citizen may—by way of the right to petition—bring this fact to the CVM's knowledge, even if they are not even a shareholder or investor in the company. The right to petition guarantees all citizens access to public authorities, as is the case of the CVM.

56. However, this right to petition is not to be confused with the right to participate in any ongoing administrative proceedings, which is subject to the requirements set forth by law subject to a decision taken by the public authority granting the special status of an interested third party in said proceedings. As a result of this status, the interested third party then acquires participation rights in the proceedings, such as the right to file pleadings in the case records.

57. Accordingly, the mere fact that a person files a petition to the CVM requesting the adoption of any measure, such as, for example, the appraisal of certain documents within the scope of an administrative proceedings, does not give this person the status of an interested third party, nor does it give this person participatory rights in the proceeding, since, in order to do so, it would be necessary that this status were granted by the CVM.

**B. The CVM regulation does not allow interested third parties in its administrative proceedings**.

58. Within the scope of the Brazilian federal public administration, the administrative processes may be governed by Law No. 9,784/1999, which establishes general rules applicable to any processes, or by sectorial laws and regulations, which specifically regulate the processes conducted by a certain federal organization. The CVM administrative proceedings fall under the latter case, because, by virtue of Article 9, §2, of Law No. 6,385 of 1976,[12] the CVM has the authority to regulate the procedure applicable to its administrative proceedings. As already mentioned above, the matter is currently regulated by CVM Resolution No. 45/2021.

59. When the administrative process is governed by specific rules, as is the case of the CVM administrative proceedings at issue here, the provisions of Law No. 9,784/1999 are not directly applicable, but subsidiarily, that is, only when necessary to fill a gap in the regulations. This is the solution expressly provided for in Art. 69 of Law No. 9,784/1999, according to which "the specific administrative processes will continue to be governed by their own law, applying the precepts of the Law complementarily."

---

[12] "Art. 9. (...) § 2. The process, in the cases of paragraph V of this Article, may be preceded by an investigative stage, in which the confidentiality necessary to clarify the facts or required by public interest will be ensured **and the procedure established by the Commission shall be followed**" (emphasis added).

60.     Among other provisions, Law No. 9,784/1999 in Article 9 deals with people entitled to participate in the administrative process, among which are third parties, who, despite not appearing as parties to the process, "have rights or interests that may be affected by the decision to be adopted."[13]  Meanwhile, as explained, this rule would only apply to the CVM administrative proceedings if there was a gap in the regulation issued by the CVM regarding the intervention of interested third parties.

61.     It is worth clarifying that, in Brazilian law, the "regulatory gap" means the omission of the legislator or regulator to address a specific matter.  The gap is not to be confused with the mere nonexistence of a rule on the matter, because there are cases in which the legislator or the regulator deliberately choose not to address the issue.  This is the case of third-party interventions in the CVM administrative proceedings, with respect to which there is no gap that should be resolved from the complementary application of Law No. 9,784/1999.

62.     Indeed, it is settled in the CVM case law that it would not be possible for third parties to participate in its administrative proceedings.  In this regard, one can consult the statement of the Federal Specialized Prosecutor before CVM ("Prosecutor's Office"), in charge of controlling the legality of CVM acts, within the scope of Administrative Proceedings CVM No. RJ2015/2386, of which I was the rapporteur.  Upon being consulted regarding a request made by a third party to be admitted as an interested third party, the Prosecutor's Office concluded that CVM Deliberation No. 538/2008—that at that time ruled the administrative proceedings—did not admit this type of request:

> "When analyzing Deliberation CVM no. 538/2008 [current CVM Resolution No. 45/2021], the rule governing the Administrative Proceedings within the scope of

---

[13] "Art. 9. They following have legal standing as interested parties in the administrative process: (...) II – those who, without having initiated the process, have rights or interests that may be affected by the decision to be adopted;"

the CVM, it can be noted that **it provides no provision regarding the intervention of third parties. This is not due to mere forgetfulness of the legislator, but to incompatibility with the accusatory system**, originating from the Criminal Proceedings, adopted by the CVM to apply its administrative sanctions".[14]

63.     The matter was also examined by the CVM Commission Board in the decision made on March 17, 2020 within the scope of the CVM Administrative Proceedings No. 19957.005983/2019-18.  In its decision, the Board considered the request made by a third party to participate in the administrative proceedings as *amicus curiae*, having unanimously rejected the request and, by majority of votes, decided to remove from the records the documents filed by the third party.

