**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>*EX PARTE A*PPLICATION OF SPS I FUNDO DE INVESTIMENTO DE AÇÕES – INVESTIMENTO NO EXTERIOR FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:21-mc-00118-LAK |

## ADDITIONAL DECLARATION OF PABLO RENTERIA

I, Pablo Renteria, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.      On June 3, 2022, I presented a declaration in this action in support of  Joesley Batista, Wesley Batista, JBS S.A., and J&F Investimentos S.A. ("Intervenors")'s motion to vacate the ex parte order authorizing SPS I Fundo De Investimento De Ações – Investimento No Exterior ("SPS" or "Petitioner") to take discovery pursuant to 28 U.S.C. § 1782 and to quash the subpoena served on J.P. Morgan Chase Bank, N.A. ("J.P. Morgan") and Barclays USA, Inc. ("Barclays" and, with J.P. Morgan, "Respondents") in this matter ("Renteria's First Declaration").

2.      Subsequently, Intervenors' representatives informed me of the Petitioner's submission of the opposition to Intervenors' motion to vacate the court's order to take discovery pursuant to 28 U.S.C. § 1782 and to quash the subpoenas served on Respondents in this matter ("SPS's Opposition"), as well as of an additional statement made by Mr. Gustavo Machado Gonzalez.

3.      Through such documents, SPS and Mr. Gonzalez contested some of the points presented in the Renteria's First Declaration, such as (i) the speculative nature of SPS's discovery request; (ii) the fact that SPS will not be considered an interested third-party in the investigations

it wants the Brazilian Securities and Exchange Commission (the "CVM") to start; (iii) the fact that the investigative procedures conducted by the CVM do not qualify as a proceeding; and (iv) the CVM capacity to obtain information it deems relevant in the United States of America through a US-Brazil mutual legal assistance treaty.

4.      After reviewing SPS's Opposition and Mr. Gonzalez's supplemental declaration, I submit this supplemental declaration in support of Intervenors' reply to SPS's Opposition.

5.      All facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents and (c) information supplied to me by the Intervenors or their officers, directors, and employees, or professionals retained by them.

## I.      THE SPECULATIVE NATURE OF THE COMPLAINT TO BE FILED BY SPS WITH CVM AND ITS LACK OF MERIT

6.      SPS seeks to contradict the argument that its potential complaint is purely speculative, as I exposed it in the Renteria's First Declaration, stating that it had already prepared a draft complaint of 115 paragraphs, with 15 exhibits, which would state what SPS has already discovered the alleged irregular use of certain foreign companies (the "Target Companies"). The draft complaint was purportedly prepared by Mr. Gonzalez (a lawyer hired by SPS), and, according to SPS's allegations, would reveal violations of Brazilian corporate and capital market legislation (Mr. Gonzalez's supplemental declaration, §§ 41-43).

7.      Mr. Gonzalez's supplemental declaration alleges that "[t]he evidence gathered by SPS includes, but is not limited to, information arising from the 'FinCen Files'" (§ 41) and that I "ha[ve] never had access to the existing draft complaint and, therefore, [I am] not able to opine on the sufficiency of the support therein" (§ 46 and, in the same direction, SPS's Opposition, p. 11).

8.      However, with all due respect to Mr. Gonzalez, the argument is not convincing. Without bringing any evidence to support his claims, Mr. Gonzalez – SPS's lawyer – wants

everyone to believe that his client has robust evidence against the Intervenors, which, in his opinion, would be sufficient for the CVM to initiate a sanctioning administrative proceeding to punish them. Again, with all due respect, this kind of argument, which is not based on disclosed facts but only on the lawyer's opinion, is meritless.

9.      It is worth noting that SPS's Opposition and Mr. Gonzalez's supplemental declaration do not indicate to what extent the documents sought through SPS's 1782 discovery request would relate to the exhibits and information contained in the draft complaint they claim to have already prepared. There is no element to demonstrate that the documents referred to by the FinCEN Files would be relevant or complementary to the draft. There is only the generic statement that "[t]he draft complaint sets forth evidence for charges to be brought against the Batistas (…), including for use of their control of JBS to cause it to engage in sham transactions; breach of fiduciary duties in management; and failure to properly disclose corporate transactions and their purposes" (Mr. Gonzalez's supplemental declaration, § 43).

10.     Mr. Gonzalez says that I did not have access to the document, but the truth is that no one else did, so it is impossible to make an objective assessment of the merit of this so-called draft complaint and the probability that the CVM will initiate a sanctioning proceeding based on it. As a former employee of the CVM (who worked there for approximately ten years, holding different positions, including as Commissioner and Superintendent of Administrative Proceedings) and an active lawyer in the Brazilian capital market, I can say that I have witnessed numerous complaints, with more paragraphs and exhibits than described by SPS and Mr. Gonzalez, being dismissed, without any formal accusation being made by the CVM.  The only thing that one can safely assess here is what Mr. Gonzalez and SPS have disclosed in their filings in this proceeding—

and based on those disclosures I do not see any concrete evidence or basis that the CVM would be interested in the allegations made therein.

11.     In fact, just a few days ago, the CVM dismissed an extensive complaint filed by SPS itself.  According to the Technical Opinion n. 34/2022-CVM/SEP/GEA-4, rendered by the CVM's Corporate Relations Superintendence within the scope of CVM Process n. 19957.007423/2021-12, SPS filed a complaint with the CVM in which it requested the CVM to charge the controlling shareholders and managers of JBS with several serious alleged irregularities, namely: (i) abuse of power of control, in violation of art. 117 of Law n. 6,404/1976 (the Brazilian Corporate Law); (ii) managers acting in conflict of interest, in violation of art. 156 of Law n. 6,404/1976; (iii) management actions to the detriment of the Company's interests, in violation of art. 154 of Law n. 6,404/1976; (iv) unfaithful actions of managers, in violation of art. 155, II, of Law n. 6,404/1976; and (v) negligent actions of managers, in violation of the duty of care provided for in art. 153 of Law n. 6,404/1976. Based on excerpts of the complaint quoted by the Technical Opinion, that complaint had at least 28 exhibits.[1]

12.     That complaint was evidently extensive, with almost twice as many exhibits that, according to SPS, would be filed with the draft complaint it intends to bring against the Batista brothers here. However, through Official Decision n. 487/2022/CVM/SOI/GOI-2, of 6.16.2022, the CVM informed the Petitioner that, after analyzing the complaint, it did not identify any of the alleged illegalities and, for that reason, decided to dismiss the complaint and close the investigation.[2]

---

[1]  Technical Opinion, §9.

