**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE *EX PARTE* APPLICATION OF
SPS I FUNDO DE INVESTIMENTO DE AÇÕES –
INVESTIMENTO NO EXTERIOR

*Petitioner,*

Case No. 22-mc-00118-LAK

For an Order Pursuant to 28 U.S.C. § 1782 to Take
Discovery for use in Contemplated Proceeding in the
Federative Republic of Brazil.

---

## AMENDED APPLICATION FOR ORDER PURSUANT TO 28 U.S.C. § 1782 AND MEMORANDUM OF LAW IN SUPPORT THEREOF

**BAIRD HOLM LLP**
Jeremy C. Hollembeak
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
Phone: 402.636.8317
Email: jhollembeak@bairdholm.com

**MB SCANLON PLLC**
Gabriela M. Scanlon
4301 50th Street NW, 1st Floor
Washington, D.C., 20016
Telephone:  (202) 410-9293
Email: gabriela@mbscanlon.com

*Attorneys for Petitioner SPS I Fundo de Investimento de Ações – Investimento no Exterior.*

April 26, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................2

A.  The Parties and Relevant Procedural History ...........................................6

1.  Barclays USA Subpoena Is Quashed Without Prejudice............................6

2.  The Target Companies ................................................................................8

3.  Respondent Barclays Bank PLC ...............................................................10

B.  The Contemplated Proceeding Before The Foreign Tribunal, CVM .................11

C.  Legal Standard............................................................................................16

ARGUMENT .......................................................................................................17

I.  RESPONDENTS ARE FOUND IN THE DISTRICT. ...........................18

A.  Barclays NY is Subject to General Personal Jurisdiction in this District .............19

B.  Barclays NY is Subject to Specific Personal Jurisdiction in this District.............21

II.  THE AMENDED APPLICTION IS BEING SERVED ON NOTICE...................24

CONCLUSION ....................................................................................................25

SPS I Fundo de Investimento de Ações – Investimento no Exterior ("**SPS**" or the "**Petitioner**") respectfully submits this amended application and memorandum of law in support thereof (the "**Amended Application**") for an order permitting Petitioner to obtain discovery from The New York Branch of Barclays Bank PLC ("**Barclays NY**" or "**Respondent**") pursuant to 28 U.S.C. § 1782 ("**Section 1782**") for use in a contemplated foreign proceeding.  The Amended Application amends Petitioner's original application in this miscellaneous action (ECF No. 6, the "**Application**") which sought authority to obtain discovery for use in the same contemplated foreign proceeding from J.P. Morgan Chase Bank, N.A. ("**JPM**") and Barclays USA, Inc. ("**Barclays USA**").  After this Court granted the Application on an *ex parte* basis (ECF No. 8, the "**Order**") and Petitioner served subpoenas on JPM and Barclays USA, Joesley Batista, Wesley Batista, JBS S.A. and J&F Investimentos (collectively, the "**Intervenors**") intervened and moved to vacate the Order and quash those subpoenas.  In a December 9, 2022 decision (ECF No. 34, the "**Memorandum Opinion**"), this Court granted the Intervenors' motion with respect to the Barclays USA subpoena without prejudice to Petitioner filing this Amended Application, and otherwise denied the motion *en toto*.  As of the date hereof, Intervenors' appeal of the Memorandum Opinion remains pending before the Second Circuit Court of Appeals (Appeal No. 22-3200) but Intervenors' motions for a stay pending appeal have been denied by this Court [ECF No. 46] and by the Second Circuit [CA2 No. 72], respectively.

For the avoidance of doubt, the Amended Application does not supersede the original Application and is not intended to impact the Order granting that application or the Petitioner's ability to seek discovery from JPM thereunder (which it is actively doing as of the date hereof).  The Amended Application – together with the second supplemental declaration of Petitioner's Brazilian attorney, Gustavo Machado Gonzalez (the "**Second Supplemental Gonzalez Declaration**") and the supplemental declaration of Petitioner's US counsel, Jeremy C.

Hollembeak (including exhibits thereto, the "**Supplemental Hollembeak Declaration**") being filed contemporaneously herewith, and upon which the Amended Application relies – incorporates as if fully set forth herein all the factual and legal bases set forth in the original Application and documents filed by Petitioner in support thereof[1] except and only to the extent those bases are contradicted by the factual and legal bases set forth herein and/or in the Second Supplemental Gonzalez Declaration or Supplemental Hollembeak Declaration.

## PRELIMINARY STATEMENT

The Amended Application seeks an order authorizing SPS to seek the discovery of documents evidencing transactions conducted by the following companies: Unifleisch Limited ("**Unifleisch UK**"), Unifleisch SA ("**Unifleisch SA**"), Lunsville International Inc. ("**Lunsville**") and Valdarco Investments Inc. ("**Valdarco**" and, together with Unifleisch UK, Unifleisch SA and Lunsville, the "**Target Companies**"), through the intermediation of the services provided by Respondent, a financial institution located in the Southern District of New York, for use in a contemplated proceeding in Brazil.  The discovery requests are detailed in the form of a subpoena addressed to Respondent which is exhibited to Petitioner's proposed form of order being filed contemporaneously herewith (the "**Proposed Order**").

