**SUPPLEMENTAL HOLLEMBEAK DECLARATION
IN SUPPORT OF AMENDED APPLICATION OF SPS I FUNDO DE
INVESTIMENTO DE AÇÕES – INVESTIMENTO NO EXTERIOR
FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**


# <u>EXHIBIT F</u>

Barclays consent order

**NEW YORK STATE DEPARTMENT**
**OF FINANCIAL SERVICES**

In the Matter of

BARCLAYS BANK PLC and BARCLAYS BANK
PLC, NEW YORK BRANCH

## CONSENT ORDER UNDER
## NEW YORK BANKING LAW SECTIONS 39 and 44

The New York State Department of Financial Services (the "Department"), Barclays

Bank PLC and Barclays Bank PLC, New York Branch (the "New York Branch") (together,

"Barclays" or the "Bank") (collectively, the "Parties") are willing to resolve the matters

described herein without further proceedings.  The Department hereby finds as follows:

### The Department's Findings After Investigation

**Introduction**

1.      In June 2016, and again in July 2016, the Chief Executive Officer of Barclays

Bank PLC, James "Jes" Staley, personally directed the head of Barclays' Group Security to

attempt to identify the author(s) of two anonymous letters which concerned the recruiting and

employment of a recently-hired senior executive that Mr. Staley had recruited to Barclays (the

"New Executive").

2.      Mr. Staley's primary motivations in seeking to learn the identity of the author(s)

were to protect the New Executive (who was a friend and colleague) from a personal attack that

Mr. Staley believed was false and malicious; and to defend his own ability as CEO to continue

recruiting high-level hires to the Bank.

3.     Among other things, however, these letters directly or indirectly criticized Mr. Staley's own role, and the role of the Bank's management, in the recruitment and employment of the New Executive.   Mr. Staley's efforts to identify the anonymous author(s) were in contravention of Barclays' established whistleblowing policies and procedures, as well as advice he had received from several senior executives.  His actions risked creating an atmosphere where employees might doubt it was safe to escalate to Group Compliance issues of concern to the Bank -- although Bank policies and procedures had made a commitment of security to its employees.

4.     This episode was a step backwards for Barclays.   In response to several enforcement actions brought by government agencies against the Bank, including a Cease and Desist Order brought jointly in August 2010 by the Department and Board of Governors of the Federal Reserve, Barclays took the commendable step in 2012 of commissioning a broad and independent review of its business practices and culture.  Out of that review, Barclays began to implement constructive changes across multiple business lines.

5.     Barclays also took other meaningful remedial steps following two written Consent Orders entered into between the Department and Barclays in 2015, which primarily concerned control deficiencies in its foreign exchange business.

6.     As set forth below, however, certain shortcomings in governance, controls and corporate culture relating to Barclays' whistleblowing function together permitted a sequence of events that potentially could have had a detrimental impact on the efficacy of Barclays' whistleblowing program.  In light of certain deficiencies identified in this investigation (the "Department's Investigation" or "Investigation"), the Department has determined that an enforcement action is warranted.

**Background**

7.    The Department's Investigation included reviewing thousands of pages of documents, obtaining sworn testimony from a number of witnesses, and collecting other relevant information from additional sources.

8.    Barclays is a global financial institution with approximately $1.4 trillion in assets and 80,000 employees worldwide.  Barclays operates a foreign branch in New York State, which has been licensed, supervised and regulated by the Department since 1963.  As of June 2018, the New York Branch had approximately 215 employees and held total assets exceeding $53 billion.

9.    Barclays operates a number of important business lines out of the New York Branch, including wholesale lending and underwriting, high-yield loan trading, deposit taking, management of Barclays' U.S. dollar funding position and dollar payments clearing, settlement of foreign exchange trades in U.S. dollars, and corporate accounts.

10.    Barclays' Financial Institutions Group (known as "FIG") provides services and products to banks, insurance companies, asset management firms and specialty finance institutions.  During the period 2014 through 2016, more than 160 employees assigned to FIG worked at Barclays' office location that houses its New York Branch.

11.    Mr. Staley has served as Barclays' CEO and a member of its Board of Directors since December 2015.  Based at Barclays' London headquarters, he also maintains an office located in the office space where the New York Branch is located as well.

12.    Mr. Staley serves on Barclays' Executive Committee (the "ExCo"), along with other senior members of Barclays' management who are members or participate in its meetings, including the Chief of Staff, Group General Counsel, Group Chief Compliance Officer ("GCCO"), Chief Operating Officer, and Group Human Resources Officer.  The principal

purpose of the ExCo is to work with the CEO to shape and implement the firm's business strategy.

13.    The Chief of Staff's responsibilities include priority setting for the CEO, providing advice to the CEO on how he should spend his time, and "ensuring that the right information gets to the CEO." As part of his responsibilities, the Chief of Staff possesses general knowledge and understanding of policies and principles on whistleblowing matters under the relevant laws and regulations such as U.K. law and the Bank's policies and procedures.

14.    The GCCO's responsibilities during the relevant period included managing regulatory and compliance risk associated with Barclays' various business lines and locations. The GCCO also was the principal risk owner for conduct and reputational risk under Barclays' enterprise-wide risk management framework. The GCCO had approximately ten direct reports (all Managing Directors) and supervised approximately 1,400 employees within the Bank's global compliance function.

15.    The Group General Counsel's responsibilities include overseeing and managing the legal and regulatory affairs of the Group, and serving as counsel to the Board of Directors and several Board-level committees.

**Barclays' Whistleblowing Program**

16.    **The Salz Review**: As noted above, in response to several enforcement actions brought by government agencies against the Bank, Barclays in 2012 took the commendable step of commissioning a broad and independent review of its business practices and culture. Known as the "Salz Review,"[1] this report was issued in 2013 and contained several findings and conclusions pertinent here:

---

[1]  The review was led by Sir Anthony Salz, a U.K. solicitor (available at https://online.wsj.com/public/resources/documents/SalzReview04032013.pdf.)

- The Salz Review found that there was a *"cultural unwillingness to escalate issues"* relating to risk and controls. A survey of Barclays' employees found, for example, that a significant number of employees in one of the Bank's divisions *"did not feel able to 'report unethical behaviour without fear of reprisal.'"* The Salz Review further found that this sentiment "is not isolated to [that particular Division of the Bank]."

- The Salz Review also counseled that *maintaining the independence of the Compliance function was "particularly important to the effective execution of [its] mandate and the escalation of matters from the business units to the Group Head of Compliance."*

17.    Prior to 2014, Barclays' compliance structure did not include a centralized division that handled whistleblowing complaints or investigations. Generally, each business unit had its own process for handling whistleblowing complaints and its own team to do the work. Although some cooperation existed among the individual groups handling whistleblowing, no unit focused on whistleblowing on a Bank-wide scale.

