**SUPPLEMENTAL HOLLEMBEAK DECLARATION
IN SUPPORT OF AMENDED APPLICATION OF SPS I FUNDO DE
INVESTIMENTO DE AÇÕES – INVESTIMENTO NO EXTERIOR
FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

# EXHIBIT J

Excerpts – Barclays 2022 Annual Statement




# Fulfilling our Purpose

**Our Purpose…**

We deploy finance responsibly to support people and businesses, acting with empathy and integrity, championing innovation and sustainability, for the common good and the long term.

**and our Values…**

Respect

Integrity

Service

Excellence

Stewardship

**influence our strategy…**

Our diversification, built to deliver double-digit returns

+

Strategic priorities to sustain and grow



**delivered through Group synergies…**

We work as one organisation to create synergies and deliver greater value.

**creating positive outcomes for our stakeholders.**

Customers and clients

Colleagues

Society

Investors

Strategic report | Shareholder information | Climate and sustainability report | Governance | Risk review | Financial review | Financial statements

Case 1:22-mc-00118-LAK  Document 50-10  Filed 04/26/23  Page 4 of 19

Barclays PLC
Annual Report 2022

01

Parts 1, 2 and 3 of Barclays PLC 2022 Annual Report together comprise Barclays PLC's annual accounts and report for the purposes of Section 423 of the Companies Act 2006.

Please note that throughout the document, graphical representation of component parts may not cast due to rounding.

**Strategic report**

The Barclays PLC Strategic Report 2022 was approved by the Board of Directors on 14 February 2023 and signed on its behalf by the Chairman.

The Strategic Report 2022 is a part of Barclays PLC's Annual Report 2022 and is not the Group's statutory accounts. It does not contain the full text of the Directors' Report, and it does not contain sufficient information to allow us an understanding of the results and state of affairs of the Group and of its policies and arrangements concerning Directors' remuneration as would be provided by the full Annual Report 2022.

**Report of the auditor**

The Auditor's report on the Financial statements of Barclays PLC for the year ended 31 December 2022 was unmodified, and its statement under Section 496 of the Companies Act 2006 was also unmodified (see page 399 of Part 3 of the Annual Report 2022).

## Inside Part 1

| | |
|---|---|
| **Strategic report** | **1** |
| Group overview | 2 |
| Prepared for the road ahead | 3 |
| Chairman's introduction | 4 |
| Chief Executive's review | 6 |
| Our business model | 10 |
| Our strategy | 12 |
| Section 172(1) statement | 16 |
| Engaging with our stakeholders | 21 |
| Key performance indicators | 23 |
| **Customers and clients** | |
| Supporting our customers and clients | 26 |
| **Colleagues** | |
| Our people and culture | 31 |
| **Society** | |
| Making a difference | 39 |
| **Investors** | |
| Summary financial review | 45 |
| Barclays UK | 49 |
| Barclays International: Corporate and Investment Bank | 52 |
| Barclays International: Consumer, Cards and Payments | 54 |
| Managing risk | 56 |
| Viability statement | 58 |
| Non-financial information statement | 60 |
| ESG ratings performance | 63 |
| ESG-related reporting and disclosures | 64 |
| TCFD Content Index | 65 |
| **Shareholder information** | **66** |
| Key dates, Annual General Meeting, dividends, and other useful information | 66 |

## Inside Part 2

| | |
|---|---|
| **Climate and sustainability report** | **69** |
| Introduction | 70 |
| Risks and opportunities | 73 |
| Implementing our climate strategy | 77 |
| Resilience of our strategy | 127 |

## Inside Part 3

| | |
|---|---|
| **Governance** | **141** |
| Governance contents | 141 |
| Board Governance | 142 |
| Directors' report | 143 |
| Remuneration report | 197 |
| Other Governance | 246 |
| **Risk review** | **264** |
| Risk review contents | 264 |
| Risk management | 266 |
| Material existing and emerging risks | 269 |
| Principal risk management | 282 |
| Risk performance | 296 |
| Supervision and regulation | 370 |
| **Financial review** | **378** |
| Financial review contents | 378 |
| Key performance indicators | 379 |
| Consolidated summary income statement | 381 |
| Income statement commentary | 382 |
| Consolidated summary balance sheet | 383 |
| Balance sheet commentary | 384 |
| Analysis of results by business | 385 |
| Non-IFRS performance measures | 392 |
| **Financial statements** | **397** |
| Financial statements contents | 397 |
| Consolidated financial statements | 416 |
| Notes to the financial statements | 424 |

# Supervision and regulation

## Supervision of the Group

The Group's operations, including its overseas branches, subsidiaries and associates, are subject to a large number of rules and regulations applicable to the conduct of banking and financial services business in each of the jurisdictions in which the Group operates. These apply to business operations, impact financial returns and include capital, leverage and liquidity requirements, authorisation, registration and reporting requirements, restrictions on certain activities, conduct of business regulations and many others.

Regulatory developments impact the Group globally. We focus particularly on UK, US and EU regulation due to the location of the Group's principal areas of business. Regulations elsewhere may also have a significant impact on the Group due to the location of its branches, subsidiaries and, in some cases, clients. For more information on the risks related to the supervision and regulation of the Group, including regulatory change, see the material existing and emerging risk entitled 'Regulatory Change agenda and impact on Business Model' in the Material existing and emerging risks section.

### Supervision in the UK

In the UK, day-to-day regulation and supervision of the Group is divided between the Prudential Regulation Authority (PRA) (a division of the Bank of England (BoE)) and the Financial Conduct Authority (FCA). In addition, the Financial Policy Committee (FPC) of the BoE has influence on the prudential requirements that may be imposed on the banking system through its powers of direction and recommendation. Certain members of the Group are also subject to regulatory initiatives undertaken by the UK Payment Systems Regulator (PSR), as a participant in payment systems regulated by the PSR.

Barclays Bank PLC and Barclays Bank UK PLC are authorised with permission to accept deposits, amongst other things, and subject to prudential supervision by the PRA and subject to conduct regulation and supervision by the FCA. The Barclays Bank Group is subject to prudential supervision on a solo-consolidated basis and the Barclays Bank UK Group is subject to prudential supervision on a group consolidated basis and on an individual basis. The Group is also subject to prudential supervision by the PRA on a group consolidated basis. Barclays PLC has been approved by the PRA as a financial holding company.

Barclays Capital Securities Limited is authorised and subject to prudential supervision by the PRA as a PRA-designated investment firm and subject to conduct regulation and supervision by the FCA. Barclays Execution Services Limited is an appointed representative of Barclays Bank PLC, Barclays Bank UK PLC and Clydesdale Financial Services Limited.

The PRA's supervision of the Group is conducted through a variety of regulatory tools, including the collection of information by way of prudential returns or cross-firm reviews, reports obtained from skilled persons, regular supervisory visits to firms and regular meetings with management and directors to discuss issues such as strategy, governance, financial resilience, operational resilience, risk management, and recovery and resolution.

Further, the BoE, as the UK resolution authority, informs prudential requirements and sets requirements for the Group relating to resolution preparedness.

The FCA's supervision of the UK firms in the Group is carried out through a combination of proactive engagement, regular thematic work and project work based on the FCA's sector assessments, which analyse the different areas of the market and the risks that may lie ahead.

The FCA and the PRA also apply the Senior Managers and Certification Regime (the SMCR) which imposes a regulatory approval, individual accountability and fitness and propriety framework in respect of senior or key individuals within relevant firms.

FCA supervision has focused on conduct risk and customer/client outcomes, including product design, customer behaviour, market operations, fair pricing, affordability, access to cash, and fair treatment of vulnerable customers.

PRA supervision has focused on financial resilience, credit risk management, Board effectiveness, operational resilience, climate risk and resolvability, where resolvability is reviewed in conjunction with the Resolution Directorate (a separate division of the BoE).

Both the PRA and the FCA apply standards that generally either anticipate or go beyond requirements established by global or EU standards, whether in relation to capital, leverage and liquidity, resolvability and resolution or matters of conduct. The UK is in the process of reviewing and revising the EU legislation that was onshored into English law following the UK's departure from the EU. This process is at a very early stage, but based on current indications, it is not expected to result in a materially different standard of regulation with respect to PRA and FCA standards. The medium term outlook for the costs and impact of operating under the post-Brexit UK regime remains unclear until details of any changes are confirmed. There is potential for an increase in regulatory implementation costs in the near term to adapt systems and controls.

Both the PRA and the FCA have assessed the impact of COVID-19 and Brexit on UK financial markets and customers as well as the orderly transition away from LIBOR and have issued guidance for regulated entities accordingly. In each case, the guidance focussed on customer / client outcomes and conduct risk, as well as ensuring fair and orderly markets.

### Supervision in the EU

The Group's operations in Europe are authorised and regulated by a combination of its home regulators and host regulators in the European countries where the Group operates.

Barclays Bank Ireland PLC is licensed as a credit institution by the Central Bank of Ireland (CBI) and is designated as a significant institution falling under direct supervision on a solo basis by the European Central Bank (ECB) for prudential purposes. Barclays Bank Ireland PLC's EU branches are supervised by the ECB and are also subject to direct supervision for local conduct purposes by national supervisory authorities in the jurisdictions where they are established. Barclays Bank Ireland PLC is subject to the requirements set by the Single Resolution Board (SRB) as the host resolution authority of Barclays Bank Ireland PLC. Barclays Bank Ireland PLC is also subject to supervision by the CBI as home state or competent authority under various EU financial services directives and regulations.

The Group provides the majority of its cross-border banking and investment services to EEA clients via Barclays Bank Ireland PLC. Additionally, in certain EEA Member States, Barclays Bank PLC and Barclays Capital Securities Limited (BCSL) have cross-border licences to enable them to continue to conduct a limited range of activities, including accessing EEA trading venues and interdealer trading. Barclays Bank PLC also has a Paris branch (to facilitate access to Target 2), which is regulated by the ACPR.

