IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF SPS I FUNDO DE INVESTIMENTO DE AÇÕES – INVESTIMENTO NO EXTERIOR FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:22-mc-00118-LAK |

## DECLARATION OF DAVID CARUSO

I, David Caruso, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.  I submit this declaration in support of Joesley Batista, Wesley Batista, JBS S.A., and J&F Investimentos S.A.'s (collectively, "Intervenors") Memorandum of Law in Opposition to SPS I Fundo de Investimento de Ações – Investimento no Exterior's ("SPS" or "Petitioner") Amended Application for Order Pursuant to 28 U.S.C. § 1782, Dkt. 48, in the above-captioned matter.

2.  All facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents and (c) information supplied to me by Intervenors or professionals retained by them.

3.  All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies.

I.   PROFESSIONAL BACKGROUND

4.  I am a Managing Partner of i3strategies, a Phoenix, Arizona-based firm providing Financial Crime Compliance advisory and consulting services to US-based financial institutions. Financial institutions include commercial banks, securities broker-dealers, and financial technology companies, referred to as "FinTechs." i3strategies assists financial institutions in

1

designing, developing, and implementing suspicious activity monitoring, detection, and reporting programs.

5. I am a 1991 graduate of George Washington University. My relevant experience with Suspicious Activity Reports dates to 1996 when while working at JP Morgan & Company, I managed a department responsible for Bank Secrecy Act ("BSA") Suspicious Activity Reports ("SARs"). Since 1996 I have worked as an Anti-Money Laundering compliance executive or a retained expert and advisor to over 50 financial institutions in the United States and Europe, including the United Kingdom. During the past 25 years, I have conducted hundreds of suspicious activity investigations. Under my supervision, teams of hundreds of professional financial institution suspicious activity investigators have completed thousands of suspicious activity investigations. I have completed hundreds of Suspicious Activity Reports and reviewed thousands of Suspicious Activity Reports prepared by individuals working for teams I manage.

6. Between September 1991 and October 1996, I was a Special Agent with the U.S. Secret Service.

7. A copy of my curriculum vitae is attached herein as **Exhibit 1**.

II.     **BACKGROUND ON SUSPICIOUS ACTIVITY REPORTS**

    A.      **The Regulatory Framework For SARs**

8. All financial institutions operating within the United States must comply with the Bank Secrecy Act, including requirements to detect and report suspicious activity conducted by an institution's customer or counterparty. Regulated financial institutions comply with this BSA requirement by filing Suspicious Activity Reports with the Financial Crimes Enforcement Network ("FinCEN"). FinCEN is the bureau of the U.S. Treasury Department. According to its website, "The mission of the Financial Crimes Enforcement Network is to safeguard the financial system from illicit use, combat money laundering and its related crimes including terrorism, and

promote national security through the strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence."[1]

9. Barclays Bank PLC, New York Branch, is a regulated financial institution. Its regulator is the Federal Reserve Board of the United States. Banks regulated by the Federal Reserve Board are required to comply with Title 12 of the U.S. Code of Federal Regulations § 208.62, Suspicious Activity Reports, which states, "This section ensures that a member bank files a Suspicious Activity Report when it detects a known or suspected violation of Federal law, or a suspicious transaction related to a money laundering activity or a violation of the Bank Secrecy Act. This section applies to all member banks."[2]

10. FinCEN maintains databases of all SARs filed by entities covered by the BSA. FinCEN provides access to SARs to U.S. Federal law enforcement agencies such as the Federal Bureau of Investigation, The U.S. Secret Service, and the Internal Revenue Service Criminal Investigation Division. SARs are also available to the Department of Justice and local law enforcement. Law enforcement agencies use SARs to support or prompt investigations of possible violations of U.S. laws. The public does not have access to SARs.

B. **How SARs Are Typically Prepared**

11. SARs are typically prepared in the following manner: Financial institutions have software applications known as "transaction monitoring systems" programs" to identify transaction activity that appears potentially suspicious. Examples of potentially suspicious activity include but are not limited to, large numbers of currency deposits or strange patterns of currency deposits,

---

[1] https://www.fincen.gov/about/mission.

[2] Title 12—Banks and Banking Chapter II —Federal Reserve System Subchapter A—Board of Governors of the Federal Reserve System Part 208—Membership of State Banking Institutions in the Federal Reserve System (Regulation H) Subpart F —Miscellaneous Requirements.