64.     Although the decision specifically dealt with the admission of a third party as *amicus curiae*, the members of the Board made more general considerations about the different forms of third-party intervention in the administrative proceedings.  In his vote, CVM Chairperson Marcelo Barbosa (who still remains in this position) concluded that CVM Instruction No. 607/2019—which, at the time, governed the administrative proceedings—did not allow third-party participation in the administrative proceedings. In this regard, see the following excerpt from his vote:

> "The fact of Law No. 13,506/2018 and CVM Instruction No. 607/2019 [current CVM Resolution No. 45/2021] saying nothing about amicus curiae **does not mean that there is a gap regarding the possibility of such third-party intervention in the administrative proceedings under the responsibility of the Brazilian Securities and Exchange Commission.  On the contrary, it does reflect a deliberate choice, at least on the part of the regulator**" (Emphasis added).

---

[14] Opinion No. 00166/2017/GJU-4/PFE-CVM/PGF/AGU, 10/19/2017 (emphasis added).

17

65.     This is the understanding that currently prevails in the CVM.  CVM Resolution No. 45/2021, which replaced CVM Instruction No. 607/2019, also does not provide for the participation of interested third parties in the administrative proceedings carried out by the CVM. It is not for any other reason than that up to now there is no case of any administrative proceedings in which the CVM has allowed an interested third party intervention.

**C.      SPS was not admitted as an interested third party in the CVM Action**.

66.     On October 22, 2021, SPS filed a petition in the CVM Action requesting the inclusion of certain documents in the case records.  In this regard, SPS alleges (incorrectly) in its 1782 Application that it "has been formally recognized as an interested party in the Brazilian Proceeding, and the evidence that it formally submitted to the foreign tribunal has been accepted for review."  D.I. 2 at 18.

67.     In addition to not being possible for SPS to be recognized by the CVM as an interested third party, for the reasons indicated in the previous section, the examination of CVM Action records reveals a different reality from that described by SPS in its 1782 Application.

68.     Contrary to what SPS alleged in its petition, SPS has not even requested to be admitted as an interested third party in the CVM Action, as proven by the following excepts extracted from the order issued by the rapporteur on December 30, 2021.

> "Conveniently, I would also emphasize herein that in the Claims, [SPS] did not formally request to be admitted into these Proceedings as assistant, amicus curiae or under any other method of third-party intervention under the Brazilian legal system."
>
> ***
>
> "I reject petition (ii) from the Plaintiffs, determining the upholding of the Claims in the case records of these Proceedings, bearing in mind that:
>
> (...)

18

there is no formal petition from the Fund to see its direct hypothesis of formally intervening in these proceedings as an interested third party being acknowledged, whether as an assistant, amicus curiae or under any other third-party intervention method permitted under the Brazilian legal system";

***

"Here, as stated above, there is no formal petition from [SPS] to formally intervene in these Proceedings, but merely an as-yet undecided petition, that the documents and information filed into the case records be brought into consideration when judging this case."

69.     Accordingly, if SPS has not even petitioned for its entry as an interested third party (and as a result, the rapporteur has not even examined whether the relevant requirements are satisfied in this case), it is incorrect to state, as SPS does, that it had already gained the status of an interested third party in the case.  At this time, there is no decision by the rapporteur or CVM Commission Board granting SPS the status of an interested third party in the case.  It is also worth pointing out, as proven by the abovementioned order, that the rapporteur has not yet examined admittance of the documents submitted by SPS into the case records of the CVM Action.  This matter is still pending analysis by the rapporteur, and his decision is subject to appeal before the Commission Board of the CVM.

## V.     SPS IS NOT AUTHORIZED TO INTRODUCE ANY EVIDENCE IN THE CVM ACTION

### A.     The CVM establishes conditions for a third party to introduce evidence in the administrative proceedings.

70.     In addition to not being considered an interested third party for the reasons given above, SPS was also not authorized to introduce any evidence within the scope of the CVM Action.