[2]  With the aim of updating the Court with developments that have occurred since my First Declaration was filed, it is important to note that the arbitration SPS commenced (CAM Arbitration No. 110/18) was terminated by the Brazilian Supreme Court on June 10, 2022.  The Brazilian

13.     This dismissal demonstrates that SPS's assertion that it has a draft complaint with 115 paragraphs and 15 exhibits does not support any conclusion about the actual existence of evidence against the Intervenors sufficient to support the allegations.

14.     It is worth noting that none of the aforementioned 15 exhibits was used to support the discovery request made by the SPS. Rather, to support its request, SPS referred only to the report allegedly prepared by Barclays and published by FinCEN Files to state, without much conviction, that "[t]he evidence **suggests** that these entities [the Target Companies] received orders directly from the Batista family" that "**may** be linked to unlawful conducts taken in detriment to JBS' assets and its minority shareholders" (p. 2 of the Application, emphasis added). If the exhibits had the substance that SPS claims they have, it would be expected that they would have been filed in its application for *discovery*.

15.     In short, the only evidence that SPS has referenced so far about the alleged illegalities committed by the Intervenors is the Barclays financial transaction report and, as already exposed in the Renteria's First Declaration, it would be absolutely speculative to say that the CVM would conduct an investigation based on this document alone. As already clarified, it is up to the CVM itself to assess the appropriateness of an investigation and it would be highly unlikely that it would start one based on the Barclays report.

16.     Indeed, given that the FinCEN Files is a public journalistic operation since 2020, disclosed by a series of press outlets around the world, including Brazilian media, and that, according to Mr. Gonzalez's supplemental declaration, "the CVM gives press coverage on matters under its jurisdiction substantial importance" (§ 47), it is very likely that the information has

---

Supreme Court essentially held that SPS did not have standing to bring the arbitration.  The second arbitration, in which SPS acts as an interested party to JBS, remains pending.

already come to CVM's attention. Despite that, there is no evidence that any investigation has already been commenced.

## II.   CVM'S INVESTIGATIVE PROCEEDINGS DO NOT ADMIT INTERESTED THIRD PARTY INTERVENTION

17.   In its section VI, Renteria's First Declaration states that SPS is not to be considered an interested party in the contemplated investigation and proceeding should such investigation and proceeding actually be initiated. Mr. Gonzalez disagrees and seeks to rebut such statement arguing that "[t]he investor who filed a complaint will be an interested third party" (§ 35). As per my understanding, his argument is based on (i) the alleged application of Law No. 9,784/1999; (ii) his interpretation about the CVM case law; and (iii) the possibility for the investor to submit documents and to appeal against a decision of a CVM unit not to pursue an accusation.

18.   In my opinion, however, Mr. Gonzalez's conclusions are not correct, as I will explain below.

### A.   The applicability of Law n. 9,784/1999 to the CVM administrative proceedings

19.   Within the scope of the Brazilian federal public administration, an administrative proceeding may be governed either by Law No. 9,784/1999 (which establishes general rules applicable to any administrative proceeding) or by sectorial laws and regulations, which specifically regulate the investigations and proceedings conducted by a certain federal organization. The CVM investigations and proceedings, which by nature are not criminal, but administrative and sanctioning, fall under the latter case, because, by virtue of Article 9, §2, of Law n. 6,385/1976, the CVM has the authority to regulate its administrative procedures and proceedings. As already mentioned above, the matter is currently regulated by CVM Resolution n. 45/2021.

20.     As Renteria's First Declaration briefly explains (footnote n. 25), when the administrative proceeding is governed by specific rules, as is the case of the CVM administrative proceedings at issue here, the provisions of Law n. 9,784/1999 are not directly applicable, but subsidiarily applicable—that is, applicable only when necessary to fill a gap in the regulations. This is the solution expressly provided for in Art. 69 of Law n. 9,784/1999, according to which "the specific administrative proceeding will continue to be governed by their own law, applying the rules of the Law complementarily." So, contrary to what Mr. Gonzalez suggests, the CVM rules can contradict the provisions of the Law No. 9,784/1999.

21.     Among other provisions, art. 9 of Law n. 9,784/1999 deals with individuals entitled to participate in the administrative proceeding, among which are third parties, who, despite not appearing as parties to the proceeding, "have rights or interests that may be affected by the decision to be rendered." Meanwhile, as explained, this rule would only apply to the CVM administrative proceedings if there was a gap in the regulation issued by the CVM regarding the intervention of interested third parties.

22.     It is worth clarifying that, under Brazilian law, the "regulatory gap" means the omission of the legislator or regulator to address a specific matter. The gap is not to be confused with the mere nonexistence of a rule on the matter, because there are cases in which the legislator or the regulator deliberately chooses not to address the issue.

**B.**     **There is no gap that should be resolved through the complementary application of Law n. 9,784/1999 regarding third-party interventions within CVM administrative proceedings**

23.     As Renteria's First Declaration states (§§ 76-79), the CVM has expressed, in more than one opportunity, its understanding that the regulations enacted by it do not permit the participation of third parties.

24.     Mr. Gonzalez affirms that it would be wrong to interpret the decision rendered by the Board of Commissioners within the scope of PAS CVM 19957.005983/2019-18 ("PAS Argúcia"), which I have cited in Renteria's First Declaration, as prohibiting the participation of third parties in administrative proceedings. According to him, the excerpt of the Chairman's vote to which I referred in the Renteria's First Declaration refers only to the participation of a third party in the capacity of *amicus curiae*. Besides, Mr. Gonzalez mentions a subsequent decision in the same enforcement proceeding, dated as of March 9, 2021, which, in his opinion, would have confirmed his interpretation (Mr. Gonzalez's supplemental declaration, § 15).