As discussed below, Petitioner is a minority shareholder of one of the largest Brazilian public companies, JBS S.A. ("**JBS**") (Gonzalez Declaration ¶¶ 23 and 24.), which was used by its controlling shareholders (the "**Batista family**") for the purpose of conducting an illicit bribery scheme, defrauding JBS and its minority shareholders.  This complex bribery scheme involved several companies and financial institutions headquartered outside Brazil and led to a

---

[1] The supporting documents include the original Gonzalez declaration attached as Exhibit A to the original Application (including exhibits thereto, the "**Gonzalez Declaration**"), the first supplemental Gonzalez declaration (ECF No. 26, including exhibits thereto, the "**Supplemental Gonzalez Declaration**"), the declaration of Petitioner's Brazilian attorney, Fabiano Robalinho Cavalcanti (ECF No. 27, the "**Cavalcanti Declaration**") and the first Hollembeak declaration (ECF No. 28, including exhibits thereto, the "**Hollembeak Declaration**").

series of investigations and proceedings involving JBS and the Batista family in Brazil and in the United States, from which important evidence was obtained (Gonzalez Decl. ¶ 24 and 29.). In 2020, the Batista family, through the controlling company of JBS, J&F Investimentos S.A. ("**J&F**"), entered into a Plea Agreement with the United States Department of Justice ("**DOJ**") due to a series of unlawful actions taken by them, including the fraudulent merger of Bertin S.A. and JBS in 2009 (the "**JBS-Bertin Merger**").

In September 2020, new facts connecting JBS and the Batista family to certain companies incorporated outside Brazil and previously unknown to Brazilian authorities were unveiled through an international journalistic investigation named "**FinCEN Files**" (Gonzalez Decl. ¶ 30.).  Among other relevant information included in the FinCEN files was a 2017 suspicious activity report (SAR) submitted by Barclays NY to the United States Financial Crimes Enforcement Network ("**FinCEN**") that raised red flags regarding the Target Companies.  As specifically relevant here, the SAR issued by Barclays NY for the first time linked the Target Company Unifleisch UK directly to the Batista family and to the corruption scheme they operated in Brazil (Gonzalez Decl. ¶ 37.).  Based on the SAR, Barclays NY has documents and information evidencing hundreds of millions if not billions of dollars in previously undisclosed transactions from Unifleisch UK to Target Companies Valdarco and Lunsville – two offshore companies revealed in 2017 to be controlled by Joesley and Weseley Batista and used to pay bribes to Brazilian officials.  Specifically, the SAR indicates that, solely for the period between September 6, 2011 and April 12, 2016, Unifleisch UK made 859 money transfers totaling almost US$644 million to Valdarco, Lunsville and other entities linked to the Batista family from high-risk jurisdictions known for money laundering.  Moreover, while Unifleisch UK continued to exist and presumably engage in similar transactions through at least the end of 2016, the SAR indicates Barclays NY has account opening and transfer information concerning Unifleisch UK going back to at least June 17, 2007.

The funds used to make these transactions were siphoned away from JBS revenues to the detriment of JBS shareholders other than the Batistas (Gonzalez Decl. ¶ 47.).  As a minority shareholder, SPS has been investigating the Target Companies for the purpose of making a formal complaint against the Batistas to the *Comissão de Valores Mobiliários* (the "**CVM**") – the Brazilian governmental agency with the authority to regulate Brazil's securities and capital markets and to bring enforcement actions against and punish bad actors in those markets.  The evidence sought in this Amended Application is for use by SPS in preparing that complaint, including by incorporating some of that evidence into the CVM Complaint itself.  (Gonzalez Decl. ¶ 27 and 48.).  Notably, although SPS's investigation has revealed significant evidence to corroborate that the recurrent international transactions in question were directed by members of the Batista family to carry out illicit ends, the Batista family has continued to insist otherwise, including by refusing to acknowledge any relationship their ownership and control of Unifleisch UK and its numerous money transfer counterparties.  Therefore, documents and information in the possession and control of Respondent Barclays NY will be highly relevant to claims Petitioner intends to make before the CVM.

As discussed in the original Application and further below, the CVM (a) has formal administrative procedures for handling the intake and disposition of investor complaints against public Brazilian companies, their managers and/or shareholders, and (b) is duty-bound to (i) analyze all complaints received, (ii) conduct further investigations as needed, (iii) make a charging decision based on the evidence contained in the complaint as supplemented by its investigation, (iv) to the extent charges are brought, adjudicate proceedings against the accused, and (v) address appeals from any decisions to not investigate or otherwise progress complaints received and/or bring charges against the accused.  Although the CVM has authority to commence proceedings of its own volition (i.e., without first receiving a formal third-party complaint), historically, information provided by third-party investors, like SPS, have been

extremely important for investigations and enforcement proceedings conducted by the CVM (Gonzalez Decl. ¶ 16-19.).

To invoke this process and thereby trigger a new CVM proceeding (the "**Contemplated Proceeding**"), SPS has put together a substantial draft formal complaint (the "**CVM Complaint**").  As of the date hereof, the CVM Complaint includes at least 115 paragraphs of detailed allegations and 15 annexed exhibits demonstrating what SPS has uncovered to date about the Batistas' illicit use of the Target Companies.  SPS would have filed the CVM Complaint already in its present form, but for various reasons – including risks posed by CVM's chronic lack of investigatory resources, and SPS's desire to present the results of its investigation in the most comprehensive and effective manner possible – SPS is waiting to commence the Contemplated Proceeding so its complaint can include documents and information SPS will obtain from Respondent through this proceeding.  (Suppl. Gonzalez Decl. ¶ 44.)  SPS is confident its filing of the CVM Complaint – as is, and even more so if it contains the information it is seeking from Barclays NY herewith – will cause CVM to further investigate and/or bring charges against the Batistas for, among other things, using their control over JBS to have it engage in sham transactions, failing to properly disclose corporate transactions and their purposes, and breaching their fiduciary duties to JBS and its shareholders.  (Gonzalez Decl. ¶ 12; Suppl. Gonzalez Decl. ¶ 43.)  In any event, SPS's filing of the CVM Complaint will cause CVM's relevant technical office(s) to analyze the information and proposed charges laid out therein, make civil law magistrate-like determinations how the CVM's investigating and charging powers should be wielded under the circumstances, and provide SPS a response indicating whether charges will be brought.  (Suppl. Gonzalez Decl. ¶¶ 35, 52)