18.    As relevant here the Salz Review recommended a number of steps to remediate and improve Barclays' compliance function, including that:

- *"Barclays should foster a culture where employees feel that escalating issues is safe and valued"*;

- Barclays should devise protocols *to encourage employees to raise concerns "which are perceived to protect those raising them."*; and

- Barclays should *"ensure it constantly reinforces the compliance culture throughout the bank . . . ."*

19.    In response to the Salz Review, Barclays enacted a series of measures designed to remediate and improve the Bank's compliance culture, including by providing new protections of, and encouragement to, anonymous whistleblowers.

20.    **The I&W Team**: In 2015, in anticipation of new U.K. regulatory rules scheduled to take effect in 2016, the Bank consolidated most of its whistleblowing functions into a newly-created unit, the "Investigations & Whistleblowing" division ("I&W" or "I&W Team"). The

I&W Team consisted of two groups: one that handles the administrative receipt and disposition of whistleblowing concerns, and another group that conducts the day-to-day investigations of complaints received.  The head of I&W reports directly to the GCCO and oversees both groups (the "I&W Head").

21.     New U.K. whistleblowing regulations obligated regulated institutions such as Barclays to assign the responsibility to an individual for "*ensuring and overseeing the integrity, independence and effectiveness of the firm's policies and procedures on whistleblowing . . . including those policies and procedures intended to protect whistleblowers from being victimized because they have disclosed reportable concerns.*"  (Emphasis supplied.)  Barclays created the position of "Whistleblowers' Champion" in response to this mandate and, among other things, the Whistleblowers Champion oversees on behalf of the Board of Directors the I&W Team.

22.     The I&W Team maintains and monitors several reporting channels set up for the receipt of whistleblowing complaints including (a) hotlines, (b) a dedicated e-mail address, and (c) an independent third-party reporting service that allows a whistleblower to report concerns to an independent entity, which then transmits the report directly to the I&W Team.

23.     Complaints received via other channels such as letters, concerns raised verbally to Bank employees, or even complaints not made directly to Bank management, are also required to be referred directly to the I&W Team.  The I&W Team is also charged with promoting and advertising the whistleblowing program and available resources to Barclays' employees, as well as assisting in the preparation of its training materials.

24.     The I&W Team conducts initial triage of whistleblower complaints and then assigns complaints to its investigators for follow-up as appropriate.  The I&W Team then

collects all information relating to a complaint, including any findings made by investigators, and makes a final determination about the extent to which each complaint should be credited. For substantiated complaints, the I&W Team refers the matter to the relevant division of the Bank for appropriate action.

25.    *Notably, Barclays' policies and procedures assign the determination of whether a matter is being treated as a whistleblowing complaint (known as a "whistleblow") to the I&W Team.*

26.    The I&W Team also prepares a report for senior management and the Board relating to significant whistleblowing cases and general trends, known as the "Whistleblowers' Champion Report." The primary purpose of this report is to keep the Whistleblowers' Champion and senior members of management abreast of key developments in the whistleblowing function. The report typically includes (a) updates about notable or serious whistleblowing cases opened during the previous month, and (b) notes about significant cases that were closed.

27.    The report is circulated to (among others) Mr. Staley and the Chief of Staff each month. The Chief of Staff usually (but not always) reads the report and would, from time to time, discuss a case listed on the report with the Head of I&W or I&W Team members. Although the Chief of Staff did not regularly discuss whistleblowing cases with Mr. Staley, there were occasions that something included in the monthly report was raised to Mr. Staley's attention.

28.    **The Whistleblower Anonymity Policy**: In 2014, Barclays created the position of "Global Head of Whistleblowing," a position that reported directly to the I&W Head. The new position included responsibility for consolidating and creating the new whistleblowing program, and managing the process for receipt and disposition of whistleblowing concerns.

Following his appointment, the new Global Head of Whistleblowing gave consideration to whether the Bank had adequate policies and procedures addressing the ability of whistleblowers to remain anonymous.

29.     Consequently, in October 2014 the Global Head of Whistleblowing drafted and circulated to other I&W managers a proposed policy that set out practices and procedures to protect the anonymity of whistleblowers (the "Draft Anonymity Policy"). The Draft Anonymity Policy relied on at least two sources of authority for these policies. First, it cited to the U.S. Sarbanes-Oxley law, including Section 301(4)(b), which had for more than decade required public company Board audit committees to establish procedures for "the confidential, anonymous submission by employees of the issuer of concerns regarding questionable accounting or auditing matters."[2]  Second, the Draft Anonymity Policy cited to the Financial Conduct Authority Systems & Controls Section 18.2.2(iii), which was interpreted to require U.K. firms subject to its jurisdiction to have "respect for the confidentiality of workers who raise concerns."[3]

30.     The Draft Anonymity Policy set forth certain fundamental principles governing whistleblower anonymity, including that (a) no one involved in the whistleblowing process should attempt to investigate the identity of an anonymous whistleblower, and (b) the team designated to receive and manage whistleblowing concerns should carefully guard any information about the submitter that might be used improperly to unmask them.[4]

---

[2] *See* 15 U.S.C. § 78j-1(4)(b).

[3] *See* FCA Senior Management Systems, Arrangements and Controls (SYSC) Section 18.2.2 (2)(a)(iii) (Release 13, Feb. 2016), available at: https://www.handbook.fca.org.uk/handbook/SYSC/18/2.pdf.

[4] The thrust of the Draft Anonymity Policy was subsequently integrated into the Bank's formal whistleblowing policies released in 2015 by the newly-consolidated I&W Team. *See, e.g.,* "Raising Concerns (Whistleblowing) Global Policy (July 2015 v.)".

31.     Under Barclays' policies in place in 2014 (and which remained in place until 2017), whistleblowing protections applied only to Barclays employees and not third parties. These policies separately discussed the rare case where it might be appropriate to seek to identify an anonymous reporter, which was partially sourced in U.K. law. If, after an appropriate investigation, the I&W Team determines a complaint is ***both*** unsubstantiated and submitted for malicious purposes; or, where there is a pattern of the same person repeatedly abusing the whistleblowing process, then it may be (but is not necessarily) appropriate to seek to identify the complainant.

32.     The I&W Team Leader has emphasized that, under Barclays' whistleblowing program, any attempt to identify an anonymous complainant should occur on only the "***rarest of occasions***," and that a complete auditable record should be kept of any such effort.