# Supervision and regulation (continued)

**Supervision in the US**

Barclays PLC, Barclays Bank PLC and its New York branch, and Barclays Bank PLC's US subsidiaries are subject to a comprehensive regulatory framework involving numerous statutes, rules and regulations in the US. For example, the Group's US activities and operations are subject to supervision and regulation by the Board of Governors of the Federal Reserve System (FRB), as well as additional supervision, requirements and restrictions imposed by other federal and state regulators and self-regulatory organisations (SROs). In some cases, US requirements may impose restrictions on the Group's global activities, in addition to its activities in the US.

Barclays PLC, Barclays Bank PLC, Barclays US Holdings Limited (BUSHL), Barclays US LLC (BUSL), and Barclays Group US Inc. (BGUS) are regulated as bank holding companies (BHCs) by the FRB.

BUSL is the Group's ultimate US holding company that holds substantially all of the Group's US subsidiaries (including Barclays Capital Inc. (BCI) and Barclays Bank Delaware). BUSL is subject to requirements in respect of capital adequacy, capital planning and stress testing, risk management and governance, liquidity, leverage limits, large exposure limits, activities restrictions and financial regulatory reporting. Barclays Bank PLC's New York branch is also subject to enhanced prudential standards relating to, among other things, liquidity and risk management.

Barclays PLC, Barclays Bank PLC, BUSHL and BUSL have financial holding company (FHC) status under the Bank Holding Company Act of 1956. FHC status allows these entities to engage in a variety of financial and related activities, directly or through subsidiaries, including underwriting, dealing and market making in securities. Failure to maintain FHC status could result in increasingly stringent penalties and, ultimately, in the closure or cessation of certain operations in the US.

In addition to oversight by the FRB, Barclays Bank PLC's New York branch and many of the Group's subsidiaries are regulated by additional US authorities based on the location or activities of those entities. The New York branch of Barclays Bank PLC is subject to supervision and regulation by the New York State Department of Financial Services (NYSDFS). Barclays Bank Delaware, a Delaware chartered bank, is subject to supervision and regulation by the Delaware Office of the State Bank Commissioner, the Federal Deposit Insurance Corporation (FDIC), the FRB and the Consumer Financial Protection Bureau (CFPB). The deposits of Barclays Bank Delaware are insured by the FDIC, up to applicable limits. Barclays PLC, Barclays Bank PLC, BUSHL, BUSL, and BGUS are required to act as a source of strength for Barclays Bank Delaware. This could, among other things, require these entities to provide capital support to Barclays Bank Delaware if it fails to meet applicable regulatory capital requirements.

The Group's US securities broker/dealer and investment banking operations are conducted primarily through BCI, and are also subject to ongoing supervision and regulation by the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA) and other government agencies and SROs under US federal and state securities laws. BCI is also registered as a Futures Commission Merchant with the Commodity Futures Trading Commission (CFTC), through which the Group conducts its US futures and options on futures business, including client clearing operations, which are subject to ongoing supervision and regulation by the CFTC, the National Futures Association and other SROs.

Under the US framework for regulating swaps and security-based swaps established under Title VII of the Dodd-Frank Act, the CFTC has regulatory authority over swaps, the SEC has regulatory authority over security-based swaps, and the CFTC and SEC jointly regulate mixed swaps (as such terms are defined in the relevant legislation). Accordingly, the Group's activities related to US swaps and security-based swaps are principally conducted by Barclays Bank PLC and are subject to ongoing supervision and regulation by the CFTC and the SEC, respectively. Barclays Bank PLC is provisionally registered as a swap dealer with the CFTC and conditionally registered as a Security-based swap dealer with the SEC. Barclays Bank PLC is also subject to the FRB swaps rules with respect to margin and capital requirements. In addition, Barclays Bank Ireland PLC is provisionally registered as a swap dealer with the CFTC and is subject to the FRB swaps rules with respect to margin and capital.

**Supervision in Asia Pacific**

The Group's operations in Asia Pacific are supervised and regulated by a broad range of national banking and financial services regulators.

**Prudential regulation**

Certain Basel III standards were implemented in EU law through the Capital Requirements Regulation (CRR) and the Capital Requirements Directive IV (CRD IV), as amended by CRR II and CRD V. These standards were retained in the UK regulatory framework via a series of onshoring instruments as part of the UK's withdrawal from the European Union. Beyond the minimum standards required by CRR, the PRA has expected the Group, in common with other major UK banks and building societies, to meet a 7% Common Equity Tier 1 (CET1) ratio at the level of the consolidated group since 1 January 2016. The 7% CET1 ratio is made up of a Pillar 1 minimum capital requirement of 4.5% CET1 and a capital conservation buffer which must be met entirely with CET1 capital.

Global systemically important banks (G-SIBs), such as the Barclays Group, are subject to a number of additional prudential requirements, including the requirement to hold additional loss-absorbing capacity and additional capital buffers above the level required by Basel III standards. The level of the G-SIB buffer is set by the Financial Stability Board (FSB) according to a bank's systemic importance and can range from 1% to 3.5% of risk-weighted assets (RWAs). The G-SIB buffer must be met with CET1. In November 2022, the FSB published an update to its list of G-SIBs, maintaining the 1.5% G-SIB buffer that applies to the Group.

The Group is also subject to a 'combined buffer requirement' consisting of (i) a capital conservation buffer of 2.5%, and (ii) a countercyclical capital buffer (CCyB). The CCyB is based on rates determined by the regulatory authorities in each jurisdiction in which the Group maintains exposures. In March 2020, the FPC cut the UK CCyB rate to 0% with immediate effect in order to support the supply of credit expected as a result of the COVID-19 pandemic. In December 2021, the FPC raised the UK CCyB to 1% with effect from 13 December 2022. In July 2022, the FPC announced that it would raise the UK CCyB rate to 2% with effect from 5 July 2023.

The PRA requires UK firms to hold additional capital to cover risks which the PRA assesses are not fully captured by the Pillar 1 capital requirement. The PRA sets this additional capital requirement (Pillar 2A) at least annually, derived from each firm's individual capital guidance. Under current PRA rules, the Pillar 2A must be met with at least 56.25% CET1 capital and no more than 25% tier 2 capital. In addition,

| Strategic report | Shareholder information | Climate and sustainability report | Governance | Risk review | Financial review | Financial statements | Barclays PLC Annual Report 2022 | 372 |

Case 1:22-mc-00118-LAK   Document 50-10   Filed 04/26/23   Page 7 of 19

## Supervision and regulation (continued)

the capital that firms use to meet their minimum requirements (Pillar 1 and Pillar 2A) cannot be counted towards meeting the combined buffer requirement.

The PRA may also impose a confidential 'PRA buffer' to cover risks over a forward looking planning horizon, including with regard to firm-specific stresses or management and governance weaknesses. If the PRA buffer is imposed on a specific firm, it must be met separately to the combined buffer requirement, and must be met fully with CET1 capital.

As part of its approach to ring fencing, the FPC established a framework to apply a firm-specific systemic risk buffer (SRB) which could be set between 0% and 3% of RWAs and which had to be met solely with CET1 capital. The purpose of the SRB was to increase the capacity of ring-fenced bodies, such as Barclays Bank UK PLC, to absorb stress. The buffer rate applicable to the Group's ring-fenced sub-group was set at 1% with effect from August 2019. With the implementation of CRD V, the Other Systemically Important Institutions Buffer (O-SII buffer) replaced the SRB. As part of the implementation of CRD V, the PRA and FPC confirmed that the Barclays Bank UK PLC O-SII buffer would be held at the historic SRB rate of 1% until reassessment in December 2021. On 8 October 2021, the PRA extended the O-SII buffer rate of 1% for a further year, with any future adjustment to the O-SII buffer applicable from January 2024. In addition, in May 2022, the FPC decided to change the metric used to determine O-SII buffer rates from total assets to the UK leverage exposure measure and to recalibrate the thresholds used to determine O-SII buffer rates to prevent an overall tightening or loosening of the framework relative to its pre-Covid level. The FPC determined that the average of firms' quarter-end leverage exposure measure over the year will be used to determine O-SII buffer rates, rather than the year-end value and that this change will only take effect after the PRA's December 2023 review. Thus, the December 2023 review will be based on end-2022 leverage exposure measure. Rates set in 2023 will apply from January 2025. In addition, Barclays Bank Ireland PLC is identified as a O-SII by the CBI, who have imposed an O-SII buffer on Barclays Bank Ireland PLC.

In July 2021 and October 2021, the PRA, respectively, published a policy statement and confirmation, setting out its planned implementation of certain Basel III standards, including the net stable funding ratio (NSFR), the new counterparty credit risk standard (SA-CCR) and rules on large exposures. As part of this policy statement, the PRA also confirmed that it would maintain its approach of requiring the deduction of software assets from capital. On 30 November 2022, the PRA published consultation paper CP16/22 concerning the implementation of the remaining Basel III standards, which include a revised standardised approach for credit risk, the elimination of modelled approaches for certain credit risk exposure categories, a new standardised approach for operational risk, a new market risk approach and the implementation of an output floor requiring reported RWAs calculated under standardised and modelled approaches to be a minimum of 72.5% of fully standardised calculations. The EU has also launched its legislative process for implementing these remaining Basel III reforms. In October 2021, the FPC and PRA published a policy statement setting out changes to the leverage ratio framework, including applying the leverage ratio requirement on an individual basis and making sub-consolidation available as an alternative to individual application where a firm has subsidiaries that can be consolidated, which apply from 1 January 2023.

In the US, in October 2019, the FRB and other US regulatory agencies released final rules to tailor the applicability of prudential requirements for large domestic US banking organisations, foreign banking organisations and their intermediate holding companies (IHCs), including BUSL. BUSL is a "Category III" IHC. BUSL (and Barclays Bank Delaware) is therefore subject to reduced (calibrated at 85%) standardised liquidity requirements, including the liquidity coverage ratio and NSFR.

In June 2018 and October 2019, the FRB finalised rules regarding single counterparty credit limits (SCCL). The SCCL apply to the largest US BHCs and foreign banks' (including the Group's) US operations. The SCCL creates two separate limits for foreign banks, the first on combined US operations (CUSO) and the second on the US IHC (BUSL). The SCCL for US BHCs, including BUSL, requires that exposure to an unaffiliated counterparty of BUSL not exceed 25% of BUSL's tier 1 capital. With respect to the CUSO, the SCCL rule allows certification to the FRB that a foreign bank complies with comparable home country regulation.