3

such as a customer visiting numerous bank branches on the same and consecutive days. Other potentially suspicious activity includes wire transfers to and from countries prone to corruption, crime, and narcotics production.

12. Financial institution SAR investigators also investigate potentially suspicious activity brought to their attention by employees that work with customers, tips from other financial institutions, and public news reports alleging a bank's customer is involved in possible unlawful activity or is related to a person or company that is.

13. A case investigation involves researching records maintained in the financial institution's systems. This includes details about a customer's information such as name(s), address(es), dates of birth, corporate registration records where a customer is a business, Tax Identification Number, and when the customer relationship was established. The SAR investigator also reviews transaction records. In addition to financial institution records, the SAR investigator researches public information made available through subscriptions to commercial databases and non-subscription information found online.

14. Once a matter suggesting the presence of potentially suspicious activity is presented, SAR investigators analyze whether the incident or transaction warrants a detailed review or investigation. Commonly, up to 90% of matters produced from transaction monitoring systems, employee tips, and news stories are not suspicious, and no SAR is filed. If, after conducting a preliminary analysis, the investigator believes the matter warrants a more thorough review, this is when the matter is typically assigned as a "case investigation."

15. The SAR investigators look for patterns or incidents of transactions that are either suspicious on their face (e.g., multiple cash deposits at multiple different bank branches on the same and consecutive days) or that cannot be explained as non-suspicious with the available

supporting evidence. During the case investigation, the investigator compiles and documents evidence about the parties involved in the transaction (their institution's customer, the customer's counterparty, and other involved parties). The SAR investigator is also writing an investigative report that documents the investigative steps completed and the evidence compiled.

16. Upon completing a SAR investigation, the investigator typically recommends that either a SAR should be filed or that one should not. This recommendation, along with the case investigation file, is reviewed by a manager for several purposes. One is determining if the investigation and the supporting documentation comply with the institution's procedures. These procedures are written to ensure the institutions comply with numerous BSA regulations.

17. As part of the review, the manager also determines whether they agree with the investigator's decision on whether to recommend filing a SAR or not filing a SAR. It is not uncommon for a manager to disagree with an investigator. In such an instance, the investigator will update the case investigation report reflecting the final management decision.

18. When a manager agrees that a SAR should be filed, the investigator completes a SAR form. This is done electronically. The investigator's written report content is commonly transferred to a SAR, where this narrative constitutes Part V of a SAR form. When accessing the FinCEN SAR database, Federal law enforcement reads the information in this narrative (Part V) to determine whether to use the SAR as part of an existing investigation or to prompt a new investigation.

C. **Regulatory Agencies Prescribe Uniform Standards For Preparation and Submission of SARs**

19. The Federal Financial Institutions Examination Council (FFIEC) is, according to its website, "[A] formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of

the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Consumer Financial Protection Bureau, and to make recommendations to promote uniformity in the supervision of financial institutions. The FFIEC publishes and periodically updates "The BSA/AML Examination Manual and Procedures."[3] These are the procedures used by the above-listed Federal banking regulatory agency examiners when they review a financial institution's compliance with the BSA. These regulatory examinations typically occur at least once each year. For larger institutions like Barclays Bank PLC, New York Branch, it is common for BSA examinations to occur more than once each year.

20. The BSA/AML Examination and Procedures Manual is also published to inform financial institutions of the specific standards BSA compliance programs must meet. One section, Appendix L: SAR Quality Guidance, instructs institutions on preparing compliant SARs, specifically, what must be included in Part V, the written narrative. Appendix L states the following on the importance of completing SAR narratives:

> Banks must file SARs that are complete, sufficient, and timely. Unfortunately, some banks file SARs that contain incomplete, incorrect, or disorganized narratives, making further analysis difficult, if not impossible. Because the SAR narrative serves as the only free text area for summarizing suspicious activity, the narrative section is "critical." The care with which the narrative is written may make the difference in whether the described conduct and its possible criminal nature are clearly understood by law enforcement, and thus a failure to adequately describe the factors making a transaction or activity suspicious undermines the purpose of the SAR.[4]

---

[3] https://bsaaml.ffiec.gov/manual.