71.     As already mentioned, the right to petition, guaranteed by the Brazilian Federal Constitution, should not be confused with the right to participate in court or administrative

proceedings, which is subject to the requirements set forth by the law. In this respect, the *Federal Supreme Court*, the highest court of the Brazilian legal system, has decided that the fact that a person is legally entitled by the Federal Constitution to exercise the right to petition does not mean that this person is excused from compliance with the requirements imposed by law in order to exercise other rights as part of the proceedings or as an interested third party (such as, for example, the right to submit statements or documents during the proceedings):

> "(…) the right to petition, based on Art. 5, XXXIV, 'a', of the Constitution, may not be invoked, in a general sense, in order to exonerate any party of their duty to observe, in procedural terms, the requirements and assumptions stipulated by the legislation and the internal regulations of Courts in general."[15]

72.     In the decision already referred to above (CVM Administrative Proceedings No. 19957.005983/2019-18), CVM Chairperson Marcelo Barbosa clarified that, despite CVM regulation not authorizing third party intervention, the process rapporteur would be entitled to allow third party contributions to the evidentiary stage of the proceedings, provided that certain conditions are met. See the following excerpt from his vote:

> "(...) nothing prevents that, after an in-depth analysis of the case files to form his view in relation to the merits, the rapporteur requests, through additional steps, a statement on specific points that may be clarified by third parties,  which will certainly be evaluated with careful diligence, since it will not enjoy the impartiality typical of amicus curiae.  This, however, does not give the Appellants the standing to file petitions outside of the ordinary course of the proceedings because it disrupts the case—although they contributed to its beginning, the Appellants are not part of this proceedings and, therefore, cannot interfere with it without being properly requested.

---

[15] Regulatory Appeal (AgRg) in Motion for Clarification (Emb. Decl.) in Regulatory Appeal (AgRg) in Special Appeal (RE) No. 406.432/PI, Rapporteur Min. Celso de Mello, Second Division, judged on March 27, 2007.

73. The CVM Chairman discussed this matter once again in a new decision, issued on May, 5, 2020 in the same administrative proceedings. On this occasion, the decision of the CVM Commission Board was unanimous, in such a way that Chairperson Marcelo Barbosa's vote can be considered the current guidance of the CVM on the matter.

74. According to such guidance, in order for the collaboration of a third party to be allowed in the CVM administrative proceedings instruction, the conditions described in the excerpt transcribed below from the minutes of the Board Decision must be met:

> "Chairperson Marcelo Barbosa, rapporteur of the proceedings, believed that the premise adopted by the Claimants is not supported. This is because, as he emphasized, rapporteurs of administrative proceedings are entitled, when they believe it to be useful for better clarification of relevant facts, to request third party information, as indeed occurs, regardless of 'procedural challenge to this'. Along the same line, he emphasized that the Claimants may petition the rapporteur stating that they can contribute to the resolution of the matter under consideration. In this hypothesis, the rapporteur shall evaluate the relevance of the request and decide, indicating what clarifications will be relevant, how they can be provided and other aspects deemed important, based on the particularities of the case."

75. As can be seen from the reading of the excerpt, in order for the collaboration of the third party to be allowed in the proceedings, the following conditions must be met: (i) the third party must be in a position to provide clarification on the facts examined in the case records; (ii) if it has not been summoned by the rapporteur, the third party must petition the rapporteur stating that it is in a position to contribute to the process; (iii) the rapporteur must evaluate the request and, if he decides to allow it, must indicate what clarifications the third party is authorized to provide and how to provide them.

76. As explained below, SPS does not meet any of the above-mentioned conditions to be authorized to introduce, in the CVM Action records, the desired evidence through discovery.

**B.     SPS does not meet the conditions established by the CVM to introduce evidence in the CVM Action records.**

77.     In the first place, SPS was not a JBS shareholder at the time of the JBS-Bertin Merger and it is not involved in the facts examined in the CVM Action.  SPS, therefore, is not in a position to provide pertinent clarifications on the facts that gave rise to the accusations made within the scope of the CVM Action.

78.     The contribution that SPS aims to make is quite different from that authorized by the CVM under the terms mentioned above.  SPS seeks to obtain documents that are in the US and that could be requested directly by the CVM Action rapporteur, as deemed appropriate.  Its contribution seems, therefore, unnecessary.

79.     Secondly, SPS was neither summoned by the CVM Action rapporteur to provide clarifications nor did it petition to inform that it would be in a position to contribute to the process instruction.

80.     Thirdly, there was no decision by the CVM Action rapporteur authorizing SPS to gather any type of evidence, much less the evidence it seeks to obtain by means of *discovery*.  On the contrary, as already mentioned above, so far there is only a petition formulated by SPS asking the rapporteur to allow the SPS to introduce documents in the case records, which has not yet been decided by the rapporteur.