25.     I strongly disagree. PAS Argúcia involves a request by an investment fund manager, Argúcia Capital Gestão de Recursos Ltda. ("Argúcia"), for authorization to act as an interested third party in an enforcement proceeding. Because it had no legal grounds, the request was rejected by the Commission Board, by way of the decisions rendered on March 17, 2020 and May 5, 2020 in such proceeding.

26.     Although the Argúcia's request involved its participation as *amicus curiae*, such decisions clarified that, despite CVM regulation not authorizing third party intervention, the

rapporteur would be entitled to allow third party contributions to the evidentiary stage of the proceedings, provided that certain conditions are met.[3]

27.     This understanding is aligned with two points. One is that, in Brazil, as a consequence of the constitutional right to petition (described in Renteria's First Declaration, §§ 29-31), anyone may file a petition to public authorities in order to inform the occurrence of facts that, in his or her view, deserves the adoption of appropriate measures. It is an universal right, that may be exercised by any person, whether or not he or she is personally or financially interested in the proceeding's resolution.

28.     The other one is that the rapporteur plays a central role in conducting the administrative proceedings, especially with regard to evidence production. He or she decides, for example, which additional diligences must be conducted in order to clarify the facts related to the accusation (Art. 42 of CVM Resolution No. 45/2021), which includes determining whether specific third-party contributions must be approved.

29.     According to CVM Chairman's vote in PAS Argúcia, the possibility of submitting contributions to the evidentiary stage of the proceedings "does not give the Appellants the standing to file petitions outside of the ordinary course of the proceedings because it disrupts the case — **although they contributed to its beginning, the Appellants are not part of this proceedings and, therefore, cannot interfere with it without being properly requested**" (emphasis added).

30.     As one can see, Argúcia was not given special participation rights in the administrative proceeding. As determined by the Board of Commissioners in the May 5, 2020

---

[3] CVM Chairman Marcelo Barbosa pointed out, in the March 17, 2020 decision, that "(...) nothing prevents that, after an in-depth analysis of the case files to form his view in relation to the merits, the rapporteur requests, through additional steps, a statement on specific points that may be clarified by third parties,  which will certainly be evaluated with careful diligence, since it will not enjoy the impartiality typical of amicus curiae."

decision, such third party contributions, in order to be allowed in the administrative proceedings instruction, shall meet certain conditions, which were described in the minutes of the Board's meeting.[4]

31.      Then, after attending such conditions, Argúcia filed a new request to the rapporteur, this time so that it could submit certain evidence into the case files of the administrative proceedings. It filed a petition to the rapporteur indicating in advance how it would like to contribute towards clarifying the facts addressed in the case files. Subsequently, the rapporteur accepted the submission of certain evidence and rejected the submission of others.

32.      In line with the guidance established in the decisions of March 17, 2020 and May 5, 2020, the rapporteur of PAS Argúcia and CVM Chairman Marcelo Barbosa stressed, in the March 9, 2021, decision (the one mentioned by Mr. Gonzalez) that his decision was based on art. 42 of CVM Ruling n. 607/2019 (currently art. 42 of CVM Resolution n. 45/2021), which, as described above, grants the rapporteur, and the rapporteur only, the prerogative of producing new evidence during the course of administrative proceedings, at his or her discretion. This is what one sees in the following excerpt from Barbosa's vote:

> "In my understanding, if the evidence required is consistent with the purpose of the proceedings, able to resolve disputed points and the duly substantiated request, **the rapporteur may, in light of the arguments presented, decide on the discovery** - since, obviously, the right to a free and fair defense is respected -, taking into

---

[4] According to the referred minutes, "Chairperson Marcelo Barbosa, rapporteur of the proceedings, believed that the premise adopted by the Claimants is not supported. This is because, as he emphasized, rapporteurs of administrative proceedings are entitled, when they believe it to be useful for better clarification of relevant facts, to request third party information, as indeed occurs, regardless of 'procedural challenge to this'. Along the same line, he emphasized that the Claimants may petition the rapporteur stating that they can contribute to the resolution of the matter under consideration. In this hypothesis, the rapporteur shall evaluate the relevance of the request and decide, indicating what clarifications will be relevant, how they can be provided and other aspects deemed important, based on the particularities of the case."

account the discretionary margin granted by art. 42 of CVM Instruction n. 607/2019" (emphasis added).

33.     Contrary to what Mr. Gonzalez suggests in his additional statement, the decision made by the CVM on March 9, 2021 **does not recognize the right of a third party** – who is not part of the administrative proceedings – to submit additional evidence into the case files, **even if such third party contributed to the beginning of the proceeding**. Actually, this decision confirms the understanding adopted by the CVM in the decisions of March 17, 2020 and May 5, 2020, which was described in Renteria's First Declaration.

34.     Thus, it is not possible for anyone who is not a party in the administrative proceeding to acquire special participation rights. Regardless of its conditions, its characteristics or its involvement with the respective facts, any third party who wants to submit any evidence to such proceeding shall exercise its right to petition and previously request the approval of the respective rapporteur.

35.     This understanding, it should be emphasized once again, is currently in force in CVM and is in line with the fact that (i) the category of an interested third party does not exist in administrative proceedings instituted by the CVM; (ii) third parties, whether or not they have an interest in the proceedings, may petition the rapporteur to inform them how they intend to contribute to the judgment of the case; (iii) no special participation right is recognized for third parties – as the decisions make clear, it is the rapporteur who may determine the production of new formalities, at his or her discretion; and (iv) the submission of evidence by third parties is always dependent on authorization in advance from the reporting director.

36.     Additionally, contrary to what Mr. Gonzalez alleges in his supplementary statement (§ 25), the decisions rendered by the rapporteur of PAS 19957.008434/2019-03 ("PAS Bertin"),

Mr. Alexandre Rangel, do not show that the CVM admits interested third parties in its sanctioning proceedings. First, it should be clarified that the decisions of Director Rangel, as they were taken monocratically, do not constitute precedents of the CVM. Indeed, CVM's caselaw is formed exclusively by the deliberations of its Board of Commissioners, as this is the highest body of the CVM.