For the reasons in the original Application and as otherwise set forth below, the Petitioner respectfully requests that the Court enter an order granting this Amended Application so that SPS can obtain the additional evidence it seeks to include in or otherwise use to prepare

and finalize the CVM Complaint.  First, this Application meets the statutory requirements for a Section 1782 application because Respondent is "found" in this district, and the discovery sought is "for use" in a Brazilian proceeding to be initiated by Petitioner's filing of the CVM Complaint with the CVM.  Second, the discretionary factors established by the Supreme Court's decision *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) (hereinafter "***Intel***") all weigh in favor of granting this Application:

(i) Respondent will not be party to the Contemplated Proceeding and is not otherwise subject to compulsion by CVM to produce the sought-after discovery in Brazil;

(ii) CVM will be receptive to the discovery Petitioner seeks in the Contemplated Proceeding;

(iii) The Amended Application is not designed to circumvent Brazilian proof gathering restrictions governing CVM proceedings; and

(iv) The discovery sought is neither unduly intrusive nor burdensome.

Granting this Application would also further the "twin aims" of Section 1782: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Mees v. Buiter*, 793 F.3d 291, 297–98 (2d Cir. 2015).

Accordingly, for all these reasons Petitioner respectfully requests that the Court enter an order granting this Application substantially in the form of the Proposed Order filed contemporaneously herewith.

## **FACTUAL BACKGROUND**

### A.     **The Parties and Relevant Procedural History**

#### 1.  **Barclays USA Subpoena Is Quashed Without Prejudice**

Petitioner filed the original Application *ex parte* on April 21, 2022 commencing this miscellaneous action.  This Court entered the Order approving the original Application on April 26, 2022.  Thereafter, Petitioner served its subpoena on Barclays USA pursuant to the

Order.  (Hollembeak Decl. ¶ 6).  On May 18, 2022, Petitioner received a response from Americas Head of Civil Litigation at Barclays "[o]n behalf of Barclays USA, Inc." setting forth Barclays USA's responses and objections to the subpoena but also stating that "Barclays is willing to meet and confer to discuss the production of certain categories of non-privileged documents […]."  (Hollembeak Decl. ¶¶ 7-8).

On May 20, 2022, this Court granted Intervenors' request to intervene for the purpose of moving to vacate the Order and quash the subpoenas issued pursuant thereto.  This effectively halted the discovery process, as Barclays USA refused thereafter to engage with Petitioner regarding the subpoenas or produce any documents until Intervenors' forthcoming motion was resolved.  (Hollembeak Decl. ¶ 12).  Notably, although Petitioner urged Barclays to do so if it supported the Intervenors' motion, Barclays has never formally appeared in this action or expressed support for the motion.  (Hollembeak Decl. ¶¶ 13-14)

On December 9, 2022, this Court granted the Intervenors' motion with respect to the Barclays USA subpoena without prejudice to Petitioner filing this Amended Application, solely on the basis that Barclays USA could not be "found" in this district as required by Section 1782.  The Court went on in the Memorandum Opinion to deny all other arguments made by Intervenors in the motion, holding that Petitioner had met all other Section 1782 statutory and discretionary requirements.  As of the date hereof, Intervenors' appeal of the Memorandum Opinion remains pending before the Second Circuit Court of Appeals (Appeal No. 22-3200) but Intervenors' respective motions for a stay pending appeal have been denied by this Court [ECF No. 46] and by the Second Circuit [CA2 No. 72].

Additional relevant information concerning Petitioner and the Intervenors is set forth in the original Application.

2.   **The Target Companies**

As detailed in the original Application and supporting materials, information about the Batista family's use of foreign companies to siphon funds from JBS's revenues outside Brazil for their own personal benefit, including by laundering and then returning such funds to Brazil for use in one of the largest bribery schemes in history, started coming to light in 2017.  Sources such as the JPM Statement [2] and Brazilian plea agreement of former J&F agent, Demilton, shed light on the Batista family's illicit actions, including their use of offshore entities such as Target Companies Lunsville and Valdarco orchestrate the fraudulent JBS-Bertin Merger and aforementioned bribery scheme.  To perpetuate these illicit acts, funds JBS collected and declared as commissions related to its legitimate business exporting its meat products around the world were being diverted through bank transfers with various intermediaries to ultimate recipients such as Lunsville and Valdarco, two Panamanian companies secretly controlled by the Batista family.  Once the funds had reached these recipients, tracing them back to JBS or the Batista family was very difficult, allowing the Batistas to use such funds for their own personal benefit and/or to bribe Brazilian officials seemingly without any awareness by government regulators in Brazil and other jurisdictions.

As also detailed in the original Application and supporting materials, in September 2020, Target Company Unifleisch UK was publicly identified by the FinCEN Files as one of those intermediaries through with JBS funds were being diverted for the Batistas' illicit purposes. Specifically, the FinCEN files included a suspicious activity report submitted by Barclays NY to FinCEN in the US in 2017 (the "**Barclays SAR**," a portion of which is attached as Exhibit K to the Supplemental Hollembeak Declaration).  The Barclays SAR raised red flags about

---

[2] A copy of the original JPM Statement in Portuguese as well as an English translation of same are attached as Exhibit D to the original Application.

funds travelling through an account in the name of Unifleisch UK at one of Barclays NY's UK affiliates, including, among other things, that:

- Unifleisch UK could not be conclusively identified from available information;

- Negative information had been discovered about a counterparty identified as one of the primary sources of funds coming into the account;

- Unifleisch UK was transacting with parties located in high risk jurisdictions known for money laundering including Panama (where Lunsville and Valdarco were incorporated) and Switzerland (where Unifleisch SA appeared to be located); and

- "*There was no apparent economic, business or lawful purpose for the transactions*" which "*appeared to be layered in a circular scheme as to attempt to disguise or hide the true source of the funds and/or its origin.*"

*See* Barclays SAR, attached as Exhibit K to the Suppl. Hollembeak Decl. (emphasis added).