33.     **Barclays' Commitments to the Department Concerning Whistleblowing**:  In connection with two written Consent Orders entered into between the Department and Barclays on May 20, 2015 and November 17, 2015 concerning deficiencies in its foreign exchange business, Barclays made specific representations to the Department concerning remediation that it had implemented or would implement concerning its whistleblowing program.

34.     These representations, contained in a December 15, 2015 plan submitted to the Department (just six months before the conduct in issue here) included that (a) Barclays ***"has continued to enhance its reporting, escalation, and investigation framework through . . . the enhancement of Barclays' firm-wide Global Whistleblowing Framework***."; (b) "***Barclays has created and implemented globally two anonymous reporting channels that allow an employee to report a suspected violation via the phone or e-mail to an internal or external service***."; and (c) that "[t]he Front Office will continue to increase employee awareness of Barclays'

whistleblowing infrastructure, ***including training on how to raise concerns about the actions of staff members, without the fear of retaliation***." (Emphasis supplied.)

35.     Moreover, following his arrival at Barclays in December 2015, Mr. Staley personally took a number of notable steps to improve Barclay's compliance culture including, (i) supporting implementation of a program that places senior managers from all departments into Group Compliance for a three month rotation, in order to enhance appreciation of compliance within the Bank's business lines; (ii) supporting creation of an electronic "dashboard" on which Bank employees can provide direct feedback to the senior executive team concerning the employee's perspective on the Bank's culture of compliance; and (iii) repeatedly emphasizing in public and in private settings the importance of compliance to Barclays.

36.     <u>**Related Whistleblowing Guidance at Barclays**</u>:    In its employee code of conduct dated August 2015 and titled "The Barclays Way: How We Do Business" (the "Code of Conduct"), the Chairman of Barclays' Board (the "Board Chairman") in an introduction stated that he personally was responsible for "***ensuring that all of the people for whom I and my senior colleagues have a responsibility . . . do the right things and do things right day in and day out of their own volition.   In other words, do things The Barclays Way***." (Emphasis supplied.) Later on, the Code of Conduct instructs Barclays employees to speak up:

> If you believe something is not right – like serious misconduct, fraud or illegal activity – or if you feel that our standards aren't being met, it is vital that you speak up.  Any concerns you may have can be raised with Compliance ***in confidence*** by:
>
> • Contacting your business divisions' Raising Concerns hotline or email or
>
> • Talking directly to your local Compliance team.
>
> Concerns raised are taken seriously and will be investigated in an appropriately ***confidential and sensitive way***. . . . No one will be treated less favourably or discriminated against because they have raised a concern. (Emphasis supplied.)

37.     In its on-line "Whistleblowing Perennial Training" program for Barclays managers, in effect since at least September 2015, managers are instructed that, "[w]hen in doubt [about whether a complaint should be treated as a whistleblowing complaint], *err on the side of safety and treat the information as Whistleblowing information and the reporter as a Whistleblower*." (Emphasis supplied.)  In another training module, managers are instructed to "*please think Whistleblowing if . . . [t]he report is made anonymously*." (Emphasis supplied.)

38.     Moreover, in a presentation to the Board's Audit Committee on or about December 8, 2015 (again only six months before the events at issue here) it was reported to the Audit Committee that "Support for whistleblowers" at Barclays included (a) "Protecting Identities" by "[s]ecure internal and external reporting gateways, including anonymous reporting where permitted"; (b) "[whistleblowers] asked to confirm status (anonymous/in confidence) at inception, and status is recorded"; and (c) "[whistleblowers'] identities not shared with investigator without express consent."[5]

39.     More generally, the Board of Directors has acknowledged to regulators "the pivotal role exercised by the CEO in setting the culture and tone of the Group and the steps taken to ensure the integrity of" the Bank's Whistleblowing Program and the protection of those that use it.

40.     Despite the policies, procedures and guidance in place at the time, as set forth below, certain shortcomings in governance, controls and corporate culture together resulted in an

---

[5]  Barclays has represented to the Department that, following these reforms, whistleblowing reports increased significantly at Barclays such that by 2017, the number of surveyed employees (82 to 86 percent of employees) who stated they felt able to report unethical behavior exceeded industry benchmarks. *See, e.g.*, Navex 2017 Ethics & Compliance Hotline & Incident Management Benchmark Report; Expolink Whistleblowing Benchmarking Summary.

unfortunate effort led by Mr. Staley to expose the identity of the author(s) of two anonymous letters.

**Mr. Staley Seeks to Identify the Author(s) of Two Anonymous Letters**

41.     **The First Anonymous Letter**:  On or about June 21, 2016, several members of the Board of Directors received a letter from an anonymous author who stated he or she was a longtime shareholder, signing it "John Q. Public," and who claimed to be speaking on behalf of other long-term shareholders (the "First Anonymous Letter").   The letter was specifically addressed to the Board Chairman and commenced its first paragraph as follows:

> Given the highly sensitive nature of the matter in which I have described below *I writing to you [sic] on an anonymous basis.  I recognize the unconventional approach I am taking, but for reasons you will hopefully appreciate, I felt it necessary not to disclose my name or the firm I represent,* other than to state we are long-term holders of Barclays shares and are concerned about the potentially detrimental impact that could result from the disclosure of the following.  (Emphasis supplied.)

42.     The letter contained accusations about personal issues of a recently-hired Barclays executive, the New Executive.   These alleged issues had arisen at another large financial institution where both Mr. Staley and the New Executive had worked together previously (the "Other Bank").   Mr. Staley had initiated the recruitment of the New Executive to Barclays (although he apparently did not play a role in the hiring process).

43.     Among other things, the letter questioned the New Executive's fitness to work at Barclays and specifically criticized Mr. Staley's role in soliciting this executive to join Barclays.

44.     Thus Mr. Staley's own alleged behavior was plainly included in the subject matter of the complaints set out in the First Anonymous Letter.  Moreover, although Mr. Staley believed the bulk of the allegations contained in the letter were false, certain allegations pertaining to the New Executive were accurate, which Mr. Staley understood when he first read it.

45.     Under Barclays' then-applicable policies the letter should have been forwarded directly to the I&W Team immediately and not otherwise distributed.[6]  Despite the nature of the allegations, however, Board members and senior management failed to treat the letter as a whistleblower complaint and the First Anonymous Letter was circulated over the next few days among the Bank's most senior executives, including Mr. Staley.

46.     As the Department's Investigation revealed, Mr. Staley (based on his own knowledge of the New Executive's history) considered the letter a false and malicious personal attack on the New Executive, whom Mr. Staley considered a friend.  Mr. Staley was genuinely concerned about the New Executive, who had experienced personal difficulties in the past, and Mr. Staley was (at least in part) interested in taking steps to protect the New Executive from what Mr. Staley perceived as an unfair attack.