Barclays Bank PLC was not required to comply with the CUSO requirement until 1 January 2022, with the first certification applicable for Q1 2022 results.

**Stress testing**

The Group and certain of its members are subject to supervisory stress testing exercises in a number of jurisdictions, designed to assess the resilience of banks to adverse economic or financial developments and ensure that they have robust, forward-looking capital planning processes that account for the risks associated with their business profile. Assessment by regulators is on both a quantitative and qualitative basis, the latter focusing on such elements as data provision, stress testing capability including model risk management and internal management processes and controls.

**Recovery and Resolution**

**Stabilisation and resolution framework**

The UK framework for recovery and resolution was established by the Banking Act 2009, as amended. The EU framework was established by the 2014 Bank Recovery and Resolution Directive (BRRD), as amended by BRRD II.

The BoE, as the UK resolution authority, has the power to resolve a UK financial institution that is failing or likely to fail by exercising certain stabilisation tools, including (i) bail-in: the cancellation, transfer or dilution of a relevant entities' equity and write-down or conversion of the claims of a relevant entities' unsecured creditors (including holders of capital instruments) and conversion of those claims into equity as necessary to restore solvency; (ii) the transfer of all or part of a relevant entities' business to a private sector purchaser; and (iii) the transfer of all or part of a relevant entities' business to a "bridge bank" controlled by the BoE. When exercising any of its stabilisation powers, the BoE must generally provide that shareholders bear first losses, followed by creditors in accordance with the priority of their claims in insolvency.

In order to enable the exercise of its stabilisation powers, the BoE may impose a temporary stay on the rights of creditors to terminate, accelerate or close out contracts, or override events of default or termination rights that might otherwise be invoked as a result of a resolution action and modify contractual arrangements in certain circumstances (including a variation of the terms of any securities). HM Treasury may also amend the law for the purpose of enabling it to use its powers under this regime effectively, potentially with retrospective effect.

In addition, the BoE has the power, under the Banking Act, to permanently write-down or convert into equity tier 1 capital

# Supervision and regulation (continued)

instruments, tier 2 capital instruments and internal eligible liabilities at the point of non-viability of an institution.

The BoE's preferred approach for the resolution of the Group is a bail-in strategy with a single point of entry at Barclays PLC. Under such a strategy, Barclays PLC's subsidiaries would remain operational while Barclays PLC's capital instruments and eligible liabilities would be written down or converted to equity in order to recapitalise the Group and allow for the continued provision of services and operations throughout the resolution. The order in which the bail-in tool is applied reflects the hierarchy of capital instruments under UK CRD IV and otherwise respecting the hierarchy of claims in an ordinary insolvency. Accordingly, the more subordinated the claim, the more likely losses will be suffered by owners of the claim.

The PRA has made rules that require authorised firms to draw up recovery plans and resolution packs, as required by the BRRD. Recovery plans are designed to outline credible actions that authorised firms could implement in the event of severe stress in order to restore their business to a stable and sustainable condition. Removal of potential impediments to an orderly resolution of a banking group or one or more of its subsidiaries is considered as part of the BoE's and PRA's supervisory strategy for each firm, and the PRA can require firms to make significant changes in order to enhance resolvability. The submission of resolution packs was suspended by the PRA in 2018 until further notice and replaced by annual EBA resolution reporting. The Group has provided the PRA with a recovery plan annually, however, the PRA notified in October 2022 that it has moved submission to a biennial submission cycle. The Barclays Group continues to maintain the recovery plan annually.

Under the Resolvability Assessment Framework (RAF) firms are required to have in place capabilities covering three resolvability outcomes: (i) adequate financial resources; (ii) being able to continue to do business through resolution and restructuring; and (iii) being able to communicate and co-ordinate within the firm and with authorities. The first self-assessment report on these capabilities was submitted by the Group to the PRA/BoE in 2021 and public disclosures by both firms and the PRA/BoE were made in June 2022 (and are required every two years thereafter). The Bank of England's assessment concluded that there are no shortcomings, deficiencies or substantive impediments identified in the Group's resolution capabilities that could impede its ability to execute the preferred resolution strategy. In future, should any such issues be identified, the PRA/BoE could exercise its various powers to direct the Group to address the relevant issues.

While regulators in many jurisdictions have indicated a preference for single point of entry resolution for the Group, additional resolution or bankruptcy provisions may apply to certain Group entities or branches.

In the US, BUSL is subject to the Orderly Liquidation Authority established by Title II of the Dodd-Frank Act (DFA), a regime for the orderly liquidation of systemically important financial institutions by the FDIC, as an alternative to proceedings under the US Bankruptcy Code. In addition, the licensing authorities of Barclays Bank PLC New York branch and of Barclays Bank Delaware have the authority to take possession of the business and property of the applicable branch or entity they license and/or to revoke or suspend such licence.

In the US, Title I of the DFA, as amended, and the implementing regulations issued by the FRB and the FDIC require each bank holding company with assets of $250bn or more, including those within the Group, to prepare and submit a plan for the orderly resolution of subsidiaries and operations in the event of future material financial distress or failure. The Group submitted a "targeted plan" in December 2021. The agencies did not identify any shortcomings or deficiencies with the Group's 2021 US Resolution Plan. The Group's next submission of the US Resolution Plan in respect of its US operations will be a "full plan" due in 2024.

Barclays Bank Ireland PLC is required by the ECB to submit a standalone BRRD compliant recovery plan on an annual basis. As a Significant Institution under direct ECB supervision, Barclays Bank Ireland PLC falls within the remit of the EU Single Resolution Board (SRB), as the resolution authority for the Eurozone. Under the provisions of the BRRD and EU Single Resolution Mechanism Regulation (SRMR), the SRB is required to determine the optimal resolution strategy for Barclays Bank Ireland PLC and, also, to prepare a resolution plan for the bank. The SRB undertakes this work within the context of the BoE's preferred resolution strategy of single point of entry with bail in at Barclays PLC. In order to carry out its mandate, the SRB collects detailed structural and other information from Barclays Bank Ireland PLC on a regular basis, as well as engaging with the bank to identify and address impediments to resolution. This work is done in coordination with the BoE, as the Group resolution authority. Barclays Bank Ireland PLC will need to meet the SRB's requirements for resolution as set out in the SRB's 'Expectations for Banks' document by 31 December 2023.

**TLAC and MREL**

The Group is under the supervision of the BoE, as the UK resolution authority, and is subject to a Minimum Requirement for own funds and Eligible Liabilities (MREL), which includes a component reflecting the FSB's standards on total loss absorbency capacity (TLAC).

The MREL requirements were fully implemented by 1 January 2022, from which time G-SIBs with resolution entities incorporated in the UK are required to meet an MREL equivalent to the higher of: (i) two times the sum of their Pillar 1 and Pillar 2A requirements; or (ii) the higher of two times their leverage ratio requirement or 6.75% of leverage exposures. Internal MREL for operating subsidiaries is subject to a scalar in the 75-90% range of the external requirement that would apply to the subsidiary if it were a resolution entity. The starting point for the scalar is 90% for ring-fenced bank sub-groups.

Barclays Bank Ireland PLC is subject to the SRB's MREL policy, as issued in June 2022, in respect of the internal MREL that it will be required to issue to the Group. The SRB's current calibration of internal MREL for non-resolution entities is expressed as two ratios that have to be met in parallel: (a) two times the sum of: (i) the firm's Pillar 1 requirement; and (ii) its Pillar 2 requirement; and (b) two times the leverage ratio requirement. The SRB's policy does not apply any scalar in respect of the internal MREL requirement. Under the SRB MREL policy, a bank specific adjustment can be applied by the SRB to MREL requirements.

In the US, the FRB's TLAC rule includes provisions that require BUSL to have: (i) a specified outstanding amount of eligible long-term debt; (ii) a specified outstanding amount of TLAC (consisting of common and preferred equity regulatory capital plus eligible long-term debt); and (iii) a specified common equity buffer. In addition, the FRB's TLAC rule prohibits BUSL, for so long as the Group's overall resolution plan treats BUSL as a non-resolution entity, from issuing TLAC to entities other than those within the Group.

## Supervision and regulation (continued)

**Bank Levy and FSCS**

The BRRD established a requirement for EU member states to set up a pre-funded resolution financing arrangement with funding equal to 1% of covered deposits by 31 December 2024 to cover the costs of bank resolutions. The UK has implemented this requirement by way of a tax on the balance sheets of banks known as the 'Bank Levy'.

In addition, the UK has a statutory compensation fund called the Financial Services Compensation Scheme (FSCS), which is funded by way of annual levies on most authorised financial services firms.

**Structural reform**

In the UK, the Financial Services (Banking Reform) Act 2013 put in place a framework for ring-fencing certain operations of large banks. Ring-fencing requires, among other things, the separation of the retail and smaller deposit-taking business activities of UK banks into a legally distinct, operationally separate and economically independent entity, which is not permitted to undertake a range of activities. This regime was independently reviewed in 2021, with the final report published in March 2022. The review recommended that HM Treasury should review the practicalities of aligning the ring-fencing and resolution regimes, amongst other things, and the government has stated that it intends to issue a public call for evidence on this issue in the first quarter of 2023 and to consult on reforms to the ring-fencing regime in mid 2023 in line with the recommendations in the independent review.

US regulation places further substantive limits on the activities that may be conducted by banks and holding companies, including foreign banking organisations such as the Group. The 'Volcker Rule', which was part of the DFA and which came into effect in the US in 2015, prohibits banking entities from undertaking certain proprietary trading activities and limits such entities' ability to sponsor or invest in certain private equity funds and hedge funds (in each case broadly defined). As required by the rule, the Group has developed and implemented an extensive compliance and monitoring programme addressing proprietary trading and covered fund activities (both inside and outside of the US).