[4] https://bsaaml.ffiec.gov/manual/Appendices/13

21. In 2013 FinCEN required all SARs must be filed electronically using the FinCEN E-File system. This is done in part to ensure all minimum requirements for information are completed. Otherwise, SAR files will be rejected by the E-File system. There are more than 80 required fields on an electronic SAR file, including fields for customer information such as addresses, names, and Tax Identification Numbers.

22. The USA PATRIOT Act of 2001, section 362, required FinCEN to establish a highly secure network to facilitate and improve communication between FinCEN and financial institutions to enable financial institutions to file BSA reports electronically and permit FinCEN to provide financial institutions with alerts. In 2013 FinCEN required all SARs to be filled via its BSA E-Filing system. The BSA E-Filing system complies with the USA PATRIOT Act section 362 requirement.

23. FinCEN provides information about the BSA E-File system on its website. Here financial institutions can understand filing requirements, download technical documents, and review "Frequently Asked Questions."[5]

*SARs Cannot Be Filed If Missing Critical Data Fields*

24. According to FinCEN, the E-File system aims to add data security and protection to SARs, accelerate the submission process, confirm submissions faster, and deliver error-free forms. Notably, incomplete SARs missing fields FinCEN designates are "critical" cannot be filed.[6]

25. SARs can be filed individually (one at a time) or in batches (many at one time). Large financial institutions use case management software applications that enable large batch

---

[5] https://bsaefiling.fincen.treas.gov/AboutBsa.html.
[6] https://www.fincen.gov/sites/default/files/shared/FIN-2012-G002.pdf

filing. This is done through an Application Programming Interface (API) that uses machine language, in the case of FinCEN, XML language, that enables computers to communicate information to other computers.

26. By using an API with XML requirements, all SAR data is submitted and stored in a structured and uniform format. For example, all dates are submitted and stored in the same format—the same for Tax Identification Numbers. E-Filed SARs also contain Part V, the Narrative. As explained, the Narrative is the "story" of "the suspicious activity."

*Only Spreadsheet Files Are Permitted To Be Attached To SARS*

27. SAR submissions are allowed to contain one attachment type, a CSV (Comma Separated File). Excel is the most common type of CSV. These are spreadsheet files containing columns and rows of data. The BSA E-File system accepts no other attachment types. Attachments are permitted because Part V, the Narrative, free text section does not permit spreadsheet tables. These must be provided in the CSV attachment. Because of this requirement, SAR submissions are not allowed to contain word processing file types, such as Microsoft Word files like .docx.

*SARs from the FinCen Database Appear in ALL CAPS*

28. SAR disclosure is illegal, and thus what a filed SAR from a FinCEN database looks like is not a commonly shared fact. However, there are a few examples of what a SAR, as printed from the FinCEN electronic database, looks like. These images come from illegal leaks. For example, one of the few, if only, examples of an image of a SAR from a FinCEN database was published on a PBS website for its Frontline program.[7] The SAR relates to potentially suspicious activity involving the banking activity of the Saudi Arabian Embassy accounts held at Riggs Bank in Washington D.C.

---

[7] https://www.pbs.org/wgbh/pages/frontline/blackmoney/readings/suspicious.htm.

29.     Attached hereto as **Exhibit 2** is a true and correct copy of an image of the SAR relating to potentially suspicious activity involving the banking activity of the Saudi Arabian Embassy accounts held at Riggs Bank in Washington DC taken from the PBS website for Frontline.[8]

30.     In Exhibit 2, the Narrative (Part V) of the SAR is printed in all capital letters.  I know that this feature—printing in all capital letters—is how SARs printed from the FinCEN database appear.  I know this because, as an Anti-Money Laundering Compliance Officer at a National Bank and an advisor and consultant to many U.S. financial institutions, I have been asked to provide information to federal law enforcement agencies, including the FBI, about investigations involving potential money laundering.  In the course of this work, law enforcement showed copies of SARs to me.  Each of those SAR Part V Narratives was printed in all capital letters.

31.     In addition, on April 27, 2023, I attended the AML Partnership Forum in Washington, DC.  This event hosted speakers from the banking industry and government met to discuss Anti-Money Laundering regulation and enforcement issues.  One panel was representatives from law enforcement, including Special Agents from the FBI, Homeland Security Investigations, and the IRS Criminal Investigations Division.  When speaking about the critical role SARs play in his agency's investigation work, the IRS Special Agent said, "…even though when we read them, they are still printed in all caps."