81.     In conclusion, SPS does not fulfill any of the conditions established by the CVM for being admitted to introduce evidence in the CVM Action records.

## VI. ANY EVIDENCE OBTAINED IN THE 1782 PROCEEDING IS NOT RELEVANT

**A.** **The defendant Joesley Batista already confirmed who were the beneficial owners of Colorado Investment and their involvement in the matters examined within the scope of the CVM Action**.

82. In its 1782 Application, SPS sustains that the evidence sought through *discovery* for the CVM Action are relevant, insofar as they would allow to clarify who were the final beneficiaries of Colorado Investment and their involvement in the JBS-Bertin Merger.

83. However, based in the examination of the CVM Action records, there is nothing that makes me believe that this evidence, de facto, would be deemed useful for the judgment of the accusations. This is because the Superintendent of Administrative Proceedings has already considered sufficient the clarifications provided by Messrs. Joesley Batista and Francisco de Assis e Silva within the scope of the plea agreements they signed with the Federal Prosecution Office.

84. Those are the clarifications that, at the time, the defendant Joesley Batista provided and which are transcribed in the CVM accusation:

- "[Colorado Investment] *is company with headquarters in Delaware and constituted on December 16, 2009. On March 18, 2010, the companies USCW and LH, two important American insurance companies, become* [Colorado Investment] *shareholders and, by means of a contract called 'Administration & Management Agreement', decided to deposit any and all dividends eventually received by* [Colorado Investment] *into insurance policies the beneficiaries of which would be my children, nieces, and nephews who would receive the benefits in the event of the death of their parents. These companies did not participate in the management of the company, respecting an Operating Agreement that foresaw Andrea Prospero being the non-member management of* [Colorado Investment].

23

- *On March 15, 2010, Graal Trust was created, incorporated by José Batista Sobrinho, managed at the discretion of the Trust Company THE PRIVATE TRUST CORPORATION LIMITED ('Original Trustee'). On April 19, 2010, Graal Trust became the proprietor of Global Variable Life Insurance Policy issued by the companies USCW and LH, whose beneficiaries were the same as the Batista Family.*

- *In March 2016, my brother and I made a binding offer to acquire, from the insurance companies, 100% participation in* [Colorado Investment]."

85. Mr. Francisco de Assis e Silva, former legal director of JBS, presented the following clarification in respect of the involvement of Colorado Investment in JBS-Bertin Merger: "*I have been aware of the* [Colorado Investment] *matter since the end of November 2009, when Joesley Batista asked me to create a corporate structure to accommodate the ongoing transaction arising from the ASSOCIATION AGREEMENT signed between BERTIN and JBS, as described in the Relevant Fact disclosed to the Market on September 16, 2009 and October 22, 2009.*"

86. This information, it should be noted, was considered sufficient by both the Federal Prosecution Office, in order to enter plea agreements, and by the Superintendent of Administrative Proceedings, in order to conclude its investigation and prepare the accusations object of the CVM Action. In spite of broad investigative powers, including the power to request assistance from the SEC, the Superintendent of Administrative Proceedings thought that no additional diligence would be necessary.

87. Therefore, there is no fact that supports that the evidence to be obtained through *discovery* would, in fact, be useful for the CVM Action evidentiary instruction.

**B.** **It is up to the CVM Action rapporteur, and not SPS, to evaluate the usefulness of the evidence to be obtained by means of discovery**.

88.     As previously stated, SPS is not in a position to evaluate how useful the evidence to be obtained through discovery would be for the CVM Action.   In the CVM administrative proceedings, only the rapporteur and, ultimately, the Commission Board of the CVM have the authority to assess what evidence may be useful in clarifying the facts relating to the accusations. Only the CVM could, in fact, make a valid request to the US authorities regarding the potential materiality and relevance of the documents and information requested in the discovery proceedings commenced by SPS.   This role cannot be performed by the defendant, let alone by a third party, who is not a party to the proceedings.

**C.** **The rapporteur may not add new charges to the scope of the CVM Action**.

89.     In order to demonstrate the usefulness of the evidence to be gathered by means of discovery, SPS asserts that the evidence could lead the CVM Action rapporteur to bring new charges against the defendants in the administrative proceedings.   Therefore, SPS alleges that the CVM Commission Board could, on the basis of Art. 47 of CVM Resolution No. 45/2021, change the legal definition of the facts examined in the case to add new charges related to the potential breach of disclosure obligations and non-compliance with duties established in the Brazilian Corporate Law.