37.     Second, the decisions rendered by Director Rangel in the aforementioned sanctioning proceeding did not recognize SPS as an interested party in such proceeding. On the contrary, the decisions of the aforementioned director expressly pointed out that the Petitioner did not request its intervention as an interested third party and, therefore, there was nothing to decide in this regard. Along these lines, in his decision of December 30, 2021, the Director highlighted that

> "there is no formal request from [SPS] to have its hypothetical right to formally intervene in this Proceeding as an interested third party, either as an assistant, *amicus curiae* or under any other form of third party intervention admitted in the Brazilian legal system."

38.     What the director actually did was act in line with the procedure defined in PAS Argúcia: upon receiving a request from someone outside the proceeding, he decided whether or not to accept the contribution offered. And, because he decided that the document provided should be accepted (including because the document was already publicly available online), he approved the request made by the SPS. However, if SPS had wished to resubmit other documents or information to the same PAS Bertin proceeding, it would have had to seek leave to do so by making another request, precisely because SPS did not have special rights to participate in the proceeding.

**C.      If third-party participation is not applicable in actual administrative disciplinary proceedings, such participation is even less applicable within respect investigative procedures**

39.      As Mr. Gonzalez himself states in his supplemental declaration, "SPS's role in the new proceeding would be different from the role of the investors in the PAS Argucia and PAS Bertin" (§ 30). In fact, the situation of SPS in the scope of the contemplated investigative procedure would be substantially different, insofar as it intends to file a complaint that, if successful, would cause the CVM to investigate certain facts. A possible formal indictment will only be filed *if the CVM* deems it pertinent, after completing its investigation and based on its own assessment (see Renteria's First Declaration, §§ 49-53).

40.      As I explained in Renteria's First Declaration, the investigative activities of the CVM follow the so-called inquisitorial system, by which the CVM superintendence responsible for the investigation of the facts **unilaterally** collects information that will allow it to form a judgment as to the occurrence of any eventual irregularity. As the CVM has already clarified, in an excerpt that is worth transcribing once again, there are no parties in the investigation phase of a case – not even the investigated person is considered a party:

> "It is also worth clarifying that, **during the investigative phase, the investigated person is not regarded as a party in the procedure**, as alleged in the appeal, which, in its understanding, would allow it to access the case files, and that this restriction does not cover solely the public in general" (emphasis added).[5]

41.      The CVM has also clarified that there is "neither an accusation nor an accused party, since the relevant authority is not even persuaded of the occurrence of any irregularity." In

---

[5] Appeal against decision by the SFI relation to the request for inspection within the scope of CVM Proceedings No. RJ2005/7874, Rapporteur Dir. Norma Parente, sentenced on 12/6/2005.

this sense, CVM has already emphasized that "the unilateral nature of evidence gathering," by way of which the superintendent conducts its investigation, "is intrinsic to the nature of the procedure and it does not allow during this phase for third parties to compete with the public administration in the production of evidence, so as not to undermine the current effectiveness of said investigation."[6]

42.     Mr. Gonzalez is therefore incorrect in stating that "[t]he investor who filed a complaint will be an interested third party" and that, "[a]s (…) interested third parties, investors may participate in administrative proceedings pending before the CVM in various forms", which would include, according to him, the submission of documents, the exposition of clarifications and the suggestion of additional diligences for the appreciation of the CVM (supplemental declaration, § 35).

43.     In fact, it should be noted that all the precedents cited by Mr. Gonzalez in his supplemental declaration relate to attempts by third parties to participate in *sanctioning* administrative proceedings (that is, those initiated after the indictment was made). Indeed, Mr. Gonzalez does not cite any CVM precedent recognizing the petitioner's participation as an interested third party in an investigative procedure. And the reason for this is simple: there are no records of any such precedent.

44.     As already explained, the investor who files a claim is only exercising his or her right to petition (see Renteria's First Declaration, §§ 29-31), provided in the Brazilian Federal Constitution and guaranteed to any citizen in the country. As I was able to point out in Renteria's First Declaration, "filing a complaint does not render the complainant an interested party in the

---

[6] Id.

procedure initiated by the CVM to examine the complaint" (§ 31). The complainant has no special right to participate in the investigation – he is treated like any other citizen.

**D.    The possibility for the investor to appeal a decision of a CVM superintendence not to pursue an investigation or accusation does not make him qualify as an interested third-party**

45.    In his supplemental declaration, Mr. Gonzalez cites the possibility of the petitioner to appeal to the CVM Board of Commissioners (which is not a judicial court and does not hold any judicial review powers) against the superintendence's decision not to bring a formal accusation as basis for considering the petitioner an interested third party in the process. In his words, "[c]onsidering the decision of the Board of Commissioners, the CVM unit may perform further investigations/analyses on the matter and, as applicable, revert its initial decision not to bring charges" (§ 36).

46.    However, contrary to what Mr. Gonzalez alleges, this appeal (as with any appeal of a decision by the CVM SOI to reject a complaint) has a very limited scope and does not authorize, under any circumstances, the Board of Commissioners to review the decision not to file an accusation made by the technical area or to reject a complaint by the CVM SOI. Such an appeal, in short, does not give the claimant the right to ask the Board of Commissioners to examine the merits of his claim.

47.    Indeed, the appeal referred to in art. 4, § 4, of CVM Resolution n. 45/2021 is only applicable in two exhaustive and restricted cases: (i) if the decision of the technical area *is* groundless or (ii) if it is in disagreement with the prevailing position of the Board of Commissioners. Apart from these possibilities – which, as stated by the Board of Commissioners in a recent decision, form a "very specific and direct list" – the appeal is not even considered,

since, as already explained in the Renteria's First Declaration (§§ 26-27), due to the accusatory model adopted by the CVM in its proceedings, the Board of Commissioners cannot intervene in investigations and prosecution activities.