Because of these red flags, Barclays NY conducted a five-year USD wire look-back on Unifleisch UK which revealed that, solely for the period between September 6, 2011 and April 12, 2016, Target Company Unifleisch UK made 859 money transfers totaling almost US$644 million to Valdarco, Lunsville and other entities from high-risk jurisdictions known for money laundering linked to the Batista family. (Suppl. Hollembeak Decl. ¶ 23). The Barclays SAR indicated the source of funds coming in to Unifleisch UK was JBS, under an apparent arrangement in which Unifleisch UK – "*instructed by either JBS, Lunsville, or Valdarco for all actions required to be taken*" – was acting as sales agent for JBS beef products in the EU in exchange for a 3% commission.

Given the Batista family were majority shareholders of JBS at all relevant times and by September 2020 were suspected to also have been the beneficial owners/controllers of Lunsville and Valdarco during the same period, the release of the FinCEN Files marked the first public indication that the Batistas beneficially owned and/or controlled Unifleisch UK. Notably, to this day the Batistas have steadfastly refused to acknowledge any relationship with Unifleisch UK.

**3.  Respondent Barclays Bank PLC**

Respondent Barclays NY is a financial services institution, incorporated in the UK, which regularly transacts business in this district.  Barclays NY in New York City acts as a worldwide correspondent bank for U.S. Dollar denominated wire transfers passing from domestic banks to international banks (and vice versa).  (Suppl. Hollembeak Decl. ¶ 10).  From its address at 75 Wall Street, New York, NY 10265, Barclays NY is a participant in the Clearing House Interbank Payments System ("**CHIPS**"), which is the largest private sector U.S. Dollar clearing system in the world.  (Suppl. Hollembeak Decl. ¶ 11).  Barclays NY is also a participant in the Federal Reserve's Fedwire Fund Service ("**Fedwire**"), and is also registered with the New York Department of Financial Services ("**NYDFS**") as both a "Foreign Branch" and an "Exempt Mortgage Loan Servicer" from its address at 745 Seventh Avenue, New York, NY 10019 (Suppl. Hollembeak Decl. ¶¶ 12-13).

At the time the original application was filed and continuing through the date hereof, Barclays' website refers to Barclays NY's 32-story office tower in this district – located at 745 Seventh Avenue "in Times Square in the heart of Manhattan" – as the "headquarters" for its entire operations in the US/Americas.  (Suppl. Hollembeak Decl. ¶ 14).  Other significant contacts in this district include that (a) Barclays NY is subject to numerous pending legal actions in this district, and (b) certain of its key personnel work out of this district, including Paul Compton, the President of Barclays NY, Global Head of the Corporate and Investment Bank and member of the Barclays Group Executive Committee.  (Suppl. Hollembeak Decl. ¶ 15).

Because of its extensive contacts in the district, Barclays NY is "subject to a comprehensive regulatory framework involving numerous statutes, rules and regulations in the US" based on its location and activities in this district.  (Suppl. Hollembeak Decl. ¶ 17).  In its most recent Annual Report, Barclays NY's parent company, Barclays Plc, explained the reach of certain US laws can require compliance by its entire international bank "Group" including

entities incorporated outside of the US (e.g. Barclays Wealth UK).  (Suppl. Hollembeak Decl. ¶ 18).  When this happens, the Group effectuates compliance with US law through Barclays NY.  (Suppl. Hollembeak Decl. ¶ 19).

In fact, as discussed further below, it is Barclays NY's broad and significant contacts in this district and its role as conduit for the Barclays Group compliance with US anti-money laundering law that is responsible for the evidence Petitioner seeks by the Amended Application being available at all.  (Suppl. Hollembeak Decl. ¶ 20).

The Amended Application seeks to obtain evidence from documents evidencing wire transfers, among other conducts, taken by Unifleisch UK, the other Target Companies, and/or other entities in connection to J&F, Batista family, or JBS, through the intermediation of the services provided by Barclays NY and evidenced by documents or information in Barclays NY's possession or control that relate to the illicit use of funds from JBS, including without limitation the transfers identified in the Barclays SAR disclosed within the FinCen Files.

Barclays NY will not be party to the CVM Complaint to be filed by SPS or to the Contemplated Proceeding before the CVM that filing will initiate.  Nevertheless, the transfers described above among companies outside Brazil – effectuated with the aid of services provided by Respondent – will be key evidence considered in the Contemplated Proceeding.

## B. <u>The Contemplated Proceeding Before The Foreign Tribunal, CVM</u>

As noted, Petitioner is bringing the Amended Application to obtain discovery for use in a Contemplated Proceeding before a foreign tribunal in Brazil: the CVM.  Petitioner relies on the details about CVM procedure and the Contemplated Proceeding set forth in the original Application and Gonzalez Declaration filed therewith, as previously clarified and/or supplemented by the Supplemental Gonzalez Declaration and as further clarified and/or supplemented below and in the Second Supplemental Gonzalez Declaration.