47.     Mr. Staley also considered the letter an attack on himself and the Bank, suspecting it had been sent by a former colleague from the Other Bank who was privy to the personal issues pertaining to the New Executive.  Mr. Staley was concerned that the allegations in the First Anonymous Letter could undermine his own ability to continue recruiting high-level hires of his choosing.

48.     Senior Barclays executives who discussed the letter and the allegations with Mr. Staley observed that he was upset, and Mr. Staley expressed to them the desire to identify the letter's author(s).

49.     On the same day that certain Board members received a copy of the First Anonymous Letter, it was forwarded to the GCCO who in turn alerted the I&W Team and

---

[6]  *See, e.g.,* "Raising Concerns" Policy - § 1.3.6 ("All reports of Inappropriate Conduct are referred to the I&W Team, logged and investigated thoroughly, confidentially, and in a timely manner") (July 2015 ed.); § 1.3.12 ("there is controlled access to all records relating to reports of Inappropriate Conduct to ensure that any personal data contained in such reports is protected").

instructed them to log the complaint, open a whistleblowing case under the usual procedures, and not share it with anyone else. The I&W Team then formally logged the First Anonymous Letter as a "whistleblow." Mr. Staley was not informed of this action at this point in time.

50.     On June 23, 2016, Mr. Staley was asked by a member of the ExCo and another senior executive to address the Board concerning the First Anonymous Letter. Mr. Staley then discussed the matter during meetings of both the full Board of Directors and a subcommittee. There, Mr. Staley summarized the letter's allegations and expressed his strong belief they were untrue in material respects and wholly unfair. Mr. Staley also explained why he believed the manner in which the New Executive was recruited and hired comported with Bank policies and procedures.

51.     **The Second Anonymous Letter**: On June 24, 2016, a member of Barclays' U.S. senior management received a second anonymous letter (the "Second Anonymous Letter"). This letter stated explicitly that it was from a group of "concerned" Barclays employees in the Financial Institutions Group or "FIG," which was the Barclays division that had been joined by the New Executive. The author(s) again requested anonymity.

52.     The Second Anonymous Letter raised nearly identical concerns about the qualifications and fitness of the New Executive, including with respect to the executive's personal issues. The letter was signed, "***Concerned FIGers***." The criticism of the recruitment and hiring of the New Executive, and the concerns expressed about its impact on the functioning of FIG Group, at a minimum placed Mr. Staley in the position of a principal witness concerning the letter's subject matter.

53.     Mr. Staley learned about and received a copy of the Second Anonymous Letter soon after it had been received by the U.S. executive on June 24. According to the DFS

Investigation, Mr. Staley came to believe both letters had been written by the same person or persons, and that the letters were a campaign of sorts to attack both the New Executive and Barclays.

54.     On June 28, 2016, Mr. Staley contacted Barclays' Chief Information Security Officer ("CISO"), who led Barclays' Group Security.  Mr. Staley informed the CISO in only vague terms that a "negative" letter had been received by the Bank and asked the CISO if he could try to identify the letter's author.  The CISO understood from Mr. Staley that identifying the author was necessary because its subject matter was serious and troubling.

55.     Direct requests from the Bank's CEO to its CISO for assistance like this were unusual, and the CISO started right in on the assignment.  The CISO e-mailed the head of Group Human Resources, asking that he be sent the "*letters that [Staley] wants to trace*."  (Emphasis supplied.)

56.     Also on June 28, the CISO sent two text messages to Mr. Staley indicating that he had sought "*to get a hold of the letters*" from the Group Human Resources Officer and had informed him that "*I thought it was urgent*."  The CISO told Mr. Staley that he was "[r]eady to move now."

57.     The same day, although not yet in receipt of the letters or informed of their contents, the CISO began steps to identify the author(s).  Among other things he enlisted a U.S.-based Barclays cybersecurity intelligence analyst, who was temporarily assigned to an outside cybersecurity organization that included law enforcement agents (the "Analyst").  The Analyst, who had not been informed of the background of the request, asked his contacts at several U.S. law enforcement agencies for assistance in this task.

58. Also on or about June 28, 2016, the CISO was informed by both the Group General Counsel and the head of Group Human Resources that the letters might qualify as whistleblows, such that any efforts to identify the author(s) would be improper. Following that discussion the CISO texted Mr. Staley, "Talked to [the head of Group Human Resources] and [the Group General Counsel]. I will start my 'engine' tomorrow when all the whistleblowing part has been dealt with."

59. On or about June 29, 2016, the Second Anonymous Letter was transmitted to Group Compliance and referred to the I&W Team, which opened an investigation and shortly related it to the investigation arising from the First Anonymous Letter. The I&W Team again formally logged the Second Anonymous Letter as a "whistleblow." Mr. Staley was not informed of this action at this point in time.

60. **The June 29th Meeting**: On June 29, 2016, Mr. Staley participated in a brief meeting with his Chief of Staff, the GCCO, the Group General Counsel and the head of Group Human Resources (all of whom are ExCo members or participants), which took place in the executive suite at the Bank's headquarters (the "June 29th Meeting"). Mr. Staley expressed to this group his desire to learn the identity of the author or authors of the two letters and informed them about the assignment he gave to the CISO.

61. The GCCO and the General Counsel both firmly advised Mr. Staley against trying to identify the author(s). The GCCO stated that Group Compliance would be looking into the matters raised in the letters, that Barclays needed to treat the letters as a whistleblowing matter, and that the whistleblowing function needed to conduct that evaluation before anyone took any additional steps regarding the letter. Mr. Staley was also counseled that efforts to identify the author(s) were not a good use of the Bank's resources.

62.    Unfortunately, none of the senior executives involved in the June 29th Meeting documented this important discussion with Mr. Staley.

63.    **The CISO's Initial Stand-down**:  Shortly after the June 29th Meeting, the GCCO directed the Head of I&W to reach out to the CISO to ensure no steps had been taken to try to identify the author(s) of the letters.  The Head of I&W then confirmed with the CISO that no firm steps yet had been taken, instructed the CISO that no further efforts to identify the author(s) should be made without express approval from Group Compliance, and informed him that, as a general matter, efforts to identify a whistleblower are almost always improper.

64.    Shortly afterwards, the Group Human Resources Officer followed up with the CISO, told him the questions about whether the letters were "whistleblows" remained pending, and that any efforts to identify the author(s) should remain tabled.  The CISO confirmed this understanding with his own team, who in turn informed outside law enforcement contacts that no help was going to be requested at that time.  Similarly, around this time, the I&W Head reported to the GCCO that he had spoken with the CISO and confirmed "***nothing was done***" to identify the author(s).