**Market infrastructure regulation**

In recent years, regulators as well as global-standard setting bodies such as the International Organisation of Securities Commissions (IOSCO) have focused on improving transparency and reducing risk in markets, particularly risks related to over-the-counter (OTC) derivative transactions. This focus has resulted in a variety of new regulations across the G20 countries and beyond that require or encourage on-venue trading, clearing, posting of margin and disclosure of pre-trade and post-trade information.

In particular, the Markets in Financial Instruments Directive and Markets in Financial Instruments Regulation (collectively referred to as MiFID II) have affected many of the markets in which the Group operates, the instruments in which it trades and the way it transacts with market counterparties and other customers. MiFID II is currently undergoing a review process in both the EU and the UK, including as part of the EU's ongoing focus on the development of a stronger Capital Markets Union and the UK's Wholesale Markets Review.

**Regulation of benchmarks**

The EU and UK Benchmarks Regulation apply to the administration, contribution and use of benchmarks within the EU and the UK, respectively. Financial institutions within the EU or the UK, as applicable, are prohibited from using benchmarks unless their administrators are authorised, registered or otherwise recognised in the EU or the UK, respectively. The FCA has also been working to phase out use of LIBOR, with GBP LIBOR ceasing to be published in its original form from the end of 2021 and synthetic versions of GBP LIBOR being made available only for a limited period of time. Similarly, USD LIBOR will cease to be published in its current form in June 2023 and other LIBOR and IBOR rates are also being wound down. Global regulators in conjunction with the industry have developed and are continuing to develop alternative benchmarks and risk-free rate fallback arrangements, including updates to existing, as well as new, applicable legislation.

**Regulation of the derivatives market**

The European Market Infrastructure Regulation (EMIR) has introduced requirements designed to improve transparency and reduce the risks associated with the derivatives market. EMIR has operational and financial impacts on the Group, including by imposing new collateral requirements on a broader range of market participants with effect from 2022. Access to the clearing services of certain Central Clearing Counterparties (CCPs) used by Group entities is currently permitted under temporary equivalence and recognition regimes and decisions in the UK and EU. If not extended or made permanent, the EU's equivalence decision for UK Central Clearing Counterparties (CCPs), and exemption for certain intragroup transactions from the EMIR derivatives clearing and margin obligations, both due to expire at the end of June 2025, could also have operational and financial impacts on the Group, as could the removal of temporary recognition of non-UK CCPs by the UK. EMIR is currently undergoing a review process in the EU which may result in changes to the intragroup transactions exemption, potentially making it easier to rely on. However, the review is in its very early stages so it is not yet certain what changes may result from it.

US regulators have imposed similar rules as the EU with respect to the mandatory on-venue trading and clearing of certain derivatives, and post-trade transparency, as well as in relation to the margining of OTC derivatives. US regulators have finalised certain aspects of their rules with respect to their application on a cross-border basis, including with respect to their registration requirements in relation to non-US swap dealers and security-based swap dealers. The regulators may adopt further rules, or provide further guidance, regarding cross-border applicability. In December 2017, the CFTC and the European Commission recognised the trading venues of each other's jurisdiction to allow market participants to comply with mandatory on-venue trading requirements while trading on certain venues recognised by the other jurisdiction. In December 2022, the CFTC extended temporary relief that would permit trading venues and market participants located in the UK to continue to rely on this mutual recognition framework following the withdrawal of the UK from the EU.

Certain participants in US swap markets are required to register with the CFTC as 'swap dealers' or 'major swap participants' and/or, with the SEC as 'security-based swap dealers' or 'major security-based swap participants'. Such registrants are subject to CFTC and/or SEC regulation and oversight. Entities required to register as swap dealers and/or security-based swap dealers are subject to business conduct, record-keeping and reporting requirements under either or both CFTC

# Supervision and regulation (continued)

and SEC rules. Barclays Bank PLC is also subject to regulation by the FRB, and is both provisionally registered with the CFTC as a swap dealer and conditionally registered with the SEC as a security-based swap dealer. In addition, Barclays Bank Ireland PLC is provisionally registered as a Swap Dealer with the CFTC.

Accordingly, Barclays Bank PLC and Barclays Bank Ireland PLC are subject to CFTC rules on business conduct, record-keeping and reporting and to FRB rules on capital and margin. The CFTC has approved certain comparability determinations that permit substituted compliance with non-US regulatory regimes for certain swap regulations. Substituted compliance is a recognition program whereby compliance with a comparable regulatory requirement of a foreign jurisdiction is deemed to serve as a substitute for compliance with comparable requirements of the U.S. Commodity Exchange Act and the CFTC's regulations. Substituted compliance has been granted only in respect of certain requirements promulgated by regulatory authorities in certain identified jurisdictions that the CFTC believes are sufficiently comparable to its own requirements. Substituted compliance was granted in respect of certain European Union requirements in December 2013. In December 2022, the CFTC extended temporary relief that would permit swap dealers located in the UK to continue to rely on existing CFTC substituted compliance determinations with respect to EU requirements in the event of a withdrawal of the UK from the EU. Barclays Bank PLC and Barclays Bank Ireland PLC rely upon the CFTC's grant of substituted compliance as a means to comply with certain swap dealer requirements.

Barclays Bank PLC conditionally registered as a security-based swap dealer with the SEC as of 1 November 2021. As a registered security-based swap dealer, Barclays Bank PLC is subject to SEC business conduct, recordkeeping and reporting rules similar to the CFTC rules noted above. Like the CFTC, the SEC approved certain comparability determinations that permit conditional substituted compliance with non-US regulatory regimes for certain security-based swap regulations. Due to the imposition by the SEC of more stringent requirements on which its grant of substituted compliance is conditioned, Barclays Bank PLC is relying on substituted compliance only with respect to a limited number of SEC security-based swap dealer rules.

Many of the regulations under the CFTC and SEC regimes are similar in scope of application. The rules of both the SEC and the CFTC are roughly divided into "transaction-level rules" and "entity-level rules". Transaction-level rules apply only in circumstances in which at least one of the parties to the swap or security-based swap transaction has sufficient nexus to the United States. Entity-level rules apply to swap dealers or security-based swap dealers across all their swap or security-based swaps without distinction as to the counterparty or location of the transaction. Unlike the CFTC, certain SEC rules apply to transactions entered into by non-US security-based swap dealers based on the location from which certain activities are undertaken. These SEC rules apply to security-based swap transactions facing non-US person counterparties that are "arranged, negotiated or executed" by US-based security-based swap dealer personnel. This distinction expands the scope and impact of the SEC regime to transactions with a greater number of non-US counterparties.

As noted above, Barclays Bank PLC and Barclays Bank Ireland PLC are subject to FRB rules on capital and margin.

In 2022, the SEC proposed Rule 10B-1 that would require any person with a security-based swap position (aggregated across all affiliated persons) that exceeds any of the thresholds specified by the SEC to promptly report certain information by the next business day, including the identity of the reporting person and the security-based swap position, as well as the ownership of securities positions related to the security-based swap position. Such reports would be available publicly. If adopted as proposed, this rule could increase the burden and cost to Barclays Bank PLC of utilising security-based swaps.

**Other regulatory developments in the US**

The SEC has also put forth a number of other recent proposals that, if adopted, could have a significant impact on the Group's business and operations, including: (i) proposed amendments to Exchange Act Rule 15c6-1 that would shorten the standard settlement cycle for most broker-dealer transactions in securities from two business days after the trade (T+2) to one business day after the trade (T+1), which could require significant changes to BCI's settlement procedures and practices, and new Exchange Act Rule 15c6-2 which would generally require market-wide improvements in the rate of same-day affirmations and on central matching service providers; (ii) a proposed rule that would mandate central clearing of many US Treasury securities transactions and would amend the broker-dealer customer protection rule as it applies to margin posted for transactions in US Treasury securities, which could impose additional costs on the Group's Treasury securities trading activity; and (iii) a series of market structure proposals which would have a significant impact on securities trading activity by BCI and other Group entities, as the SEC proposals would (a) impose a new SEC best execution obligation on securities broker-dealers, including BCI, (b) require that certain individual investor orders be exposed to auctions before they could be executed internally by certain trading centres, and (c) amend certain rules under Regulation NMS (National Market System) to adopt variable minimum pricing increments, reduce access fee caps for protected quotations, require that the amount of exchange fees and rebates be determinable at the time of execution, and update and expand to certain broker-dealers the disclosures required for order executions in NMS stocks, among other changes.

**Other regulation**

**Consumer protection, culture, and diversity and inclusion**

In May 2021, the FCA published a consultation paper proposing the imposition of a new consumer duty on firms. The duty looks to set higher expectations for the standard of care that firms provide to customers and will impact all aspects of Barclays' retail businesses, including every customer journey, product and service as well as our relationships with partners, suppliers and third parties. This will result in significant implementation costs and there will also be higher ongoing costs for the industry as a result of extensive monitoring and evidential requirements. Final rules were published in July 2022 and will come into force on 31 July 2023 for new and existing products or services that are open to sale or renewal, and on 31 July 2024 for closed products or services.

Our regulators have enhanced their focus on the promotion of cultural values as a key area for banks, although they generally view the responsibility for reforming culture as primarily sitting with the industry. The UK regulators have also begun focusing on diversity and inclusion in financial services firms, with the Bank of England, PRA and FCA having published a joint discussion paper and the FCA having published a policy statement on this topic in April 2022.

# Supervision and regulation (continued)

**Data protection**

Most countries where the Group operates have comprehensive laws requiring openness and transparency about the collection and use of personal information, and protection against loss and unauthorised or improper access. Regulations regarding data protection are increasing in number, as well as levels of enforcement, as manifested in increased amounts of fines and the severity of other penalties. We expect that personal privacy and data protection will continue to receive attention and focus from regulators, as well as public scrutiny and attention.