**D.      SARs Are Subject to Strict Confidentiality Requirements**

32.     Financial institutions regulated by the Federal Reserve, including Barclays Bank PLC, New York Branch, are governed under Title 12 of the United State Code.  Title 12 §208.62

---

[8] https://www.pbs.org/wgbh/pages/frontline/blackmoney/readings/suspicious.htm.

Suspicious Activity Report prohibits the disclosure of "a SAR or the information contained in a SAR[.]" Disclosing the existence of a SAR or information contained in a SAR is a violation of law.

33. Disclosure of a SAR or the content of a SAR is rare. When disclosure does occur, the government acts. Three individuals have been convicted of unauthorized SAR information disclosure. One, Frank Mendoza, a former employee of Chase Manhattan Bank, was convicted in 2011 of disclosing the existence of a SAR to a bank customer.[9] The second, Robert Lustyik, an FBI Special Agent, was also convicted, in part, for revealing SAR information.[10] The third, Natalie Mayflower Sours Edwards, pled guilty in 2020 to leaking SAR information to a reporter as part of the "FinCen Files" leak.[11] All three were sentenced to Federal prison.

34. Confidentiality is critical to maintaining the integrity of the SAR process. Financial Institutions are required by law to secure the personal private information of customers. SAR rules allow institutions to report confidential customer information, and they expect this information to remain confidential. A SAR is not proof of customer wrongdoing. It is only a report of potentially unlawful activity. By revealing SAR information, financial institutions are exposed to negative publicity, potential lawsuits, and associated economic and reputation damage.

35. In many cases, SARs are filed on matters where customers have not engaged in illegal activity. To have this information disclosed to the public undermines the Bank Secrecy

---

[9] https://archives.fbi.gov/archives/losangeles/press-releases/2011/la011111.htm.

[10] https://www.justice.gov/usao-sdny/pr/former-fbi-special-agent-robert-lustyik-sentenced-white-plains-federal-court.

[11] https://www.justice.gov/usao-sdny/pr/former-senior-fincen-employee-pleads-guilty-conspiring-unlawfully-disclose-suspicious.

Act's purpose to have financial institutions freely report suspected legal violations or suspicious transactions, harms individuals and entities who are mentioned in SARs, and makes financial institutions distrustful of government regulators (because their confidential information is not being protected) and regulators distrustful of institutions.  There is a reason why those who disclose SAR information are prosecuted, convicted, and sentenced to prison.

**III.     ANALYSIS OF PETITIONER'S EXHIBIT K**

36.     Attached hereto as **Exhibit 3** is a true and correct copy of Exhibit K to Petitioner's Amended Application for Order Pursuant to 28 U.S.C. § 1782, Dkt. 48, in the above-captioned matter, provided to me on May 11, 2023 by Intervenors or professionals retained by them.

37.     Exhibit K is not a copy of a submitted SAR from a FinCEN database. If Exhibit K were a copy of a submitted SAR, it would be in all capital letters and look like the SAR exposed by the PBS Frontline program, Exhibit 2.

38.     Exhibit K is also missing required critical data fields, without which the BSA E-Filing System would reject a submitted SAR.  As specific examples, Exhibit K is missing critical, required information about the filing institution, including the institution's primary regulator, its Tax Identification Number, its street address and zip code, and a telephone number of a contact at the filing institution. This is further indication that Exhibit K is not a copy of a SAR from FinCen's records.

39.     In addition, Exhibit K contains a shaded table at its top showing Activity Dates, Subjects, transaction amounts, and Filer and Activity Location headings.  The FinCEN E-File system does not accept such tables.  A SAR filing containing such a table would be rejected for submission by the E-File System.

40.     Exhibit K, as provided to me, has features indicating it was produced using software with editing or proofreading capability, such as Microsoft Word.  This is evident from the redlines

under some of the text and highlighting of certain words. The FinCEN E-File system does not have proofreading or editing features that would allow for redlining or highlighting.

41. What purports to be a SAR in Exhibit K is also incomplete. The paragraph at the bottom of the page ends in mid-sentence.

42. Finally, the top of Exhibit K seems to be an introductory paragraph created by someone. This suggests Exhibit K was written or created by someone other than the SAR investigator who has completed what purports to be the Narrative below the created table.

43. Considering these facts, it is clear that Exhibit K is not a copy of a FinCEN database record.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on May 18, 2022

Fairfax, Virginia

_____
David Caruso