90.     This statement, however, is not correct.   The CVM adopts, in its enforcement activity, the accusatory system, based on the separation between, on one hand, the accusatory function and, on the other, the judging function.   In this way, CVM superintendents are responsible for conducting investigations and making accusations, while the judgment of administrative

proceedings is reserved to the Commission Board.[16]  This system, which is currently in force under CVM Resolution No. 45/2021, prevents the Commission Board from intervening in the accusatory activity carried out by CVM superintendents.

91.     This being the system adopted by the CVM, it is clear that the legal reclassification of the facts, which is dealt with in Article 47 of CVM Resolution No. 45/2021, does not authorize the CVM Commission Board to bring new charges in the administrative proceedings.  Actually, the legal reclassification, inspired by the Brazilian criminal process, is based on the premise that the defendant defends himself against the alleged facts, and not against the legal qualification given to the facts.  For this reason, the judging authority may, without altering the facts, correct the legal qualification made by the CVM superintendent responsible for the accusation, whenever it understands that the superintendent has not given the correct legal framework to the specific case.[17]

---

[16] This characteristic of the CVM enforcement system has already been underlined several times in CVM Board decisions. Citing the recent sentence of Administrative Proceedings No. RJ2018/8272, on March 23, 2021 and reported by Commissioner Flávia Perlingeiro, in which it was shown that, "since the enactment of the already revoked CVM Deliberation No. 457, of December 23, 2002, which established the procedures to be followed in the [administrative proceedings], the CVM established the separation between the investigative and accusatory functions, attributed to the superintendents, and the judging function, exercised by the Commission Board.  In this way, the superintendent has total autonomy to initiate and lead the processes or administrative investigations and, if deemed appropriate, to make an accusation.  As a logical consequence, it is also up to the superintendent to decide on the structure of these processes, if it concludes there is no sufficient evidence to bring an indictment, without interference of the Commission Board." See also, in the same sense: (i) CVM Administrative Proceedings no. RJ2015/10677, Rapporteur Director Henrique Machado, ruling on February 7, 2017; (ii) CVM Administrative Proceedings No. RJ2013/6635, Rapporteur Director Luciana Dias, ruling on May 26, 2015; (iii) CVM Administrative Proceedings No. SP2016/0246, Rapporteur Director Gustavo Borba, ruling on September 11, 2018; and (iv) CVM Administrative Proceedings No. RJ2015/5493, Rapporteur Director Pablo Renteria, ruling on October 27, 2015.

[17] V. Gustavo Henrique Badaró, *Criminal Process*, São Paulo: Revista dos Tribunais, 2016, 4th edition, p. 542.

92.     In other words, Art. 47 of CVM Resolution No. 45/2021 authorizes the Board to make only a "judgment of typical adequacy";[18] that is, an evaluation of a correct qualification of the facts in light of the different types of illegal acts provided for in legal and regulatory regulations. Such a judgment of typicality cannot be extrapolated for broader purposes and does not authorize the CVM Commission Board to add accusations other than those that already appear in the indictment because, as already explained, it would violate the accusatory system adopted by the CVM.

93.     This issue has already been addressed by the CVM Board in a decision issued on January 30 , 2017, within the scope of Administrative Proceedings RJ2013/11703.  At that time, the rapporteur submitted a proposal to the Commission Board for a new legal definition of the facts, based on Article 25 of CVM Decision No. 538/2008, which was in force.  The wording of this provision is identical to Art. 47 of CVM Resolution No. 45/2021, currently in force.

94.     Among other items, the rapporteur proposed the introduction of a new accusation against the defendants. However,  the other members of the Commission Board disagreed with the rapporteur and followed my vote. As seen in the transcribed section below, the prevailing understanding is that the legal redefinition of the facts does not allow the introduction of new charges by the Commission Board:

> "As this is a new and autonomous charge in relation to those that appear in the Accusation, I understand that, in this way, it would extrapolate the judgment of typical adequacy, characteristic of the institute referred to in Art. 25 of CVM Deliberation Act no. 538, with a true accusatory judgment taking place instead, which, in the current regulatory system adopted by the CVM, is reserved for the superintendent of the Regulatory Authority.
> (...)