48.     This is what the CVM Chairman clarified in the judgment of Process n. 19957.010563/2018-72, j. on March 3, 2020. In his words, the appeal in question "is not an instrument for reviewing any and all aspects of the accusatory judgment rendered by the technical area, as it is limited to the possibilities strictly provided for in the rules" and "does not allow the appellant the possibility of re-discussing the merits of the decision of the technical area."

49.     The CVM Chairman reported that, according to the appellants, the configuration of the illicit acts alleged by them "is casuistry and would require an analysis of the facts of the specific case, by the Board of Commissioners, so that it could reformulate the decision of the SEP [superintendence];" However, the Chairman clarified that it is not up to the Commissioners of the CVM to proceed with this analysis within the scope of the appeal in question:

> "art. 4, §4, does not seem to have such reach. The analysis of these issues implies assessing whether the evidence in the records is sufficient to characterize just cause, which, in my view, would result in a prejudgment by the Board of Commissioners as to the verisimilitude of the Appellants' allegations. And it is precisely this type of judgment that the institutional model adopted by the CVM after 2002 [the segregation between the accusatory and judging functions] and, currently provided in CVM Instruction n. 607/2019, seeks to avoid."

50.     In other words, the Board of Commissioners can order the technical area to proceed with its investigation, but in no case can it issue a judgment on the merits of the complaint or the appropriateness of bringing an accusation. As established in § 6 of art. 4 of CVM Resolution n. 45/2021, on remand, the accusatory judgment is reserved only for the technical area: "[t]he decision of the Board of Commissioners (...) will not determine the initiation of a sanctioning

administrative proceeding, being the superintendence in charge of complementing the reasoning or reviewing the factual circumstances in accordance with the prevailing position in the Board of Commissioners".

51.     Thus, after complementing the reasoning of its conclusions on the complaint or reviewing the evidence in the light of the Board of Commissioners' order, the technical area may, based on its own assessment, close the investigative procedure, without the complainant's or the CVM Board of Commissioners' consent.

52.     On the other hand, Mr. Gonzalez suggests that the CVM's decision not to file an accusation can be appealed by the investor who has filed a complaint, as he states that "[a] decision of the CVM unit not to pursue an accusation, upon a complaint made by an investor, may even be subject to an appeal **by the respective investor** to the Board of Commissioners" (supplemental declaration, § 36, emphasis added). Put this way, the reader is led to believe that the claimant has special status, being the sole holder of the right to bring the appeal in question.

53.     This, however, is not correct. Art. 4, § 4, of CVM Resolution n. 45/2021 does not restrict the right to appeal, making it clear that anyone, regardless of whether they have filed the complaint or the interest they may have in the case, can file it.

54.     In this regard, see the SDM Public Hearing n. 02/2018, under which the CVM carried out a public consultation to gather suggestions on its proposal for a new regulation of its enforcement activity. This proposal resulted in CVM Instruction n. 607/2019, which provided, for the first time, the regulation of the appeal against the closing of an investigative procedure, in identical terms to what currently appears in art. 4 of CVM Resolution n. 45/2021.

55.     At this Public Hearing, the Brazilian Association of Capital Markets Investors (AMEC) argued that "the provision mentions an appeal against the decision of the

superintendencies, but without specifying who has such right" and suggested that "the CVM should specify this right of appeal, including not only the applicant/complainant, but also other third parties affected by the outcome of the administrative process." This participant even suggested that "[t]he third parties, once admitted, should be able to monitor the entire proceeding, being notified of the decisions and their regular progress."

56.     In response, contained in the Analysis Report of the Public Hearing, the CVM informed that "it did not consider it appropriate to bring the debate to the restricted and special scope of the rule of sanctioning administrative proceedings, which is why this Instruction does not provide specific provision as to the matter." As it can be seen, therefore, the CVM deliberately chose not to restrict the legitimacy for bringing an appeal, thus authorizing it to be brought by anyone, regardless of their interest in the investigative procedure.

57.     All of this shows that interested third parties do not exist in the scope of investigative procedures and that SPS will not become the holder of any special right to participate simply because it has filed a complaint.

### III.    THE EFFECTIVENESS OF AGREEMENTS MAINTAINED WITH OTHER PUBLIC INSTITUTIONS FOR THE DIRECT OBTENTION OF THE DOCUMENTS SUBJECT TO THE DISCOVERY REQUEST FROM THE US AUTHORITIES

58.     In its Memorandum of Law, SPS questions the effectiveness of the agreements maintained by the CVM with other public institutions, such as the Central Bank of Brazil (BCB) and the Brazilian Federal Prosecutor's Office (MPF), which grant the CVM the ability to obtain, if it deems it necessary, the documents that are the subject of the discovery request. SPS claims that this power of the CVM would be speculative and conditional. It also claims in this regard that there is no evidence (i) of the probability that the CVM will be successful in using these agreements; (ii) of the scope of documents that could be obtained through the agreements; and (iii)

of the time it would take to obtain the documents through the agreements. Finally, SPS speculates that, due to its budgetary constraints, the CVM would not be in a position to properly conduct its investigative activity.

### A.   CVM's power is neither speculative nor conditional

59.     SPS alleges that the CVM's power to obtain, via agreements, the documents sought by the discovery request would be speculative and conditional because the Intervenors claim, with the support of Renteria's First Declaration, that the CVM "*may* obtain relevant information from the SPS's hypothetical proceeding" and "*may* also leverage agreements with various institutions" (SPS's Opposition, p. 24).

60.     In this regard, I would like to clarify that the only reason I used the auxiliary verb 'may' is because the CVM is under no obligation to use the agreements. Of course, it will only engage its counterparts if it deems it helpful for the conduct of its investigation. But my First Declaration was quite clear in the sense that both the agreement with the Central Bank of Brazil and the agreement with the Brazilian Federal Prosecutor's Office conferred on the CVM the power to request the assistance of these institutions and to obtain from them information, documents, and evidence that is useful for its enforcement activity (Renteria's First Declaration, §§ 58-68).