In brief, the CVM has specific procedures that contemplate the handling of formal complaints submitted by outside investors within the inquisitorial system CVM has adopted based on Brazil's similar criminal law model.  The system proceeds in two stages.  Once such a complaint has been filed, the first stage begins, which is an investigative proceeding to consider the issues and evidence raised in the complaint, to gather further evidence (or not) as warranted under the circumstances, and ultimately to determine whether formal charges should be brought.  (Gonzalez Decl. ¶ 16; Suppl. Gonzalez Decl. ¶ 52)  CVM's investigative powers have been divided among its several units or technical offices which each focus on a different type of Brazilian corporate or securities law function.  (Gonzalez Decl. ¶ 17)  A stage one investigative proceeding takes place before one or more of these technical offices depending on the focus of the underlying complaint or conduct at issue.  A stage one investigative proceeding concludes when the technical office in charge makes a charging decision.  (Gonzalez Decl. ¶ 17; Suppl. Gonzalez Decl. ¶ 52)  If the technical office decides not to conduct further investigation and/or to bring charges, the investor-complainant that commenced the stage one proceeding can appeal that decision to the technical office and to CVM's Board of Commissioners, who can order the technical office to conduct further investigation if warranted.  (Suppl. Gonzalez Decl. ¶¶ 36-39, 52)

If and when formal chargers are brought by the technical office, the second stage of the CVM process begins, which is a quasi-judicial enforcement proceeding before the CVM's Board of Commissioners.  (Gonzalez Decl. ¶ 18; Suppl. Gonzalez Decl. ¶ 52)  During the second stage proceeding, the parties charged are presented with the evidence gathered against them in support of the charges made and are able to introduce their own evidence and defend themselves before the Board, which ultimately decides whether to convict or acquit on the charges brought. (Gonzalez Decl. ¶ 18; Suppl. Gonzalez Decl. ¶¶ 22, 32)  During the second stage proceeding, third persons interested in the proceedings – which, under applicable Brazilian law, explicitly

includes the person that submitted the complaint originally initiating the proceeding – are able to submit additional evidence for admission into the record.  (Suppl. Gonzalez Decl. ¶¶ 5-7, 17-19, 23-28, 33-34, 55, 60)  In that circumstance, the charged parties are given the opportunity to oppose the admission of such evidence before an admission decision is made.  (Suppl. Gonzalez Decl. ¶ 32)  In fact, after Petitioner made a formal request to include additional evidence in the record of a pending CVM proceeding related to the JBS-Bertin Merger, the Batista brothers – as two of the parties against whom charges had been made – raised eight separate objections to Petitioner's request.  (Exhibit III to Suppl. Gonzalez Decl. (Translation of April 20, 2022 Ruling by CVM Commissioner) ¶ 9 (summarizing objections).   Moreover, after the CVM Commissioner rejected all eight objections and permitted the evidence to be admitted into the record, the Batista brothers had the right – which they tellingly chose not to exercise – to appeal that rejection to CVM's full Board of Commissioners.  (Suppl. Gonzalez Decl. ¶ 29)

Thus, as explained further in the original Application and supporting declarations and exhibits, when Petitioner obtains the discovery it is seeking in the Amended Application here and thereafter files its CVM Complaint, it will automatically trigger a stage one proceeding by which Petitioner is guaranteed that its complaint will be reviewed and considered by one of more of the CVM's technical offices, decisions whether to conduct further investigation and/or to bring charges based on the complaint will be made, and Petitioner will have the right to appeal an adverse decision by the relevant technical office not to investigate or bring charges to the CVM Board of Commissioners.

In light of arguments raised by the Intervenors in opposition to the original Application and/or on appeal from the Memorandum Opinion – which this Court properly rejected in the Memorandum Opinion and/or should reject in granting this Amended Application – Petitioner clarifies and/or supplements the bases on which the Amended Application should be granted as follows.

First, Petitioner is seeking Section 1782 discovery for use before the entirety of the CVM, as the relevant foreign "tribunal", in a "proceeding" (i.e., the Contemplated Proceeding) that will include a first stage investigation and charging determination by CVM's relevant technical office(s) and should (but may not) include a second stage enforcement action before CVM's Board of Commissioners.  Petitioner may use the discovery in the first stage by submitting it with CVM Complaint, only to have the proceeding end without a second stage because no charges are brought against the Batistas.  Conversely, if charges are brought, a part of the discovery Petitioner did not incorporate into its petition may become relevant after stage one has been completed, in which case Petitioner may use it in stage two of the proceeding by submitting it to the CVM Commissioner in charge of the enforcement action.  The possibility that Petitioner may only be able to use the discovery it seeks in one stage of the Contemplated Proceeding does not sever the Contemplated Proceeding into two separate "proceedings" for purposes of Section 1782 analysis.  In other words, for the Amended Application to be granted, Petitioner is *not* required to specify that it seeks discovery for use (i) exclusively in stage one or stage two of the Contemplated Proceeding (or any other stage the Intervenors wrongly suggest is involved), and (ii) exclusively before one *but only one* of CVM's several investigating technical offices or its Board of Commissioners as the relevant "tribunal."

Similarly, in considering the Amended Application, this Court is *not* required to focus on one stage of the Contemplated Proceeding and deny the Amended Application unless Section 1782's statutory requirements and discretionary factors are satisfied by the features of that stage alone.  This Court already rejected such a myopic view of Section 1782's requirements in connection with the original Application.  *See* January 24, 2023 Memorandum Opinion (ECF 46), at 4 (denying Intervenors' motion for a stay pending appeal, finding "no support in the law or facts for such a narrow view" and noting the Second Circuit had already affirmed a district court's rejection of such view in another action).  Nevertheless, in their pending appeal before

the Second Circuit, Intervenors argue this Court committed reversible error because neither stage of the Contemplated Proceeding viewed in isolation can satisfy Section 1782. Specifically, Intervenors argue:

a)  Looking only at the first stage, CVM's technical office is too biased to qualify as a "tribunal" and its investigation and charging decision on a third-party investor's complaint is insufficiently adjudicatory in nature to qualify as a "proceeding"; and

b)  Looking only at the second stage, the lack of judicial review from a decision by CVM's Board of Commissioners to convict or acquit the accused of the charges brought disqualifies the Board from being the relevant "tribunal," and in any event Petitioner cannot unilaterally commence a "proceeding" before the Board, rending the potential "use" of requested discovery in such proceeding outside of 'reasonable contemplation'.