65.    **The June 2016 Whistleblowers' Champion Report**:  On or about July 5, 2016, the I&W Team circulated the June 2016 monthly Whistleblowers' Champion Report.  This report included an entry describing the two whistleblowing cases that had been opened in response to the First and Second Anonymous Letters.  The report included these two letters among a list of significant or noteworthy whistleblowing cases that had been opened during the prior month.  It categorized the allegations of the letters as "Staff/HR related" and described the allegations as "***Anonymous letter*** alleged that employee had historically behaved in a manner contrary to the Bank's values."  (Emphasis supplied.)

66.     Mr. Staley received the report on July 5, 2016, although he does not recall reviewing it.  The Chief of Staff also received it on July 5, 2016.

**Mr. Staley's July 8th Call With the Head of Investigations and Whistleblowing**

67.     On July 7, 2016 Mr. Staley e-mailed his Chief of Staff to ask, "have we cleared the whistleblowing issues with [the New Executive's] letters?"  Mr. Staley did not pose the same question to any of the senior executives who had principal responsibility for this matter – *i.e.,* the GCCO, Group General Counsel or I&W Team Leader.  At no time did Mr. Staley seek any additional advice from the GCCO or Group General Counsel in follow up to the matter of "clearing the whistleblowing issues," even though both of these executives previously advised him not to try to identify the letters' author(s).

68.     The Chief of Staff promptly e-mailed the Head of I&W to ask, "*I recall that we were trying to determine whether the letter constituted a whistleblow matter.  Any sense of when we'll have a conclusion on that one way or another?*"  In light of his presence at the June 29th Meeting, the better course would have been for the Chief of Staff also to seek confirmation of the status of the matter with the GCCO or Group General Counsel, and in documented form.

69.     The Head of I&W replied by e-mail, "*We are treating it as a whistleblower matter.*"  The I&W Head also provided a short update about the I&W Team's inquiry into the substance of the complaints raised in the letters.  The Chief of Staff clearly understood this to mean that Group Compliance was treating this as a whistleblowing matter, such that the laws, rules and guidelines applicable to whistleblowing applied.[7]  Also on July 7, 2016, the GCCO asked the Head of I&W to brief Mr. Staley directly about the status of the whistleblowing unit's investigation into the allegations made in the two letters.

---

[7] Although he could not be sure, the Chief of Staff believes he may have shared the information provided by the Head of I&W with Mr. Staley shortly thereafter, consistent with the Chief of Staff's general practice to follow up on such requests from Mr. Staley.

70.     The next day, July 8, 2016, the Head of I&W had a ten- or fifteen-minute phone conversation with Mr. Staley.  The I&W Head explained to Mr. Staley the letters were being treated as whistleblowing complaints by I&W, and advised Mr. Staley not to make any attempts to identify the letters' author or authors.

71.     The I&W Head also stated during this conversation that there were narrow exceptions to the rules prohibiting identification of anonymous whistleblowers, but explained to Mr. Staley why those exceptions were inapplicable in this case.  The I&W Head also identified for Mr. Staley certain risks to the Bank that would flow from attempting to identify the letters' author(s), including that determining who had made the complaints could make it appear that the Bank was intent on retaliating against the complainant(s), and that the act of seeking to identify the author(s) by itself risked causing reputational harm to the Bank.

72.     The Head of I&W also informed Mr. Staley that the I&W Team had preliminarily concluded that the allegations contained in the two anonymous letters were unsubstantiated, and that the Bank had followed appropriate hiring processes and properly vetted the New Executive. The I&W Head noted that his team was collecting the paperwork underlying that conclusion and would write a report closing the case.

73.     The Head of I&W came away from this call with the understanding Mr. Staley had accepted his advice not to attempt to identify the author(s) of the letters and reported in an e-mail to the GCCO immediately after the call that he had spoken with Mr. Staley and that "*we are good*." The GCCO replied only, "Thank you."

74.     None of this was otherwise documented by anyone in Group Compliance, nor was Mr. Staley provided any confirmation of this advice in writing by Group Compliance.

19

**Three Days Later, Mr. Staley Resumes Efforts to Identify the Letters' Author(s)**

75.     The DFS Investigation determined that Mr. Staley appears to have gained a different impression from the July 8th call with the head of I&W.  Mr. Staley believes that, in the Summer of 2016, he was given a "*green light*" to try and identify the author(s) of the two anonymous letters, and believes that the basis for his understanding was the July 8th call with the Head of I&W.

76.     As noted, senior management involved with counseling Mr. Staley in this matter failed, more than once, to appropriately document with Mr. Staley and for the Bank's internal records the advice provided to Mr. Staley in this matter.

77.     Thus, despite all of the above-described events, Mr. Staley resumed his effort to identify the author(s) of the letters just three days after the July 8th call.  On July 11, 2016, the CISO texted Mr. Staley, "*Just FYI I was never handed any info on the letters and could not identify the sender.*"  Mr. Staley texted back, "*they just cleared the whistleblowing issue.  Can u call into [the Chief of Staff].*"

78.     The next day the Chief of Staff (without checking with Group Compliance or Group Legal) provided the CISO a scanned copy of the envelope that enclosed the First Anonymous Letter.  The CISO indicated he would arrange for an investigator to obtain the original envelope from one of the Board members who had received it initially.  Subsequently the CISO arranged for the original envelope to be delivered from the Bank's New York Office to the Analyst, who remained detailed to the outside cybersecurity organization.  The Analyst then contacted a Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), also assigned to the cybersecurity organization, for assistance in obtaining information about the envelope's sender(s).

79.     Notably, USPIS had been provided minimal information about the nature of the First Anonymous Letter and had not been provided the letter itself.  USPIS had been advised only that the letter was "a threat to the Bank" and involved "potential criminal activity."  USPIS was never informed (a) the letter only pertained to a whistleblowing matter concerning the hiring of an executive, (b) there was an absence of an imminent threat to the Bank, or (c) there was no evidence of criminal activity at that point in time.[8]

80.     On July 27, 2016, the Analyst updated the CISO that an agent from USPIS had identified the post office from which the First Anonymous letter had been mailed, as well as other parcels or letters the sender had paid for as part of the same postal transaction.  The Analyst indicated that USPIS was seeking to determine if video of the person conducting this transaction was available.

81.     Shortly after receiving this information the CISO updated Mr. Staley by e-mail: "You asked me to investigate if it was possible to determine more about the anonymous letter(s) received some weeks ago."  The CISO updated Mr. Staley on what he had just learned from the Analyst and provided the identical update to his direct supervisor, the Bank's Chief Operating Officer, saying "Jes gave me this task personally."  Shortly thereafter, both Mr. Staley and the Chief of Staff praised the CISO's investigative efforts up to this point.