The EU's General Data Protection Regulation (GDPR) created a broadly harmonised privacy regime across EU member states, introducing mandatory breach notification, enhanced individual rights, a need to openly demonstrate compliance, and significant penalties for breaches. The extraterritorial effect of the GDPR means entities established outside the EU may fall within the Regulation's ambit when offering goods or services to European based customers or clients. Following the UK's withdrawal from the EU, the UK continues to apply the GDPR framework (as onshored into UK law and hence now referred to as the 'UK GDPR' - this sits alongside an amended version of the UK Data Protection Act 2018). Following the invalidation by the European Court of Justice (CJEU) of the EU-US Privacy Shield as a mechanism for transferring EU personal data to the US, the European Commission published new standard contractual clauses (SCCs) in 2021 to meet the requirements of GDPR and the CJEU decision, known as Schrems II. In early 2022, the UK Information Commissioner set out its own international data transfer agreement, and the international data transfer addendum to the European Commission's SCCs for international data transfers. Implementing the new EU SCCs and/or the UK addendum, which involve case-by-case transfer impact assessments and other safeguards, is likely to result in increased compliance costs for the Group. In 2021, China adopted its first comprehensive law in relation to personal information called the Personal Information Protection Law (PIPL). The PIPL applies to processing activities within mainland China, but similar to the GDPR, the PIPL has extraterritorial reach. As the global data protection regulatory landscape develops, noncompliance with any such requirements could lead to regulatory fines and other penalties.

In the US, Barclays Bank Delaware is subject to the US Federal Gramm-Leach-Bliley Act (GLBA) and the California Privacy Rights Act of 2020, which amended the California Consumer Privacy Act of 2018 and came into effect on 1 January 2023 (CPRA). The GLBA limits the use and disclosure of non-public personal information to non-affiliated third parties, and requires financial institutions to provide written notice of their privacy policies and practices and implement certain information security policies and practices. Any violations of the GLBA could subject Barclays Bank Delaware to additional reporting requirements or regulatory investigation or audits by the financial regulators. More broadly, the Group's US operations are subject to the CPRA which applies to personal information that is not collected, processed, sold or disclosed subject to the GLBA. The CPRA requires applicable members of the Group to both provide California residents with additional disclosures regarding the collection, use and sharing of personal information and grant California residents access, deletion, correction and other rights, including the right to opt-out of certain sales or transfers of personal information and the right to limit the processing of sensitive personal information to certain purposes. Any violations of the CPRA may be subject to enforcement by the California Privacy Protection Agency and the California Attorney General and the imposition of monetary penalties, as well as potential lawsuits arising from the private right of action provided to California residents in the case of certain data breaches. Bills proposed in the United States Congress and in the legislatures of various US states, if enacted, may have further impact on the data privacy practices of Barclays' US operations. In addition, all 50 states have laws including obligations to provide notification of security breaches of computer databases that contain personal information to affected individuals, state officers and others.

**Cybersecurity and operational resilience**

Regulators globally continue to focus on cybersecurity risk management, organisational operational resilience and overall soundness across all financial services firms, with customer and market expectations of uninterrupted access to financial services remaining at an all-time high.

The regulatory focus has been further heightened by the increasing number of high-profile ransomware and other supply chain attacks seen across the industry in recent years and the growing reliance of financial services on Cloud and other third party service providers. This is evidenced by the continuing introduction of new laws and regulatory frameworks directed at enhancing resilience of both firms and their critical third party providers. A new UK framework introduced last year requires firms to be able to remain within impact tolerances set for their important business services by no later than 31 March 2025, with further legislation focusing on the resilience of critical third party providers now in the pipeline. The European Union's Digital Operational Resilience Act (DORA) entered into force in January 2023 and will apply in early 2025 (after a two-year implementation period), introducing comprehensive and sector specific regulation on Information Communication Technologies (ICT) incident reporting, testing and third party risk management, and providing for direct oversight of critical third party providers servicing the EU financial services sector. The existing and anticipated requirements for increased controls will serve to improve industry standardisation and resilience capabilities, enhancing our ability to deliver services during periods of potential disruption. However, such measures are likely to result in increased technology and compliance costs for the Group.

In 2022, the SEC published proposed disclosure rules and amendments regarding cybersecurity risk management, governance and incident reporting by US-listed companies, including foreign private issuers such as Barclays PLC and Barclays Bank PLC. Also in 2022, NYDFS both increased enforcement of and published proposed amendments to its main cybersecurity regulation applying to the New York Branch of Barclays Bank PLC. Final versions of the SEC proposed disclosure rules and NYDFS proposed amendments are expected in 2023.

**Regulatory initiatives on ESG disclosure**

The EU Regulation on Sustainability-Related Disclosures introduces disclosure obligations requiring financial institutions to explain how they integrate environmental, social and governance factors in their investment decisions for certain financial products. In addition, the EU Taxonomy Regulation provides for a general framework for the development of an EU-wide classification system for environmentally sustainable economic activities. The EU Corporate Sustainability Reporting Directive will introduce sustainability related reporting obligations for various entities including EU banks and certain listed companies, with reporting to

## Supervision and regulation (continued)

commence on a phased basis from the financial year 2024. Draft sustainability reporting standards are being developed by the European Financial Reporting Advisory Group.

From June 2022, the EU's Capital Requirements Regulation requires certain large financial institutions to disclose information on environmental, social and governance risks, including physical risks and transition risks.

The EU has also proposed a Directive on Corporate Sustainability Due Diligence which, if adopted, would require EU firms, including financial institutions, to carry out due diligence on companies in their value chain and identify and prevent, bring to an end or mitigate the impact of their activities on human rights and the environment.

In the UK, the UK Government has confirmed its intention to develop a UK Green Taxonomy, and the Green Technical Advisory Group has published advice on development of a Green Taxonomy with further advice expected to follow. Reporting against the Taxonomy will form part of the UK's new Sustainability Disclosure Requirements (SDR). Certain companies will be required to disclose which portion of their activities are Taxonomy-aligned. The structure of the Taxonomy draws on the EU approach and has six environmental objectives (climate change mitigation, climate change adaptation, sustainable use and protection of water and marine resources, transition to a circular economy, pollution prevention and control and protection and restoration of biodiversity). The UK regulators are also consulting on a new SDR Framework for firms as well as investment product disclosures, including a new sustainable investment labelling regime. Additionally, TCFD-aligned reporting requirements now apply to UK publicly quoted companies, large private companies and LLPs with financial years starting on or after 6 April 2022 (in addition to existing TCFD-related reporting requirements under the Listing Rules).

In March 2022, the SEC proposed climate related-disclosure requirements for US-listed companies (which would include Barclays PLC and Barclays Bank PLC) that would, among other things, require disclosure of direct and indirect greenhouse gas emissions, with certain emissions disclosures subject to third-party attestation requirements; climate-related scenario analysis (if the issuer conducts scenario analysis), together with qualitative and quantitative information about the hypothetical future climate scenarios used in its analysis; climate transition plans or climate-related targets or goals, along with disclosure of progress against any such plans, targets or goals; climate-related risks over the short-, medium- and long-term; qualitative and quantitative information regarding climate-related risks and historical impacts in audited financial statements; corporate governance of climate-related risks; and climate-related risk-management processes.

**Sanctions and financial crime**

The UK Bribery Act 2010 introduced a new form of corporate criminal liability focused broadly on a company's failure to prevent bribery on its behalf. The Criminal Finances Act 2017 introduced new corporate criminal offences of failing to prevent the facilitation of UK and overseas tax evasion. Both pieces of legislation have broad application and in certain circumstances may have extraterritorial impact on entities, persons or activities located outside the UK, including Barclays PLC's subsidiaries outside the UK. The UK Bribery Act requires the Group to have adequate procedures to prevent bribery which, due to the extraterritorial nature of the Act, makes this both complex and costly. Additionally, the Criminal Finances Act requires the Group to have reasonable prevention procedures in place to prevent the criminal facilitation of tax evasion by persons acting for, or on behalf of, the Group.

The Sanctions and Anti-Money Laundering Act (the Sanctions Act) became law in the UK in 2018. The Sanctions Act allows for the adoption of an autonomous UK sanctions regime, as well as a more flexible licensing regime post-Brexit. On 6 July 2020, the UK Government announced the first sanctions that have been implemented independently by the UK outside the auspices of the UN and EU. The autonomous UK sanctions regime came into force on 1 January 2021. The sanctions apply within the UK and in relation to the conduct of all UK persons wherever they are in the world; they also apply to overseas branches of UK companies (including the Barclays Bank PLC New York branch).

In the US, the Bank Secrecy Act, the USA PATRIOT Act 2001, the Anti-Money Laundering Act of 2020 and regulations thereunder contain numerous anti-money laundering and anti-terrorist financing requirements for financial institutions. In addition, the Group is subject to the US Foreign Corrupt Practices Act, which prohibits, among other things, corrupt payments to foreign government officials. It is also subject to various economic sanctions laws, regulations and executive orders administered by the US government, which prohibit or restrict some or all business activities and other dealings with or involving certain individuals, entities, groups, countries and territories.

In some cases, US state and federal regulations addressing sanctions, money laundering and other financial crimes may impact entities, persons or activities located or undertaken outside the US, including Barclays PLC and its subsidiaries. US government authorities have aggressively enforced these laws against financial institutions in recent years.

As a result of the conflict in Ukraine, there has been an increased regulatory focus on sanctions compliance in various jurisdictions, including in the US, UK and EU.

Failure of a financial institution to ensure compliance with such laws could have serious legal, financial and reputational consequences for the institution.

# Notes to the financial statements (continued)
Accruals, provisions, contingent liabilities and legal proceedings

## 26 Legal, competition and regulatory matters

The Group faces legal, competition and regulatory challenges, many of which are beyond our control. The extent of the impact of these matters cannot always be predicted but may materially impact our operations, financial results, condition and prospects. Matters arising from a set of similar circumstances can give rise to either a contingent liability or a provision, or both, depending on the relevant facts and circumstances.

The recognition of provisions in relation to such matters involves critical accounting estimates and judgments in accordance with the relevant accounting policies applicable to Note 24, Provisions. We have not disclosed an estimate of the potential financial impact or effect on the Group of contingent liabilities where it is not currently practicable to do so. Various matters detailed in this note seek damages of an unspecified amount. While certain matters specify the damages claimed, such claimed amounts do not necessarily reflect the Group's potential financial exposure in respect of those matters.

Matters are ordered under headings corresponding to the financial statements in which they are disclosed.