---

[18] V. Eugênio Pacelli de Oliveira, *Course of Criminal Process*, Sao Paulo: Atlas, 2016, 20th edition, p. 650.

> In accordance with this regulatory system, currently in force under CVM Deliberation No. 538, 2008, the Commission Board does not intervene in the investigation and prosecution activities, so the adding of charges or holding people liable in addition to those already in the indictment does not seem lawful to me, based on Article 25 of the aforementioned Deliberation."

95.    In short, contrary to what SPS alleges, the CVM Commission Board would not be able to, based on Article 47 of CVM Resolution No. 45/2021, alter the legal definition of the facts examined in the case in order to add new charges within the scope of the CVM Action.

**D.    The charge of fraudulent transaction absorbs the alleged infractions mentioned by SPS.**

96.    By analyzing the proceedings of the CVM Action, it is clear that the Superintendent of Administrative Proceedings was fully aware that the facts under investigation could, in theory, lead to new charges alleging violation of disclosure obligations and the duties under the Brazilian Corporate Law.

97.    In this regard, note the "Investigation Report" prepared by the Corporate Relations Superintendent, which supported the request made to the CVM General Superintendent so the Superintendent of Administrative Proceedings could conduct an additional investigation.  This document shows that the investigation to be conducted by this Superintendent should have the following scope:

> "This proposed inquiry does not aim to assess the equity merger process, but only the possible omission regarding the true beneficial ownership of Blessed Holding, an entity that appeared in the JBS Reference Forms beginning in 2010, at the time without indicating who the ultimate owners were, and which is currently listed as a company owned by the controllers of JBS (Wesley and Joesley Batista)."

98.    Nonetheless, at the end of the investigation, the Superintendent of Administrative Proceedings brought a single charge, concluding that the defendants had conducted a fraudulent transaction on in the Brazilian securities market.  The fraudulent transaction is found in s. II(c) of

CVM Instruction no. 8/1979 in broad terms, embracing any transaction "in which a ruse or artifice is used to deceive third parties, with the purpose of obtaining unlawful equity advantage for the parties to the transaction, an intermediary or third parties."

99.    The decision to bring a single charge reveals that the Superintendent of *Administrative Proceedings* observed, in this case, the "principle of consumption", provided for in Brazilian criminal law and applied by CVM in its enforcement activity, by analogy.[19]  Such principle helps the judge to settle the apparent overlapping of illegal acts and determines that in case an illegal act is practiced as a means to commit another illegal act, the "illicit-means" must be absorbed by the "illicit-end."  The defendant, therefore, is tried only for the practice of the "illicit-end."

100.    In this regard, the CVM Action records reveal that the Superintendent of Administrative Proceedings concluded that any possible breaches regarding information disclosure, as well as any possible breaches of the Brazilian Corporate Law, served as a means to the practicing of the fraudulent transaction.  Consequently, the aforementioned Superintendent brought only one single charge.

101.    For this additional reason, it would not be possible to add new charges to the scope of the CVM Action related to the alleged non-compliance with disclosure obligations and duties provided for in the Brazilian Corporate Law.  Even if it was possible, for the sake of argument, that the CVM Commission Board could give a new legal definition to the facts in order to add new

---

[19] See as example, Administrative Proceedings CVM No. (i) RJ2015/6143, Rapporteur Director Gustavo Gonzalez, ruling on April 24, 2018 (ii) RJ2014/13977, Rapporteur Director Gustavo Gonzalez, ruling on January 30, 2020; and (iii) 19957.010573/2019-99, Rapporteur Director Alexandre Rangel, ruling on December 21, 2021.

charges, it is certain that, due to the "principle of consumption", these charges would be absorbed by the charge of fraudulent transaction practice.

> **E.  The filing of charges for lack of information disclosure would violate the terms of the plea bargaining agreements signed between the defendants and the Brazilian Federal Prosecution Office**.

102.    According to the Superintendent of Administrative Proceedings, Joesley Batista revealed facts in his plea bargain signed with the Brazilian Federal Prosecution Office that provided evidence of the practice of irregular information relating to the incorporation of Colorado Investment and the participation of that company within the scope of the JBS-Bertin Merger.