61.     In this sense, with respect to the agreement with the Brazilian Federal Prosecutor's Office, I highlighted that, under the terms of the aforementioned agreement, "the  MPF *should* send the CVM any information, documents and elements of proof that are obtained within the scope of the administrative, civil or criminal investigations (...)" (Clause 2.3) (Renteria's First Declaration, § 61).  Likewise, with regard to the Central Bank of Brazil, I highlighted that, under the terms of the agreement currently in force, "the BCB and CVM *should* maintain a

permanent exchange of information, albeit protected by the secrecy (...)" (Clause 5.1) (Renteria's First Declaration, § 67).

62.    As it can be seen from the content of the agreements, there is no doubt that the CVM has the power to obtain from both the Brazilian Federal Prosecutor's Office and the Central Bank of Brazil the documents that these institutions can provide for its investigative activity.

**B.    The effectiveness of the agreements to obtain the documents sought by the discovery request**

63.    In its Memorandum of Law, SPS alleges that there is no evidence of the effectiveness of the agreements maintained with the BCB and the MPF for the CVM to succeed in obtaining, in a reasonable time, the same documents that are the subject of the discovery request. In my opinion, there is no need for evidence to prove the effectiveness of these agreements, since the CVM, the MPF and the BCB are recognized as serious institutions committed to fulfilling their legal duties.

64.    In any case, there is concrete evidence that these agreements have been successfully used by the CVM in its enforcement activity, including in cases involving transnational illicit acts.

65.    In this sense, one can review PAS CVM n. RJ2015/1760 and n. 01/2016[7], in which accusations were made against managers of Embraer – a Brazilian company that manufactures aircraft with ADRs listed in the United States – due to the commitment of acts of corruption in international sales of aircraft to the Dominican Republic's air force. As addressed in the Report of PAS n. RJ2015/1760, of which I was the rapporteur, the investigations that resulted in the

---

[7] The Administrative Sanctioning Proceeding CVM n. RJ2015/1760 was judged by the CVM Board of Commissioners on 9.11.2018, under the report of Director Pablo Renteria. The CVM Sanctioning Administrative Proceeding was judged on 3.22.2022, under the reporting of Director Flávia Perlingeiro.

accusations made were based on the Official Letter PR/RJ/GAB/TPF/12442/2014, through which the MPF shared with the CVM the evidence it had on the acts of corruption. Due to its transnational nature, the case involved the cooperation of the CVM and the MPF with public authorities from the Dominican Republic and the United States of America, through the Securities and Exchange Commission (SEC) and the Department of Justice (DOJ).[8]

66.    As highlighted in this case by the Federal Prosecutor's Office, in its Opinion n. 00003/2016/PFE-CVM/PGF/AGU), "(...) parallel criminal and administrative investigations are pending, in the United States of America (USA), before the Department of Justice (DOJ) and the Securities and Exchange Commission (SEC), specially related to the non-compliance with the rules of the *Foreign Corrupt Practices Act* (FCPA), <u>which contributed decisively to the criminal investigation procedure</u> [of the MPF] precursor of criminal action n. 002250003.2014.4.02.5101 and, therefore, <u>of the procedures currently underway at the CVM</u>."

67.    It is also worth mentioning that the close cooperation between, on the one hand, the CVM and the MPF and, on the other hand, the SEC and the DOJ resulted in the simultaneous execution of terms of commitment and conduct adjustment agreements with both the Brazilian and North American authorities to close all lawsuits filed against Embraer (CVM Case n. 00783.001957/2016-89). The term of commitment with the CVM was approved by its Board of Commissioners at a meeting held on 10.6.2016. In its minutes it was recorded that "the Federal Prosecutor's Office ("MPF"), the CVM, through its Specialized Federal Attorney's Office ("PFE-CVM"), as well as the aforementioned US authorities, maintained contact and exchanged information, including for the purpose of making possible the concomitant execution of

---

[8] This fact is mentioned in § 105 of the Report, which mentions the existence of parallel investigations by the SEC and the DOJ.

agreements in the two countries". On the occasion, as recorded in the minutes, CVM Chairman Leonardo Pereira emphasized that "the execution of the TCAC [agreements] highlights the importance of coordination between local and foreign public authorities for the effectiveness of action, in their respective spheres of competence, to curb the practice of crimes of this magnitude".

68.     Definitely, the Embraer case shows that the cooperation agreements with the MPF and US authorities are effective and in fact allow the CVM to obtain, albeit indirectly, through the MPF, evidence to be used in its investigative activities, including in cases involving the alleged commitment of acts of transnational corruption.

### C.     The scope of the cooperation agreements and the documents that can be obtained through them

69.     SPS also alleges in its Memorandum of Law that there is no evidence that the cooperation agreements would be able to provide the CVM with the same documents that are the subject of a discovery request. On this point, however, I refer to the Renteria's First Declaration, in which I demonstrate, through the quotes of excerpts from the aforementioned agreements, that their scope is very broad, with no restriction on the nature of the documents that can be obtained by the CVM.

70.     In this sense, under the terms of the agreement signed between the CVM and the MPF, "the MPF should send the CVM *any information, documents, and elements of proof* that are obtained within the scope of the administrative, civil or criminal investigations ". Likewise, Item 2 of Article I of the Agreement on Legal Assistance in Criminal Matters entered into between Brazil and the United States provides, in broad terms, "the supply of documents, records and assets (paragraphs b and d); the enforcement of search and seizure warrants (paragraph f); and any other

means of assistance not prohibited by the laws of the country whose assistance has been requested"
(paragraph h).

71.     Nor is there any restriction on the documents and information that may be
transmitted to the CVM through the agreement entered into with the Central Bank of Brazil. As
already mentioned in my first statement, this agreement comprises all information that any of the
bodies "have obtained or may obtain during the exercise of their legal attributions", even if they
are protected by bank secrecy.

    **D.     CVM's budget difficulties**

72.     SPS also alleges that, in the Renteria's First Declaration, I did not address "the
practical constraints on CVM investigations generally due to its severe underfunding in recent
years or suggest why those constraints will not be an issue in this case". First of all, I clarify that I
did not initially address this argument because I understood it to be purely rhetorical.