The Court needn't wear such blinders or engage in Intervenors' false choice.  There is nothing inconsistent or otherwise improper with the Court granting this Amended Application upon simultaneous findings that the Contemplated Proceeding is (i) within reasonable contemplation because of Petitioner's ability to unilaterally commence stage one AND (ii) sufficiently adjudicatory because of the quasi-judicial (including appellate) functions performed by CVM's Board of Commissioners during stage two.

Finally, the CVM Board of Commissioners' decision at the conclusion of stage two to convict or acquit *is* subject to review.  Petitioner did not say so explicitly in the original Application, which opened the door for Intervenors to imply no such review is available with the misleading representation that "Petitioner does not dispute that the record lacks any indications that the CVM Board's ultimate decision is reviewable in court or elsewhere." (Intervenor's Reply Brief (CA2 ECF 96), at 25)  For the record, Intervenors' implication is incorrect.

As explained in the Second Supplemental Gonzalez Declaration, rulings of CVM's Board of Commissioners that impose any penalties, are subject to an appeal to the Counsel of Appeals of the National Financial System (*Conselho de Recursos do Sistema Financeiro Nacional*) ("**CRSFN**").  (Second Suppl. Gonzalez Decl. ¶ 4).  The CRSFN is an administrative entity within the Brazilian Ministry of Economy and is the last administrative instance for ruling on such appeals.  (Second Suppl. Gonzalez Decl. ¶ 5).  Moreover, rulings of CVM's Board of Commissioners (or rulings of the CRSFN) are subject to review by Brazilian courts, on the basis that they violate the applicable Brazilian laws.  (Second Suppl. Gonzalez Decl. ¶ 6).  For instance, one could seek annulment of a CVM Board ruling on the basis that it violates principles of the Brazilian administrative proceeding (such as due process, among others).  (Second Suppl. Gonzalez Decl. ¶ 6).  The ability to subject any such violations to the review of the judiciary is granted by the Brazilian Constitution.  (Second Suppl. Gonzalez Decl. ¶ 6).  In fact, in one CVM proceeding, a 2016 decision by CVM's board imposing fines on former board members of a public company that were found to have committed insider trading was and continues to be subject to review outside the CVM.  (Second Suppl. Gonzalez Decl. ¶ 7)  The decision was first appealed to the CRSFN, which affirmed the CVM Board ruling and imposition of the fine.  (Second Suppl. Gonzalez Decl. ¶ 7)  Thereafter, the former board members successfully challenged imposition of the fine before a Brazilian court which declared the fine to be a nullity.  (Second Suppl. Gonzalez Decl. ¶ 7)  As of the date hereof that court's declaration is on appeal before another Brazilian court.  (Second Suppl. Gonzalez Decl. ¶ 7)

## C.  <u>Legal Standard</u>

In evaluating an Application pursuant to Section 1782, courts must first determine whether "certain statutory requirements" are met.[3]  Specifically, a district court may grant a Section 1782 application where: "(1) the person from whom discovery is sought resides (or is

---

[3] *In re Accent Delight Int'l Ltd.,* 869 F.3d 121, 128 (2d Cir. 2017).

found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign or international tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."[4]

Where, as here, those statutory requirements are satisfied, a court may grant a Section 1782 application at its discretion.[5] The Supreme Court has enumerated four factors relevant to the court's exercise of discretion: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" such that "the need for § 1782(a) aid is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign ... court ... to U.S. federal court judicial assistance"; (3) whether the request "conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome[.]"[6] Finally, when considering a Section 1782 application, courts must "exercise their discretion under § 1782 in light of the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.' "[7]

## ARGUMENT

The Court has already fully considered and rejected Intervenors' argument on two of the three statutory requirements and all four discretionary factors in the Memorandum Opinion. That decision – unless and until it is overturned on appeal (which it won't) – must be given preclusive affect as res judicata on the Court's consideration of the Amended Application. Even

---

[4] *Mees*, 793 F.3d at 297

[5] *Id.*

[6] *Intel*, 542 U.S. at 264-65.

[7] *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012).

if that was not the case, for all the same reasons set forth in the original Application and supporting declarations, the Amended Application satisfies the foregoing two statutory requirements and four discretionary factors of Section 1782 and should be granted.  The only requirement even subject to attack by Intervenors is the statutory requirement that Barclays NY be "found" in this district for Section 1782 discovery to be granted.  For the reasons discussed herein, that requirement has been satisfied as well and the Amended Application should be granted.

## I.     RESPONDENTS ARE FOUND IN THE DISTRICT.

In order for the Amended Application to be granted, Barclays NY must be "found" in the Southern District of New York for purposes of Section 1782.  *See* 28 U.S.C. 1782(a) ("The district court of the district in which a person . . . is found may order him to give his testimony or statement or to produce a document or other thing . . . .").  Section 1782 does not define "found." *In re del Valle Ruiz*, 939 F.3d 520, 527 (2d Cir. 2019).  However, "§ 1782(a) supports a flexible reading of the phrase 'resides or is found.'" *Id.* (citing *Edelman v. Taittinger (In re Edelman)*, 295 F.3d 171 (2d Cir. 2002)).  The Second Circuit has "repeatedly recognized Congress's intent that §1782 be 'interpreted broadly' […]." and held that the "statutory scope of 'found' extends to the limits of personal jurisdiction consistent with due process." *Id*. at 528 (quoting *Brandi-Dohrn*, 673 F.3d 76).