82.     On July 28, 2016, Mr. Staley contacted a former colleague from the Other Bank by text message about the anonymous letters, writing, *"Looks like I'll know who sent the letters."*  On August 2, 2016, Mr. Staley texted the CISO again to inquire about the progress of the

---

[8] USPIS is the criminal investigative division of the United States Postal Service.  Following the Bank's disclosure of these events in April 2017, the USPS Office of Inspector General conducted a review and determined that, had the Postal Inspector who was contacted by the Analyst been aware that the letter in question pertained only to a whistleblower issue, the Postal Inspector would not have assisted Barclays in this matter. *See, e.g.,* "US Postal Official Was Misled in Barclays Whistleblower Hunt," *Financial Times* (Apr. 12, 2018) (available at https://www.ft.com/context/19dFd0c2-3e64-11e8-b7e0-529724fec4.)

investigation. The CISO responded that he was still waiting on the video footage and would follow up shortly. The next day, the CISO texted Mr. Staley to say that relevant video footage no longer existed. Mr. Staley responded with additional questions that aimed to identify the author(s) of the anonymous letters.

83. On August 5, 2016, the CISO updated Mr. Staley by text message, reporting that the investigation had reached a "dead end." Because the Chief of Staff had told the CISO that Mr. Staley might have a notion about the identity of the author(s), the CISO asked Mr. Staley whether he had any potential "suspects" in mind that could be investigated. Mr. Staley did not respond to this inquiry.

84. The I&W Team, which was winding down its investigation into the allegations raised in the anonymous letters, was completely unaware of the efforts by Mr. Staley and the CISO to identify the author(s) of the letters.[9]

85. **Five Months Later These Events Come to Light**: On or about January 11, 2017, a whistleblowing complaint was submitted to Barclays that, among other things, revealed more broadly the improper efforts of Mr. Staley to identify the author(s) of the First and Second Anonymous Letters.

**Deficiencies in Governance, Policies and Procedures and Culture**

86. Shortcomings in governance, controls and corporate culture together contributed to this episode, which has the potential for a detrimental impact on the efficacy of Barclays' whistleblowing program.

---

[9] In September 2016, the I&W Team determined that the whistleblowing cases relating to the First and Second Anonymous Letters were unsubstantiated and that the Bank had properly vetted the New Executive. Several months later the I&W Team formally closed the two related cases.

87.     During the relevant time, Barclays generally had in place a suitable set of whistleblowing policies and procedures, along with what appeared to be a competent, well-trained and adequately-staffed unit dedicated to handling and investigating whistleblowing complaints.  Additionally, annual training for all Barclays employees addressed the subject of whistleblowing and the procedures to be followed in making and investigating concerns.

88.     At bottom, several members of senior management failed to follow or apply the whistleblowing policies and procedures in a manner that protected Mr. Staley and the Bank itself.  Additionally, limited gaps in whistleblowing policies and procedures became apparent during this affair.  And it appears that the positive cultural transformation, which Group Compliance had been working very hard to instill in the more than 100,000 Barclays employees worldwide, was not nearly complete.

89.     **Mr. Staley**:  Mr. Staley erred in seeking to identify the author(s) of the First and Second Anonymous Letters and by communicating about the matter outside of the Bank.  The allegations of both letters concerned the New Executive, a friend and colleague of Mr. Staley's.  Both letters addressed, directly or indirectly, Barclays' hiring process in this particular case, which involved Mr. Staley as he had initially acted to recruit the New Executive to the Bank.  Mr. Staley thus was a subject of the complaints contained in both letters.

90.     In all events, Mr. Staley was a (if not the) principal witness concerning the letters' allegations.  Although Mr. Staley believed the bulk of the letters' allegations were false and malicious, he knew that certain of the letters' historic allegations pertaining to the New Executive were accurate, and he knew that certain allegations in the letters concerning his own involvement with recruiting the New Executive to Barclays also were accurate.  Further, under the circumstances the only reasonable conclusion to be drawn was that both letters were authored

by the same person or persons. Mr. Staley thus had a clear conflict of interest with respect to both letters.

91.     Additionally, Mr. Staley was aware of the important policies and process in place to handle whistleblowing complaints, including measures to guard anonymity. Against this backdrop, Mr. Staley's understanding was reinforced by two authoritative figures on this issue, the GCCO and Group General Counsel, on or about June 29, 2016, advising that he should not attempt to identify the author(s) of the letters.

92.     Mr. Staley also received the Monthly Whistleblowers' Champion Report on July 5, 2016, which identified the cases arising out of each of the anonymous letters as significant ones, and indicated they were being treated as whistleblower investigations. And on July 8, 2016, Mr. Staley was again reminded of the guidance that he not seek to identify the letters' author(s) by the Head of I&W.

93.     After initially heeding the advice, following the June 29th Meeting, not to try and identify the anonymous author(s), Mr. Staley resumed efforts to identify the letters' author(s) just three days after his July 8th conversation with the Head of I&W. Mr. Staley failed to take the important step of consulting directly with either the GCCO or the Group General Counsel prior to resuming his search for the author(s)' identity, even though the matter was of substantial importance to Barclays, the New Executive and Mr. Staley himself.

94.     Mr. Staley's actions risked jeopardizing the independence of the whistleblowing function. The I&W Team properly followed its protocols in initially classifying the two anonymous letters as "whistleblows" and conducting an investigation independent of senior management and supervised by the GCCO. Following its three-month investigation, the I&W Team determined that, while some of the allegations of the letter were true, ultimately the

recruitment process involving the New Executive had been handled properly. Mr. Staley's efforts to identify the letters' author(s) at the outset of the investigation, however, potentially cast a shadow over the independence of this particular investigation, and failed to serve the independence of the whistleblowing function.

95.    Finally, while genuinely motivated to protect the Bank and the New Executive, who was a friend and colleague, Mr. Staley also undermined the whistleblower process and exposed the Bank to additional risk by discussing the anonymous letters with two ex-colleagues outside of the Bank (neither of whom was ever a Barclays employee). As Barclays' policies and procedures recognize, whistleblowing investigations are among the most sensitive confidential information possessed by a large financial institution, and the need to protect this information from inappropriate disclosure is imperative.

96.    **Other Senior Executives and the Board of Directors**:  Responsibility for this matter cannot fairly be placed solely on Mr. Staley's shoulders.  Other senior executives and Board members missed opportunities to intercede or take steps to ensure the independence of the whistleblowing function and the importance of fostering anonymity.