### 1. Barclays PLC and Barclays Bank PLC
**Investigations into certain advisory services agreements**

*FCA proceedings*

In 2008, Barclays Bank PLC and Qatar Holdings LLC entered into two advisory service agreements (the Agreements). The Financial Conduct Authority (FCA) conducted an investigation into whether the Agreements may have related to Barclays PLC's capital raisings in June and November 2008 (the Capital Raisings) and therefore should have been disclosed in the announcements or public documents relating to the Capital Raisings. In 2013, the FCA issued warning notices (the Warning Notices) finding that Barclays PLC and Barclays Bank PLC acted recklessly and in breach of certain disclosure-related listing rules, and that Barclays PLC was also in breach of Listing Principle 3. The financial penalty provided in the Warning Notices was £50m. Barclays PLC and Barclays Bank PLC contested the findings. In September 2022, the FCA's Regulatory Decisions Committee (RDC) issued Decision Notices finding that Barclays PLC and Barclays Bank PLC breached certain disclosure-related listing rules. The RDC also found that in relation to the disclosures made in the Capital Raising of November 2008, Barclays PLC and Barclays Bank PLC acted recklessly, and that Barclays PLC breached Listing Principle 3. The RDC upheld the combined penalty of £50m on Barclays PLC and Barclays Bank PLC, the same penalty as in the Warning Notices. Barclays PLC and Barclays Bank PLC have referred the RDC's findings to the Upper Tribunal for reconsideration.

**Investigations into LIBOR and other benchmarks and related civil actions**

Regulators and law enforcement agencies, including certain competition authorities, from a number of governments have conducted investigations relating to Barclays Bank PLC's involvement in allegedly manipulating certain financial benchmarks, such as LIBOR. Various individuals and corporates in a range of jurisdictions have threatened or brought civil actions against the Group and other banks in relation to the alleged manipulation of LIBOR and/or other benchmarks.

*USD LIBOR civil actions*

The majority of the USD LIBOR cases, which have been filed in various US jurisdictions, have been consolidated for pre-trial purposes in the US District Court in the Southern District of New York (SDNY). The complaints are substantially similar and allege, among other things, that Barclays PLC, Barclays Bank PLC, Barclays Capital Inc. (BCI) and other financial institutions individually and collectively violated provisions of the US Sherman Antitrust Act (Antitrust Act), the US Commodity Exchange Act (CEA), the US Racketeer Influenced and Corrupt Organizations Act (RICO), the US Securities Exchange Act of 1934 and various state laws by manipulating USD LIBOR rates.

Putative class actions and individual actions seek unspecified damages with the exception of one lawsuit, in which the plaintiffs are seeking no less than $100m in actual damages and additional punitive damages against all defendants, including Barclays Bank PLC. Some of the lawsuits also seek trebling of damages under the Antitrust Act and RICO. Barclays Bank PLC has previously settled certain claims. In 2022, Barclays Bank PLC also settled one further matter. The financial impact of the settlement is not material to the Group's operating results, cash flows or financial position.

*Sterling LIBOR civil actions*

In 2016, two putative class actions filed in the SDNY against Barclays Bank PLC, BCI and other Sterling LIBOR panel banks alleging, among other things, that the defendants manipulated the Sterling LIBOR rate in violation of the Antitrust Act, CEA and RICO, were consolidated. The defendants' motion to dismiss the claims was granted in 2018. The plaintiffs have appealed the dismissal.

*Japanese Yen LIBOR civil actions*

In 2012, a putative class action was filed in the SDNY against Barclays Bank PLC and other Japanese Yen LIBOR panel banks by a lead plaintiff involved in exchange-traded derivatives and members of the Japanese Bankers Association's Euroyen Tokyo Interbank Offered Rate (Euroyen TIBOR) panel. The complaint alleges, among other things, manipulation of the Euroyen TIBOR and Yen LIBOR rates and breaches of the CEA and the Antitrust Act. In 2014, the court dismissed the plaintiff's antitrust claims, and in 2020, the court dismissed the plaintiff's remaining CEA claims.

In 2015, a second putative class action, making similar allegations to the above class action, was filed in the SDNY against Barclays PLC, Barclays Bank PLC and BCI. Barclays and the plaintiffs have reached a settlement of $17.75m for both actions. A final court approval hearing has been scheduled for March 2023.

*SIBOR/SOR civil action*

In 2016, a putative class action was filed in the SDNY against Barclays PLC, Barclays Bank PLC, BCI and other defendants, alleging manipulation of the Singapore Interbank Offered Rate (SIBOR) and Singapore Swap Offer Rate (SOR). The plaintiffs and remaining defendants (which includes Barclays Bank PLC) reached a joint settlement to resolve this matter for $91m, which received final court

## Notes to the financial statements (continued)
Accruals, provisions, contingent liabilities and legal proceedings

approval in November 2022. This matter is now concluded. The financial impact of Barclays' share of the joint settlement is not material to the Group's operating results, cash flows or financial position.

*ICE LIBOR civil actions*

In 2019, several putative class actions were filed in the SDNY against a panel of banks, including Barclays PLC, Barclays Bank PLC, BCI, other financial institution defendants and Intercontinental Exchange Inc. and certain of its affiliates (ICE), asserting antitrust claims that the defendants manipulated USD LIBOR through the defendants' submissions to ICE. These actions have been consolidated. The defendants' motion to dismiss was granted in 2020 and the plaintiffs appealed. In February 2022, the dismissal was affirmed on appeal. The plaintiffs did not seek US Supreme Court review. This matter is now concluded.

In August 2020, an ICE LIBOR-related action was filed by a group of individual plaintiffs in the US District Court for the Northern District of California on behalf of individual borrowers and consumers of loans and credit cards with variable interest rates linked to USD ICE LIBOR. The plaintiffs' motion seeking, among other things, preliminary and permanent injunctions to enjoin the defendants from continuing to set LIBOR or enforce any financial instrument that relies in whole or in part on USD LIBOR was denied. The defendants' motion to dismiss the case was granted in September 2022. The plaintiffs have filed an amended complaint, which the defendants have moved to dismiss.

*Non-US benchmarks civil actions*

There remains one claim, issued in 2017, against Barclays Bank PLC and other banks in the UK in connection with alleged manipulation of LIBOR. Proceedings have also been brought in a number of other jurisdictions in Europe, Argentina and Israel relating to alleged manipulation of LIBOR and EURIBOR. Additional proceedings in other jurisdictions may be brought in the future.

**Credit Default Swap civil action**

A putative antitrust class action is pending in New Mexico federal court against Barclays Bank PLC, BCI and various other financial institutions. The plaintiffs, the New Mexico State Investment Council and certain New Mexico pension funds, allege that the defendants conspired to manipulate the benchmark price used to value Credit Default Swap (CDS) contracts at settlement (i.e. the CDS final auction price). The plaintiffs allege violations of US antitrust laws and the CEA, and unjust enrichment under state law. The defendants have moved to dismiss the case.

**Foreign Exchange investigations and related civil actions**

The Group has been the subject of investigations in various jurisdictions in relation to certain sales and trading practices in the Foreign Exchange market. Settlements were reached in various jurisdictions in connection with these investigations, including the EU and US. The financial impact of any remaining ongoing investigations is not expected to be material to the Group's operating results, cash flows or financial position. Various individuals and corporates in a range of jurisdictions have threatened or brought civil actions against the Group and other banks in relation to alleged manipulation of Foreign Exchange markets.

*US FX opt out civil action*

In 2018, Barclays Bank PLC and BCI settled a consolidated action filed in the SDNY, alleging manipulation of Foreign Exchange markets (Consolidated FX Action), for a total amount of $384m. Also in 2018, a group of plaintiffs, who opted out of the Consolidated FX Action, filed a complaint in the SDNY against Barclays PLC, Barclays Bank PLC, BCI and other defendants. Some of the plaintiffs' claims were dismissed in 2020. Barclays PLC, Barclays Bank PLC, and BCI have reached a settlement in principle of all claims against them in the matter. The financial impact of this settlement is not material to the Group's operating results, cash flows or financial position.

*US retail basis civil action*

In 2015, a putative class action was filed against several international banks, including Barclays PLC and BCI, on behalf of a proposed class of individuals who exchanged currencies on a retail basis at bank branches (Retail Basis Claims). The SDNY has ruled that the Retail Basis Claims are not covered by the settlement agreement in the Consolidated FX Action. The Court subsequently dismissed all Retail Basis Claims against the Group and all other defendants. The plaintiffs have filed an amended complaint.

*Non-US FX civil actions*

Legal proceedings have been brought or are threatened against Barclays PLC, Barclays Bank PLC, BCI and Barclays Execution Services Limited (BX) in connection with alleged manipulation of Foreign Exchange in the UK, a number of other jurisdictions in Europe, Israel, Brazil and Australia. Additional proceedings may be brought in the future.

The above-mentioned proceedings include two purported class actions filed against Barclays PLC, Barclays Bank PLC, BX, BCI and other financial institutions in the UK Competition Appeal Tribunal (CAT) in 2019. The CAT refused to certify these claims in the first quarter of 2022 although the claimants have obtained permission to appeal and judicially review the CAT's decisions. Also in 2019, a separate claim was filed in the UK in the High Court of Justice (High Court), and subsequently transferred to the CAT, by various banks and asset management firms against Barclays Bank PLC and other financial institutions alleging breaches of European and UK competition laws related to FX trading. This claim has been settled as part of the settlement in principle referred to under the US FX opt out civil action above.

**Metals-related civil actions**

A number of US civil complaints, each on behalf of a proposed class of plaintiffs, have been consolidated and transferred to the SDNY. The complaints allege that Barclays Bank PLC and other members of The London Gold Market Fixing Ltd. manipulated the prices of gold and gold derivative contracts in violation of the Antitrust Act and other federal laws. The parties reached a joint settlement to resolve this matter for $50m. The settlement received final court approval in August 2022. This matter is now concluded. The financial impact of Barclays' share of the joint settlement is not material to the Group's operating results, cash flows or financial position. A separate US civil complaint by a proposed class of plaintiffs against a number of banks, including Barclays Bank PLC, BCI and BX, alleging

# Notes to the financial statements (continued)

Accruals, provisions, contingent liabilities and legal proceedings

manipulation of the price of silver in violation of the CEA, the Antitrust Act and state antitrust and consumer protection laws, has been dismissed as against the Barclays entities. The plaintiffs have the option to seek the court's permission to appeal.