103.    Under Brazilian law, it is understood that evidence produced within the scope of plea agreements cannot be used against the collaborator himself in order to apply penalties other than those provided for in the agreement signed with the Federal Prosecution Office.  According to the highest Brazilian court, the *Federal Supreme Court*,

> "The cooperating defendant agrees to produce evidence against himself under the terms provided in the plea bargain agreement with the State. Thus, the use of the evidence produced by the collaborator himself, to his detriment, in a manner other than that agreed in the plea and approved by the Judiciary is abusive practice, which violates the right to non-self-incrimination."[20]

104.    With regard to the above-mentioned understanding, the Superintendent of Administrative Proceedings noted, in the CVM Action indictment, that "the authority believes that, *a priori*, evidence produced in a plea agreement cannot be used against the signatory of the plea to apply punishments in addition to those agreed in the agreement," and stated, based on that,

---

[20] Ag. Record in Request 7,065-DF, Rapporteur Min. Edson Fachin, 2 Division, ruling on 10/30/2018. Likewise, Ag. Reg. in Inq. 4,420-DF, Rapporteur Min. Gilmar Mendes, 2nd Division, ruling on 8/28/2018.

"Joesley Batista will not be charged for irregularities found on informational issues related to [Colorado Investment]."

105.    As you can see, the decision of the Superintendent of Administrative Proceedings not to charge Joesley Batista with informational irregularities was not due to the lack of evidence of the practice of an illegal act, but rather because such a charge would be illegal and abusive. For this reason, the evidence sought by SPS through discovery could not lead to new charges of informational disclosure defects against Joesley Batista.

## VII.    SPS'S ATTEMPT TO OBTAIN DISCOVERY IS AN ATTEMPT TO CIRCUMVENT ITS OBLIGATION TO ARBITRATE MATTERS RELATING TO JBS

106.    The discovery request submitted by SPS in its 1782 Application constitutes an attempt to circumvent a mandatory arbitration clause provided for in JBS's corporate bylaws and, as a result, the authority of the arbitral tribunal to examine and judge the requirement for producing new evidence.

107.    Indeed, the nature of the litigation that justifies the request for discovery is private: it is a *corporate dispute* whose purpose is to investigate illegal practices that occurred in the JBS-Bertin Merger, allegedly to the detriment of the Company and its shareholders.

108.    Being a private dispute, which involves the Company and its shareholders (JBS, SPS and the Batista Brothers), the arbitration clause provided for in Article 48 of the JBS's bylaws must be enforced, as follows:

> "The Company, its shareholders, managers, members of the Supervisory Board, permanent and substitutes, if any, undertake to resolve, through arbitration before the Market Arbitration Chamber, under its regulation, any dispute that may arise between its issuer, shareholders, or managers (...)."

109.    The fact that the request for the discovery of evidence is addressed to Colorado Investment does not change SPS's obligation to comply with the aforementioned arbitration clause. This is because, **(i)** as mentioned, the dispute behind this request involves JBS and its shareholders (SPS and the Batista Brothers); **(ii)** Colorado Investment is, in SPS's opinion, just the *vehicle* used to perpetuate the alleged fraud involving the incorporation of shares of Bertin; and **(iii)** Colorado Investment is controlled by the Batista Brothers.

110.    SPS seeks to hide the private nature of the current lawsuit against the Batista Brothers in what appears to be an attempt to evade the Art. 48 of JBS's bylaws, which states that all disputes between the Company's shareholders and the Company itself must be resolved through arbitration, initiated at CAM.  Only the arbitral tribunal constituted under the arbitration clause provided for in JBS's corporate bylaws has jurisdiction to decide on SPS's attempt to obtain documents from Colorado Investment.

111.    Law No. 9,307 of 1996 ("Brazilian Arbitration Law") expressly acknowledges that, upon establishing an arbitration agreement, the parties waive their right to resolve their disputes through court venues,[21] in Brazil or overseas.

112.    It is also important to underline that the Superior Court of Justice—the court responsible in Brazil for standardizing the interpretation of the federal infra-constitutional legislation and also ensuring its uniform application by the federal and local second instance authorities—has had the opportunity to reaffirm the binding and compulsory nature of the

---

[21] In accordance with Article 7 of the Brazilian Arbitration Law, "if there is an arbitration clause and the other party refuses to agree on the constitution of the arbitration institution", the interested party may enforce the arbitration clause before the Brazilian courts to compel the resistant party to participate in the arbitration proceedings.

arbitration clause, so that, by doing so, it will actually "remove the Judiciary Power from hearing the conflict of interests that the parties have reserved for the arbitrators to resolve."[22]

113.    It follows that the granting of requests made by SPS through the Court of Delaware would be a violation of procedural rules in force in the Brazilian legal system, since said court—like any other state court—simply has no jurisdiction to decide on any disputes between JBS and the Company's shareholders, including SPS.  This jurisdiction, as mentioned, is exclusive to the arbitral tribunal already constituted (in Arbitration Proceedings) or the one that is to be constituted under Art. 48 of the JBS corporate bylaws.