73.     In any case, given the insistence of SPS, I will now address it. First, it is not correct
to say that the CVM has been suffering, in recent years, from a greater budgetary problem. At the
beginning of this year, there was, in fact, an announcement that the National Congress would
significantly reduce the CVM budget, but this announcement caused a broad reaction from the
Brazilian market, which struggled to reverse such reduction. In fact, to help the CVM in this
campaign, I made a public statement in the Brazilian newspaper *Valor Econômico*, about the risks
that the budget cut could bring to the activities of the regulatory body.[9]

74.     This campaign had important effects. In an article published in the Brazilian
newspaper *Brazil Journal*, the current Commissioner of the CVM, Alexandre Rangel, said that

---

[9] See https://valor.globo.com/financas/noticia/2022/02/08/enxugamento-da-cvm-ameaca-
capacidade-de-supervisionar-mercado-dizem-ex-diretores.ghtml, accessed on 6.23.2022.

"the Board of Budget Execution [of the Brazilian Government] published a decision <u>that almost</u> <u>fully meets the budget proposed by the CVM for 2022</u> (a measured amount, consistent with the reality fiscal and economic of the country; <u>but that at the same time makes viable the activities of</u> <u>the entity this year</u>)".[10]

75.     In other words, according to the aforementioned Commissioner, the CVM received almost all the resources it had requested, so it is not correct to say that CVM "*has been suffering from a major insufficiency of resources*" (Mr. Gonzalez's supplemental declaration, § 51).  In fact, its current budget situation is not different from that observed in recent decades. Historically, the CVM has always asked the Federal Government and the National Congress to expand its budget, on the grounds that the lack of resources could harm its activities,[11] but that never stopped the CVM from carrying out work that was recognized as being of high quality, including in its investigative activity.

76.     According to the figures released by the CVM in its 2020 supervisory activity report (last published annual report), the CVM reports that, despite all the challenges, it managed to meet

---

[10] See https://braziljournal.com/opiniao-o-problema-orcamentario-da-cvm-tem-solucao-e-preciso-vontade-politica/, accessed on 6.23.2022.

[11] This can be seen from the reports prepared by the CVM on its risk-based supervision activities. The first of these reports referred to the 2009-2010 biennium, and already then the Brazilian regulator pointed out that "[in] the last few years, the CVM started to face a bottleneck, resulting, on the one hand, from the large volume [of] cases, and, on the other hand, the shortage of personnel." The report for the 2017-2018 biennium, in turn, highlighted that, "[w]ith respect to the limiting factors to the implementation of the 2017-2018 Biennial Plan, the highlights remain the same as those reported by the CVM in recent years". SBR semiannual reports: budget, human resources and computerized systems." Finally, the 2019 report reiterated that one of the factors limiting the supervision in question "refers to the continuous reduction, since 2014, of the discretionary budget available to the CVM." All reports prepared can be accessed at https://www.gov.br/cvm/pt-br/acesso-a-informacao-cvm/acoes-e-programas/plano-de-supervisao-baseada-em-risco.

_one hundred percent_ of the supervision actions planned for the year.[12] Moreover, according to the report published by the CVM on its sanctioning activity in 2021 (last one published), the CVM opened, in 2021, 113 new investigative administrative proceedings, a number higher than observed in 2020 (83), 2019 (102 ) and 2018 (105).[13]

77.     Also according to the report on the sanctioning activity,[14] in 2021, the CVM opened 18 inquiries (as already explained in Renteria's First Declaration, § 50, inquiries are used to conduct more complex investigations). This number is higher than the number of inquiries opened in 2020 (14), 2019 (17) and 2018 (13). In fact, the number of inquiries opened in 2021 is the highest in the CVM's historic series since 2013.

78.     In this context, there is no reason to justify Mr. Gonzalez's statement that the CVM would not be in a position to "perform broad investigations – especially, an international investigation with the cooperation of various local and foreign authorities" (Mr. Gonzalez's supplemental declaration, § 50). Such an argument is purely rhetorical and does not match reality, in addition to being unfair to the effort of all the CVM employees to ensure the quality of the regulatory body's activities.

## IV.   FINAL CLARIFICATIONS

79.     Before concluding this statement, I believe it is important to clarify two final points.

---

[12] See report available at https://www.gov.br/cvm/pt-br/acesso-a-informacao-cvm/acoes-e-programas/plano-de-supervisao-baseada-em-risco/2019-2020/relatorio-anual-2020.pdf.

[13] See report available at https://www.gov.br/cvm/pt-br/centrais-de-conteudo/publicacoes/relatorios/relatorio-de-atividade-sancionadora/relatorio-de-atividade-sancionadora-cvm-2021-4o-trimestre-e-anual-integra/@@download/file/20220328_relatorio_atividade_sancionadora_4o_trimestre_e_anual_2021_integra.pdf, p. 19.

[14] Id.

80.     The first one regards Mr. Gonzalez's supplemental declaration's assertion that "the CVM will certainly review and consider the evidence to be provided by SPS within an administrative proceeding" (§ 52). To this point, it is important to clarify that, in line with the Renteria's First Declaration, that complaints filed with CVM go through two consecutive phases of analysis. The first one is conducted by the Superintendent Office for Investor Protection and Guidance – SOI, which is in charge of receiving complaints from the general public. SOI (which has no adjudicatory power, as this is the sole power of the Board of Commissioners) conducts a preliminary analysis in order to verify whether the complaint contains elements that justify investigating the facts, as well as whether the CVM has any jurisdiction in relation to the subject of the complaint (Renteria's First Declaration, §§ 32-33).

81.     Such preliminary investigation provides the CVM with an initial mechanism to eliminate frivolous and speculative complaints without having to conduct a complete investigation. This phase can result in the dismissal of the complaint, but cannot result in the filing of charges.

82.     If the SOI understands that the complaint should continue to be analyzed by the CVM, it must forward the complaint to the relevant technical area of the Brazilian regulator (which like the SOI has no adjudicatory power), which will start a second analysis. *See* Figure 1 below. Firstly, it will proceed with another preliminary assessment of the complaint, supplementary to the one conducted by the SOI, in order to verify whether there is substantial evidence of an irregularity that must be investigated (Renteria's First Declaration, §§34-35).