In 2019, noting that the Supreme Court has not addressed specific jurisdiction over nonparties, the Second Circuit held that "found" extends the reach of a district court under Section 1782 to the outer bounds of personal jurisdiction it can exercise over a subpoena recipient without violating that recipient's right to Constitutional due process.  *Id.* at 528-30.  As a result, this Court has statutory authority to grant the Amended Application and permit SPS to seek Section 1782 discovery from Barclays NY so long as either (A) Barclays NY is sufficiently "at home" in this district for this Court exercise general personal jurisdiction over

it, or alternatively, (B) this Court can exercise specific jurisdiction over Barclays NY here because Barclays NY's "having purposefully availed itself of the forum [is] the primary or proximate reason that the evidence sought is available at all," or, given Barclays NY's "contacts are broader and more significant"  here, because "the evidence sought would not be available but for the [Barclays NY's] forum contacts." *Id*. at 530.

For the following reasons, both bases of personal jurisdiction are satisfied here and therefore Barclays NY is "found" in this district for purposes of Section 1782.

### A. <u>Barclays NY is Subject to General Personal Jurisdiction in this District</u>

Respondent Barclays NY is a financial services institution that, notwithstanding its incorporation in the UK, regularly transacts business in this district.  As detailed further above and in the Supplemental Hollembeak Declaration, among other business activities performed in New York City, Barclays NY acts as a worldwide correspondent bank for U.S. Dollar denominated wire transfers passing from domestic banks to international banks (and vice versa). (Suppl. Hollembeak Decl. ¶ 10).  Barclays NY also has long-established connections to New York and maintains its headquarters here for its entire operations in the US and Americas. (Suppl. Hollembeak Decl. ¶¶ 13-15).

Furthermore, because of its extensive contacts in the district, Barclays NY is "subject to a comprehensive regulatory framework involving numerous statutes, rules and regulations in the US" based on its location and activities in this district.  (Suppl. Hollembeak Decl. ¶ 17).  In its most recent Annual Report, Barclays NY's parent company, Barclays Plc, explained the reach of certain US laws can require compliance by its entire international bank "Group" including entities incorporated outside of the US (e.g. Barclays Wealth UK).   (Suppl. Hollembeak Decl. ¶ 18).  When this happens, the Group effectuates compliance with US law through Barclays NY.  (Suppl. Hollembeak Decl. ¶ 19).  In other words, Barclays NY has purposefully established its substantial presence in this district to enable Barclays Plc and its

various subsidiaries to effectively function in a global marketplace where compliance with US laws and regulations, as well as access to New York capital markets, are table stakes for being a viable international banking institution.

For all these reasons, Petitioner submits this Court can and should exercise general personal jurisdiction over Barclays NY because its "affiliations with the [district] are so 'continuous and systematic' as to render the entity essentially at home" in this district. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). Doing so would comport with applicable precedent in this district. *See, e.g.*, *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 330 (S.D.N.Y. 2018) ("*Nike I*") (holding because Banks' ability to conduct business and process U.S. Dollar denominated wire transfers is completely dependent upon their extensive use of their contacts in New York, "This alone would be sufficient to establish that the Banks have sufficient minimum contacts with the forum, as 'the selection and repeated use of New York's banking system … constitutes purposeful availment of the privilege of doing business in New York.'" (quoting *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 97 (S.D.N.Y. 2015) ("*Gucci III*") (internal quotation omitted))), *aff'd*, *Nike, Inc. v. Wu*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018) ("*Nike II*"). Indeed, the New York Court of Appeals has recognized the "widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 338 (2012) ("*Licci III*").

Here, Barclays NY's repeated operation as a correspondent account in New York for its international banking affiliates is, in effect, a "course of dealing" that shows its "purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci IV*") (quoting *Licci III*, 20 N.Y.3d 327). Under these circumstances, Courts in this district have

exercised jurisdiction over banks such as Barclays NY. *See, e.g.*, *Nike II*, 349 F. Supp. 3d at 354-57 (relying on *Licci III* and *Gucci III* to hold that "the Banks' establishment and maintenance of correspondent accounts was sufficient to support the exercise of personal jurisdiction over the Banks for purposes of the Subpoenas").

**B.  Barclays NY is Subject to Specific Personal Jurisdiction in this District**

      Assuming for the sake of argument that Barclays NY is not subject to general personal jurisdiction in this district, the Court nevertheless can and should exercise specific personal jurisdiction over Barclays NY for purposes of granting the Section 1782 discovery requested in this Amended Application.

      The Amended Application seeks to obtain evidence from documents evidencing wire transfers, among other conducts, taken by Unifleisch UK, the other Target Companies, and/or other entities in connection to J&F, Batista family, or JBS, through the intermediation of the services provided by Barclays NY and evidenced by documents or information in Barclays NY's possession or control that relate to the illicit use of funds from JBS, including without limitation the transfers identified in the Barclays SAR disclosed within the FinCen Files.

      Because of its extensive contacts in the district, Barclays NY is "subject to a comprehensive regulatory framework involving numerous statutes, rules and regulations in the US" which are "based on the location or activities of those entities." (Suppl. Hollembeak Decl. ¶ 17). In its most recent Annual Report, Barclays NY's parent company, Barclays Plc explained the reach of certain US laws can require compliance by its entire international bank "Group" including entities incorporated outside of the US:

> In the US, the Bank Secrecy Act, the USA PATRIOT Act 2001, the Anti-Money Laundering Act of 2020 and regulations thereunder contain numerous anti-money laundering and anti-terrorist financing requirements for financial institutions.  In addition, the Group is subject to the US Foreign Corrupt Practices Act, which prohibits, among other things, corrupt payments to foreign government officials.  It is also subject to various economic sanctions laws, regulations and executive orders administered by the US government, which prohibit or restrict some or all business activities and other dealings with or involving certain individuals, entities, groups,

> countries and territories.
>
> In some cases, US state and federal regulations addressing sanctions, money laundering and other financial crimes may impact entities, persons or activities located or undertaken outside the US, including Barclays PLC and its subsidiaries.