97.    For example, the Chief of Staff had been present during the June 29th Meeting, when Mr. Staley was counseled by the General Counsel and GCCO not to make efforts to identify the author(s) and told the matter was likely to be deemed a "whistleblow." Then, after the Chief of Staff was told "quite categorically" by the I&W Head on July 7, 2016 that the letters were being treated as "whistleblows," the Chief of Staff failed to ask any questions when, only a few days later, Mr. Staley (both a subject of and witness to the matter and therefore conflicted) told the Chief of Staff that the whistleblowing question had been "cleared" and that the investigation into the identity of the author(s) was resuming.  Nor did the Chief of Staff seek

confirmation from the GCCO or anyone else that the matter had, in fact, purportedly been "cleared" to identify the whistleblower(s).

98.     While the Bank's Board acted properly by timely commencing an internal investigation once the allegations concerning Mr. Staley's actions surfaced in early January 2017, the Board did not act in all respects appropriately when the First and Second Anonymous Letters arrived in June 2016.

99.     For example, the First Anonymous Letter was provided to Mr. Staley shortly after some Board members began receiving it.  Additionally, the Board requested that Mr. Staley discuss with the Board the subject matter of the First Anonymous Letter.  While the Board had a legitimate and timely interest in ensuring that the hiring of senior managers occurs in a sound fashion, no safeguards were put in place to ensure that Mr. Staley was appropriately walled off from the inquiry.

100.    Further, recognizing that in June 2016, the new U.K. regime governing whistleblower protection had only been in effect for several months, it nonetheless would have been constructive for appropriate Board members to be more involved in the supervision of this particular matter.

101.    **Tone at the Top**:  The Department's Investigation determined that, while senior management had taken essential steps to implement an appropriate whistleblower program following changes to U.K. law, a few but influential members of the Bank's top echelon had not yet fully embraced the critical importance of protections for anonymity in whistleblowing.  The Department's Investigation determined that a senior, influential member of the Bank made known, within certain divisions of the Bank, that person's own view that "if you're not prepared to stand up, be counted and put your name on something, why should we listen to you?"  The

message communicated by this person was that Barclays did not sufficiently value anonymity for whistleblowers. In light of Barclays' other commendable efforts to convey to its workforce that whistleblowing should be encouraged and strong protections for whistleblowers exist, the expression of this person's point of view created a potential dissonance.

102.    This was of serious concern to the Department, given that a culture of compliance at a large financial institution (or any company for that matter) starts with the "tone at the top." As members of Barclays' own senior leadership have publicly and repeatedly recognized, senior executives and Board members are assigned the important responsibility of setting an example and the right tone regarding compliance.

103.    Accordingly, what senior executives and Board members say and do carries outsized weight for the firm's stakeholders and most critically, its employees.[10]   While the Department recognizes setting the proper tone at the top is not a simple task, the Bank's Board and most senior managers should have taken additional steps here to ensure that the important goal of whistleblower protection was communicated clearly and appropriately to Bank employees.

104.    **Governance**: The Board of Directors has faulted Mr. Staley for certain acts or omissions and, as noted more fully below, Mr. Staley has taken responsibility for his actions,

---

[10] *See, e.g.*, Statement of Maria T. Vullo, DFS Superintendent ("I cannot stress enough that our institutions must be proactive. . . . Management must set the tone of robust compliance from the top and throughout the entire enterprise. Employees must know what is expected of them. Management at the top must want compliance and promote a positive compliance culture . . . ." (10/21/16 keynote speech at NYU Law School's Program on Corporate Compliance and Enforcement); William Dudley, former CEO of the New York Federal Reserve Bank ("The 'tone at the top' and the example that senior leaders set is critical to an institution's culture—it largely determines the 'quality of the barrel.'") (10/14/2014, at https://www.newyorkfed.org/newsevents/speeches/2014/dud141020a.html .); Jonathan Davis, Director of Supervision, Financial Conduct Authority ("Our ambition is for the conduct element of culture: that mindsets and incentives will shift to make doing the right thing for consumers and the markets the objective that is always considered, and that it trumps all other objectives for everyone in financial services." (7/13/2016, at https://www.fca.org.uk/news/speeches/getting-culture-and-conduct-right-role-regulator).

including by publicly apologizing and consenting to enforcement actions brought by the Financial Conduct Authority ("FCA") and Prudential Regulatory Authority ("PRA").

105.    Yet the Board's role in ensuring effective governance of the whistleblowing program is also subject to review here. While the policies and procedures in place in June 2016 appeared generally competent to govern the whistleblowing process as a whole, there was a limited gap in guidance concerning identification and handling of whistleblowing complaints that both involved senior management and might also be received by senior management or the Board. Whether or not such complaints have merit, it is not at all uncommon in a global institution like Barclays for whistleblows to be made about the most senior managers or Board members. Yet controls in place at the time failed to adequately contemplate this circumstance.

106.    Additionally, not one of the ExCo members who became aware of the anonymous letters early on requested that the Whistleblowers' Champion monitor this matter as it developed, which was of obvious high importance and sensitivity to Barclays.

107.    **Training**: By the Summer of 2016, Barclays had implemented revised policies and procedures that required, at a minimum, annual training for all employees about the whistleblowing program. This training included important information about the option to report anonymously and the protections afforded those who do.

108.    Although Barclays' annual whistleblowing training requirements applied to all Bank employees, they exempted its most senior management and Board members. Given the likelihood that whistleblowing matters might easily reach the top echelon of Barclays one way or another, this omission is concerning.

**Cooperation with the Department**

109.    **Mr. Staley's Strong Acceptance of Responsibility**:  The Department recognizes and appreciates Mr. Staley's commendable and constructive steps to accept responsibility for his actions, to apologize to the employees of the Bank, and to recommit to the Department that he will oversee an independent and effective whistleblowing function.  Additionally, Mr. Staley has fully accepted the financial consequences imposed on him by both the FCA and PRA and the Bank.

110.    **Cooperation and Additional Remediation by Barclays**:    The Department recognizes and credits the very substantial cooperation that Barclays has provided with the Department's Investigation of this matter, including the manner in which it performed its own internal investigation, its responsiveness to the Department's Investigation, and its timely communications with the Department.   The Department further acknowledges the Bank's agreements with the PRA and FCA in their reviews of this matter and the remediation now required of Barclays in connection with those reviews.

111.    In May 2017, Barclays engaged an outside consultant to perform an independent review of the Bank's whistleblowing policies, processes and controls.  Following this review, the Bank has now implemented certain additional controls to address the deficiencies that are identified in this Order, including, but not limited to, (a) procedures to recognize that concerns raised outside certain whistleblowing channels may nevertheless constitute whistleblows, (b) procedures to avoid escalating a whistleblow to the subject of the concern, and (c) preserving whistleblower anonymity.