Civil actions have also been filed in Canadian courts against Barclays PLC, Barclays Bank PLC, Barclays Capital Canada Inc. and BCI on behalf of proposed classes of plaintiffs alleging manipulation of gold and silver prices.

**US residential mortgage related civil actions**

There are two pending US Residential Mortgage-Backed Securities (RMBS) related civil actions arising from unresolved repurchase requests submitted by Trustees for certain RMBS, alleging breaches of various loan-level representations and warranties (R&Ws) made by Barclays Bank PLC and/or a subsidiary acquired in 2007. In one action, the Barclays defendants' motion for summary judgment was granted in June 2022 and the plaintiffs' R&W breach claim was dismissed. The plaintiffs are appealing the decision. The other repurchase action is pending.

Barclays Bank PLC reached settlements to resolve two other repurchase actions, which have received final court approval. Payment of the settlement amounts was completed in July 2022. These matters are now concluded. The financial impact of the settlements is not material to the Group's operating results, cash flows or financial position.

In 2020, a civil litigation claim was filed in the New Mexico First Judicial District Court by the State of New Mexico against six banks, including BCI, on behalf of two New Mexico state pension funds and the New Mexico State Investment Council relating to legacy RMBS purchases. As to BCI, the complaint alleges that the funds purchased approximately $22m in RMBS underwritten by BCI. The parties have reached a joint settlement to resolve this matter for $32.5m. The settlement was paid in April 2022. The financial impact of BCI's share of the joint settlement is not material to the Group's operating results, cash flows or financial position.

**Government and agency securities civil actions**

*Treasury auction securities civil actions*

Consolidated putative class action complaints filed in US federal court against Barclays Bank PLC, BCI and other financial institutions under the Antitrust Act and state common law allege that the defendants (i) conspired to manipulate the US Treasury securities market and/or (ii) conspired to prevent the creation of certain platforms by boycotting or threatening to boycott such trading platforms. The court dismissed the consolidated action in March 2021. The plaintiffs filed an amended complaint. The defendants' motion to dismiss the amended complaint was granted in March 2022. The plaintiffs are appealing this decision.

In addition, certain plaintiffs have filed a related, direct action against BCI and certain other financial institutions, alleging that defendants conspired to fix and manipulate the US Treasury securities market in violation of the Antitrust Act, the CEA and state common law.

*Supranational, Sovereign and Agency bonds civil actions*

Civil antitrust actions have been filed in the SDNY and Federal Court of Canada in Toronto against Barclays Bank PLC, BCI, BX, Barclays Capital Securities Limited and, with respect to the civil action filed in Canada only, Barclays Capital Canada, Inc. and other financial institutions alleging that the defendants conspired to fix prices and restrain competition in the market for US dollar-denominated Supranational, Sovereign and Agency bonds.

In one of the actions filed in the SDNY, the court granted the defendants' motion to dismiss the plaintiffs' complaint. The dismissal was affirmed on appeal; however, the district court subsequently informed the parties of a potential conflict. The matter was assigned to a new district court judge and the plaintiffs moved to vacate the dismissal order, which was denied. The plaintiffs' time to appeal has expired and this matter is now concluded. The plaintiffs have voluntarily dismissed the other SDNY action. In the Federal Court of Canada action, the parties have reached a settlement in principle, which will require court approval. The financial impact of the settlement is not expected to be material to the Group's operating results, cash flows or financial position.

*Variable Rate Demand Obligations civil actions*

Civil actions have been filed against Barclays Bank PLC and BCI and other financial institutions alleging the defendants conspired or colluded to artificially inflate interest rates set for Variable Rate Demand Obligations (VRDOs). VRDOs are municipal bonds with interest rates that reset on a periodic basis, most commonly weekly. Two actions in state court have been filed by private plaintiffs on behalf of the states of Illinois and California. Three putative class action complaints have been consolidated in the SDNY. In the consolidated SDNY class action, certain of the plaintiffs' claims were dismissed in November 2020 and June 2022. In the California action, the plaintiffs' claims were dismissed in June 2021. The plaintiffs have appealed the dismissal. In the Illinois action, trial has been scheduled for August 2023.

**Odd-lot corporate bonds antitrust class action**

In 2020, BCI, together with other financial institutions, were named as defendants in a putative class action. The complaint alleges a conspiracy to boycott developing electronic trading platforms for odd-lots and price fixing. The plaintiffs demand unspecified money damages. The defendants' motion to dismiss was granted in 2021 and the plaintiffs have appealed the dismissal.

**Interest rate swap and credit default swap US civil actions**

Barclays PLC, Barclays Bank PLC and BCI, together with other financial institutions that act as market makers for interest rate swaps (IRS), are named as defendants in several antitrust class actions which were consolidated in the SDNY in 2016. The complaints allege the defendants conspired to prevent the development of exchanges for IRS and demand unspecified money damages.

In 2018, trueEX LLC filed an antitrust class action in the SDNY against a number of financial institutions including Barclays PLC, Barclays Bank PLC and BCI based on similar allegations with respect to trueEX LLC's development of an IRS platform. In 2017, Tera Group Inc. filed a separate civil antitrust action in the SDNY claiming that certain conduct alleged in the IRS cases also caused the plaintiff to suffer harm with respect to the Credit Default Swaps market. In 2018 and 2019, respectively, the court dismissed certain claims in both cases for unjust enrichment and tortious interference but denied motions to dismiss the federal and state antitrust claims, which remain pending.

# Notes to the financial statements (continued)
Accruals, provisions, contingent liabilities and legal proceedings

**BDC Finance L.L.C.**

In 2008, BDC Finance L.L.C. (BDC) filed a complaint in the Supreme Court of the State of New York (NY Supreme Court), demanding damages of $298m, alleging that Barclays Bank PLC had breached a contract in connection with a portfolio of total return swaps governed by an ISDA Master Agreement (the Master Agreement). Following a trial, the court ruled in 2018 that Barclays Bank PLC was not a defaulting party, which was affirmed on appeal. In April 2021, the trial court entered judgement in favour of Barclays Bank PLC for $3.3m and as yet to be determined legal fees and costs. BDC appealed. In January 2022, the appellate court reversed the trial court's summary judgment decision in favour of Barclays Bank PLC and remanded the case to the lower court for further proceedings. The parties have filed cross-motions on the scope of trial. The trial has been adjourned pending a decision on the motions and any subsequent appeal.

In 2011, BDC's investment advisor, BDCM Fund Adviser, LLC and its parent company, Black Diamond Capital Holdings, LLC, also sued Barclays Bank PLC and BCI in Connecticut State Court for unspecified damages allegedly resulting from Barclays Bank PLC's conduct relating to the Master Agreement, asserting claims for violation of the Connecticut Unfair Trade Practices Act and tortious interference with business and prospective business relations. This case is currently stayed.

**Civil actions in respect of the US Anti-Terrorism Act**

There are a number of civil actions, on behalf of more than 4,000 plaintiffs, filed in US federal courts in the US District Court in the Eastern District of New York (EDNY) and SDNY against Barclays Bank PLC and a number of other banks. The complaints generally allege that Barclays Bank PLC and those banks engaged in a conspiracy to facilitate US dollar-denominated transactions for the Iranian Government and various Iranian banks, which in turn funded acts of terrorism that injured or killed the plaintiffs or the plaintiffs' family members. The plaintiffs seek to recover damages for pain, suffering and mental anguish under the provisions of the US Anti-Terrorism Act, which allow for the trebling of any proven damages.

The court granted the defendants' motions to dismiss three out of the six actions in the EDNY. The plaintiffs appealed in one action and the dismissal was affirmed in January 2023. The remaining EDNY actions are stayed. Out of the two actions in the SDNY, the court granted the defendants' motion to dismiss the first action. That action is stayed, and the second SDNY action is stayed pending any appeal on the dismissal of the first.

**Shareholder derivative action**

In November 2020, a purported Barclays shareholder filed a putative derivative action in New York state court against BCI and a number of current and former members of the Board of Directors of Barclays PLC and senior executives or employees of the Group. The shareholder filed the claim on behalf of nominal defendant Barclays PLC, alleging that the individual defendants harmed the company through breaches of their duties, including under the Companies Act 2006. The plaintiff seeks damages on behalf of Barclays PLC for the losses that Barclays PLC allegedly suffered as a result of these alleged breaches. An amended complaint was filed in April 2021, which BCI and certain other defendants moved to dismiss. The motion to dismiss was granted in April 2022. The plaintiff is appealing the decision.

**Derivative transactions civil action**

In 2021, Vestia, a Dutch housing association, brought a claim against Barclays Bank PLC in the UK in the High Court in relation to a series of derivative transactions entered into with Barclays Bank PLC between 2008 and 2011, seeking damages of £329m. Barclays Bank PLC is defending the claim and has made a counterclaim.

**Timeshare loans, skilled person review, and associated matters**

In August 2020, the FCA granted an application by Clydesdale Financial Services Limited (CFS), which trades as Barclays Partner Finance and houses Barclays' point-of-sale finance business, for a validation order with respect to certain loans to customers brokered between April 2014 and April 2016 by Azure Services Limited (ASL), a timeshare operator, which did not, at the point of sale, hold the necessary broker licence. As a condition to the validation order, the FCA required CFS to undertake a skilled person review of the assessment of affordability processes for the loans brokered by ASL (ASL Loans) as well as CFS' policies and procedures for assessing affordability and oversight of brokers more generally, and dictated a remediation methodology in the event that ASL Loans did not pass the affordability test. The skilled person made a number of observations, some of which were adverse, about both current and historic affordability practices as well as current oversight practices. CFS is not required to conduct a full back book review but, following a review of certain cohorts of loans to determine historic affordability and/or broker oversight practices that may have caused customer harm, where harm is identified, CFS' intention is to remediate. To date, CFS has identified a number of areas for remediation, but the scoping exercise is ongoing and remediation will only begin once the scoping exercise is complete. As at 31 December 2022, CFS booked a provision in respect of the expected remediation for these matters of £10.4m.