114.    At this point, by the way, it is necessary to underline that the competent Brazilian court of arbitration would have no obstacle in assessing and granting the request for discovery made by SPS against Colorado Investment, despite the fact that the latter company is headquartered in Delaware and does not necessarily appear as a formal part of the respective arbitration procedure.

115.    This is because, in accordance with Article 18 of the Brazilian Arbitration Law, ""the arbitrator is the judge in fact and in law, and his/her award is not subject to any appeal or recognition by the courts."  In other words, the arbitrator has the exact same powers granted to a

---

[22] According to that established in the ruling of Rep. 1569422/RJ, Rapporteur Minister Marco Aurélio Bellizze, Third Division, ruling on April 16, 2016, "through the arbitration clause, the signatory parties adjust the arbitration agreement to resolve any conflicts of interest, determined or not, arising from an underlying contractual relationship, whose decision to be rendered is as effective as that of a court decision.  Thus, based on the principle of parties' autonomy, the contracting parties elect a third party—the arbitrator, who can be any person who has the confidence of the parties—to definitively settle the dispute submitted to him or her.  As an alternative method of resolving disputes, the establishment of the arbitration agreement immediately produces two well-defined effects.  The first one is the positive effect, which consists of the parties submitting to arbitration to resolve possible dispute arising from the underlying contractual relationship (in the case of an arbitration clause).  The second one is the negative effect, which refers to the impossibility of the courts to hear the conflict of interest that the parties have reserved for the arbitrators to resolve."

court judge,[23] even being subject to criminal liability in the exercise of their functions in the same way as a public official.[24]

116.    With regard to Colorado Investment possibly not formally appearing as a party in the arbitration proceedings established in compliance with the arbitration clause provided for in JBS corporate bylaws, the Brazilian Code of Civil Procedure expressly provides for the judge to determine that a third party may exhibit and present documents in its possession.[25]

117.    The fact that Colorado Investment is headquartered in Delaware does not matter since Brazilian law recognizes various international cooperation instruments and any national judiciary authority may request assistance from foreign courts in "gathering evidence and obtaining information," as provided for in Article 27 of the Brazilian Code of Civil Procedure.  In addition, Brazil ratified the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters,[26] to which the United States of America also adhered.  It authorizes the judge of a signatory country to request the obtaining of evidence from another signatory country by means of a letter rogatory.

118.    It would be enough, therefore, for SPS to request the intended discovery against Colorado Investment before the regularly constituted arbitral tribunal, which, in turn, could request assistance from the Court of Delaware to produce the necessary documents.  More than a mere possibility, this is a hypothesis expressly provided for in Brazilian law.

---

[23] The arbitrator is only not granted the so-called *ius imperium* ("power of empire"); that is, he does not have, under Brazilian law, powers to practice execution acts—*i.e.* those aimed at forcing compliance with their decisions and rulings, for example, by searching and attaching assets or by freezing bank accounts etc.

[24] Pursuant to Art. 17 of the Brazilian Arbitration Law.

[25] Citing Arts. 401 to 404 of the Brazilian Civil Process Code.

[26] Enacted under Decree-Law No. 9,039 of 2017.

119. Based on all the above, it seems clear to me that the request for discovery submitted by SPS constitutes an attempt to circumvent the arbitration clause provided for in JBS bylaws by removing the authority of the arbitral tribunal instituted before the CAM to examine and approve such request.

120. Moreover, as already mentioned above, it is an attempt to obtain, indirectly, based on an alleged interest in contributing to the CVM Action's instruction, evidence that may help it in the Arbitration Proceedings. After two failed attempts to be granted the status of an interested third party in ongoing criminal proceedings before the Brazilian Courts, SPS is currently seeking to qualify as an "interested third party in foreign proceedings" through the CVM Action in order to finally be able to make the request for discovery in the United States viable and, thus, obtain the evidence that appear to be useful for its claims in the Arbitration Proceedings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on January 10th, 2022

Rio de Janeiro, Brazil

Pablo Renteria