83.     Subsequently, if the technical area does not summarily dismiss the case, it shall deepen its investigations, taking the measures it deems to be applicable in order to check evidence of illicit activity (Renteria's First Declaration, § 36). This is the most lengthy, pondered and decisive stage of the investigation procedure conducted by the CVM, and only after this stage it

may formulate a term of indictment – or, alternatively, close the case; or require the initiation of an administrative inquiry in order to deepen the investigation.

84.     According to Art. 21 of CVM Resolution No. 45/2021, the administrative enforcement proceeding (called, in Portuguese, "*processo administrativo*") is considered formally constituted only after the defendants are summoned to present their defenses against an accusation formalized in a term of indictment. It is only from that moment on that CVM sets up an adversarial procedure, in which the Brazilian regulator engages in a proceeding to resolve the dispute between prosecution and defense by way of an administrative judgment, carried on by the Board of Commissioners. As I explained in Renteria's First Declaration (§ 38), before the summons is served, there is no administrative proceedings, but only an administrative procedure (called, in Portuguese, "*procedimento administativo*") initiated for investigation purposes.[15]

---

[15]   While this distinction is legally well-established, as a matter of convenience it is not unusual for the terms to be used interchangeably for clerical and administrative purposes.



**Figure 1: Decision Tree of CVM Investigation & CVM Proceeding In Response to Complaint**

85.     The second final point concerns the possibility for the CVM to use evidence arising from the FinCEN Files.

86.     As disclosed by the DOJ and the International Consortium of Investigative Journalists , the FinCEN Files were criminally leaked in violation of U.S. criminal law by a former senior adviser at the Treasury Department's Financial Crimes Enforcement Network (FinCEN).[16] Therefore, if according to US Law, these documents, including Barclays' financial report, were considered illegal or inadmissible evidence, then they would be likewise regarded as illegal or inadmissible evidence in Brazil. This means that CVM is unlikely to investigate SPS's allegations as they are based on the documents that were criminally leaked under U.S. law.

87.     This is because, under Brazilian Law, the method and means for the collection of evidence is governed by the law of the forum where the evidence is collected (*lex diligentiae*).[17] In this regard, Article 13 of the Law of Introduction to the Brazilian Law (Decree-Law n. 4,657/1942), sets forth that "the proof of the facts that occurred in a foreign country is governed by the law in force in that country, regarding the burden and the means of producing it (…)".

88.     In several decisions, the Brazilian Supreme Court and the Brazilian Superior Court of Justice (*Superior Tribunal de Justiça,* the highest adjudicating body  for non-constitutional issues) have ruled that the admissibility of evidence collected in a foreign country must be assessed in the light of the law governing this forum.[18] Should the evidence be deemed illegal in the foreign

---

[16] See https://www.justice.gov/usao-sdny/pr/former-senior-fincen-employee-pleads-guilty-conspiring-unlawfully-disclose-suspicious and https://www.icij.org/investigations/fincen-files/what-is-the-fincen-files-investigation/, accessed on 6.28.2022.

[17] See Jacob Dolinger, Carmen Tiburcio, *Direito Internacional Privado*, 14ª ed., Rio de Janeiro, Forense, 2018, p. 554.

[18] See STJ, j. 1.6.2022, APn 927, Rel, Min. Maria Isabel Gallotti, *DJe* de 10/6/2022; STJ, j. 1.6.2022, APn 927, Rel, Min. Maria Isabel Gallotti, *DJe* de 10/6/2022; STJ, j. 4.5.2021, AREsp n. 701.833, Rel. Min. Ribeiro Dantas, *DJe* de 10/5/2021; STJ, j. 24.5.2018, AgRg no REsp

forum where collected, then it will be regarded as illegal in Brazil as well.[19] For example, documents that where stolen or obtained in violation of local laws cannot be used in Brazil.[20]

89.    Moreover, as I exposed in my First Declaration (§ 50(ii)), the Brazilian courts apply the doctrine of the fruit of the poisonous tree. As per the consolidated case law of the Federal Supreme Court, the highest Brazilian court, as a consequence of such doctrine, "evidence obtained by unlawful means contaminates evidence which 'exclusively' results therefrom; rendering it inadmissible in the proceedings and may not give rise to a criminal investigation and, with more reason, be the basis of a complaint, request for evidence, and judgment (Federal Constitution (CF), Art. 5, LVI)".[21]

90.    Such understanding is entirely applicable to the CVM investigations and proceedings, even if they have no criminal nature. Therefore, in my understanding, the CVM is unlikely to initiate an investigation based on the documents sought by the discovery request as they derive exclusively from FinCEN Files, which have been criminally leaked under U.S. law.

---

1.656.153, Rel. Min. Felix Fischer, DJe de 30/5/2018; STJ, j. 24.5.2018, AgRg no REsp 1.656.153, Rel. Min. Felix Fischer, DJe de 30/5/2018.

[19] See Carmen Tiburcio, *The Current Practice of International Co-Operation in Civil Matters, Recueil des cours,* vol. 293 (2018), p. 273: "Hence, evidence collected in disregard to this rule [lex diligentiae] should be deemed inadmissible in the country where the main proceedings are taking place".

[20] Carmen Tiburcio, *The Current Practice of International Co-Operation in Civil Matters, Recueil des cours,* vol. 293 (2018), p. 285: "Along the same lines, documents that where stolen or obtained in violation of local laws cannot be used either".

[21] See among others, Habeas Corpus 72.588/PB, Rapporteur Min. Maurício Corrêa, sentenced on 6/12/1996; Habeas Corpus Appeal (RHC) 90376, 2nd Division, Min. Rapporteur Celso de Mello, sentenced on 4/3/2007; Habeas Corpus 93050/RJ, 2nd Division, Min. Rapporteur Celso de Mello, sentenced on 6/10/2008; Interlocutory Appeal (AgR) on Habeas Corpus Appeal (RHC) 153869/DF, 2nd Division, Min. Rapporteur Celso de Mello, sentenced on 5/4/2020.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on June 30, 2022

Rio de Janeiro, Brazil

_____

Pablo Renteria