(Suppl. Hollembeak Decl. ¶ 18 (quoting Exhibit J thereto, Barclays 2022 Annual Statement, at 377)).  When this happens, the Group effectuates compliance with US law through Barclays NY.  (Suppl. Hollembeak Decl. ¶ 19).

In fact, it is Barclays NY's broad and significant contacts in this district and its role as conduit for the Barclays Group compliance with US anti-money laundering law that is responsible for the evidence Petitioner seeks by the Amended Application being available at all.  (Suppl. Hollembeak Decl. ¶ 20).  The Barclays SAR was submitted to FinCEN by Barclays NY based on information it received from one of its UK affiliates (identified therein as "Barclays UK Wealth") or that it otherwise was in possession of as a result of maintaining a United States Dollar correspondent account for such affiliate and fulfilling its role as conduit of information for reporting and compliance to US regulators like FinCEN on behalf of the entire Barclays Group.  (Suppl. Hollembeak Decl. ¶ 22).  For example, the Barclay SAR states that "*Barclays NY is filing this Suspicious Activity Report*" after Unifleisch UK's account with Barclays UK Wealth "was flagged for review *as part of Barclay NY's surveillance program*." (Suppl. Hollembeak Decl. ¶ 22 (quoting Exhibit K thereto, Barclays SAR, at 2) (emphasis added)).

Thus, The Barclays SAR evidences that Barclays NY has possession and/or control over documents and information concerning the Target Companies, which in 2017 it compiled, analyzed and marshalled to report to FinCEN that, solely for the period between September 6, 2011 and April 12, 2016, Target Company Unifleisch UK made 859 money transfers totaling almost US$644 million to Valdarco, Lunsville and other entities from high-risk jurisdictions known for money laundering linked to the Batista family.  (Suppl. Hollembeak Decl. ¶ 25).  In

other words, Barclays NY's actions *in this district* as correspondent or intermediary bank responsible for completing US dollar denominated wire transfers passing to and from Barclays UK Wealth and reporting to FinCEN when those transfers evidenced suspicious activity are the but for and proximate cause of the discovery SPS seeks by the Amended Application existing and being within Barclays NY's possession and/or control.  (Suppl. Hollembeak Decl. ¶ 26).

Moreover, the Respondents would not suffer hardship as they are "simply required to produce" limited records maintained in (or controlled from) this district.  *Nike I*, 349 F. Supp. 3d at 333 ("Here, as in *Gucci III*, such burdens are either 'minimal or non-existent,' as all of the Banks have physical branches in the forum, and can be no stranger to litigation in it […]") (internal citation omitted); *see also First Am. Corp. v. Price Waterhouse Ltd. Liab. P'ship*, 154 F.3d 16, 23 (2d Cir. 1998). Given the lighter burden placed on respondents in the discovery context—who are asked only to provide evidence, not to defend their conduct or risk damages or other penalties—it is wholly consonant with due process to authorize a petitioner to seek discovery from a correspondent bank in New York, as the burden is "minimal or non-existent." *Nike I*, 349 F. Supp. 3d at 333.

Here, the scope of discovery sought here is likely within Barclays NY's document retention policies.  A correspondent/intermediary bank such as Barclays NY keep electronic records of US dollar denominated transfers and are able to easily search and produce these record.  All indications are that Barclays NY has in fact done so in response to subpoenas issued by numerous prior Section 1782 applicants in this district.  *See, e.g.*, *In re Abraaj Inv. Mgmt. Ltd.*, No. 20-MC-229 (VSB), 2023 WL 2674752, at *4–6 (S.D.N.Y. Mar. 29, 2023) (granting Section 1782 application and permitting subpoena to be issued to numerous banks found in this district including Barclays NY); *In re Banco Santander (Brasil) S.A.*, No. 22MC00022ALCSN, 2022 WL 1546663, at *3 (S.D.N.Y. Apr. 6, 2022) (same); *In re Inv. Bank PSC*, 567 F. Supp.

3d 449 (S.D.N.Y. Oct. 15, 2021) (same); *In re First Monolith Inc.*, No. 20 MISC. 735 (AT), 2021 WL 1093658, at *2 (S.D.N.Y. Feb. 1, 2021) (same).

Accordingly, for all these reasons, this Court has and may exercise specific personal jurisdiction over Barclays NY in this district for purposes of the discovery sought by this Amended Application.   Therefore, Petitioner has satisfied all statutory requirements and discretionary factors, and the Amended Application should be granted.

II.        **THE AMENDED APPLICTION IS BEING SERVED ON NOTICE**

Finally, unlike the original Application which sought entry of the Order on an *ex parte* basis, this Amended Application and all supporting papers are being filed and served on notice to Respondent Barclays NY and the Intervenors.   Accordingly, pursuant S.D.N.Y. Civ. R. 6.1(b), and in accordance with this Court's individual practices, any opposing affidavits and answering memoranda shall be served within fourteen days after service of the Amended Application and supporting papers is effectuated.

## CONCLUSION

For the foregoing reasons, SPS respectfully requests that the Court enter an order granting this Amended Application substantially in the form of the Proposed Order filed contemporaneously herewith and such other relief as the Court deems just and proper.


Dated:   April 26, 2023                         Respectfully submitted,
         Omaha, Nebraska

                                                **BAIRD HOLM LLP**


/s/ _____
Jeremy C. Hollembeak
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
Phone: 402.636.8317
Email: jhollembeak@bairdholm.com

 -and-

**MB SCANLON PLLC**
Gabriela M. Scanlon
4301 50th Street NW, 1st Floor
Washington, D.C., 20016
Telephone:  (202) 410-9293
Email: gabriela@mbscanlon.com

*Attorneys for Petitioner SPS I Fundo De Investimento De Ações – Investimento No Exterior*