112.    Additionally, Barclays has created a "Whistleblowing Oversight Forum," which is intended to advise on legal issues related to whistleblower claims and ensure consistency of approach and implementation of best practices.

113.    The Department has given substantial weight to the factors set forth in Paragraphs 109 through 112 above, among others, in agreeing to the terms and remedies of this Consent Order, including the amount of the civil monetary penalty imposed and the remediation and reporting required.

**NOW THEREFORE,** to resolve this matter without further proceedings pursuant to the Superintendent's authority under Sections 39 and 44 of the Banking Law, the Department and Barclays hereby stipulate and agree to the terms and conditions listed below requiring further review of Barclays' activities, for remediation, and for imposition of a penalty:

## Violations of Laws and Regulations

114.    Barclays conducted its banking business in an unsafe and unsound manner by failing to implement effective governance and controls with respect to its whistleblowing program, in violation of New York Banking Law § 44.

115.    Barclays failed to submit a report to the Superintendent immediately upon discovering misconduct, whether or not a criminal offense, in that Barclays failed to report on the use of federal law enforcement resources secured through incomplete or inaccurate information provided to a federal agency, in order to investigate a non-threatening and non-exigent whistleblower complaint, in violation of 3 N.Y.C.R.R. §§ 300.1(a).

**Settlement Provisions**

**Civil Monetary Penalty**

116.     Barclays shall pay a penalty pursuant to Banking Law §§ 39 and 44 to the

Department in the amount of $15,000,000.  It shall pay the entire amount within ten (10) days of

executing this Consent Order.  The Bank agrees that it will not claim, assert or apply for a tax

deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly,

for any portion of the penalty paid pursuant to this Consent Order.

**Remediation and Reporting**

117.     By March 31, 2019, Barclays shall submit the following:

    a.   an enhanced written plan for internal controls and a compliance program, acceptable to the Department, to ensure implementation of and compliance with best practices for whistleblowing programs, including, but not limited to, (i) protections for all whistleblowers, whether or not anonymous, (ii) appropriate independence of the Bank's whistleblowing, investigative and security functions in connection with whistleblowing matters, and (iii) adequate training for all employees (including senior management) and Board members; and

    b.   a written plan, acceptable to the Department, to improve the Board's and senior management's oversight of Barclays' implementation of and compliance with best practices for whistleblowing programs, including, but not limited to, (i) protections for all whistleblowers, whether or not anonymous, (ii) appropriate independence of the Bank's whistleblowing, investigative and security functions in connection with whistleblowing matters, and (iii) adequate training for all employees (including the Executive Committee) and Board members.

    c.   In drafting the plans required by Paragraph 117 a. and b. above, Barclays shall take into account, as appropriate, any guidance issued by the Department concerning whistleblowing programs and practices.

118.     By March 31, 2019, Barclays shall submit to the Department a report that

provides an update on the following information:

    a.   All instances since January 1, 2017 where Barclays received a whistleblowing complaint or concern that included allegations against one or more members of the Group Executive Committee or Board of Directors of Barclays Bank PLC, and, for each instance so identified, details about the complaint, handling and

31

investigation of the complaint, oversight of the investigation, and any conclusions reached;

b.  All instances since January 1, 2017 where a Barclays current or former employee or agent attempted to learn the identity of an anonymous whistleblower, and, for each instance identified, details about the decision to undertake the effort, the steps taken, and the outcome;

c.  All instances since January 1, 2017 where a Barclays current or former employee, agent or contractor alleged that he or she was the subject of retaliation or other negative consequences as a result of the employee, agent or contractor having raised a whistleblowing complaint or concern, and, for each instance identified, details about Barclays' investigation of the retaliation allegation and any conclusions reached; and

d.  Any identified (1) substantiated allegations of retaliation or (2) instance of someone other than the Investigations and Whistleblowing Team, Whistleblowers' Champion and Group Chief Compliance Officer (collectively) making a determination of whether a whistleblowing concern is false and/or malicious, occurring since January 1, 2017, along with adequate details about both the incident and Barclays' response to any such incident.

119.   At the point of twelve (12) and twenty-four (24) months following the submission of the initial reports required by Paragraphs 117 and 118 above, the Bank shall submit to the Department a report that updates the Department on the status of the implementation and of the matters set forth in Paragraph 117(a) – (c) above and Paragraph 118(a) – (d) above.

**Full and Complete Cooperation of Barclays**

120.   Barclays commits and agrees that it will fully cooperate with the Department regarding all terms of this Consent Order.

**Breach of Consent Order**

121.   In the event that the Department believes Barclays to be in material breach of the Consent Order, the Department will provide written notice to Barclays and Barclays must, within ten (10) business days of receiving such notice, or on a later date if so determined in the

Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

122.    The Parties understand and agree that Barclays' failure to make the required showing within the designated time period shall be presumptive evidence of Barclays' breach. Upon a finding that Barclays has breached the Consent Order, the Department has all the remedies available to it under New York Banking and Financial Services Law and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

**Waiver of Rights**

123.    The Parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order**

124.    This Consent Order is binding on the Department and Barclays, as well as any successors and assigns.  This Consent Order does not bind any federal or other state agency or law enforcement authority.

125.    No further action will be taken by the Department against Barclays for the specific conduct set forth in this Order, provided that Barclays complies with the terms of the Order.

**Notices**

126.    All notices or communications regarding this Consent Order shall be sent to:

For the Department:

James Caputo
Senior Assistant Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

Mickelle Damassia
Assistant Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

Victoria Choi
Attorney and Excelsior Fellow
New York State Department of Financial Services
One State Street
New York, NY 10004

For Barclays Bank PLC and the New York Branch:

Matthew S. Fitzwater
Global Head of Litigation, Investigations and Enforcement
Barclays Bank PLC
1 Churchill Place
London, England E14 5HP

## Miscellaneous

127.    Each provision of this Consent Order shall remain effective and enforceable until
stayed, modified, suspended or terminated by the Department.

128.    No promise, assurance, representation, or understanding other than those
contained in this Consent Order has been made to induce any Party to agree to the provisions of
the Consent Order.

*[remainder of page intentionally left blank]*

34

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this 11th

of December, 2018.

**BARCLAYS BANK PLC**

By: _____
MATTHEW S. FITZWATER
Global Head of Litigation, Investigations and
Enforcement


**BARCLAYS BANK PLC, NEW YORK
BRANCH**

By: _____
MATTHEW S. FITZWATER
Global Head of Litigation, Investigations and
Enforcement

**NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES**

By: _____
MARIA T. VULLO
Superintendent of Financial Services


By: _____
MATTHEW L. LEVINE
Executive Deputy Superintendent for
Enforcement