Separately, and notwithstanding this, CFS decided in March 2022 to extend the proactive remediation of ASL Loans beyond those brokered between April 2014 and April 2016 to include the full portfolio of ASL Loans brokered between 2006 and 2018. In the first quarter of 2022, an additional customer remediation provision was recognised in relation to the remediation of the ASL Loans originated outside the April 2014 to April 2016 period. As at 31 December 2022, the provision recognised in relation to this matter by CFS is £183m. Remediation of the full portfolio of ASL Loans started in October 2022 and is expected to be completed in 2023.

In addition, CFS completed a review of all other legacy timeshare retailers during 2022. No concerns were identified in relation to the majority of those retailers, but where concerns were identified, CFS' intention is to remediate. As at 31 December 2022, the provision recognised in relation to this matter by CFS is £96m.

**Over-issuance of Securities in the US**

Barclays Bank PLC maintains a US shelf registration statement with the US Securities and Exchange Commission (SEC) in order to issue securities to US investors. In May 2017, Barclays Bank PLC lost its status as a "well-known seasoned issuer" (or WKSI) as a result of an SEC settlement order involving BCI. Due to its loss of WKSI status, Barclays Bank PLC was required to register a specified amount of

# Notes to the financial statements (continued)
Accruals, provisions, contingent liabilities and legal proceedings

securities to be issued under certain US shelf registration statements filed with the SEC. In March 2022, executive management became aware that Barclays Bank PLC had issued securities materially in excess of the set amount under its 2019 US shelf registration statement and subsequently became aware that securities had also been issued in excess of the set amount under the predecessor US shelf registration statement. The securities that were over-issued included structured notes and exchange traded notes (ETNs). Securities issued in excess of the amount registered were considered to be "unregistered securities" for the purposes of US securities laws, with certain purchasers of those securities having a right to recover, upon the tender of such security to Barclays Bank PLC, the consideration paid for such security with interest, less the amount of any income received, or to recover damages from Barclays Bank PLC if the purchaser sold the security at a loss (the Rescission Price). Barclays Bank PLC commenced its rescission offer on 1 August 2022, by which Barclays Bank PLC offered to repurchase the relevant affected securities for the Rescission Price (the Rescission Offer). The Rescission Offer expired on 12 September 2022.

In September 2022, the SEC announced the resolution of its investigation of Barclays PLC and Barclays Bank PLC relating to the over-issuance of securities by Barclays Bank PLC under certain of its US shelf registration statements. Pursuant to the terms of the resolution, Barclays PLC and Barclays Bank PLC paid in the fourth quarter of 2022 a combined penalty of $200m (£165m[a]), without admitting or denying the SEC's findings. The SEC found that the independent Rescission Offer made by Barclays Bank PLC to holders of the relevant over-issued securities satisfied its requirements for disgorgement and related prejudgment interest.

The Group is engaged with, and responding to inquiries and requests for information from, various other regulators who may seek to impose fines, penalties and/or other sanctions as a result of this matter. Furthermore, Barclays Bank PLC and/or its affiliates may incur costs and liabilities in relation to private civil claims which have been filed and may face other potential private civil claims, class actions or other enforcement actions in relation to this matter. By way of example, in September 2022, a purported class action claim was filed in the US District Court in Manhattan seeking to hold Barclays PLC and former and current executives responsible for declines in the prices of its American depositary receipts, which the plaintiffs claim occurred as a result of alleged misstatements and omissions in its public disclosures; and in February 2023, a claim was brought in a New York federal court by holders of a series of ETNs alleging that Barclays' failure to disclose that these ETNs were unregistered securities misled investors and that, as a result, Barclays is liable for the holders' alleged losses following the suspension of further sales and issuances of such series of ETNs.

Following completion of the rescission offer on 12 September 2022, Barclays utilised a provision of £1,008m in settlement of valid structured note claims and paid a monetary penalty of $200m (£165m[1]) to the SEC. A contingent liability exists in relation to civil claims or any further enforcement actions taken against Barclays Bank PLC and/or its affiliates, but Barclays Bank PLC is unable to assess the likelihood of liabilities that may arise out of such claims or actions.

Any liabilities, claims or actions in connection with the over-issuance of securities under Barclays Bank PLC's US shelf registration statements could have an adverse effect on the Group's business, financial condition, results of operations and reputation as a frequent issuer in the securities markets.

**Note**
a   Exchange rate USD/GBP 1.22 as at 30 June 2022.

**Investigation into the use of unapproved communications platforms**

In September 2022, the SEC and the Commodity Futures Trading Commission (CFTC) announced settlements with a number of financial institutions, including Barclays Bank PLC and BCI, of financial industry-wide investigations regarding compliance with record-keeping obligations in connection with business-related communications sent over unapproved electronic messaging platforms. The SEC and the CFTC found that Barclays Bank PLC and BCI failed to comply with their respective record-keeping rules, where such communications were sent or received by employees over electronic messaging platforms that had not been approved by the bank for business use by employees. As part of the settlement, in the third quarter of 2022, Barclays Bank PLC and BCI paid a combined $125m civil monetary penalty to the SEC and a $75m civil monetary penalty to the CFTC. There are also non-financial components to the settlements, including the retention of an independent compliance consultant and certain ongoing undertakings. This matter is now concluded.

**2. Barclays PLC, Barclays Bank PLC and Barclays Bank UK PLC**

**HM Revenue & Customs (HMRC) assessments concerning UK Value Added Tax**

In 2018, HMRC issued notices that have the effect of removing certain overseas subsidiaries that have operations in the UK from Barclays' UK VAT group, in which group supplies between members are generally free from VAT. The notices have retrospective effect and correspond to assessments of £181m (inclusive of interest), of which Barclays would expect to attribute an amount of approximately £128m to Barclays Bank UK PLC and £53m to Barclays Bank PLC. HMRC's decision has been appealed to the First Tier Tribunal (Tax Chamber).

**Local authority civil actions concerning LIBOR**

Following settlement by Barclays Bank PLC of various governmental investigations concerning certain benchmark interest rate submissions referred to above in 'Investigations into LIBOR and other benchmarks and related civil actions', in the UK, certain local authorities brought claims in 2018 against Barclays Bank PLC and Barclays Bank UK PLC asserting that they entered into loans between 2006 and 2008 in reliance on misrepresentations made by Barclays Bank PLC in respect of its conduct in relation to LIBOR. Barclays Bank PLC and Barclays Bank UK PLC were successful in their applications to strike out the claims. The claims have been settled on terms such that the parties have agreed not to pursue these claims further and to bear their own costs. The financial impact of the settlements is not material to the Group's operating results, cash flows or financial position.

**FCA investigation into transaction monitoring**

The FCA has been investigating Barclays' compliance with UK money laundering regulations and the FCA's rules and Principles for Businesses in an investigation which is focussed on aspects of Barclays' transaction monitoring in relation to certain business lines now in Barclays Bank UK PLC. Barclays has been co-operating with the investigation and responding to information requests.

# Notes to the financial statements (continued)
Accruals, provisions, contingent liabilities and legal proceedings

**3. Barclays PLC**

**Alternative trading systems**

In 2020, a claim was brought against Barclays PLC in the UK in the High Court by various shareholders regarding Barclays PLC's share price based on the allegations contained within a complaint by the New York State Attorney General (NYAG) in 2014. Such claim was settled in 2016, as previously disclosed. The more recent claim seeks unquantified damages and Barclays is defending the claim. The NYAG complaint was filed against Barclays PLC and BCI in the NY Supreme Court alleging, among other things, that Barclays PLC and BCI engaged in fraud and deceptive practices in connection with LX, BCI's SEC-registered alternative trading system.

**General**

The Group is engaged in various other legal, competition and regulatory matters in the UK, the US and a number of other overseas jurisdictions. It is subject to legal proceedings brought by and against the Group which arise in the ordinary course of business from time to time, including (but not limited to) disputes in relation to contracts, securities, debt collection, consumer credit, fraud, trusts, client assets, competition, data management and protection, intellectual property, money laundering, financial crime, employment, environmental and other statutory and common law issues.

The Group is also subject to enquiries and examinations, requests for information, audits, investigations and legal and other proceedings by regulators, governmental and other public bodies in connection with (but not limited to) consumer protection measures, compliance with legislation and regulation, wholesale trading activity and other areas of banking and business activities in which the Group is or has been engaged. The Group is cooperating with the relevant authorities and keeping all relevant agencies briefed as appropriate in relation to these matters and others described in this note on an ongoing basis.

At the present time, Barclays PLC does not expect the ultimate resolution of any of these other matters to have a material adverse effect on the Group's financial position. However, in light of the uncertainties involved in such matters and the matters specifically described in this note, there can be no assurance that the outcome of a particular matter or matters (including formerly active matters or those matters arising after the date of this note) will not be material to Barclays PLC's results, operations or cash flows for a particular period, depending on, among other things, the amount of the loss resulting from the matter(s) and the amount of profit otherwise reported for the reporting period.



### Our 2022 suite of Reports

**Barclays PLC Annual Report 2022**
A detailed review of Barclays' 2022 performance with disclosures that provide useful insight and go beyond reporting requirements. The 2022 report integrates our ESG (Environmental, Social and Governance), and DEI (Diversity, Equity and Inclusion) reporting, and incorporates our Task Force on Climate-related Financial Disclosures (TCFD) recommendations in this, the sixth year of disclosure.

**Barclays PLC Pillar 3 Report 2022**
A summary of our risk profile, its interaction with the Group's risk appetite, and risk management.

**Barclays PLC Fair Pay Report 2022**
An overview of our approach to pay, including the principles and policies of our Fair Pay agenda.

**Barclays PLC Country Snapshot 2022**
An overview of our global tax contribution as well as our approach to tax, including our UK tax strategy, together with our country-by-country data.

© Barclays PLC 2023
Registered office: 1 Churchill Place, London E14 5HP
Registered in England. Registered No: 48839